No. 24-2810

---

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

---

GET LOUD ARKANSAS, et al.,
Plaintiffs-Appellees,

v.

JOHN THURSTON et al.,
Defendants-Appellants.

---

On Appeal from the United States District Court for the
Western District of Arkansas
No. 5:24-CV-5121 (Hon. Timothy L. Brooks)

---

## MOTION TO STAY INJUNCTION PENDING APPEAL AND FOR TEMPORARY ADMINISTRATIVE STAY

---

Graham Talley, Ark. Bar No. 2015159
**MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, PLLC**
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Phone: (501) 688-8800
Fax: (501) 688-8807
Email: gtalley@mwlaw.com

## INTRODUCTION AND SUMMARY OF ARGUMENT

Appellants John Thurston, Sharon Brooks, Jamie Clemmer, Bilenda Harris-Ritter, William Luther, James Harmon Smith, III, and Johnathan Williams (collectively, the "SBEC") serve as appointed Commissioners on the Arkansas State Board of Election Commissioners, an agency constitutionally tasked with, among other things, adopting the rules necessary to ensure a uniform and secure voter registration process in Arkansas.

In advance of the November 2024 general election, the SBEC learned that the county clerks charged with processing voter registration applications were treating applications bearing electronic or digital signatures differently. Some accepted them; others did not. Given the disparate treatment, the SBEC passed an emergency rule, effective May 4, 2024, and a permanent rule, effective September 2, 2024, requiring that voter registration applications bear a handwritten "signature or mark," rather than an electronic or digital one.

Four Plaintiffs on June 5, 2024 sued the SBEC and the clerks of Benton, Pulaski, and Washington Counties, alleging that the "signature or mark" requirement violated the Materiality Provision codified at 52 U.S.C. § 10101(a)(2)(B). More than five weeks after filing their Complaint, Plaintiffs on July 11, 2024 moved for a preliminary injunction, which the District Court granted from the bench on August

2

29, 2024, just thirty-nine days before voters must register in advance of the November 2024 general election.

With the status quo now upended, the SBEC seeks a stay of the District Court's injunction. Absent a stay, the non-uniform treatment of voter registration applications which occurred prior to May 4, 2024 will recur, as only three of Arkansas's seventy-five county clerks were enjoined by the District Court's ruling. Moreover, the District Court's compelled changes to Arkansas's voter registration system occurred just over one month prior to the close of voter registration.

This ruling offends the *Purcell* principle, which generally disfavors last-minute changes to election rules. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006). *Purcell*, as well as traditional stay factors, weigh strongly in favor of a stay pending a full appeal of the District Court's injunction, chief among them the likelihood that this Court will find—as others have in cases filed by Appellee Vote.org ("VDO")— that a signature requirement like the one adopted by the SBEC does not violate the Materiality Provision. *See Vote.Org v. Callanen*, 89 F.4th 459 (5th Cir. 2023) (holding a similar signature requirement was material and therefore did not violate the Materiality Provision); *Vote.org v. Byrd*, 700 F. Supp. 3d 1047 (N.D. Fla. 2023) (dismissing a similar challenge to a Florida signature requirement because the plaintiffs failed to allege plausibly a violation of the Materiality Provision).

3

With the voter registration deadline looming on October 7, 2024, the confusion the District Court's injunction threatens to create is ongoing. Accordingly, the SBEC asks this Court to issue a stay of the order on September 9, 2024 (four weeks before registration closes, a period during which county clerks receive the greatest number of new registration applications) and enter an expedited briefing schedule requiring any response to this motion be filed by 12:00 PM on September 9, 2024. The SBEC further asks this Court in the interim to enter any administrative stay it deems appropriate.

Appellate Case: 24-2810    Page: 4    Date Filed: 09/06/2024 Entry ID: 5432887

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................2

TABLE OF CONTENTS..............................................................................5

TABLE OF AUTHORITIES ........................................................................7

STATEMENT OF THE CASE......................................................................9

I.      Voters Passed Amendment 51 to Guide the Voter Registration Process in Arkansas. ...................................................9

II.     The SBEC Has a Constitutional Responsibility Under Amendment 51 "to Secure Uniform and Efficient" Voter Registration Procedures in Arkansas...........................................10

III.    County Clerks Throughout Arkansas Unevenly Applied the "Signature or Mark" Requirement, Necessitating Intervention by the SBEC. ..................................................................................11

IV.     Plaintiffs Waited to Seek Judicial Intervention on the Emergency Rule..................................................................................14

V.      The District Court Enjoined the Emergency Rule and Permanent Rule, Upending the Process for Voter Registration Thirty-Nine Days Before the Registration Deadline on October 7, 2024. ...........................................................................14

ARGUMENT ...........................................................................................16

I.      *Purcell* Mandates a Stay of the District Court's Injunction. ..........17

    A.  The District Court Issued the Injunction "on the Eve of an Election."...............................................................................18

Appellate Case: 24-2810     Page: 5     Date Filed: 09/06/2024 Entry ID: 5432887

B.  The Merits Are Not "Entirely Clear Cut" in Plaintiffs' Favor.
.................................................................................................... 19

C.  Plaintiffs Needlessly Waited for Over Two Months Before Seeking to Enjoin the SBEC's Emergency Rule. ........................................20

D.  Plaintiffs Cannot Carry Their Burden of Demonstrating the Injunction Will Not Result in Significant "Confusion" or "Hardship." ..................................................................................................21

II.  The SBEC Is Likely to Succeed on the Merits Because the "Signature or Mark" Requirement Is "Material." ...........................................23

CONCLUSION ..................................................................................................27

CERTIFICATE OF COMPLIANCE ......................................................................28

CERTIFICATE OF SERVICE ..............................................................................29

Appellate Case: 24-2810    Page: 6    Date Filed: 09/06/2024 Entry ID: 5432887

# TABLE OF AUTHORITIES

**Constitutional Provisions**

Ark. Const. art. 5 ................................................................................. 13, 26

Ark. Const. amend. 51 ................................................................................. passim

**Statutes**

52 U.S.C. § 10101 ................................................................................. 2, 14

Ark. Code Ann. § 7-1-105 ................................................................................. 13

Ark. Code Ann. § 7-5-404 ................................................................................. 13

**Regulation**

Code Ark. R. 108.00.14-1400 ................................................................................. 13

**Cases**

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ........................ 23, 26

*Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28
  (2020) ................................................................................. 22

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ................................................................................. 16

*Husted v. Ohio State Conf. of N.A.A.C.P.*, 573 U.S. 988 (2014) ........................... 18

*League of Women Voters v. Fla. Sec'y of State*, 32 F.4th 1363 (11th
  Cir. 2022) ................................................................................. 18-19

Appellate Case: 24-2810    Page: 7    Date Filed: 09/06/2024 Entry ID: 5432887

*Martin v. Kohls*, 444 S.W.3d 844 (Ark. 2014) ........................................................9

*Merrill v. Milligan*, 142 S. Ct. 879 (2022) ...................................... passim

*New Georgia Project v. Raffensperger*, 976 F.3d 1278 (11th Cir. 2020) ...............................................................................................17

*Nken v. Holder*, 556 U.S. 418 (2009) ...............................................................16

*North Carolina v. League of Women Voters*, 574 U.S. 927 (2014)........................18

*Org. for Black Struggle v. Ashcroft*, 978 F.3d 603 (8th Cir. 2020) .................. 16-17

*Pierce v. North Carolina State Bd. of Elections*, No. 4:23-CV-193-D, 2024 WL 307643 (E.D.N.C. Jan. 26, 2024) ............................................. 20-21

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ........................................................ passim

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423 (2020)................................................................................. 16-17

*Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020) ..............................................18

*Vote.org v. Byrd*, 700 F. Supp. 3d 1047 (N.D. Fla. 2023).............................. passim

*Vote.Org v. Callanen*, 89 F.4th 459 (5th Cir. 2023)........................................ passim

*Walen v. Burgum*, No. 1:22-CV-31, 2022 WL 1688746 (D.N.D. May 26, 2022) ................................................................................... 17-18

8

## STATEMENT OF THE CASE

Like all states, Arkansas imposes certain requirements before an individual may vote in elections. A prospective voter must be a United States citizen, reside in the State of Arkansas, and have reached the age of eighteen. Ark. Const. art. III, § 1(a)(1)-(3). She must also be "[l]awfully registered to vote in the election." *Id.*, § 1(a)(4).

## I.    Voters Passed Amendment 51 to Guide the Voter Registration Process in Arkansas.

Arkansans in 1964 passed a "comprehensive regulatory scheme governing the registration of voters." *Martin v. Kohls*, 444 S.W.3d 844, 854 (Ark. 2014) (Goodson, J., concurring). This "comprehensive regulatory scheme," Amendment 51 to the Arkansas Constitution, was designed for the express purpose of ensuring that all persons who vote in Arkansas elections are "legally qualified" to do so. Ark. Const. amend. 51, § 1; *see also id.*, § 3 ("No person shall vote or be permitted to vote in any election unless registered in a manner provided for by this amendment.").

Amendment 51 included a host of important features, including a requirement that any "mail voter registration application" bear "[a] signature or mark made under penalty of perjury that the applicant meets each requirement for voter registration." *Id.*, § 6(a)(3)(F). When voters passed this requirement six decades ago, they made clear that a "signature or mark" is part and parcel of the "identifying information . . . necessary to assess the applicant's eligibility and to administer voter registration

9

and other parts of the election process." *See id.*, § 6(a)(1) ("The mail voter registration application form may only require *identifying information, including signature or mark*, and other information, including data relating to previous registration by the applicant, as is necessary to assess the applicant's eligibility and to administer voter registration and other parts of the election process." (emphasis added)).

## II. The SBEC Has a Constitutional Responsibility Under Amendment 51 "to Secure Uniform and Efficient" Voter Registration Procedures in Arkansas.

While Amendment 51 did not constitutionally define the phrase "signature or mark" when enacted in 1964, voters tasked the SBEC[1] with the responsibility to "prescribe, adopt, publish and distribute" the "Rules and Regulations supplementary to . . . and consistent with [Amendment 51] and other laws of Arkansas as are necessary to secure uniform and efficient procedures in the administration of [Amendment 51] throughout the State." *Id.*, § 5(e)(1). In addition, the SBEC has a constitutional obligation to "prescribe, adopt, publish and distribute" the "detailed specifications of the registration record files, the voter registration application forms and other registration forms, including voter registration list maintenance forms, all

---

[1] The SBEC is a seven-member board comprised of the Arkansas Secretary of State, two members appointed by the Governor, and one member each appointed by the chair of the state Democratic party, the chair of the state Republican party, the President Pro Tempore of the Arkansas Senate, and the Speaker of the Arkansas House of Representatives.

of which shall be consistent with [Amendment 51] and uniform throughout the State." *Id.*

## III. County Clerks Throughout Arkansas Unevenly Applied the "Signature or Mark" Requirement, Necessitating Intervention by the SBEC.

For nearly sixty years, Arkansas has registered voters—seemingly with little or no controversy—using the system voters approved in Amendment 51. Appellee Get Loud Arkansas ("GLA"), a nonprofit organization formed to increase civic participation and mobilize voters, utilized the existing system to register several thousand voters from 2021 to 2023. *See* APP 67-68, R. Doc. 46-2 ¶ 8 (noting GLA registered 1179 voters in 2021 and 3731 voters in 2023). At some point in 2023, GLA rolled out a "digital online tool," where a voter registration applicant could sign her voter registration form using "an electronic signature." *See id.*, ¶ 12.

Appellee Nikki Pastor on February 24, 2024 used GLA's system to complete a voter registration application. *See* APP 90, R. Doc. 46-4 ¶¶ 7, 9. Pastor signed the application with an electronic signature, and GLA submitted the application to the Washington County clerk. *Id.*, ¶ 9. The clerk rejected the application and notified Pastor. *Id.*, ¶ 11.

Appellee Trinity Loper similarly attempted to register using GLA's "online tool." *See* APP 91, R. Doc. 46-5 ¶ 5. Loper completed an application using an electronic signature, which GLA submitted to the Pope County clerk on December 11, 2023. APP 92, R. Doc. 46-5 ¶ 7. The clerk rejected the application. *Id.*, ¶ 8.

11

Unlike Pastor, however, Loper also submitted an application bearing a traditional handwritten signature. *Id.*, ¶ 9. This application "appears to have been accepted," though a scrivener's error caused Loper's name to be incorrectly identified on voter rolls as "Trinity Lopez." *Id.* Accordingly, Loper appears to have successfully registered to vote.

The SBEC eventually learned of this uniformity problem. "[I]n some counties, the clerk was accepting electronically signed voter registration applications," and in others (like Pope and Washington Counties), the clerk rejected "electronically signed applications." APP 245, R. Doc. 53-1 at 3. The problem necessitated emergency rulemaking because it "created an unfair and non-uniform application process." APP 245-46, R. Doc. 53-1 at 3-4. In the SBEC's view, "[w]hether the applicant could apply using an electronic signature was dependent on the county [in] which the applicant resided." APP 246, R. Doc. 53-1 at 4.

Accordingly, the SBEC acted. Pursuant to its constitutional mandate, *see* Ark. Const. amend. 51, § 5(e)(1), the SBEC adopted an emergency rule defining what constituted an acceptable "signature or mark" for purposes of Amendment 51:

> a handwritten wet signature or handwritten wet mark made on a Registration Application Form with a pen or other writing device that is physically moved across the form and that forms the applicant's signature or mark on the paper form. A Signature or Mark that utilizes a computer to generate or recreate the applicant's signature or mark is

12

not an acceptable signature or mark of the applicant for purposes of Amendment 51 §§ 6(a)(1) & (a)(3)(F) Registration Application Form.

Code Ark. R. 108.00.14-1400(7).

The SBEC passed the rule for several reasons.  A uniform "signature or mark" requirement furthers "the interests of 'uniform and efficient procedures'" and "does not change the current and historical means of registration in the State."  APP 248, R. Doc. 53-1 at 6.  It also serves as "a necessary component for the verification of the voter's identity."  APP 260-61, R. Doc. 53-2 at 6-7.  Moreover, because Ark. Code Ann. § 7-5-404(a)(2) requires a clerk to compare an absentee ballot application (which must be signed) with the voter's "registration application," the "signature or mark" requirement has practical utility—a handwritten signature on the registration application is the superior means of comparing an absentee request bearing a written or facsimile signature.  APP 261, R. Doc. 52-2 at 7.  And finally, physically signing or marking documents deters voter fraud, as Arkansas criminalizes the forgery of signatures on voter registration applications.  *See id.* (citing Ark. Code Ann. § 7-1-105(a)(19)).

After receiving legislative approval, *see* Ark. Const. art. 5, § 42, the emergency rule took effect on May 4, 2024.  It expired September 1, 2024, and was replaced by an identical permanent rule, which took effect September 2, 2024.

13

**IV. Plaintiffs Waited to Seek Judicial Intervention on the Emergency Rule.**

More than a month after the emergency rule took effect, GLA, VDO (which had filed similar challenges to signature requirements in Florida, Georgia, and Texas), Pastor, and Loper (collectively, "Plaintiffs") sued the SBEC and the clerks of Benton, Pulaski, and Washington Counties in the United States District Court for the Western District of Arkansas. Alleging a violation of the Materiality Provision codified at 52 U.S.C. § 10101(a)(2)(B), Plaintiffs sought both declaratory and injunctive relief concerning any so-called "wet signature rule," which Plaintiffs defined as the "emergency rule [passed by the SBEC], and any other regulations or procedures that county clerks have applied to reject applications with electronic or digital signatures." APP 4, R. Doc. 2 at 2 n.1. More than five weeks then passed before Plaintiffs moved for a preliminary injunction. APP 28, R. Doc. 46 (filed July 11, 2024). The SBEC filed its response in opposition on July 25, 2024. Plaintiffs did not request a hearing or expedited review.

**V. The District Court Enjoined the Emergency Rule and Permanent Rule, Upending the Process for Voter Registration Thirty-Nine Days Before the Registration Deadline on October 7, 2024.**

Plaintiffs' request to halt the "signature or mark" rule finally came before the District Court during its customary case management hearing on August 29, 2024, just thirty-nine days prior to the close of voter registration. Ruling from the bench, the District Court granted Plaintiffs' motion and enjoined the SBEC and others from

14

"enforcing the wet signature rule AND from rejecting or refusing to accept any voter registration application on the ground that it was signed with a digital or electronic signature."  APP 294, R. Doc. 65, at 2.  Minutes from the bench ruling were filed of record at 5:58 PM on Friday, August 30.  *See id.*

The SBEC's request to stay the injunction was denied.  *Id.*; *see also* Fed R. App. P. 8(a)(1).  Thus, the District Court's ruling went immediately into effect thirty-nine days before the voter registration deadline, fifty-three days prior to the start of early voting, and sixty-eight days before election day.

The District Court announced that it planned to "file a more fulsome memorandum opinion to further explain its findings and rulings by no later than September 10," 2024, a date which falls within thirty days of the close of voter registration.  *Id.*  While the parties wait for this memorandum opinion, the injunction remains in effect.

This appeal followed.

15

## ARGUMENT

Traditionally, courts consider four factors when assessing a stay request: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).[2] The analysis, however, differs in elections cases, as "the Supreme Court has 'repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.'" *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020)).

Under the "*Purcell* principle," *see Purcell v. Gonzalez*, 549 U.S. 1 (2006), the "traditional test for a stay" does not apply "in election cases when a lower court has issued an injunction of a state's election law in the period close to an election." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring). Rather, courts considering whether to stay an injunction pending appeal are required to weigh "considerations specific to election cases." *Purcell*, 549 U.S. at 4-5. Most important is the state's "extraordinarily strong interest in avoiding late, judicially

---

[2] Because the SBEC is a government defendant, the balance-of-harms and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Appellate Case: 24-2810   Page: 16   Date Filed: 09/06/2024 Entry ID: 5432887

imposed changes to its election laws and procedures." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). "[T]he *Purcell* principle" has thus become "a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled," *id.* at 880-81, and courts routinely stay injunctions while "express[ing] no opinion" on the merits. *Purcell*, 549 U.S. at 5. The principle makes sense, too, because "a stay preserves the status quo and promotes confidence in our electoral system—assuring voters that all will play by the same, legislatively enacted rules." *Org. for Black Struggle*, 978 F.3d at 609 (quoting *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020)).

## I.    *Purcell* **Mandates a Stay of the District Court's Injunction.**

*Purcell* reflects the Supreme Court's belief that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm.*, 589 U.S. at 424. Beyond this "on-the-eve-of-an-election" factor, courts have recently evaluated stay requests through the lens of a "relaxed" test articulated in Justice Kavanaugh's concurring opinion in *Merrill*,

> in which he suggested that the bar on eleventh-hour election injunctions "might be overcome . . . if a plaintiff establishes at least the following": (1) "the underlying merits are entirely clearcut in favor of the plaintiff"; (2) "the plaintiff would suffer irreparable harm absent the injunction"; (3) "the plaintiff has not unduly delayed bringing the complaint to court"; and (4) "the changes in question are at least feasible before the election without significant cost, confusion, or hardship."

17

*Walen v. Burgum*, No. 1:22-CV-31, 2022 WL 1688746, at \*5 (D.N.D. May 26, 2022) (quoting *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring)).

Under this "relaxed" standard, and indeed even under the traditional standard, a stay of the District Court's injunction is appropriate here.

### A.     The District Court Issued the Injunction "on the Eve of an Election."

There is no bright line on what constitutes "on the eve of an election" for purposes of the *Purcell* analysis.  In *Purcell*, the district court issued the injunction under review "just weeks before the election."  *Purcell*, 549 U.S. at 4.  In subsequent cases, stays were entered by the Supreme Court when issued thirty-three days prior to an election, *North Carolina v. League of Women Voters*, 574 U.S. 927 (2014), sixty days before election day.  *Husted v. Ohio State Conf. of N.A.A.C.P.*, 573 U.S. 988 (2014), and, in *Merrill*, with an election "about four months away."  *Merrill*, 142 S. Ct. at 888 (Kagan, J., dissenting).  In recent election cycles, federal district courts have charted a course in which the *Purcell* "on-the-eve-of-an-election" window opens in the *months* leading up to an election.  *See League of Women Voters v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022) (holding that "[w]hatever *Purcell*'s outer bounds," it included times where "voting in the next statewide election was set to begin in *less* than four months"); *Thompson v. DeWine*, 959 F.3d 804, 813 (6th Cir. 2020) (a stay was warranted despite election being "months away").

Appellate Case: 24-2810     Page: 18     Date Filed: 09/06/2024 Entry ID: 5432887

The District Court's injunction unquestionably falls within the period in which *Purcell* applies. Arkansans must register to vote thirty days before a general election; here, the deadline falls on October 7, 2024. The District Court enjoined the "signature or mark" requirement on August 29, 2024, thereby altering the system used to register voters, thirty-nine days before this deadline. *See* APP 293, R. Doc. 65 at 1 (noting the District Court granted the preliminary injunction from the bench on August 29, 2024). This ruling came on the "eve" of the relevant election-related deadline. *Purcell* applies.

### B. The Merits Are Not "Entirely Clear Cut" in Plaintiffs' Favor.

While this Court may stay the injunction for November 2024 general election without "express[ing] [an] opinion" on the merits, *Purcell*, 549 U.S. at 5, courts have considered whether "the underlying merits are entirely clearcut in favor of the plaintiff." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring); *see also League of Women Voters*, 32 F.4th at 1372 (noting the "entirely clearcut" standard and holding that "[w]hatever the precise standard, we think it clear that, for cases controlled by *Purcell*'s analysis, the party seeking injunctive relief has a 'heightened' burden").

The merits here are not "entirely clearcut" in Plaintiffs' favor. Far from it. As explained, *infra*, signature requirements like the one passed by SBEC and approved by the Arkansas legislature are "material" and thus withstand review under

19

the Materiality Provision.  *See Callanen*, 89 F.4th at 489 (upholding a similar signature requirement because "an original signature advances voter integrity" and "makes such a signature a material requirement"); *Byrd*, 2023 WL 7169095, at *7 (similar).  The District Court's ruling is the outlier—both merits decisions on these types of signature requirements support the SBEC's position.  *See, e.g.*, *Byrd*, 2023 WL 7169095, at *6 ("[T]he question is whether Plaintiffs' allegations here plausibly show that the wet-signature requirement is immaterial, and I conclude they do not.").  Given this authority, it is evident that Plaintiffs cannot show "the underlying merits are entirely clearcut in [their] favor."  *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring).

### C.    Plaintiffs Needlessly Waited for Over Two Months Before Seeking to Enjoin the SBEC's Emergency Rule.

Though this Court need not engage in further analysis, the next factor articled by Justice Kavanaugh—whether the plaintiff "unduly delayed bringing the complaint to court"—weighs heavily in favor of a stay under *Purcell*.  *Id.*  Here, Plaintiffs let thirty-two days (May 4, 2024 to June 5, 2024) pass before bringing suit to enjoin the SBEC's emergency rule.  Another thirty-six days (June 5, 2024 to July 11, 2024) elapsed before Plaintiffs moved for a preliminary injunction.  Federal district courts, when analyzing this issue under the *Merrill* concurring opinion, have found undue delay on more compressed timelines.  In *Pierce v. North Carolina State Board of Elections*, the court noted the plaintiffs' delay in its ruling, "[P]laintiffs

20

Appellate Case: 24-2810    Page: 20    Date Filed: 09/06/2024 Entry ID: 5432887

unduly delayed bringing this case by waiting 26 days after the General Assembly enacted [the challenged law] to file suit and waiting 28 days after the General Assembly enacted [the challenged law] to seek a preliminary injunction." No. 4:23-CV-193-D, 2024 WL 307643, at *33 (E.D.N.C. Jan. 26, 2024). Here, the delay was not twenty-six or twenty-eight days; it was nearly seventy. And by waiting almost ten weeks to seek injunctive relief, Plaintiffs allowed the machinery of the voter registration process to ramp up in advance of the October 7, 2024 deadline, only to have it upended by an eleventh-hour change to how voters may register in Arkansas. A stay of the District Court's ruling is appropriate on such facts.

**D.    Plaintiffs Cannot Carry Their Burden of Demonstrating the Injunction Will Not Result in Significant "Confusion" or "Hardship."**

A stay is also warranted because Plaintiffs cannot show the changes to Arkansas's voter registration system will not come "without significant . . . confusion, or hardship." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). This requirement reinforces the principle that "[l]ate judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Id.* at 880-81.

Prior to May 4, 2024, county clerks across Arkansas unevenly applied Amendment 51 "signature or mark" requirement. Some allowed voters to sign using electronic or digital means; others required a handwritten signature. But the

21

SBEC—through the "signature or mark" requirement approved by the state legislature—brought certainty to the process. And this was the status quo for nearly four of the five months leading up to the October 7, 2024 voter registration deadline.

For its part, GLA seems to acknowledge that District Court's ruling creates a period of uncertainty. Since the ruling was announced from the bench, GLA has unilaterally contacted at least one county clerk and urged her to adapt promptly to the ruling and conduct training and communication with staff without delay. And to make matters more complicated, the District Court's injunction binds only three of Arkansas's seventy-five county clerks. How the other seventy-two will handle voter registration applications in the busiest time for registration, the month immediately preceding the deadline, remains unknown, as the SBEC does not supervise the conduct of these popularly elected officials. Because the injunction, if not stayed, will foster confusion, hardship, and non-uniform practices for the registration of voters on the eve of the October 7, 2024 registration deadline, the injunction should be stayed. *See Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring) ("Even seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences.").

22

## II. The SBEC Is Likely to Succeed on the Merits Because the "Signature or Mark" Requirement Is "Material."

While *Purcell* provides the framework for this Court, traditional stay principles—principally, the SBEC's likelihood of prevailing on appeal—also weigh in favor of a temporary pause on the District Court's ruling.

As at least two courts have found, a signature requirement like the one validly adopted by the SBEC, and approved by the Arkansas legislature, does not run afoul of the Materiality Provision. Arkansas "indisputably has a compelling interest in preserving the integrity of its election process." *Purcell*, 549 U.S. at 4. And a state regulation enacted to protect the integrity of a state's election instills public confidence in the electoral process because it "encourages citizen participation in the democratic process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008).

*Purcell* makes clear that Arkansas has an important interest in verifying a prospective voter's identity during the registration process in order to promote integrity in its elections. The Fifth Circuit so found in a recent decision in which VDO and others challenged a similar Texas signature requirement. There, the court ultimately ruled the requirement did not violate the Materiality Provision, as "requiring an original signature meaningfully, even if quite imperfectly, corresponds to the substantial State interest of assuring that those applying to vote are who they

23

say they are." *Callanen*, 89 F.4th at 489. To reach this conclusion, the Fifth Circuit appropriately framed the issue against this important state interest:

> [F]irst, . . . Texas's interest in voter integrity is substantial. Second, that interest relates to the qualifications to vote—are the registrants who they claim to be? Finally, most voter registration forms likely are completed far from any government office or employee. That limits the methods of assuring the identity of the registrant. Though the effect on an applicant of seeing these explanations and warnings above the signature block may not be dramatic, Texas's justification that an original signature advances voter integrity is legitimate, is far more than tenuous, and under the totality of the circumstances, makes such a signature a material requirement.

*Id.* In a second challenge brought by VDO, this time in Florida, the district court reached the same conclusion in response to the same arguments Plaintiffs make here, namely that a pen and ink signature "bears no relation to the statutory qualifications" and "the act of signing—rather than the method used—affirms the information provided as true and accurate." *Byrd*, 2023 WL 7169095 at *6.

The present case is no different. The SBEC adopted "signature or mark" requirement in order to secure "the interests of 'uniform and efficient procedures.'" APP 248, R. Doc. 53-1 at 6. Moreover, both the emergency and permanent rules include a "signature or mark" requirement to confirm "the verification of the voter's identity," to serve as safeguard during the absentee balloting process, and to prevent voter fraud. APP 260-61, R. Doc. 53-2 at 6-7. These are some of the exact same justifications that led Florida and Texas to adopt materially identical signature requirements, both of which survived judicial review. For these reasons, and

24

because "original signatures carry different weight than other 'signatures,'" *Byrd*, 2023 WL 7169095 at *6, the SBEC's rules do not offend the Materiality Provision and are likely to hold up on appeal.

Plaintiffs sidestepped these decisions before the District Court, focusing heavily on a pair of points. *First*, Plaintiffs reason any rule proscribing the use of electronic or digital signatures must be immaterial because electronic signatures are customarily used in other contexts, even to register voters through governmental actors such as the Department of Motor Vehicles. But as the *Byrd* court noted, "the acceptance of electronic signatures in certain circumstances does not render the wet signature requirement immaterial in this circumstance." *Byrd*, 2023 WL 7169095, at *6. The Fifth Circuit rejected this argument in *Callanen*, too, where the court noted, "That Texas allows electronic submissions via the Department of Public Safety does not necessarily alter the calculus. Texas exerts more control over and may legitimately have more confidence in that department's systems." *Callanen*, 89 F.4th at 490-91. The same is true here.

*Second*, Plaintiffs attempt to create some distance between the two merits decisions and the SBEC's rulemaking by arguing that both *Callanen* and *Byrd* involved "legislative judgment" missing from the SBEC's process. This argument, however, ignores a unique feature of Arkansas government—Arkansas voters, through Amendment 92, gave the legislature the final say over all agency rules,

25

including those passed by the SBEC. Thus, after the SBEC (again, a group comprised of officials appointed by the Governor, legislative leaders, and the two major political parties) passed both the emergency and permanent rules, the rules did "not become effective until reviewed and approved by the legislative committee charged by law with the review of administrative rules." Ark. Const. art. 5, § 42. There was unquestionably "legislative judgment" during this process. The Arkansas legislature had an opportunity to reject the rules, or to send them back for amendment. The legislature chose to adopt the rules as written. This judgment should receive some measure of deference upon review. *See Callanen*, 89 F.4th at 489 ("We must give weight to a state legislature's judgment when it has created 'evenhanded restrictions that protect the integrity and reliability of the electoral process.'" (quoting *Crawford*, 553 U.S. at 189-90)).

For these reasons, the SBEC is likely to prevail on the merits, as the "signature or mark" requirement does not violate the Materiality Provision.

Appellate Case: 24-2810    Page: 26    Date Filed: 09/06/2024 Entry ID: 5432887

## **CONCLUSION**

The Court should grant the motion, stay the District Court's injunction pending appeal prior to September 9, 2024, and issue any temporary administrative stay it seems appropriate.

Respectfully submitted,

Graham Talley (Ark. Bar No. 2015159)
**MITCHELL, WILLIAMS, SELIG,**
**GATES & WOODYARD, PLLC**
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Phone: (501) 688-8800
Fax: (501) 688-8807
Email: gtalley@mwlaw.com

27

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 4825 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Times New Roman font, using Microsoft Word.

I certify that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/ Graham Talley
Graham Talley

## **CERTIFICATE OF SERVICE**

I certify that on September 5, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ Graham Talley
Graham Talley

No. 24-2180

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

GET LOUD ARKANSAS, et al.,
Plaintiffs-Appellees,

v.

JOHN THURSTON et al.,
Defendants-Appellants.

On Appeal from the United States District Court for the
Western District of Arkansas
No. 5:24-CV-5121 (Hon. Timothy L. Brooks)

**APPENDIX**

Graham Talley, Ark. Bar No. 2015159
**MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, PLLC**
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Phone: (501) 688-8800
Fax: (501) 688-8807
Email: gtalley@mwlaw.com

# APPENDIX

## TABLE OF CONTENTS

**Exhibit**                                                                                 **Page**

Complaint for Declaratory and Injunctive Relief,
Doc. 2 (June 5, 2024) ................................................................ APP3

Motion for Preliminary Injunction,
Doc. 46 (July 11, 2024) ............................................................ APP28

Brief in Support of Motion for Preliminary Injunction,
Doc. 46-1 (July 11, 2024) ......................................................... APP32

Response in Opposition to Motion for Preliminary Injunction,
Doc. 53 (July 25, 2024) .......................................................... APP227

Reply Brief in Support of Motion for Preliminary Injunction,
Doc. 58 (Aug. 5, 2024) .......................................................... APP266

Minutes for Bench Rulings,
Doc. 65 (Aug. 30, 2024) ........................................................ APP293

Notice of Appeal,
Doc. 66 (Sept. 4, 2024) .......................................................... APP295

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| GET LOUD ARKANSAS; VOTE.ORG; NIKKI PASTOR; and TRINITY "BLAKE" LOPER, | Civil Action |
| Plaintiffs, | Case No. 5:24-cv-05121-TLB |
| *v.* | |
| JOHN THURSTON; SHARON BROOKS; JAMIE CLEMMER; BILENDA HARRIS-RITTER; WILLIAM LUTHER; JAMES HARMON SMITH, III; and JOHNATHAN WILLIAMS, in their official capacities as Commissioners of the Arkansas State Board of Election Commissioners; BETSY HARRELL, in her official capacity as Benton County Clerk; BECKY LEWALLEN, in her official capacity as Washington County Clerk; and TERRI HOLLINGSWORTH, in her official capacity as Pulaski County Clerk, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Defendants. | |

**INTRODUCTION**

1.      Get Loud Arkansas, a nonprofit organization dedicated to providing easily accessible means for all Arkansans to register to vote—with a focus on young and minority citizens in particular—created an online tool on its website that allowed prospective voters to complete a voter registration application using a computer or mobile device. Through GLA's streamlined process, voters filled out the applications digitally, rather than by hand; signed the forms electronically, rather than with pen and ink; and authorized GLA to print and submit the completed application to county clerks. Arkansas's election officials even assured GLA that this online process was lawful. Indeed, the use of an electronic signature on a voter registration application

was so uncontroversial in Arkansas that the Secretary of State's office stated on multiple occasions that an electronic signature should not be treated any differently than a wet signature, and the Attorney General confirmed this in a formal opinion.

2.      But once media outlets began reporting on GLA's success in registering hundreds of young and minority voters, the Secretary abruptly reversed himself and recommended for the first time that counties reject electronic signatures on voter registration applications. The State Board of Election Commissioners followed suit, ignoring the Attorney General's opinion and issuing an emergency rule prohibiting electronic signatures. To make matters worse, Arkansas officials have refused to clarify whether registered voters who previously used an electronic signature to register will have their registrations canceled, despite repeated requests from GLA, leaving many currently-registered Arkansas voters in limbo.

3.      Although the wet signature rule is a new invention in Arkansas, it bears a striking resemblance to the suppressive tactics that spurred Congress to enact the materiality provision in its landmark Civil Rights Act of 1964.[1] The provision seeks to eliminate opportunities for arbitrary, discriminatory practices "in the registration of voters for Federal elections . . . by prohibiting the disqualification of an individual because of immaterial errors or omissions in papers or acts" requisite to voting. H.R. Rep. No. 88-914 (1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391, 2394. As demonstrated by the legislative record, Congress had good reason to be concerned about such disenfranchisement, especially as it related to voter registration applications. Extensive testimony showed that many local registrars rejected Black applicants based on hyper-technical or entirely invented errors, while they ignored more substantive errors when the applicants were white.

---

[1] The phrase "wet signature rule" refers to the State Board of Election Commissioners' emergency rule, and any other regulations or procedures that county clerks have applied to reject applications with electronic or digital signatures.

Appellate Case: 24-2810     Page: 33     Date Filed: 09/06/2024 Entry ID: 5432887
APP4

4.      These practices resulted in disparate voting opportunities for minority voters in many states, including Arkansas. In 1961, for example, the U.S. Commission on Civil Rights observed that Black Arkansans remained disproportionately unregistered to vote compared to white Arkansans. *See* Book 1, U.S. Comm'n on Civ. R., *Voting: 1961 Commission on Civil Rights Report* 105 (1961). As arbitrary barriers continued to disenfranchise voters—and especially minority citizens—Congress determined that national legislation was necessary to prevent states from devising creative methods to deny individuals the right to vote.

5.      Yet more than half a century later, the legacy of past discrimination endures. Arkansas has the lowest voter registration rate in the country at only 62 percent, with young and minority voters registered at even lower rates. And its election officials continue to reject new applications, including from Plaintiffs Nikki Pastor and Blake Loper, simply because they signed their applications with the "wrong" instrument—a meaningless technicality that creates unlawful barriers to the franchise and obstructs the efforts of civic organizations like Plaintiffs GLA and Vote.org that use innovative technology to promote civic engagement.

6.      Simply put, Arkansas has erected an arbitrary restriction that is irrelevant in determining voter qualifications but denies eligible citizens the right to vote. This Court should enforce the guarantees of the Civil Rights Act and enjoin the enforcement of Arkansas's wet signature rule.

## JURISDICTION & VENUE

7.      Plaintiffs bring this action under 42 U.S.C. §§ 1983, 1988, as well as 52 U.S.C. § 10101, to redress the deprivation under color of state law of rights secured by the laws of the United States. This Court has original jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1343, because the matters in controversy arise under the laws of the United

States and involve the assertion of a deprivation, under color of state law, of a right under the laws of the United States.

8.      This Court has the authority to enter declaratory relief, pursuant to 28 U.S.C. §§ 2201, 2202, and authority to enter injunctive relief pursuant to Fed. R. Civ. P. 65.

9.      This Court has personal jurisdiction over the Defendants, who are sued in their official capacities and reside within this State.

10.      Venue is proper in the United States District Court for the Western District of Arkansas because at least one of the Plaintiffs resides within this District and a substantial part of the events that give rise to Plaintiffs' claims have occurred and will occur in this District. 28 U.S.C. § 1391(b)(2). Defendants, who are sued in their official capacities, include statewide officials whose conduct and duties cover the entire State of Arkansas, as well as county officials who reside in and have their offices in this district. *Id.* § 1391(b)(1).

## PARTIES

11.      Plaintiff GET LOUD ARKANSAS ("GLA") is an Arkansas nonprofit corporation, founded in 2021, after Census data revealed that Arkansas had the lowest rate of registered voters and one of the lowest voter turnout rates in the nation, particularly among young and minority residents. To increase civic participation in Arkansas, GLA works to register new voters, engage low propensity voters, and mobilize all eligible citizens to utilize the power of their vote to shape the future of Arkansas. GLA's website directs voters to tools that allow them to verify their voter registration status, find their polling place, and submit a voter registration application.

12.      Since its founding, GLA has invested significant resources in developing the most effective means of increasing voter participation in Arkansas, especially among young and minority voters, who have historically faced disproportionate barriers to voter participation. GLA learned through its work that disseminating and tracking paper registration applications, along with

4

educational resources to help voters properly return those applications, is often a time-consuming and cumbersome process to register large numbers of voters, and in particular younger voters. GLA also learned that many Arkansans, especially those in rural areas, do not have easy access to materials necessary to print and submit paper applications. Accordingly, GLA focused its efforts on developing online tools to make voter registration less burdensome for Arkansans. After piloting an online registration portal on its website in 2023, GLA officially launched its online voter registration tool in early 2024, which allowed users to complete *and sign* voter registration applications electronically. The tool was immediately successful and helped hundreds of Arkansans to fill out voter registration applications using a computer, phone, or tablet.

13.     To ensure that electronically signed voter registration applications were valid, GLA consulted the Secretary of State's office and received assurances that they were. Soon after the success of GLA's program became public and its constituents began to register in greater numbers, however, state election officials soured on GLA's online tool. The Secretary instructed county officials that any application signed digitally should not be accepted, and county officials obliged; shortly after, the SBEC enacted an emergency rule requiring wet signatures on voter registration applications.

14.     As a result of the SBEC's wet signature rule, GLA's voter registration efforts have been severely inhibited. It was forced to disable its online tool and now must rely on less efficient and more expensive methods to register voters across Arkansas: traditional voter registration campaigns involving hard-copy applications, face-to-face interactions between staff and potential applicants, and frequent encouragement and reminders for potential applicants. That, in turn, has forced GLA to divert time and money away from other activities crucial to its mission—such as initiatives focused on encouraging citizen involvement in local government, monitoring changes

Appellate Case: 24-2810     Page: 36     Date Filed: 09/06/2024 Entry ID: 5432887
APP.7

in local election law, and assisting those purged from voter rolls reestablish their registration, as well as get-out-the vote campaigns.

15.     Plaintiff VOTE.ORG ("VDO") is the largest 501(c)(3) nonprofit, nonpartisan voter registration and get-out-the-vote technology platform in the county. VDO uses technology to simplify political engagement, increase voter turnout, and strengthen American democracy. VDO works extensively to support low-propensity voters, including racial and ethnic minorities and younger voters, who tend to have lower voter-turnout rates. In 2022 alone, VDO helped register more than 725,000 voters nationwide.

16.     Between 2018 and 2022, VDO helped more than 80,000 Arkansans register to vote by providing a tool that allowed voters to fill in prompts on VDO's website that would populate the information onto a voter registration application provided by the State. The applicant could then print, sign, and send that application to the appropriate county clerk.

17.     Nationwide, one of VDO's most effective tools is the e-signature function of its voter registration web application. The e-signature function allows qualified voters in states across the country to digitally enter information into a voter registration application, sign the application by uploading an image of their original signature, review their signed voter registration application, and have the completed application sent to the appropriate registration official. VDO has invested significant resources in developing the e-signature function and would like to offer it to Arkansas citizens, just as it has done in several other states. Although VDO has the capability and desire to deploy this tool in Arkansas, it cannot do so in the upcoming election because of the wet signature rule. Unable to use the e-signature function in Arkansas, VDO will be forced to print and mail physical copies of the application to each user that completes a voter registration application on VDO's web platform, which is a much less effective means of registering voters. Operating this

6

print and mail program also requires significantly more resources, including time and costs for printing and postage, whereas the e-signature tool would eliminate the need to send paperwork to voters. And it requires VDO to reallocate resources from other engagement efforts around the country, including absentee ballot assistance programs and get-out-the-vote projects.

18.    Plaintiff NIKKI PASTOR is a U.S. citizen, at least eighteen years of age, and a resident of Fayetteville, Arkansas, in Washington County. Pastor attempted to register to vote using GLA's online tool and used an electronic signature to complete her voter registration application. That application was rejected as a result of Defendants' enforcement of the wet signature rule, and Pastor remains unregistered to vote in Arkansas.

19.    Plaintiff TRINITY "BLAKE" LOPER is a U.S. citizen, at least eighteen years of age, and a resident of Russellville, Arkansas, in Pope County. Loper attempted to register to vote using GLA's online tool and used an electronic signature to complete their voter registration application. That application was rejected as a result of Defendants' enforcement of the wet signature rule, and Loper remains unregistered to vote in Arkansas.

20.    Defendants JOHN THURSTON,[2] SHARON BROOKS, JAMIE CLEMMER, BILENDA HARRIS-RITTER, WILLIAM LUTHER, JAMES HARMON SMITH, III, and JOHNATHAN WILLIAMS serve as Commissioners of the State Board of Election Commissioners ("SBEC") and are sued in their official capacities only. The SBEC has authority to make rules and regulations "to secure uniform and efficient procedures in the administration of" Arkansas's voter registration laws "throughout the State." Ark. Const. amend. 51, § 5(e)(1). The SBEC also creates "detailed specifications of the registration record files, [and] the voter

_____

[2] Defendant Thurston serves as the Arkansas Secretary of State and as *ex officio* chairman and secretary of the SBEC. Ark. Code Ann. § 7-4-101(b). He is sued in his official capacity on the SBEC.

registration application forms, . . . all of which shall be consistent with [the constitutional provisions governing voter registration] and uniform throughout the State." *Id.* § 5(e)(3). The SBEC has authority to "promulgate all necessary rules to assure even and consistent application of voter registration laws." Ark. Code § 7-4-101(f)(5). Additionally, the SBEC is authorized to conduct training for election officials, as well as to "[i]nvestigate alleged violations, render findings, and impose disciplinary action . . . for violations of election and voter registration laws." *Id.* § 7-4-101(f)(2), (9).

21.     Defendants BETSY HARRELL, BECKY LEWALLEN, and TERRI HOLLINGSWORTH serve as the County Clerks for Benton County, Washington County, and Pulaski County, respectively, and are sued in their official capacities. Each county in Arkansas has a county clerk, who serves as the "Permanent Registrar" of that county. Ark. Const. amend. 51, § 2(b). County clerks have authority to register qualified applicants to vote. *See id.* §§ 5(a), 6(a)(8), 9(c)–(h). Each county clerk "shall register qualified applicants when a legible and complete voter registration application is received and acknowledged by the permanent registrar." *Id.* § 9(c)(1); *see id.* § 9(c)(3).

## GENERAL ALLEGATIONS

### I.    Registering to vote in Arkansas.

22.     The Arkansas Constitution sets forth the qualifications a person must satisfy to vote in Arkansas. It provides that any person may vote in an election if they are: (1) a United States citizen; (2) a resident of Arkansas; (3) at least eighteen 18 years of age; and (4) lawfully registered to vote in the election. Ark. Const. art. 3, § 1; *see also Martin v. Haas*, 556 S.W.3d 509, 512 (Ark. 2018). Absent constitutional amendment, state and county election officials may not "impose[] a requirement that falls outside the ambit of article 3, section 1, of the Arkansas Constitution." *Martin v. Kohls*, 444 S.W.3d 844, 852–53 (Ark. 2014).

8

APP10

23.     The voter registration process in Arkansas is governed by Amendment 51 to the Arkansas Constitution. *See id.* at 850. Amendment 51 provides "a comprehensive regulatory scheme governing the registration of voters," *Haas*, 556 S.W.3d at 516, in order "to establish a system of permanent personal registration as a means of determining that all who cast ballots in general, special and primary elections in this State are legally qualified to vote in such elections," Ark. Const. amend. 51, § 1.

24.     Under Amendment 51, a person may register to vote in several ways. First, they may submit a voter registration application created by the Secretary of State to their respective county clerk in person or by mail. *See* Ark. Const. amend. 51, §§ 6(a), 9(c)(1). Arkansas law permits third-party organizations to submit a voter registration application on the voter's behalf. *E.g.*, *id.* § 6(a)(2)(G).

25.     A person may also register to vote at a voter registration agency. *See id.* § 5(a). Voter registration agencies include (1) the Office of Driver Services ("ODS"); (2) public assistance agencies; (3) disabilities agencies; (4) public libraries; and (5) the Arkansas National Guard. *Id.* Voter registration agencies may use a "computer process" to register applicants or alternatively use the same voter registration applications created by the Secretary of State. *Id.* § 5(b)(1)–(4).

26.     Amendment 51 prescribes the "information . . . required of the applicant" to register to vote. *See generally id.* § 6. Among other requirements, the applicant must provide a "signature or mark made under penalty of perjury that the applicant meets each requirement for voter registration." *Id.* § 6(a)(3)(F). Amendment 51 does not state that a signature or mark must be made using a specific method or made with any specific type of ink. *See id.* § 6(b)(1). Applicants who register at a voter registration agency often use electronic signatures to satisfy this same requirement.

APP 11

27.     Once a county clerk receives a voter registration application, the clerk "shall register qualified applicants" if the application is "legible and complete." *Id.* § 9(c)(1); *see also id.* § 9(c)(3).

## II.     Arkansas's low rates of voter registration and participation.

28.     The 2020 United States Census revealed that Arkansas has the lowest voter registration rate in the country at 62 percent. The 2020 Census also showed that young and Black Arkansans are registered to vote at lower rates than their older and white counterparts. Ahead of the 2020 presidential election, 55.3 percent of Black citizens in Arkansas were registered to vote, compared to 63 percent of white Arkansans. And only 48.7 percent of 18- to 24-year-old citizens were registered to vote, compared to 65.7 percent of those aged 45 to 64 and 67.7 percent of those older than 65.

29.     These trends have persisted. A report released in December 2023 found that Arkansas continues to have the lowest voter registration rate of any U.S. state, and registration rates are particularly low among Black Arkansans and younger people.[3]

30.     That same report also found that "Arkansas has consistently ranked below the national average in voter turnout,"[4] meaning Arkansas lags the nation not just in voter registration rates, but also in actual voter participation in elections once they are registered. For example, an analysis of the 2020 general election—which saw record voter turnout across the country—showed that Arkansas had the third lowest voter turnout rate of any state at 56.1 percent, compared to a

---

[3] Chul Hyun Park, et al., *2023 Arkansas Civic Health Index*, Nat'l Conf. on Citizenship, 5 (Dec. 4, 2023), https://ncoc.org/wp-content/uploads/2024/04/Arkansas-CHI-FINAL-4.1.2024.pdf.

[4] *Id.* at 7.

APP 12

national turnout rate of roughly 67 percent.[5] Similarly, during the 2016 general election, Arkansas's turnout rate was 53.2 percent—the fourth lowest in the nation that election.[6]

**III.      GLA develops a successful online tool to help Arkansans register to vote.**

31.      In 2021, in response to Arkansas's woeful voter registration and election participation rates, then-State Senator Joyce Elliott founded GLA with the express mission of improving civic participation in Arkansas, first and foremost through the registration of new voters.

32.      GLA has launched several initiatives in pursuit of its broad mission to promote civic engagement in Arkansas. For example, it has implemented get-out-the-vote campaigns in the lead-up to recent elections, including by organizing volunteers to engage in text banking to voters and by investing in advertisements to encourage voting among younger voters. GLA has also developed a program to identify and assist voters who are periodically purged from Arkansas's voting lists, a labor-intensive effort that requires GLA staff and volunteers to make repeated contacts with such voters to ensure they are re-registered.

33.      To encourage deeper civic engagement, GLA launched a campaign to raise awareness of and promote citizen involvement in local government, including by publishing and promoting information to educate people across the state about local elections and hearings. And GLA has started building voter protection teams to monitor and document changes to local election rules, including last minute changes to polling locations, which are often passed without widespread public awareness.

---

[5] *2020g: 2020 November General Election Turnout Rates*, U.S. Elections Project, https://www.electproject.org/2020g (Dec. 7, 2020).

[6] *2016 General Election, 2016 November General Election Turnout Rates*, U.S. Elections Project, https://www.electproject.org/2016g (Sept. 5, 2018).

APP13

34.     While all of these initiatives are critical to GLA's mission to promote civic engagement in Arkansas, registering new voters is the organization's highest priority. Accordingly, over the past year, GLA's primary focus has been to create accessible tools that make it easier for Arkansans, and particularly young and minority Arkansans, to register to vote.

35.     To that end, GLA committed significant resources—including staff time and financial resources—towards creating an online tool that allowed applicants to fill out the voter registration application created by the Secretary of State using a computer, phone, or tablet. Once functional, the tool allowed applicants to authorize GLA to print the completed application and submit it to the relevant county clerk on the applicant's behalf.

36.     To use the online tool, an applicant would go to GLA's website and click on the tab titled "Register to Vote." The applicant was then prompted to fill in information on two website pages that populate the Secretary of State's form, including all the information required by Amendment 51 § 6. The applicant was then required to use their finger, stylus, or mouse to sign their name above the identical "penalty of perjury" language used on the form issued by the Secretary of State. This information, and the signature, was then entered into the Secretary of State's form, which the applicant was able to review and save before authorizing GLA to print and submit it to the applicant's county clerk.

37.     GLA piloted a version of its online tool in January 2023 without the option for applicants to sign electronically. Using this version, an applicant completed the application online; GLA printed or mailed them a copy of the completed application; the applicant hand-signed the application; and then either the applicant or GLA returned the application to the appropriate county clerk. Although it was more successful than disseminating blank paper applications, GLA found that printing, signing, and mailing the application back to a county clerk continued to impose

Appellate Case: 24-2810    Page: 43    Date Filed: 09/06/2024  Entry ID: 5432887

barriers for most voters. GLA therefore developed a new version of the tool that would allow voters to complete and *sign* their applications through GLA's website, which GLA would subsequently print and submit to the appropriate county clerk.

38.     GLA developed this online tool and officially launched it in January 2024 with widespread success in helping Arkansans register to vote. The organization's efforts caught public attention, and an article in the Arkansas Times, published on February 26, 2024, further highlighted GLA's success registering hundreds of new voters.[7] The article reported that 358 people had already used the tool to register to vote in the early months of 2024, and that 78 percent of the new registrants were under 20 years old.

39.     The tool not only helped people apply to register to vote, but also made GLA's own outreach efforts more effective. By allowing applicants to complete the Secretary of State's voter registration application on a personal device, GLA was able to engage with a far greater numbers of potential applicants at community events, schools, and other areas where it seeks to register people. GLA staff and volunteers found it far easier to instruct large groups of applicants at schools or public events on how to complete the registration application on their phones or laptops versus having to distribute clipboards and paper applications. It also resulted in much more legible applications than those filled out in handwriting. And it was easier for GLA to table at outdoor events, where inclement weather sometimes made it impossible for people to complete paper applications. GLA found that people completed the application more quickly on their personal devices, meaning people with limited amounts of time were far more likely to complete the application electronically than on paper.

---

[7] *See* Mary Hennigan, *Get Loud Arkansas sees success in new voter registration strategy*, Ark. Times (Feb. 26, 2024), https://arktimes.com/news/2024/02/26/get-loud-arkansas-sees-success-in-new-voter-registration-strategy.

APP.15

40.     GLA found it was easier to disseminate the application electronically using QR codes and text messages. Many people who registered through GLA's online tool forwarded the link to friends and families, which cannot be done with paper applications. GLA's online tool also made it easier to remind people to complete the applications, and it allowed GLA to track applicants and ensure they were successfully entered on the state's voter rolls—a far more cumbersome and less accurate process when using paper applications.

41.     In the short time the online tool was available, GLA saw significantly higher rates of successful voter registration.

**IV.     The Secretary of State confirms that GLA's online tool complies with Arkansas law.**

42.     GLA believed its online voter registration tool complied with Arkansas law because Amendment 51, on its face, does not require an applicant's *wet* signature to complete the voter registration application. Moreover, many Arkansans register to vote with electronic signatures at voter registration agencies. And electronic signatures are now a common feature of modern life used for all manner of transactions, from executing large commercial contracts to signing a credit card receipt for a cup of coffee.

43.     Nonetheless, out of an abundance of caution, Senator Elliott, GLA's Executive Director, emailed the Secretary of State's office on February 5, 2024, asking the office to confirm GLA's understanding that there was no wet signature requirement for voter registration applications.

44.     On February 5, the Secretary of State's office responded, "our attorneys looked into this last week and came to the same conclusion [as GLA] about the wet signature."

45.     Later the same day, GLA's Deputy Director followed up with the Secretary of State's office and explained that, when applying to register to vote with GLA's help, applicants sometimes sign the touchscreen with a stylus and sometimes with their finger. She then asked: "So

14

just to make sure I'm understanding correctly – the registrations we submit right now are not going to be rejected based on the signature . . . . Is that correct?"

46.    The Secretary of State's office replied that, while it could not "officially speak on the acceptance or rejection of applications" because the "authority lies solely with the county clerk's office," its "unofficial, non-attorney, advice to the county clerks would be to err on the side of the voter and accept the registrations."

47.    On February 12, 2024, GLA's Deputy Director again wrote to the Secretary of State's office and asked, among other questions: "For registration purposes, should digital signatures be treated differently than 'wet' signatures?"

48.    On February 14, 2024, the Secretary of State's office, after indicating that it was a "sensitive issue," stated: "[T]he Secretary of State does not see how a digital signature should be treated any differently than a wet signature." Accordingly, the Secretary's office assured GLA that its online tool complied with Arkansas law on no fewer than three occasions during their correspondence in early February 2024.

## V.    The Secretary of State reverses course and advises county clerks to reject applications with electronic signatures.

49.    Despite the assurances given to GLA that electronically signed voter registration applications should be accepted, the Secretary of State abruptly reversed his position mere weeks later.

50.    On February 28, 2024, two days after the Arkansas Times reported on GLA's success registering new voters with its online tool, the Secretary wrote a letter to all county clerks, stating: "It has come to my attention that there have been some entities registering citizens to vote

by electronic applications and signature. . . . I strongly recommend that counties do not accept voter registration applications executed by electronic signature."[8]

51.     The Secretary's brief, two-paragraph letter provided no explanation or legal basis for his sudden shift in position. Moreover, the Secretary issued this letter without any warning to GLA, despite the aforementioned correspondence with the Secretary's office about this precise issue.

52.     On March 8, 2024, Lindsey French, an attorney for the Association of Arkansas Counties, emailed all county clerks and advised them, based on the Secretary of State's letter, "that current efforts to register voters electronically run afoul of the law." Ms. French advised the county clerks to follow the recommendation of the Secretary of State but also to "consult with your county attorney in making these determinations."

53.     After the Secretary of State's letter and Ms. French's email, many county clerks began to reject applications submitted with electronic signatures, while others continued to accept such applications.

54.     On March 12, 2024, after having already advised county clerks to reject applications with electronic signatures, the Secretary of State asked the Attorney General for an opinion on the lawfulness of such signatures. The Secretary wrote:

> My office has received inquiries regarding the use of electronic voter registration applications, created by a third-party non-governmental agency, that include an electronic signature. These applications are then either printed out and turned in or sent electronically to county clerks. I'm asking for a formal opinion from your office as to whether this practice is allowed under Arkansas law.

---

[8] *See* Austin Gelder, *Secretary of state warns against voter registration e-signatures; Pulaski clerk says she'll keep taking them*, Ark. Times (Mar. 7, 2024), https://arktimes.com/arkansas-blog/2024/03/07/mixed-messages-from-the-arkansas-secretary-of-state-sow-confusion-over-online-voter-applications.

APP18

55.      On April 10, 2024, the Attorney General issued opinion stating that "an electronic signature or mark is generally valid under Arkansas law" and that:

> Consequently, given the historical acceptance of signatures produced through a variety of means, the widespread acceptance of electronic signatures, and the fact that Amendment 51 does not contain any restrictions on how a "signature or mark" may be made, I believe that an electronic signature satisfies Amendment 51's "signature or mark" requirement.

Ark. Att'y Gen. Op. No. 2024-049 at 3 (Apr. 10, 2024).[9] In other words, the Attorney General's opinion confirmed the Secretary's initial position that electronic signatures satisfy Amendment 51.

56.      After the Attorney General issued his opinion, the Arkansas Democrat-Gazette reported that the SBEC—which the Secretary of State chairs—asked its staff to prepare an emergency rule addressing this issue.

57.      On April 23, 2024, the SBEC adopted an emergency rule prohibiting county clerks from accepting voter registration applications signed with an electronic signature.

58.      The wet signature rule bans electronic signatures on voter registration applications in three ways. First, it grafts non-textual language onto the term "signature or mark" in Amendment 51, redefining it to mean "a handwritten wet signature or handwritten wet mark made on a Registration Application Form with a pen or other writing device that is physically moved across the form and that forms the applicant's signature mark on the paper form."

59.      Second, the wet signature rule provides that "[a] Signature or Mark that utilizes a computer to generate the applicant's signature or mark is not an acceptable signature or mark of the applicant for purposes of" Amendment 51, even though Amendment 51 imposes no such prohibition.

---

[9] Available at: https://ag-opinions.s3.amazonaws.com/uploads/2024-049.pdf.

APP 19

60.       Third, while Amendment 51 requires county clerks to accept voter registration applications that are "legible and complete," *see* § 9(c)(1), (c)(3)(A), the wet signature rule adds that voter registration applications must also be "executed with a Signature or Mark" as defined by the rule.

61.       On May 2, 2024, the Arkansas Legislative Council's Executive Subcommittee approved the emergency rule, which took effect on May 4 and remains in place until September 1, 2024, at which point it will expire unless it is re-issued as a final rule.

**VI.    Qualified Arkansas voters, including Plaintiffs Nikki Pastor and Blake Loper, have had their voter registration applications rejected due to the wet signature rule.**

62.       In the wake of the wet signature rule's adoption, many otherwise qualified Arkansans have had their voter registration applications rejected because they signed the applications with an electronic signature. Such rejected applicants include Plaintiffs Nikki Pastor and Blake Loper.

63.       Nikki Pastor grew up in Clinton, Arkansas. She is a U.S. citizen and at least eighteen years of age. She has been a resident of Washington County, Arkansas since August 2023, before which she was a student in Missouri. She has never been convicted of a felony or adjudged as incompetent to vote by any court.

64.       On February 24, 2024, Pastor attended the Black Owned Northwest Arkansas Business Expo in Fayetteville, at which GLA was conducting its voter registration work. Pastor learned about GLA's online tool, scanned the QR code provided by GLA, and saved the link to the tool on her phone, intending to register when she got home. Using the link saved on her phone, Pastor was able to return to the tool and complete a registration application later that day. Pastor gave GLA approval to print the application and submit it to the Washington County Clerk, which GLA did.

65.     Pastor's application was rejected by the Washington County Clerk for its use of an electronic signature. Consequently, Pastor remains unregistered to vote despite having submitted an otherwise complete voter registration application to the Washington County Clerk.

66.     Blake Loper is a U.S. citizen, is at least eighteen years of age, and has never been convicted of a felony or adjudged as incompetent to vote by any court. Loper grew up in Dardanelle, Arkansas, in Yell County, but has been a resident of Russellville, in Pope County, since November 2022.

67.     Because they were previously registered in Yell County, Loper used GLA's online voter registration tool to complete and sign electronically a voter registration application for Pope County. Loper gave GLA approval to print and submit the application to the Pope County Clerk, which GLA did.

68.     A staff member of GLA had shared the link to the online tool, which Loper found to be a convenient way to update their voter registration to their new address in Pope County. In fact, Loper shared the link with several friends, thinking they would find it helpful and convenient too.

69.     GLA submitted Loper's application on December 11, 2023, but Loper did not receive any confirmation that their registration status had been updated. Accordingly, GLA resubmitted a carbon copy of the application on Loper's behalf several months later. On May 2, 2024, Loper received notice that the application was rejected by the Pope County Clerk for its use of an electronic signature.

70.     Loper remains unregistered to vote despite having submitted an otherwise complete voter registration application to the Pope County Clerk.

Appellate Case: 24-2810     Page: 50     Date Filed: 09/06/2024 Entry ID: 5432887

71.     GLA is aware that many other users of its online tool have had their voter registration applications rejected due to the wet signature rule. For example, GLA staff and volunteers visited Camden Fairview High School in Camden, Arkansas in February 2024—before the announcement of the SBEC's emergency rule—to help register high school students. GLA collected dozens of voter registration applications through its online tool and delivered them to the county clerk. However, GLA was soon notified that none of the applications would be accepted because they were signed with electronic signatures.

72.     Likewise, after announcement of the wet signature rule, GLA became concerned that applicants who previously submitted applications using an electronic signature may be at risk of having their registrations voided. The SBEC has stated that it believes it has the power to re-review previously accepted voter registration applications. Despite repeated attempts to seek guidance and clarity from the Secretary of State's office on this specific issue, GLA has not received any response to its inquiries. Consequently, hundreds of voters appear at risk of having their registrations retroactively canceled.

## VII.   GLA and VDO are harmed by the wet signature rule.

73.     The Secretary's turnabout, and the SBEC's subsequent issuance of the wet signature rule, caused immediate damage to GLA's voter registration efforts and will severely restrict how it conducts voter registration efforts moving forward.

74.     After the Secretary's instruction to county clerks to reject electronic signatures, but before the wet-signature requirement went into effect as an emergency rule, county clerks were announcing piecemeal whether they would accept electronic signatures. Two GLA staff members contacted each of Arkansas's 75 county clerks to catalog each clerk's position on electronic signatures. Based on that information, GLA staff then redesigned the online tool, devoting over 20

staff hours in one week—a significant amount for a small organization—to account for the various counties' positions on electronic signatures.

75.      Once the emergency rule was issued, GLA was forced to redesign its tool once again to account for the statewide prohibition. This time, it entirely disabled its online voter registration tool, redirecting the "Register to Vote" link on its website to a disclaimer about the emergency rule. Consequently, GLA's ability to register new voters was severely limited.

76.      In preparation for the general election, GLA plans to reactivate the "Register to Vote" tool on its website but will be forced to remove many of its features in order to comply with the wet signature rule. Most notably, applicants will no longer be able to sign the application electronically and have GLA submit it on their behalf. Instead, they must complete the application online, print it out, apply a handwritten wet signature, and then mail or deliver the application to their county clerk themselves.

77.      Without the online tool's electronic signature capabilities, GLA has seen the pace at which it registers new voters decline precipitously. GLA has also ceased engaging in certain other efforts that rely upon the accessibility of the online tool to help voters. This includes asking volunteers to text the link to potential new registrants or asking large groups of people to register simultaneously at public events. Instead, GLA must rely on paper applications, which are less likely to be successfully completed by an applicant.

78.      GLA has also been forced to divert its limited staff and financial resources towards less efficient means of pursuing its voter registration goals, including renewed use of paper registration applications and the dedication of significant staff time towards meeting potential applicants in public spaces, encouraging them to register, and subsequently reminding them to

APP23

complete and submit their applicants. This diversion has, in turn, come at the expense of GLA's ability to pursue other parts of its broad civic-engagement mission.

79.     For example, in response to the wet signature rule, GLA has dedicated significant resources towards retraining its staff and hiring full-time paid interns—who needed to be trained as well—to attend public events to encourage people to register to vote using paper applications, an expense it did not have prior to the wet signature rule.

80.     This unexpected pivot has come at the expense of GLA's other programming. Typically, in an election year, GLA would begin planning and implementing get-out-the-vote ("GOTV") programming for the lead-up to the November general election. And although GLA has had its GOTV campaign plans in place since the end of last year, the staff time required to stand up new voter registration operations in response to the wet signature rule has prevented GLA from starting work on those campaigns.

81.     Likewise, GLA staff have had far less time to assist voters who have been purged from voter rolls, effectively eliminating GLA's ability to help such individuals reestablish their registration status and vote in Arkansas elections. While such work was previously a priority for GLA, the organization no longer asks volunteers to assist purged voters either because it must redirect this time towards facilitating in-person interactions to promote voter registration. GLA has also ceased programs aimed at monitoring changes to local election rules and encouraging involvement in local councils and commissions, and it has even abandoned some of its research projects.

82.     The wet signature rule has caused similar harm to VDO, which has developed its own e-signature tool to assist applicants in completing voter registration applications in several states. Consistent with its goal of enhancing political engagement through the use of technology,

APP24

VDO would like to deploy its web platform in future elections in Arkansas; but the wet signature rule bars the use of VDO's e-signature function and frustrates its mission.

83.     Consequently, VDO will be forced to redirect limited financial and staff resources from absentee ballot assistance and other GOTV projects, towards less efficient and more resource-intensive ways of assisting voters to register in Arkansas, including its print and mail program. Because the print and mail program is so laborious, VDO will be forced to pull staff members off of the partnerships, program & policy, product, and operations teams to focus on mailing Arkansas voters their nearly-completed voter registration applications.

84.     This diversion of resources, in turn, harms VDO's mission. VDO is a technology-first company with a mission of building best-in-class, culturally competent, cutting-edge digital tools to reach and empower voters across America. But because of the wet signature rule, VDO will be forced to divert its efforts away from building and improving its digital tools.

**CLAIM FOR RELIEF**

**COUNT I**

**Materiality Provision of the Civil Rights Act of 1964**
**52 U.S.C. § 10101(a)(2)(B); 42 U.S.C. §§ 1983, 1988; 28 U.S.C. §§ 2201, 2202**

85.     Plaintiffs incorporate paragraphs one through 84 above as if set forth fully herein.

86.     The materiality provision prohibits any person acting under color of law from "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

23

APP25

87.     Rejection of a voter registration application, for a paperwork error immaterial to qualification determinations, constitutes denial of the right to vote for purposes of the materiality provision. *See* 52 U.S.C. § 10101(a)(3)(A), (e).

88.     To be eligible to vote in an election in Arkansas, an individual must be (1) a U.S. citizen; (2) a resident of Arkansas; (3) at least 18 years of age; and (4) lawfully registered to vote in that election. Ark. Const. art. 3, § 1(a).

89.     Whether an individual uses an electronic signature on their voter registration application "is not material in determining whether such individual is qualified under [Arkansas] law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

90.     Rejection of a voter registration application for noncompliance with the wet signature rule is "an error or omission on a[] record or paper relating to an[] application" and constitutes the denial of the right to vote for purposes of the materiality provision. 52 U.S.C. § 10101(a)(2)(B).

91.     Therefore, the wet signature rule violates the materiality provision of the Civil Rights Act of 1964.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a)     Declare that the wet signature rule, and any other requirement that applicants sign their voter registration applications by hand or with a wet signature, violates the materiality provision of the Civil Rights Act of 1964;

(b)     Enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the wet signature rule, or any other requirement that applicants sign their voter registration applications by hand or with a wet signature;

(c)     Enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting or refusing to accept a voter registration application on the grounds that the application contains an electronic or digital signature;

(d)    Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and any other applicable law.

(e)    Grant Plaintiffs any such other, different, or further relief as this Court deems just and proper.

Dated: June 5, 2024                              Respectfully submitted,
                                                 */s/ Peter Shults*

**SHULTS LAW FIRM LLP**                          **ELIAS LAW GROUP LLP**
Peter Shults (Ark. 2019021)                      Uzoma N. Nkwonta* (DC 975323)
Amanda G. Orcutt (Ark. 2019102)                  Christopher D. Dodge* (DC 90011587)
Steven Shults (Ark. 78139)                       Omeed Alerasool* (DC 90006578)
200 West Capitol Ave., Suite 1600                Julie Zuckerbrod* (DC 1781133)
Little Rock, AR 72201                            250 Massachusetts Ave. NW, Suite 400
T: (501) 375-2301                                Washington, DC 20001
F: (501) 375-6861                                T: (202) 968-4490
pshults@shultslaw.com                            F: (202) 968-4498
aorcutt@shultslaw.com                            unkwonta@elias.law
sshults@shultslaw.com                            cdodge@elias.law
                                                 oalerasool@elias.law
                                                 jzuckerbrod@elias.law

                                                 **Pro hac vice** application forthcoming

                                                 *Attorneys for Plaintiffs*

APP27

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| GET LOUD ARKANSAS, et al., | |
| Plaintiffs, | Civil Action |
| *v.* | Case No. 5:24-cv-05121-TLB |
| JOHN THURSTON, et al., | |
| Defendants. | |

**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs Get Loud Arkansas ("GLA"), Vote.org ("VDO"), Nikki Pastor, and Blake Loper, for their Motion for Preliminary Injunction, pursuant to Fed. R. Civ. P. 65, state as follows:

1.      Plaintiffs seek to preliminarily enjoin Defendants from enforcing the Arkansas State Board of Election Commissioners' emergency rule, effective May 4, 2024, requiring that voter registration applications be signed with a handwritten or "wet" signature, rather than an electronic or digital signature (the "wet signature rule").

2.      Plaintiffs further seek to enjoin Defendants from enforcing any requirement that a voter registration application be signed with a handwritten or "wet" signature, rather than an electronic or digital signature, whether such requirement is imposed pursuant to the wet signature rule or any other authority.

3.      As set forth more fully in the accompanying brief, the wet signature rule violates the materiality provision of the Civil Rights Act of 1964.

4.      Under the materiality provision, "[n]o person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any

APP28

record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

5.      Rejecting a voter registration application for noncompliance with the wet signature rule constitutes a denial of the right to vote for purposes of the materiality provision. *Id.* § 10101(a)(3)(A), (e).

6.      And the wet signature rule makes the use of an electronic signature "an error or omission on a[] record or paper relating to an[] application." *Id.* § 10101(a)(2)(B).

7.      Lastly, whether an applicant uses an electronic or wet signature on their voter registration application "is not material in determining whether such individual is qualified under [Arkansas] law to vote in such election." *Id.*; *see* Ark. Const. art. 3, § 1; *see also Martin v. Haas*, 556 S.W.3d 509, 512 (Ark. 2018).

8.      Accordingly, Defendants' enforcement of the wet signature rule—and any other requirement that voter registration applications be signed with a handwritten or "wet" signature— violates the materiality provision of the Civil Rights Act of 1964.

9.      A brief in support of Plaintiffs' Motion for Preliminary Injunction is submitted alongside this Motion. *See* Local Rule 7.2(e).

10.      Plaintiffs also submit the following Declarations, and the Exhibits attached therein, in support of this Motion:

    a.      Declaration of Kristin Foster, Deputy Executive Director of GLA;
    b.      Declaration of Andrea Hailey, Chief Executive Officer of VDO;
    c.      Declaration of Nikki Pastor;
    d.      Declaration of Blake Loper;
    e.      Declaration of Susan Inman, former Arkansas election official;
    f.      Declaration of Christopher D. Dodge, attorney for Plaintiffs.

2

APP29

WHEREFORE, Plaintiffs respectfully request that the Court grant their Motion and issue a preliminary injunction, pending a decision on the merits of Plaintiffs' claims in this matter, enjoining the enforcement of the wet signature rule or any similar requirement.

Dated: July 11, 2024

Respectfully submitted,

*/s/ Uzoma N. Nkwonta*

**SHULTS LAW FIRM LLP**
Peter Shults (Ark. 2019021)
Amanda G. Orcutt (Ark. 2019102)
Steven Shults (Ark. 78139)
200 West Capitol Ave., Suite 1600
Little Rock, AR 72201
T: (501) 375-2301
F: (501) 375-6861
pshults@shultslaw.com
aorcutt@shultslaw.com
sshults@shultslaw.com

**ELIAS LAW GROUP LLP**
Uzoma N. Nkwonta* (DC 975323)
Christopher D. Dodge* (DC 90011587)
Omeed Alerasool* (DC 90006578)
Julie Zuckerbrod* (DC 1781133)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
F: (202) 968-4498
unkwonta@elias.law
cdodge@elias.law
oalerasool@elias.law
jzuckerbrod@elias.law

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

APP30

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served this 11th day of July, 2024, with a copy of this document via the Court's CM/ECF system.

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta

4
APP31

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| GET LOUD ARKANSAS, et al., | |
| Plaintiffs, | Civil Action |
| *v.* | Case No. 5:24-cv-05121-TLB |
| JOHN THURSTON, et al., | |
| Defendants. | |

**BRIEF IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

APP32

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 2

I.   Amendment 51 governs voter registration in Arkansas and does not impose a wet signature requirement.................................................................... 2

II.  GLA and VDO develop innovative tools to help Arkansans register to vote.................... 3

III. State officials repeatedly assured GLA that electronic signatures comply with Arkansas law. ............................................................................ 4

IV.  Weeks later, state officials issued the wet signature rule despite the Attorney General's confirmation that electronic signatures are permitted. ...................... 6

V.   The wet signature rule impedes GLA's and VDO's registration efforts while also denying Arkansans the right to register and vote.............................................. 8

LEGAL STANDARD.......................................................................................... 11

ARGUMENT ...................................................................................................... 12

I.   The Civil Rights Act of 1964 prohibits state officials from rejecting voter registration applications for errors that are immaterial in determining a person's qualifications to vote.............................................................................. 12

II.  Plaintiffs are likely to succeed on their claim that the wet signature rule violates the materiality provision of the Civil Rights Act.......................................... 14

    A.   Rejecting an applicant's registration form constitutes a denial of the right to vote under the Civil Rights Act. ................................................ 14

    B.   The wet signature rule renders the use of an electronic signature an error or omission on a record related to registration......................................... 15

    C.   The use of a wet signature is immaterial in determining whether an individual is qualified to vote under Arkansas law. ............................................ 16

III. Absent relief, Plaintiffs will face continued and ongoing irreparable harm because of the wet signature rule. ................................................................ 24

IV.  The remaining equitable factors strongly favor granting a preliminary injunction. ......... 26

CONCLUSION .................................................................................................. 27

CERTIFICATE OF SERVICE ............................................................................ 29

APP33

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Awad v. Ziriax,*
  670 F.3d 1111 (10th Cir. 2012) ..............................................................27

*Brandt by & through Brandt v. Rutledge,*
  47 F.4th 661 (8th Cir. 2022) ...................................................................27

*Cigna Corp. v. Bricker,*
  103 F.4th 1336 (8th Cir. 2024) ...............................................................24

*Condon v. Reno,*
  913 F. Supp. 946 (D.S.C. 1995)........................................................12, 13

*D.M. by Bao Xiong v. Minn. State High Sch. League,*
  917 F.3d 994 (8th Cir. 2019) ..................................................................27

*Eggers v. Evnen,*
  48 F.4th 561 (8th Cir. 2022) ...................................................................26

*Emineth v. Jaeger,*
  901 F. Supp. 2d 1138 (D.N.D. 2012)......................................................25

*Fayetteville Pub. Libr. v. Crawford County,*
  684 F. Supp. 3d 879 (W.D. Ark. 2023)...................................................26

*In re Georgia Senate Bill 202,*
  No. 1:21-CV-01259-JPB, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) ...............................25

*Holbrook v. Healthport, Inc.,*
  432 S.W.3d 593 (Ark. 2014)..............................................................18, 19

*La Unión del Pueblo Entero v. Abbott,*
  No. 5:21-CV-0844-XR, 2023 WL 8263348 (W.D. Tex. Nov. 29, 2023)........................ *passim*

*League of Women Voters of Ark. v. Thurston,*
  No. 5:20-CV-05174, 2023 WL 6446015 (W.D. Ark. Sept. 29, 2023) ...................................14

*League of Women Voters of Mo. v. Ashcroft,*
  336 F. Supp. 3d 998 (W.D. Mo. 2018) ..............................................25, 27

*League of Women Voters of N.C. v. North Carolina,*
  769 F.3d 224 (4th Cir. 2014) .............................................................25, 26

*Martin v. Crittenden,*
  347 F. Supp. 3d 1302 (N.D. Ga. 2018)....................................................16

iii

*Martin v. Haas*,
    556 S.W.3d 509 (Ark. 2018)................................................................2

*Martin v. Kohls*,
    444 S.W.3d 844 (Ark. 2014)................................................................2

*Mi Familia Vota v. Fontes*,
    No. CV-22-00509-PHX-SRB, 2024 WL 862406 (D. Ariz. Feb. 29, 2024) ...............14, 16, 17

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) ...............................................................26

*Reynolds v. Sims*,
    377 U.S. 533 (1964)........................................................................26

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) .................................................14, 15, 16

*Schwier v. Cox*,
    412 F. Supp. 2d 1266 (N.D. Ga. 2005) ...................................................21

*Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*,
    574 F. Supp. 3d 1260 (N.D. Ga. 2021) ...................................................15

*Sleep No. Corp. v. Young*,
    33 F.4th 1012 (8th Cir. 2022) ........................................................11, 12

*United States v. Georgia*,
    892 F. Supp. 2d 1367 (N.D. Ga. 2012) ...................................................26

*United States v. Mississippi*,
    380 U.S. 128 (1965)........................................................................17

*United States v. Pulsifer*,
    39 F.4th 1018 (8th Cir. 2022) .............................................................19

*Vote.org v. Byrd*,
    No. 4:23-CV-111-AW-MAF, 2023 WL 7169095 (N.D. Fla. Oct. 30, 2023)....................22, 23

*Vote.org v. Callanen*,
    89 F.4th 459 (5th Cir. 2023) ........................................................22, 24

*Vote.org v. Ga. State Election Bd.*,
    661 F. Supp. 3d 1329 (N.D. Ga. 2023) ...................................................15

*Williams v. Salerno*,
    792 F.2d 323 (2d Cir. 1986)...............................................................26

Appellate Case: 24-2810   Page: 64   Date Filed: 09/06/2024   Entry ID: 5432887
APP35

**Statutes**

1964 Civil Rights Act, 52 U.S.C. § 10101.................................................................. *passim*

Ark. Code Ann. § 25-16-702(a)..........................................................................20

**Constitutional Provisions**

Ark. Const. art 3, § 1........................................................................2, 16, 17

Ark. Const. amend. 51, § 2 ...............................................................................3

Ark. Const. amend. 51, § 5 .......................................................................3, 17, 20

Ark. Const. amend. 51, § 6 ...................................................................3, 5, 18, 19

Ark. Const. amend. 51, § 9 ...................................................................3, 8, 18, 22

Ark. Const. amend. 51 § 11 ..........................................................................16

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading the Law: The Interpretation of Legal Texts* 170 (2012) ...................................................................................19

Ark. Att'y Gen. Op. No. 2024-049 (Apr. 10, 2024) ........................................7

Calvin R. Ledbetter, Jr., *Arkansas Amendment for Voter Registration Without Poll Tax Payment*, 54 Ark. Hist. Q. 134 (1995) .......................................2

H.B. 1407, 94th Gen. Assemb., Reg. Sess. (Ark. 2023)..................................2

H.B. 1606, 80th Gen. Assemb., Reg. Sess. (Ark. 1995).................................2

H.R. Rep. No. 88-914 (1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391 ............................2, 12, 27

Justin Levitt, *Resolving Election Error: The Dynamic Assessment of Materiality*, 54 Wm. & Mary L. Rev. 83, 147–48 (2012) ...........................................12

S.B. 271, 84th Gen. Assemb., Reg. Sess. (Ark. 2003).....................................2

S.B. 353, 87th Gen. Assemb., Reg. Sess. (Ark. 2009).....................................2

*Voting: 1961 Commission on Civil Rights Report, Book 1*, U.S. Comm'n on C.R. (Sept. 9, 1961), https://perma.cc/CC7B-T888 ...........................................13

Appellate Case: 24-2810   Page: 65   Date Filed: 09/06/2024   Entry ID: 5432887

APP36

**INTRODUCTION**

In early 2024, Plaintiff Get Loud Arkansas ("GLA") launched an online tool to combat Arkansas's historically low rates of voter registration, particularly among young and minority voters. The tool allowed an applicant to complete and sign their voter registration application electronically, after which the applicant could authorize GLA to print their completed application and submit it directly on the applicant's behalf. State officials agreed that this process was perfectly lawful: GLA repeatedly sought and received assurances from the Arkansas Secretary of State's office that the tool complied with existing Arkansas law—a position confirmed by the Attorney General of Arkansas in a formal opinion.

But once the media reported on GLA's success in registering new voters, the Secretary of State abruptly reversed course. In a short letter to county officials, the Secretary advised that they should reject electronically signed applications, without any explanation as to why Arkansas law required such rejection. Just a few weeks later, the State Board of Election Commissioners ("SBEC")—which the Secretary chairs as an *ex officio* member—issued the emergency wet signature rule formalizing the Secretary's about-face, despite the absence of any wet signature requirement in Arkansas law. As a result, many qualified Arkansas voters, including Plaintiffs Nikki Pastor and Blake Loper, have had their voter registration applications rejected simply because they affirmed—under penalty of perjury—the accuracy of their applications with an electronic signature, as thousands of other Arkansans are permitted to do when they register to vote at agencies like the Office of Driver Services ("ODS").

Although the wet signature rule is new to Arkansas, it bears a striking resemblance to the suppressive tactics that spurred Congress to enact the materiality provision in the landmark Civil Rights Act of 1964. The provision seeks to eliminate opportunities for arbitrary and discriminatory practices "in the registration of voters for Federal elections . . . by prohibiting the disqualification

APP37

of an individual because of immaterial errors or omissions in papers or acts" requisite to voting. H.R. Rep. No. 88-914 (1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391, 2394. Yet more than half a century later, the wet signature rule has made it so that Arkansas's election officials must reject mail voter registration applications simply because the applicants signed with the "wrong" instrument—a meaningless technicality that creates unlawful barriers to the franchise.

Plaintiffs move for a preliminary injunction to enforce the guarantees of the Civil Rights Act and to immediately enjoin the enforcement of Arkansas's wet signature rule.

## BACKGROUND

**I.**    **Amendment 51 governs voter registration in Arkansas and does not impose a wet signature requirement.**

Under the Arkansas Constitution, any person may vote in an election if they are: a U.S. citizen; a resident of Arkansas; at least eighteen 18 years of age; and "[l]awfully registered to vote in the election." Ark. Const. art. 3, § 1; *see also Martin v. Haas*, 556 S.W.3d 509, 512 (Ark. 2018). The voter registration process in Arkansas is governed by Amendment 51 to the Arkansas Constitution, *see Martin v. Kohls*, 444 S.W.3d 844, 850 (Ark. 2014), which was originally added by citizen initiative to replace the state's poll tax with a modern voter registration system, *see generally* Calvin R. Ledbetter, Jr., *Arkansas Amendment for Voter Registration Without Poll Tax Payment*, 54 Ark. Hist. Q. 134 (1995), and was amended several times by the Legislature in the intervening decades. *See, e.g.*, H.B. 1606, 80th Gen. Assemb., Reg. Sess. (Ark. 1995); S.B. 271, 84th Gen. Assemb., Reg. Sess. (Ark. 2003); S.B. 353, 87th Gen. Assemb., Reg. Sess. (Ark. 2009); H.B. 1407, 94th Gen. Assemb., Reg. Sess. (Ark. 2023). Today, under Amendment 51, a person may register to vote in several ways. First, they may submit a voter registration application created

APP38

by the Secretary of State to their respective county clerk in person, by mail,[1] *see* Ark. Const. amend. 51, §§ 6(a), 9(c)(1), or through a third-party organization authorized to submit mail applications on the voter's behalf. *E.g.*, *id.* § 6(a)(2)(G). An applicant may also register to vote at ODS or at state public assistance offices. *Id.* § 5(a).

Although it requires applicants to provide a "signature or mark made under penalty of perjury that the applicant meets each requirement for voter registration," *id.* § 6(a)(3)(F), Amendment 51 does not mandate the use of any specific method or instrument in entering that signature or mark, *see id.* § 6(b)(1), and state agencies often register voters using a digital application process that requires electronic signatures, *id.* § 5(b)(1)–(4). Once a county clerk receives a voter registration application, the clerk "shall register qualified applicants" if the application is "legible and complete." *Id.* § 9(c)(1); *see also id.* § 9(c)(3)(A).

## II.   GLA and VDO develop innovative tools to help Arkansans register to vote.

Plaintiff Get Loud Arkansas ("GLA") was founded in 2021 to address Arkansas's lowest-in-the-nation rates of voter registration and voter turnout.[2] *See generally* Declaration of Kristin Foster ("Foster Decl.") ¶ 3. In its first few years of existence, GLA pursued its voter registration mission by distributing paper applications to register new voters, but it quickly realized the limitations of this approach. *Id.* ¶ 9. As a result, it committed significant effort and resources towards developing and launching an online tool that allows Arkansans to complete and sign a

---

[1] Each county in Arkansas has a county clerk who serves as the "Permanent Registrar" of that county. Ark. Const. amend. 51, § 2(b).

[2] According to the U.S. Census Bureau, only 62 percent of Arkansas citizens were registered to vote during the November 2020 election, and only 54 percent of Arkansas citizens voted in that election. Declaration of Christopher D. Dodge ("Dodge Decl."), Ex. A (tbl. 4a). In contrast, the nationwide averages for voter registration and voter turnout during that election were 73 percent and 67 percent, respectively. *Id.*, Ex. A (tbl. 4a). Unfortunately, these disparities are even more severe for minority and young voters in Arkansas. *Id.*, Ex. A. (tbls. 4b & 4c).

APP39

voter registration application on their phone, tablet, or computer in a process that takes less than two minutes. *Id.* ¶¶ 10–13, 19. To use the online tool, an applicant enters the information necessary to complete the voter registration application prescribed by the Secretary of State, in accordance with Amendment 51, and then uses their finger, stylus, or mouse to sign their name confirming the accuracy of the application under penalty of perjury. *Id.* ¶ 14. Once the application is complete, the applicant may review their application and then authorize GLA to print and submit it to their county clerk. *Id.* GLA released this online tool in January 2024, and almost immediately saw a rapid increase in the rate at which it registered new voters. *Id.* ¶¶ 13, 15.

Plaintiff Vote.org ("VDO") is a nationwide organization that also develops online voter registration tools with electronic signature options and offers them to voters in states across the country. Declaration of Andrea Hailey ("Hailey Decl.") ¶¶ 3, 8. VDO's online tools are specifically designed to meet the needs and legal requirements of each state in which it offers them. *Id.* ¶ 4. And one of the most effective features of its online tools is the e-sign function, which allows applicants to upload an image of their handwritten signature into VDO's web application and have their completed voter registration application sent to the appropriate officials. *Id.* ¶ 8. Currently, however, VDO is not able to use its e-sign function in Arkansas; applicants must still print, physically sign, and then submit their application to their county clerk. *Id.* ¶ 8–10. But for the wet signature rule, VDO would utilize its e-sign function for upcoming elections in Arkansas. *Id.* ¶ 9.

## III.   State officials repeatedly assured GLA that electronic signatures comply with Arkansas law.

In early 2024, as GLA began to promote its new online voter registration tool at events across Arkansas, it sought assurance from the Secretary of State's office that the tool complies with Arkansas law. Foster Decl. ¶ 21. GLA had every reason to believe that it did, as Arkansas

4

law does not require that a voter registration applicant's "signature or mark" be made with any particular instrument, so long as it is "made under penalty of perjury that the applicant meets each requirement for voter registration." Ark. Const. amend. 51, § 6(a)(3)(F). And GLA's tool requires applicants to review and affirm the identical sworn statement prescribed by the Secretary. Foster Decl. ¶ 14. Nevertheless, GLA sought the Secretary's opinion on its new online tool. *Id.* ¶ 21. And, on no fewer than *three occasions*, the Secretary's office expressly stated that the electronic signature function on GLA's new tool complies with Arkansas law.

First, on February 5, 2024, GLA's founder and executive director, former State Senator Joyce Elliott, emailed the Secretary of State's office to confirm GLA's understanding that there was no wet signature requirement in Arkansas law for voter registration applications. *Id.* ¶ 22, Ex. A. Within 30 minutes, the Secretary of State's office responded, "our attorneys looked into this last week and came to the same conclusion [as GLA] about the wet signature." *Id.* ¶ 22, Ex. A.

Later that same afternoon, GLA's Deputy Director, Kristin Foster, contacted the Secretary's office once again, explaining that, when applying to register with GLA's tool, applicants sometimes sign the touchscreen with a stylus and sometimes with their finger, and asked: "So just to make sure I'm understanding correctly – the registrations we submit right now are not going to be rejected based on the signature. . . . Is that correct?" *Id.* ¶ 22, Ex. A. The Secretary of State's office replied that, while it could not "officially speak on the acceptance or rejection of applications" because the "authority lies solely with the county clerk's office," its "unofficial, non-attorney, advice to the county clerks would be to err on the side of the voter and accept the registrations." *Id.* ¶ 22, Ex. A.

Finally, on February 12, 2024, Ms. Foster again wrote to the Secretary of State's office and asked, among other questions: "For registration purposes, should digital signatures be treated

APP41

differently than 'wet' signatures?" *Id.* ¶ 22, Ex. B. On February 14, 2024, the Secretary of State's office stated: "[T]he Secretary of State does not see how a digital signature should be treated any differently than a wet signature." *Id.* ¶ 22, Ex. B.

Based on these repeated assurances, GLA invested time and resources in rolling out and promoting its new voter registration tool at community events, schools, and other places where it seeks to register voters. *Id.* ¶ 16–18. And it set a goal of registering over 9,000 voters—nearly quadruple its goal for 2023—which seemed easily attainable given the efficiency and reach of its new voter registration tool. *See id.* ¶¶ 8, 31.

## IV.    Weeks later, state officials issued the wet signature rule despite the Attorney General's confirmation that electronic signatures are permitted.

Despite its earlier representations to GLA, the Secretary of State's office abruptly reversed course just weeks later. On February 28, 2024—two days after the Arkansas Times reported on GLA's success registering new voters, "especially young ones" with its online tool[3]—the Secretary wrote a letter to all county clerks, stating: "It has come to my attention that there have been some entities registering citizens to vote by electronic applications and signature. . . . I strongly recommend that counties do not accept voter registration applications executed by electronic signature." Dodge Decl., Ex. B. The Secretary's two-paragraph letter provided no explanation or legal basis for his sudden shift in position. *Id.*, Ex. B.

On March 12, 2024—having already advised county clerks to reject applications with electronic signatures—the Secretary of State belatedly asked the Attorney General for an opinion on the lawfulness of such signatures on voter registration applications. The Secretary wrote:

---

[3] Mary Hennigan, *Get Loud Arkansas sees success in new voter registration strategy*, Ark. Times (Feb. 26, 2024), https://arktimes.com/news/2024/02/26/get-loud-arkansas-sees-success-in-new-voter-registration-strategy/.

> My office has received inquiries regarding the use of electronic voter registration applications, created by a third-party non-governmental agency, that include an electronic signature. These applications are then either printed out and turned in or sent electronically to county clerks. I'm asking for a formal opinion from your office as to whether this practice is allowed under Arkansas law.

*Id.*, Ex. C. And, on April 10, 2024, the Attorney General issued an opinion stating that "an electronic signature or mark is generally valid under Arkansas law" and that:

> Consequently, given the historical acceptance of signatures produced through a variety of means, the widespread acceptance of electronic signatures, and the fact that Amendment 51 does not contain any restrictions on how a "signature or mark" may be made, I believe that an electronic signature satisfies Amendment 51's "signature or mark" requirement.

*Id.*, Ex. D at 1, 3 (Ark. Att'y Gen. Op. No. 2024-049 at 1, 3 (Apr. 10, 2024)). In other words, the Attorney General's opinion *confirmed* the Secretary's initial position that electronic signatures satisfy Amendment 51 and that GLA's tool complied with Arkansas law.

Nonetheless, after the Attorney General issued his opinion approving of electronic signatures, the SBEC, led by the Secretary, proceeded to issue an emergency rule prohibiting electronic signatures on voter registration applications. *See id.*, Ex. E.[4] The SBEC explained that its motivation for the emergency rule was to address a "difference in treatment for voter applicants, depending on which county they reside." *Id.*, Ex. E at 4–5, 14. The SBEC acknowledged the rule was issued in response to "third-party registration organizations" (*i.e.*, GLA) that had been assisting voters in submitting applications signed under penalty of perjury with an electronic signature. *Id.*, Ex. E at 4–5. And it repeatedly identified GLA as an organization likely to be impacted by the new rule, all but admitting the emergency rulemaking was specifically targeting GLA's new voter registration tool. *Id.*, Ex. E at 6–7.

---

[4] Before promulgating the emergency rule, the SBEC issued a declaratory order interpreting Amendment 51 to permit electronic signatures for voter registration applications that are processed through identified voter registration agencies, but not for mail applications. Dodge Decl., Ex. G.

The resulting "wet signature rule" bans electronic signatures on mail registration applications in three ways: First, it grafts non-textual language onto the term "signature or mark" in Amendment 51, redefining it to mean "a handwritten wet signature or handwritten wet mark made on a Registration Application Form with a pen or other writing device that is physically moved across the form and that forms the applicant's signature or mark on the paper form." *Id.*, Ex. F. Second, the wet signature rule provides that "[a] Signature or Mark that utilizes a computer to generate or recreate the applicant's signature or mark" is not acceptable, even though Amendment 51 imposes no such prohibition. *Id.*, Ex. F. Third, while Amendment 51 requires county clerks to accept voter registration applications that are "legible and complete," *see* Ark. Const. amend. 51 § 9(c)(1), (c)(3)(A), the wet signature rule adds that voter registration applications must also be "executed" with a "Signature or Mark" as defined by the rule—in other words, with a pen or other physical writing device. Dodge Decl., Ex. F.

Although the emergency rule expires on September 1, 2024, *id.*, Ex. E at 4, the SBEC has proposed a final rule that mirrors the text of the emergency rule.[5]

**V.   The wet signature rule impedes GLA's and VDO's registration efforts while also denying Arkansans the right to register and vote.**

*Get Loud Arkansas.* In pursuit of its mission to improve civic engagement in Arkansas, GLA's first and highest priority is to register new voters, and particularly young and minority Arkansans. Foster Decl. ¶¶ 8–9. During its brief time operating, GLA's tool achieved remarkable success; it not only helped GLA register an unprecedented number of voters, but also made GLA's

---

[5] Per procedures adopted on June 12, 2024, the SBEC opened a comment period on the proposed final rule on June 14, concluding on July 14, and with a public hearing scheduled for July 11. Dodge Decl., Ex. H. The SBEC plans to meet on July 15 such that public comments can be addressed before the Arkansas Legislative Council can consider and approve the final rule at its August 16, 2024 meeting. *Id.*, Ex. H.

APP44

own outreach efforts more effective and cost-efficient. *Id.* ¶¶ 15–16. For example, it became easier for GLA to disseminate the application electronically using QR codes and text messages, as compared to traditional paper forms. *Id.* ¶¶ 17–19. Indeed, many people who registered through GLA's online tool forwarded the link to friends and family—something that cannot be done with paper applications—which helped further GLA's reach to all 75 counties in Arkansas. *Id.* ¶ 19; *see also* Declaration of Blake Loper ("Loper Decl.") ¶¶ 5–6. In the short time the online tool was available, GLA saw significantly higher rates of successful voter registration. Foster Decl. ¶ 20.

The Secretary of State's about-face and the SBEC's subsequent issuance of the wet signature rule have seriously harmed GLA and continue to do so. After taking it offline for weeks, GLA was forced to redesign its online tool to account for the prohibition on the use of electronic signatures, rendering it far less effective. *Id.* ¶¶ 29–30. While applicants may still prefill their application with personal information, they now must print it out themselves, sign it with a wet signature, and mail or deliver it to their county clerk. *Id.* ¶ 30. Not only does this take far longer than the two minutes required by the original tool, it renders the tool useless to those without ready access to a printer. *Id.* ¶ 30. Unsurprisingly, GLA has seen its success rate at registering voters plummet. *Id.* ¶ 31. With the original tool in place, nearly 100 percent of applicants fully completed the application and had it submitted; but without the electronic signature option, that rate stands closer to 33 percent. *Id.* ¶ 20. At the same time, the wet signature rule has made it far more difficult to reach potential voters beyond those 15 counties on which GLA traditionally focused its efforts, especially in rural counties. *Id.* ¶ 18.

Because it may not rely on the tool to achieve its voter registration goals, GLA has also been forced to divert its limited staff and financial resources towards less efficient means of registering voters, including renewed use of paper registration applications and more staff-

APP45

intensive efforts for engaging voters, encouraging them to register, and subsequently reminding them to complete and submit their applicants. *Id.* ¶ 32. This unexpected pivot has come at the expense of GLA's other programming, as GLA has been forced to redirect significant staff time and financial resources away from other initiatives, including its GOTV campaign and its efforts to assist individuals who may have been incorrectly purged from the voter rolls. *Id.* ¶¶ 33–34.

***Vote.org.*** The wet signature rule has similarly impaired VDO's efforts in Arkansas. Nationwide, one of the most effective features of VDO's tools has been the e-sign function, which allows qualified voters in states across the country to digitally enter information into a voter registration application, sign the application by uploading an image of their original signature, review their signed voter registration application, and then have the completed application sent to the appropriate registration official. Hailey Decl. ¶ 8. VDO has invested significant resources in developing this e-sign function and would like to offer it to applicants in Arkansas, just as it has done in other states. *Id.* ¶ 9. But it cannot do so for the upcoming 2024 elections and beyond because of the wet signature rule. *Id.*

Consequently, the wet signature rule impedes VDO's voter registration activities and impairs its ability to accomplish its mission by forcing it to rely on less effective means of assisting voters to register. *Id.* ¶ 10.

***Individual Voters.*** Many otherwise qualified Arkansans have had their voter registration applications rejected for using an electronic signature, including Plaintiffs Nikki Pastor and Blake Loper.

Nikki Pastor, who grew up in Clinton, Arkansas, has been a resident of Washington County, Arkansas since August 2023. Declaration of Nikki Pastor ("Pastor Decl.") ¶ 4. On February 24, 2024, Pastor completed a registration application using GLA's online tool. *Id.* ¶¶ 7–

APP46

9. Pastor gave GLA approval to print the application and submit it to the Washington County Clerk, which GLA did. *Id.* ¶ 9. But Pastor's application was rejected by the Washington County Clerk for its use of an electronic signature. *Id.* ¶ 11.

Blake Loper grew up in Dardanelle, Arkansas, in Yell County, and has been a resident of Russellville, in Pope County, since November 2022. Loper Decl. ¶ 3. After moving to Pope County from Yell County, Loper used GLA's online tool to complete and sign a voter registration application to match their new address. *Id.* ¶¶ 4–5. Loper authorized GLA to print and submit the application to the Pope County Clerk, which GLA did. *Id.* ¶¶ 5, 7. But in a notice dated May 2, 2024, Loper was informed by the Pope County Clerk that the application was rejected for its use of an electronic signature. *Id.* ¶ 8, Ex. A.

In addition to Pastor and Loper, many other Arkansans have similarly had their registration applications denied after using GLA's online tool. For example, dozens of high school students in Camden, Arkansas, in Ouachita County, used GLA's online tool to complete and sign applications that were subsequently rejected. Foster Decl. ¶ 27. Absent relief here, any other Arkansan who submits an otherwise legible and complete mail application with an electronic signature will suffer the same rejection.

## LEGAL STANDARD

In determining whether to issue a preliminary injunction, a district court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (alteration in original) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). "Although no single factor

is dispositive, and the district court must balance all factors to determine whether the injunction should issue, the third factor—probability of success—is the most significant." *Id.* (cleaned up).

**ARGUMENT**

I.     **The Civil Rights Act of 1964 prohibits state officials from rejecting voter registration applications for errors that are immaterial in determining a person's qualifications to vote.**

Congress enacted the Civil Rights Act of 1964 "to protect and provide more effective means to enforce the civil rights of persons within the jurisdiction of the United States," and particularly to reduce "obstacles to the exercise of the right to vote and provide means of expediting the vindication of that right." H.R. Rep. No. 88-914, *as reprinted in* 1964 U.S.C.C.A.N. 2391, 2391. In Title I of the Act, Congress sought to eliminate arbitrary denials of the right to vote based on irrelevant paperwork errors that election officials often used to the disenfranchise Black citizens. *See id*. at 2393.

Congress had good reason to be concerned about such methods of disenfranchisement. Extensive testimony showed that many local registrars rejected Black applicants based on hyper-technical or entirely invented errors, while they ignored more substantive errors when the applicants were white. *See* Justin Levitt, *Resolving Election Error: The Dynamic Assessment of Materiality*, 54 Wm. & Mary L. Rev. 83, 147–48 (2012). One infamous example was an application that was rejected because the applicant failed to properly calculate her age in years, months, and days; she missed the mark by one day because the day had not yet ended. *Id.* at 148 (citing legislative record); *see also Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995). Similarly, during this same period, an application in Louisiana was rejected because the applicant misspelled their state as "Louiseana." Levitt, *supra*, at 148 (citing legislative record). Other applications were rejected because the applicant identified their skin color as "Negro" instead of

12

"brown" or "brown" instead of "Negro," and because an applicant underlined "Mr." when he should have circled it. *Id.* (citing legislative record).

These practices resulted in disparate voting opportunities for non-white voters in many states, including in Arkansas. In 1961, for example, the U.S. Commission on Civil Rights observed that Black Arkansans remained disproportionately unregistered to vote compared to white Arkansans. *See Voting: 1961 Commission on Civil Rights Report, Book 1* at 105, U.S. Comm'n on C.R. (Sept. 9, 1961).[6] As arbitrary barriers continued to disenfranchise voters, Congress determined that national legislation was necessary to extinguish election officials' persistent attempts to evade civil rights protections.

In the 1964 Civil Rights Act, Congress, in its effort to eradicate persistent voter suppression tactics, prohibited state officials from using trivial paperwork errors to deny *any* citizen the right to vote. Specifically, Section 101 of the Act states in part:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]

52 U.S.C. § 10101(a)(2)(B). Under this statute—often referred to as the materiality provision— states can no longer use arcane rules and administrative traps to prevent qualified voters from exercising their fundamental right to vote.

The materiality provision's text prescribes three elements for a claim under the law: (1) the denial of any individual's right to vote, as the Civil Rights Act defines that term; (2) because of an error or omission on any paper relating to registration or other act requisite to voting; (3) where such error or omission is not material in determining whether an individual is qualified to vote

---

[6] Available at https://perma.cc/CC7B-T888.

under state law. *Id.*; *see also League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2023 WL 6446015, at *16–18 (W.D. Ark. Sept. 29, 2023). Plaintiffs are likely to succeed in establishing those elements here.

## II.    Plaintiffs are likely to succeed on their claim that the wet signature rule violates the materiality provision of the Civil Rights Act.

Rejecting a voter registration application based on the instrument an applicant uses to sign their registration form is precisely the kind of disenfranchisement that Congress sought to prevent when it enacted the Civil Rights Act of 1964. A straightforward application of the materiality provision compels the conclusion that the wet signature rule cannot pass muster, and Plaintiffs are likely to succeed on the merits of their claim.

### A.    Rejecting an applicant's registration form constitutes a denial of the right to vote under the Civil Rights Act.

The first element of a materiality provision claim is whether a challenged state law or practice "den[ies] the right of any individual to vote in any election." 52 U.S.C. § 10101(a)(2)(B). The Civil Rights Act defines "vote," as used in the materiality provision, to include "all action necessary to make a vote effective including . . . *registration*." *Id.* § 10101(e) (emphasis added); *see also id.* § 10101(a)(3) (incorporating definition for purposes of materiality provision). Thus, when Arkansas election officials reject voter registration applications under the wet signature rule, they deny Arkansans the statutory right to vote.

Federal courts have uniformly recognized that the term "vote" as used in the materiality provision includes not only the ultimate act of casting a ballot, but also successfully registering to vote in the first place. *See, e.g.*, *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003); *Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *37 (D. Ariz. Feb. 29, 2024).

It makes no difference that a prospective voter whose application is rejected under the wet signature rule may be able to submit a new application before the registration deadline. "Denial of

APP50

the statutory right to vote under Section 101 is complete when a particular application . . . is rejected; an opportunity to cure the rejection[ or] submit another application . . . does not negate the denial of the statutory right to vote." *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2023 WL 8263348, at *22 (W.D. Tex. Nov. 29, 2023) ("*LUPE*"), *stayed pending appeal sub nom. United States v. Paxton*, No. 23-50885 (5th Cir. Dec. 15, 2023) (per curiam); *see also Vote.org v. Ga. State Election Bd.*, 661 F. Supp. 3d 1329, 1339 (N.D. Ga. 2023) (rejecting "argument that the opportunity to cure an error rehabilitates any potential violation"); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1282 (N.D. Ga. 2021) (same).

Because the plain text of the Civil Rights Act is clear that rejecting a registration application denies individuals the right to vote for purposes of the materiality provision, Plaintiffs satisfy the first element of their claim.

**B.    The wet signature rule renders the use of an electronic signature an error or omission on a record related to registration.**

Once a plaintiff has shown that a challenged state rule denies the right to vote, they next must show that it does so because "of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). The wet signature rule is a requirement that applies to the signature or mark "made on a Registration Application Form," Dodge Decl., Ex. F, and thus straightforwardly concerns a "record or paper relating to any application [or] registration," 52 U.S.C. § 10101(a)(2)(B), satisfying the second element of the materiality provision. Indeed, federal courts have further uniformly agreed that the materiality provision applies to requirements about how to complete the information requested on voter registration forms. *See, e.g.*, *Schwier*, 340 F.3d at 1294.

The wet signature rule also makes it an "error or omission" to sign a voter registration application with anything other than a "handwritten wet mark made . . . with a pen or other writing

device that is physically moved across the form and that forms the applicant's signature or mark."
Dodge Decl., Ex. F. Thus, even when an otherwise qualified applicant uses an electronic signature
(or any other instrument) to sign the mail voter registration form, their application will be rejected
for the omission of a wet signature. Plaintiffs therefore satisfy the second element of their
materiality provision claim.

    **C.**    **The use of a wet signature is immaterial in determining whether an individual is qualified to vote under Arkansas law.**

A wet signature on a voter registration application is not material in determining voter
qualifications. The rule simply "increase[s] the number of errors or omissions on the application
forms, thus providing an excuse to disqualify potential voters," *Schwier*, 340 F.3d at 1294, and is
precisely the type of practice the materiality provision was enacted to prevent. *Id.* This is clear
from a review of Arkansas's substantive qualifications for voting; the State's acceptance of
electronic signatures for *other* kinds of voter registration applications; and from the plain text of
Arkansas's voter registration laws.

    **1.**    **The wet signature rule is immaterial on its face because it bears no relationship to Arkansas's substantive voter qualifications.**

"To determine whether an error or omission is material, the information required must be
compared to state-law qualifications to vote." *LUPE*, 2023 WL 8263348, at *14; *see also Martin
v. Crittenden*, 347 F. Supp. 3d 1302, 1308 (N.D. Ga. 2018); *Mi Familia Vota*, 2024 WL 862406,
at *37. The qualifications to vote under Arkansas law consist of: (1) U.S. citizenship, (2) Arkansas
residency, (3) being at least eighteen years old, (4) not having been convicted of a felony, and (5)
not having been adjudged mentally incompetent by a court. *See* Ark. Const. art. 3, § 1(a); Ark.

Const. amend. 51 § 11(a).[7] The instrument a prospective voter uses to sign their registration application bears no relationship to any of these qualifications. Tellingly, when issuing the wet signature rule, the SBEC nowhere explained how the use of a wet signature is even "useful or minimally relevant"—never mind "material"—in "determining a person's eligibility to vote." *Mi Familia Vota*, 2024 WL 862406, at \*37 (explaining that required information be "*more* than useful or minimally relevant" to survive scrutiny under materiality provision (emphasis added)). And critically, county election officials do not consider the type of instrument used in signing or marking a voter registration application as a factor in determining whether the applicant is or is not qualified to vote in Arkansas. *See* Declaration of Susan Inman ("Inman Decl.") ¶¶ 15–20.

> **2.     The wet signature rule cannot be material in determining voter qualifications because the Arkansas Constitution explicitly allows for electronically signed voter registration applications.**

Arkansas's voter registration procedures also confirm that a wet signature is immaterial in determining voter qualifications. As explained, *supra* Background Part I, Arkansas permits a person to register to vote at various state agencies, like ODS. *See* Ark. Const. amend. 51 § 5(a). These agencies may employ a "computer process" to register applicants, which permits use of an electronic signature on digital applications. *Id.* § 5(b)(1)–(4). In other words, many of the registration applications received and approved by Arkansas's election officials—either through ODS or another state agency—are signed with electronic signatures. *See* Inman Decl. ¶¶ 18–19.

---

[7] Although Arkansas also requires voters to be "[l]awfully registered to vote in the election," Ark. Const. art. 3, § 1, it does not follow that every state registration requirement is, *ipso facto*, material. That logic "would erase the Materiality Provision from existence, by defining *whatever* requirements might be imposed by state law in order to vote, no matter how trivial, as being material in determining whether such individual is qualified under State law to vote in such election." *LUPE*, 2023 WL 8263348, at \*14 (quotation marks omitted); *cf. United States v. Mississippi*, 380 U.S. 128, 137–38 (1965) (phrase "otherwise qualified by law" in Section 10101(a)(1) cannot include invalid statutes; Congress "obviously" meant "qualifications required of all voters by valid state or federal laws").

That forecloses any argument that a wet signature is necessary to determine voter qualifications. The SBEC's rulemaking nowhere explained why an electronic signature is material in one context, but not another.

> **3.      The wet signature rule is contrary to the Arkansas Constitution and thus does not serve any conceivable legislative purpose.**

The wet signature rule also cannot be rationalized by any legislative judgment that a handwritten signature is material in determining voter qualifications (even assuming such judgment matters for purposes of satisfying a federal law). On the contrary, Amendment 51 provides that election officials "shall register" qualified applicants who submit "a legible and complete voter registration application." Ark. Const. amend. 51 § 9(c)(1). And while a signature or mark is required to complete an application, there is no requirement that the signature be applied with any specific instrument. Indeed, the only express requirement is that the signature or mark be "made under penalty of perjury" and affirm "that the applicant meets each requirement for voter registration." *Id.* § 6(a)(3)(F). Although the Arkansas Legislature has frequently modernized Amendment 51 in the last three decades, it has never added any further qualification, reflecting the legislative intent that a voter registration application is complete—and must be accepted by a county clerk—with *any* signature made under penalty of perjury that affirms the accuracy of the application. The SBEC's wet signature rule attempts to supplement the Constitution's text with additional requirements—that the signature is "wet."

Indeed, the SBEC's effort to graft language onto Amendment 51 violates basic rules of statutory construction, including that statutory terms must be read in a "consistent, harmonious, and sensible" manner in view of the "act in its entirety." *Holbrook v. Healthport, Inc.*, 432 S.W.3d 593, 597 (Ark. 2014). Section 6 of Amendment 51 uses the phrase "signature or mark" twice to explain what is required on (1) the mail application form, and (2) in the process used by the ODS

APP.54

and other qualified voter registration agencies that indisputably allow use of an electronic signature. Ark. Const. amend. 51 § 6(a)(3)(F), (b)(1)(G). That phrase—"signature or mark"—presumably has the same meaning in each case. After all, courts presume "that identical words used in different parts of the same statute have the same meaning." *United States v. Pulsifer*, 39 F.4th 1018, 1022 (8th Cir. 2022), *aff'd*, 601 U.S. 124 (2024); *accord* Antonin Scalia & Bryan A. Garner, *Reading the Law: The Interpretation of Legal Texts* 170 (2012). And here the phrase "signature or mark" is used twice not merely in the same statute, but in the very same subsection of the Arkansas Constitution.

The SBEC's interpretation of the term "signature or mark" turns this fundamental rule of statutory construction on its head. It is undisputed that the term "signature or mark" includes electronic signatures when used in reference to the computer process employed by ODS and certain other public agencies. Ark. Const. amend. 51 § 6(b)(1)(G); *see also* Dodge Decl., Ex. G at 2 (SBEC explaining that a county clerk may accept an application that is electronically signed if it comes from an identified registration agency). But according to the SBEC, the very same term, used in the very same section, *excludes* electronic signatures when used in the context of the mail form. Dodge Decl., Ex. G at 9–10; *see also* Ark. Const. amend. 51 § 6(a)(3)(F). Nothing in the text of Amendment 51 supports providing such disparate meanings to the same terms, as employed in the same section. In contrast, giving a consistent definition to the term "signature or mark"—text which on its face includes electronic signatures—harmonizes the two uses of the term in Amendment 51, making clear that county clerks "shall" accept any complete and legible application made with a signature under penalty of perjury. *See Holbrook*, 432 S.W.3d at 597.

That plain text reading of Amendment 51 is bolstered by the Attorney General's advisory opinion, which similarly explained that "[t]he Arkansas Constitution does not define a 'signature

APP55

or mark,' nor does it specify how a signature or mark may be made," and accordingly, "an electronic signature satisfies Amendment 51's 'signature or mark' requirement." Dodge Decl., Ex. D at 2–3. These acknowledgments from "the attorney for all state officials," Ark. Code Ann. § 25-16-702(a) (describing duties of Attorney General), and the State's "chief election official," Ark. Const. amend. 51, § 5(b)(1) (duties of Secretary), further confirm that a wet signature is not material in determining voter qualifications in Arkansas. And the Secretary's own representations to GLA make clear that, before the wet signature rule, it was uncontroversial that electronic signatures satisfied Amendment 51. While the Secretary later sent a letter—bereft of legal analysis—reversing his office's earlier opinion, his own "attorneys [previously] came to the same conclusion [as GLA] about the" meaning of Amendment 51. Foster Decl. ¶ 22, Ex. A. And the Secretary himself "d[id] not see how a digital signature should be treated any differently than a wet signature." *Id.*, Ex. B.

### 4.    Other purported state interests in enforcing the wet signature rule do not make wet signatures material in determining voter qualifications.

Defendants also cannot try to rationalize the wet signature rule by pointing to some other purpose apart from determining voter eligibility. As the plain text of the statute makes clear, state actors violate the materiality provision if they deny any individual the right to vote based on a requirement that is immaterial "in determining whether such individual is qualified . . . to vote." 52 U.S.C. § 10101 (a)(2)(B). The rules governing a voter's qualification to register are "distinct from rules governing the conduct of elections." *LUPE*, 2023 WL 8263348, at *14, *16 (citing *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 13–17 (2013), and *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966)). Thus, "the wisdom of the [wet signature rule] is entirely irrelevant to the Court's analysis of Plaintiffs' Section 101 claims on the merits" because "the Materiality Provision is not a burden-interest balancing statute. Materiality Provision

violations are prohibited no matter their policy aim." *Id.* at \*8; *see also Schwier v. Cox*, 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th Cir. 2006) (holding preventing "fraud" did not render mandatory disclosure of social security number "material").

In any event, county election officials do not consider the type of instrument used in signing a voter registration application as a factor in determining whether an applicant is qualified to vote. *See* Inman Decl. ¶¶ 15–20. County clerks are advised to accept voter registration applications with any type of signature or mark, *id.* ¶ 16, and there is no practice among county clerks of rejecting voter registration applications based on the quality or method of the signature, *id.* ¶ 17. Nor does the wet signature rule serve any function in determining the qualifications of absentee voters. While an absentee ballot application signature is compared to the voter's signature on their voter registration application, the comparable signature is *frequently* an electronic signature, since many voter registration forms come from voter registration agencies where applications are signed electronically. *Id.* ¶¶ 18–19. Additionally, when election officials compare signatures, they generally are viewing PDF scans of the signatures, and as a practical matter, it is very difficult to tell the difference between a signature made by pen and a signature made by a stylus (with electronic ink) or a digital image of a handwritten signature that is then printed and submitted. *Id.* ¶ 19. The wet signature rule therefore serves no function whatsoever in determining voters' qualifications.

Moreover, the SBEC was explicit that the purpose of the wet signature rule was to "resolve a conflict among county clerks" and promote "uniformity across the state." *See, e.g.*, Dodge Decl., Ex. E at 4–5; *id.*, Ex. I at 15:16–17. That explanation has nothing to do with determining a voter's qualifications, and thus provides no answer to Plaintiffs' materiality provision claim. And it is also unpersuasive on its own terms. Rather than promote uniformity, the wet signature rule establishes

Appellate Case: 24-2810   Page: 86   Date Filed: 09/06/2024   Entry ID: 5432887

APP57

a two-tiered system that allows some voters to sign their application forms electronically (such as those who do so at ODS) while denying the same right to others (those who mail or hand deliver an application at their county clerk's office). In contrast, Plaintiffs' construction ensures complete uniformity across the state, guaranteeing that all Arkansans may use electronic signatures regardless of where or how they register to vote. That construction is consistent with the Legislature's command that county clerks "shall" accept legible and complete voter registration forms signed under penalty of perjury. Ark. Const. amend. 51, § 9(c)(1), (c)(3)(A).

> **5.     Neither the Fifth Circuit's nor a Florida district court's determination that a wet signature requirement was material requires the same result here.**

For at least two reasons, this Court should not rely on *Vote.org v. Callanen*, 89 F.4th 459 (5th Cir. 2023), or *Vote.org v. Byrd*, No. 4:23-CV-111-AW-MAF, 2023 WL 7169095 (N.D. Fla. Oct. 30, 2023), for those courts' determinations that a wet signature requirement on a voter registration application is material in determining voter qualifications.

First, this case is distinguishable. Arkansas's wet signature rule is unsupported by any legislative judgment, *supra* Argument Section II.C.3, whereas the wet signature requirements at issue in *Callanen* and *Byrd* were each enacted by the state legislature. *See Callanen*, 89 F.4th at 468 (noting Texas's wet signature requirement was passed by the Texas Legislature and signed by the Governor); *Byrd*, 2023 WL 7169095, at *1 (describing Fla. Stat. § 97.053(5)(a)(8)). The fact that Texas's wet signature requirement was a legislative enactment was critical in *Callanen*, where the Fifth Circuit gave deference to the "state legislature's judgment" as to the utility of the wet signature requirement. *Callanen*, 89 F.4th at 489. Thus, if this Court were to follow *Callanen* (which it need not), "[a]mong the questions for [it] to answer [would be] the weight that should be given to the State's legislative judgment" as to the materiality of a wet signatures on a voter registration form. *Id.* at 480. The answer to that question here is clear: none whatsoever. The wet

signature rule was not enacted by the Arkansas Legislature and there is no mention of a wet signature requirement in the Arkansas Constitution or the election code. Moreover, the wet signature rule runs contrary to the Legislature's choice to require only a "signature or mark" from applicants, without any command as to what instrument must be used. *See supra* Argument Sections II.C.2–II.C.3. Accordingly, even assuming that *Callanen* was correctly decided, that decision *supports* finding that the wet signature is immaterial under Arkansas law.

Second, the reasoning in *Byrd* and *Callanen* was flawed, and this court need not (and should not) follow it. Both courts ignored the plain text of the Civil Rights Act, which requires that the challenged requirement be "material *in determining voter qualifications*" to conclude that an invented—and entirely amorphous—interest in solemnity was enough to justify state laws requiring wet signatures in connection with voting. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). Based on this flawed reasoning, the district court in *Byrd* dismissed a challenge to a Florida law requiring prospective voters who have not provided an electronic signature to the Department of Highway Safety and Motor Vehicles ("DMV") to complete a paper registration application signed with their "original signature." 2023 WL 7169095, at *1. In doing so, the district court erroneously concluded at the pleading stage that—because a wet-ink signature purportedly "carries a solemn weight" that other types of signatures do not—it must be "material" for purposes of the materiality provision. *Id*. at *6. And the *Byrd* court further erred by failing to grapple with the fact that—as in Arkansas—Floridians who register to vote at the DMV may do so using an electronic signature, undercutting the idea that such signatures lack the necessary "solemnity" for voter registration. That court nowhere explained why the state of Florida had an interest in the "solemnity" of some prospective voters but not others.

APP59

Similarly, in *Callanen*, the Fifth Circuit concluded on summary judgment—again, with no supporting evidence in the record—that a Texas statute requiring individuals to sign their voter registration applications using their "original" or wet signature "fit within the strictures of the Materiality Provision" because "applying an original signature to a voter registration form carries 'solemn weight' that an imaged signature does not." *Callanen*, 89 F.4th at 489. Those courts' common conclusion is flawed because "solemnity" is not a qualification to vote, and the materiality provision's plain language does not authorize courts to invoke abstract state interests to justify the denial of a registration application for immaterial paperwork errors. *See supra* Argument Section II.C.4.

As applied here, the confused logic of *Byrd* and *Callanen* leads to the untenable conclusion that voters who register at ODS using an electronic signature filled out their applications in an insufficiently "solemn" manner, even though Arkansas law allows them to do so. *See supra* Argument Section II.C.2. The SBEC therefore has no basis to say that a wet signature is material in determining the voter qualifications of applicants who submit their applications in person or by mail to their county clerk's office.

**III.    Absent relief, Plaintiffs will face continued and ongoing irreparable harm because of the wet signature rule.**

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024) (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). Here, both the organizational Plaintiffs (GLA and VDO) and the individual Plaintiffs (Pastor and Loper) are suffering irreparable harm from the wet signature rule. The harms they face are "of such imminence that there is a clear and present need for equitable relief." *Id.* (quoting *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 951 (8th Cir. 2023)).

First, both GLA and VDO face irreparable harm because the wet signature rule directly forbids them from using their most effective tools for registering new voters in Arkansas, interfering with their core activities and undercutting their mission. *See* Dodge Decl., Ex. E at 6. Because of the wet signature rule, GLA has been forced to redesign its voter registration tool in a way that makes it far less effective. Foster Decl. ¶¶ 29–32. And VDO cannot activate the e-sign function for its Arkansas online tool at all. Hailey Decl. ¶¶ 9–10.

The wet signature rule also forces both GLA and VDO to expend resources in a manner that impairs their organizational missions. "Courts routinely recognize that organizations suffer irreparable harm when a defendant's conduct causes them to lose opportunities to conduct election-related activities, such as voter registration and education." *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) (collecting cases). Here, the wet signature rule imposes upon GLA the untenable choice of having to pare back its voter registration goals or, in order to maintain such goals, scale down its other civic engagement initiatives. Foster Decl. ¶¶ 31, 35–36. Similarly, VDO is prevented from employing its e-sign function for its Arkansas online tool, and it will be forced to rely on less effective means of assisting voters to register in the state. Hailey Decl. ¶ 10. The impact on both organizations comes at the expense of their activities aimed at encouraging and supporting voter participation in the upcoming 2024 elections, such as GOTV and voter assistance programs. Foster Decl. ¶¶ 33–34; Hailey Decl. ¶¶ 6, 10. "Such mobilization opportunities cannot be remedied once lost," *In re Georgia Senate Bill 202*, No. 1:21-CV-01259-JPB, 2023 WL 5334582, at *11 (N.D. Ga. Aug. 18, 2023) (quotation omitted), because "once the election occurs, there can be no do-over and no redress," *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also Emineth v. Jaeger*, 901 F.

Supp. 2d 1138, 1142 (D.N.D. 2012) ("Elections are, by nature, time sensitive and finite. While there will be other elections, no future election will be *this* election.").

Second, as to Pastor and Loper, there is no legal remedy that can compensate them for the loss of the opportunity to register with an electronic signature and subsequently vote in the 2024 elections. *See Fayetteville Pub. Libr. v. Crawford County*, 684 F. Supp. 3d 879, 910–11 (W.D. Ark. 2023). The right to vote is fundamental, and "[o]ther rights . . . are illusory if the right to vote is undermined." *Reynolds v. Sims*, 377 U.S. 533, 560 (1964). The materiality provision "protects the franchise of United States citizens [and] the failure to comply with that [statute] is an irreparable harm." *United States v. Georgia*, 892 F. Supp. 2d 1367, 1375 (N.D. Ga. 2012). Absent a preliminary injunction, Plaintiffs Pastor and Loper are irreparably deprived of a right guaranteed by the Civil Rights Act: to register and subsequently vote without denial of that right "because of an error or omission . . . [that] is not material in determining whether such individual is qualified . . . to vote." 52 U.S.C. § 10101(a)(2)(B); *see also League of Women Voters of N.C.*, 769 F.3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (same).

**IV.    The remaining equitable factors strongly favor granting a preliminary injunction.**

"The balance-of-harms and public-interest factors 'merge when the Government'—or, in this case, a state official in [their] official capacity—'is the [nonmoving] party.'" *Eggers v. Evnen*, 48 F.4th 561, 564–65 (8th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The balance of interests here favors granting a preliminary injunction. Most obviously, absent an injunction, Arkansas voters will be denied a right guaranteed by federal statute: to have otherwise legible and complete voter registration applications accepted by their county clerks

regardless of any immaterial errors or omissions. Likewise, the efforts of civic organizations like GLA and VDO to assist Arkansas voters to register to vote will be hampered by enforcement of the wet signature rule. Foster Decl. ¶¶ 20, 31, 35–36; Hailey Decl. ¶¶ 8–10. "[E]nsuring qualified voters exercise their right to vote," on the other hand, "is always in the public interest." *Ashcroft*, 336 F. Supp. 3d at 1006 (quoting *Action NC v. Strach*, 216 F. Supp. 3d 597, 648 (M.D.N.C. 2016)); *see also Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 672 (8th Cir. 2022); *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) ("The public is served by the preservation of constitutional rights." (quotation omitted)); *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). Granting preliminary relief here also fulfills Congress's purpose in enacting the materiality provision. *See* 1964 U.S.C.C.A.N. at 2394.

In contrast, none of the Defendants will be harmed by an injunction. Indeed, it is hard to fathom how an injunction could impose any harm on Defendants when both the Secretary of State and Attorney General previously acknowledged that the use of electronic signatures is entirely consistent with Arkansas law. *See supra* Background Parts III–IV. The SBEC's only justification for the emergency rule was to provide uniformity and clarity to voter registration in Arkansas. Dodge Decl., Ex. E at 1–2. But, as explained, any lack of clarity here was *created* by the Secretary's sudden about-face on electronic signatures and Plaintiffs' requested injunction would ensure uniformity across Arkansas. *See supra* Argument Section II.C.4. Thus, the equitable factors unequivocally favor granting Plaintiffs' Motion for Preliminary Injunction.

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction enjoining Defendants from enforcing the wet signature rule and from refusing to accept any voter registration application simply because it was signed with a digital or electronic signature.

Dated: July 11, 2024

Respectfully submitted,

*/s/ Uzoma N. Nkwonta*

**SHULTS LAW FIRM LLP**
Peter Shults (Ark. 2019021)
Amanda G. Orcutt (Ark. 2019102)
Steven Shults (Ark. 78139)
200 West Capitol Ave., Suite 1600
Little Rock, AR 72201
T: (501) 375-2301
F: (501) 375-6861
pshults@shultslaw.com
aorcutt@shultslaw.com
sshults@shultslaw.com

**ELIAS LAW GROUP LLP**
Uzoma N. Nkwonta* (DC 975323)
Christopher D. Dodge* (DC 90011587)
Omeed Alerasool* (DC 90006578)
Julie Zuckerbrod* (DC 1781133)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
F: (202) 968-4498
unkwonta@elias.law
cdodge@elias.law
oalerasool@elias.law
jzuckerbrod@elias.law

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

APP64

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served this 11th day of July, 2024, with a copy of this document via the Court's CM/ECF system.

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| GET LOUD ARKANSAS, et al., | |
| Plaintiffs, | Civil Action |
| *v.* | Case No. 5:24-cv-05121-TLB |
| JOHN THURSTON, et al., | |
| Defendants. | |

**DECLARATION OF KRISTIN FOSTER**

I, Kristin Foster, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I was born in Russellville, Arkansas and currently reside in Dardanelle, Arkansas. I earned an undergraduate degree in Communication from Rockford University in Rockford, Illinois and have worked in nonprofit management since 2012.

3.      I currently serve as Deputy Executive Director of Get Loud Arkansas ("GLA"), a nonprofit organization founded by then-State Senator Joyce Elliott to combat the state's alarmingly low rates of voter registration and civic participation.[1]

4.      I have served in this position since December 2021. In my role, I am responsible for planning and directing projects, managing the organization's budget and finances, and supervising day-to-day operations.

---

[1] Senator Elliott served as a member in the Arkansas House of Representatives, from 2001 to 2007, and, served as a Senator in the Arkansas Senate on behalf of Pulaski County, from 2009 to 2023.

1

5.      GLA's mission is to improve civic participation in Arkansas by registering voters, engaging low propensity voters, and mobilizing all voters to use the power of their vote to shape the future of Arkansas.

6.      Since its founding, GLA has invested significant resources in developing the most effective means of increasing voter participation in Arkansas, especially among young and minority voters, who have historically faced disproportionate barriers to voting.

7.      In pursuit of its mission to promote civic engagement in Arkansas, GLA has launched several initiatives. GLA's website offers tools that allows a voter to find their polling location and confirm their voter registration status. GLA has implemented get-out-the-vote ("GOTV") campaigns in the lead-up to recent elections, including by organizing volunteers to engage in text banking to voters and by investing in advertisements to encourage voting among younger voters. GLA has developed a program to identify and assist voters who are periodically purged from Arkansas's voting lists, a labor-intensive effort that requires GLA staff and volunteers to make repeated contacts with such voters to ensure they are re-registered. GLA has launched a campaign to raise awareness of and promote citizen involvement in local government, including by publishing information to educate Arkansans across the state about upcoming elections and local government hearings. And GLA has started building voter protection teams to monitor and document changes to local election rules, including last minute changes to polling locations, which are often passed without widespread public awareness.

8.      Although all of these initiatives are critical to GLA's mission to promote civic engagement in Arkansas, registering voters is the organization's top priority. Our 10-year voter registration goal is to register 100,000 voters. We also set annual registration goals based on past success and our expected capacity for reaching greater numbers of Arkansans in the future. For

example, our annual goal for 2021, the year GLA was founded, was 1,000 registrations—we registered 1,179 voters. Similarly, our annual goal for 2023 was 2,327 registrations—we registered 3,731 voters. For 2024, our goal is 9,081 registered voters.

9.      Accordingly, over the past year, GLA's primary focus has been to create the most effective and accessible tools for Arkansans, and particularly young and minority Arkansans, to register to vote. Historically, GLA has used paper applications to register new voters. But GLA learned through experience that disseminating and tracking paper applications, along with educational resources to help voters properly return those applications, is often a time-consuming and cumbersome process when trying to register large numbers of voters. GLA also learned that many Arkansans, especially those in rural areas, do not have the means to easily print and submit paper applications.

10.      As a result, GLA dedicated significant staff time and financial resources towards creating an online tool that allows applicants to fill out the voter registration application created by the Secretary of State using a computer, phone, or tablet.

11.      In January 2023, GLA piloted on its website a partially digital online tool that allowed an applicant to complete a voter registration application online. GLA would print and mail the applicant a copy of their completed application, which the applicant could hand-sign. And then either the applicant or GLA—with authorization from the applicant—would return the application to the appropriate county clerk. Although this process was more efficient than disseminating blank paper applications, GLA found that printing, signing, and mailing the application back to a county clerk continued to impose barriers for many voters and significant costs—both financial and in terms of staff time—on GLA.

12.      In July 2023, GLA added an option for applicants to sign their completed

APP68

application forms with an electronic signature. While we piloted this feature, applicants still had the option to print applications and sign their applications before submitting them to their respective county clerks.

13.     Then, in January 2024, GLA officially launched an entirely digital online tool through which an applicant could complete and sign a voter registration application electronically.

14.     To use the online tool, an applicant would go to GLA's website and click on the tab on the top banner titled "Register to Vote." The applicant was then prompted to fill in information to populate the Secretary of State's voter registration form, including all the information required by Amendment 51 § 6. The applicant was then required to use their finger, stylus, or mouse to sign their name, under penalty of perjury, above the same sworn statement that appears on the application form issued by the Secretary of State. This information, and the signature, was then entered into the Secretary of State's form, which the applicant was able to review and save before authorizing GLA to print and submit it to the applicant's county clerk.

15.     The launch of GLA's online tool was highly successful. For example, a February 26, 2024 article in the Arkansas Times highlighted GLA's success registering hundreds of new voters.[2] The article reported that 358 people had already used the tool to register to vote in the early months of 2024, and that 78 percent of the new registrants were under 20 years old.

16.     The online tool not only helped Arkansans register to vote—it also made GLA's own outreach efforts more cost-effective and scalable. By allowing applicants to complete the Secretary of State's voter registration application on a personal device, GLA was able to engage with a far greater numbers of potential applicants at community events, schools, and other places

---

[2] Mary Hennigan, *Get Loud Arkansas sees success in new voter registration strategy*, Ark. Times (Feb. 26, 2024), https://arktimes.com/news/2024/02/26/get-loud-arkansas-sees-success-in-new-voter-registration-strategy/.

where it seeks to register voters. And it was easier for GLA to table at outdoor events, where inclement weather sometimes made it impossible for people to complete paper applications. GLA staff and volunteers found it far easier to instruct large groups of applicants at schools or public events on how to complete the registration application on their phones or laptops rather than having to distribute clipboards and paper applications.

17.     Before we launched the full-featured online tool, GLA had not spent much time on registration efforts at high schools because of the significant staff time and financial costs required, particularly because the only place from which physical copies of the Secretary of State's official voter registration application can be reliably obtained is the Secretary's office in Little Rock.[3] The online tool allowed us to bring these costs down significantly. Not only were we able to visit high schools across Arkansas—including those far from Little Rock—but we also experienced a significant increase in completed registrations from each visit to a high school—from 5–10 students when we were using paper applications to 40–60 students per visit using the online tool.

18.     The time and cost limitations imposed by the paper-based registration process had also forced GLA to limit its registration efforts to 15 of Arkansas's 75 counties. With the online tool, however, we were able to register voters in all 75 counties.

19.     GLA also found that people completed the application more quickly on their personal devices, meaning people with limited amounts of time were far more likely to complete the application electronically than on paper. The average applicant completed the entire process in less than two minutes. And it was easier to disseminate the application electronically using QR codes and text messages. Many people who registered through GLA's online tool forwarded the

---

[3] In our experience, county clerks are regularly out of forms or limit the number that can be picked up from their offices. In some instances, we have had to mail forms to our summer interns because they are unable to obtain any from their county clerk after multiple attempts.

APP70

link to friends and family—which cannot be done with paper applications—broadening our impact.

20.     Notably, the full-featured online tool resulted in a nearly 100 percent rate of successful completion and submission by applicants. In contrast, the completion rate for our pilot online tool (without an electronic signature option) was a mere 33 percent. Similarly, the full-featured online tool resulted in much more legible applications than those filled out in handwriting, and it allowed GLA to quickly print and resubmit completed applications to county clerks when needed.

21.     We believed that our online voter registration tool complied with Arkansas law because Amendment 51 does not require an applicant's wet signature to complete the voter registration application. Nonetheless, GLA sought and received assurances from the Secretary of State's office on no fewer than three occasions during correspondence in early February 2024 that GLA's online tool complied with Arkansas law.

22.     On February 5, Senator Elliott emailed the Secretary of State's office in her capacity as GLA's Executive Director, asking the office to confirm GLA's understanding that there was no wet signature requirement for voter registration applications. The Secretary of State's office responded the same day and said, "our attorneys looked into this last week and came to the same conclusion [as GLA] about the wet signature." Later that day, I followed up with the Secretary of State's office and explained that, when applying to register to vote with GLA's help, applicants sometimes sign the touchscreen with a stylus and sometimes with their finger. I then asked: "So just to make sure I'm understanding correctly – the registrations we submit right now are not going to be rejected based on the signature . . . . Is that correct?" The Secretary of State's office replied that, while it could not "officially speak on the acceptance or rejection of

Appellate Case: 24-2810   Page: 100   Date Filed: 09/06/2024   Entry ID: 5432887
APP71

applications" because the "authority lies solely with the county clerk's office," its "unofficial, non-attorney, advice to the county clerks would be to err on the side of the voter and accept the registrations." On February 12, I again wrote to the Secretary of State's office and asked, among other questions: "For registration purposes, should digital signatures be treated differently than 'wet' signatures?" On February 14, the Secretary of State's office replied: "[T]he Secretary of State does not see how a digital signature should be treated any differently than a wet signature."

23.     Attached as **Exhibit A** is a true and correct copy of the email correspondence between GLA and the Arkansas Secretary of State's office on February 5, 2024. And attached as **Exhibit B** is a true and correct copy of the email correspondence between GLA and the Arkansas Secretary of State's office on February 12 and 14, 2024.

24.     Despite the assurances given to GLA that electronically signed voter registration applications should be accepted, the Secretary of State abruptly reversed his position mere weeks later. On February 28, 2024—two days after the Arkansas Times reported on our success registering new voters with GLA's online tool—the Secretary wrote a letter to all county clerks, stating: "It has come to my attention that there have been some entities registering citizens to vote by electronic applications and signature. . . . I strongly recommend that counties do not accept voter registration applications executed by electronic signature."[4]

25.     The Secretary of State also later asked the Attorney General for a formal opinion on the acceptability of electronic signatures, though only after having reversed his view on the matter and instructing county clerks to reject applications with electronic signatures. The Attorney

---

[4] Austin Gelder, *Secretary of state warns against voter registration e-signatures; Pulaski clerk says she'll keep taking them*, Ark. Times (Mar. 7, 2024), https://arktimes.com/arkansas-blog/2024/03/07/mixed-messages-from-the-arkansas-secretary-of-state-sow-confusion-over-online-voter-applications.

General ultimately issued an opinion that confirmed that GLA's voter registration tool complies with state law.

26.    Soon afterwards, the State Board of Election Commissioners ("SBEC") issued an emergency rule prohibiting the use of electronic signatures, effective on May 4, 2024 and expiring on September 1, 2024. The SBEC has also made clear that it plans to implement a final rule to the same effect. It formally began the process of issuing a final rule on June 14, 2024.

27.    GLA's voter registration efforts have been severely inhibited by counties applying the wet signature requirement to reject electronically signed applications, including those from eligible Arkansas voters like Nikki Pastor and Blake Loper, and dozens of high school students from Camden Fairview High School who attempted to register in Ouachita County using GLA's online tool.

28.    These rejections have been extremely harmful to GLA's mission—Nikki, Blake, and the high school students in Camden are precisely the sort of young voters GLA hoped to reach with its online tool. Rather than welcome these new and younger voters into the fold, Arkansas has met them with arbitrary rules and rejection. This sort of discouragement from civic participation is precisely what GLA was created to help prevent.

29.    Beyond directly harming voters, the wet signature rule has also harmed GLA's operations. On May 2, 2024, after the emergency rule was issued, we were forced to fully disable our online voter registration tool. Instead of linking voters to a voter registration page, the "Register to Vote" link on the top banner of our website redirected to a disclaimer about the emergency rule. Without the online tool's electronic signature capabilities, the pace at which we were able to register new voters declined precipitously.

30.    On June 11, 2024, in preparation for the general election, we reactivated the

"Register to Vote" tool on our website but without many of its prior features in order to comply with the wet signature requirement. Most notably, applicants are no longer able to sign the application electronically or have GLA submit the application on their behalf. Instead, they must complete the application online, print it out, apply a handwritten wet signature, and then mail or deliver the application to their county clerk on their own. Although we hope this more limited version of our online tool will be an improvement from a purely paper-copy voter registration strategy, the fact that applicants must now print, sign, and submit their own applications renders it far less effective at ensuring applicants successfully complete the process. That is particularly so since many Arkansans—and particularly younger Arkansans—lack a printer at home.

31.     And now we are no longer on track to meet our voter registration goal for 2024 of 9,081 registered voters, which seemed easily attainable before the wet signature rule. If the prohibition on electronic signatures remains in effect, we will be forced to set a far more modest goal for 2025.

32.     GLA has also been forced to devote additional staff and financial resources towards the renewed use of paper registration applications. Our online tool permitted GLA staff to instruct large numbers of people at public gatherings about how to register all at once with a single link to the online tool. But now GLA must dedicate significant resources towards retraining its staff and hiring part-time paid interns—who needed to be trained as well—to attend public events to encourage people to register to vote using paper applications. The reduced effectiveness of our online tool, moreover, has also made it more difficult for us to track whether they have submitted their applications and to ensure that the applicants are ultimately placed on the voter rolls. Because information on rejected applicants is only available at the county level and each county clerk tracks applicants differently (there is no statewide list of rejected applicants), there is typically no way to

APP74

tell whether an applicant's absence from the statewide voter file is because their application has been rejected or because it was never completed and submitted by the applicant. When the online tool utilized electronic signatures, GLA could eliminate the latter scenario because we knew when applications were submitted to county clerks by GLA staff.

33.    This unexpected pivot has come at the expense of our other programming. Typically, in an election year, we would begin planning and implementing a GOTV campaign in the lead-up to the November general election. And although GLA has had GOTV campaign plans in place since the end of last year, the staff time required to stand up new voter registration operations in response to the wet signature rule has prevented us from starting work on those GOTV efforts.

34.    Similarly, GLA staff have had far less time to assist voters who have been purged from voter rolls, effectively eliminating our ability to help such individuals reestablish their registration status and vote in upcoming elections. GLA has also ceased programs and research aimed at monitoring changes to local election rules and encouraging involvement in local councils and commissions. And we have even abandoned some of our research projects because staff and interns tasked with these activities must instead dedicate their time towards more time-intensive voter registration efforts.

35.    Because of the way in which the wet signature rule restricts the use of our online tool—and forces us to use more costly and less efficient means of registering voters—GLA expects that these burdens and costs will continue indefinitely.

36.    Accordingly, the wet signature has put us in the difficult position of having to choose between reducing our voter registration goals or permanently limiting our other civic engagement initiatives.

APP75

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 7/10/2024
_____

Kristin Foster
_____

Kristin Foster

# Exhibit A

APP77



Kristin Foster <kristin@getloudarkansas.org>

---

## RE: Voter Registration Requirements
1 message

---

**Josh Bridges** <josh.bridges@sos.arkansas.gov>                    Mon, Feb 5, 2024 at 3:48 PM
To: Kristin Foster <kristin@getloudarkansas.org>

Kristin,

We cannot officially speak on the acceptance or rejection of applications. That authority lies solely with the county clerk's office. But in this instance, our unofficial, non-attorney, advice to the county clerks would be to err on the side of the voter and accept the registrations.

The potential for issues with signature comparison later on is definitely possible. Hope this helps.

Thanks,

Josh Bridges

Arkansas Secretary of State

Assistant Director of Elections

Phone: 501-682-3419

Cell: 501-414-1656

Fax: 501-682-3408

E-mail: **josh.bridges@sos.arkansas.gov**

Follow us on:

**Facebook** | **Instagram** | **Twitter** | **YouTube**

---

**From:** Kristin Foster <kristin@getloudarkansas.org>
**Sent:** Monday, February 5, 2024 2:07 PM
**To:** Josh Bridges <josh.bridges@sos.arkansas.gov>
**Subject:** Re: Voter Registration Requirements

## External Message

This is helpful information, Josh. Our canvassers ask people to sign with a stylus if we are registering them in person, but people do sign with their finger as well, especially younger folks. So just to make sure I'm understanding correctly - the registrations we submit right now are not going to be rejected based on the signature, but there is a potential for issues if the signatures don't match up with absentee ballot applications in the future. Is that correct?

**Kristin Foster**

**Deputy Director**

**Get Loud Arkansas**

p: 479.567.0042

e: kristin@getloudarkansas.org

w: www.getloudarkansas.org

a: P.O. Box 7652 Little Rock, AR 72217

To schedule a meeting with me, please use this link

*Get Loud Arkansas is a nonprofit civic engagement organization working to fight voter suppression, register new voters, engage low turnout voters, and mobilize communities to use the power of their vote to shape the future of Arkansas.*

On Mon, Feb 5, 2024 at 1:30 PM Josh Bridges <josh.bridges@sos.arkansas.gov> wrote:

> Good Afternoon Mrs. Elliott,
>
> We have been receiving the same questions from county clerks as well. While our attorneys looked into this last week and came to the same conclusion about the wet signature, there is another concern that a digital signature can cause later on in the voting process.
>
> We understand that the Get Loud program has created an application that allows for the capturing of voter registration information and, in turn, generates this information on to an actual application. Our main concern with this is the process of capturing the voter's signature. We are under the impression that the voter signs their name with their finger at the end of this process.
>
> The accuracy of the voter's signature can play an important role if that voter chooses to apply for an absentee ballot in the future. When the county clerk receives an absentee ballot application, they compare the signature

APP79

on the application to the signature on the voter's registrant record. If the clerk is not satisfied that the signatures match, they may reject the absentee application (ACA § 7-5-409).

Please let us know if you have any other questions.

Thanks,

Josh Bridges

Arkansas Secretary of State

Assistant Director of Elections

Phone: 501-682-3419

Cell: 501-414-1656

Fax: 501-682-3408

E-mail: **josh.bridges@sos.arkansas.gov**

Follow us on:

**Facebook** | **Instagram** | **Twitter** | **YouTube**

---

**From:** Joyce Elliott <joyce@getloudarkansas.org>
**Sent:** Monday, February 5, 2024 1:01 PM
**To:** Josh Bridges <josh.bridges@sos.arkansas.gov>
**Cc:** Kristin Foster <kristin@getloudarkansas.org>
**Subject:** Voter Registration Requirements

# External Message

Good afternoon, Josh. We've received some questions from county clerks regarding whether a wet signature is required on voter registration forms. Our attorneys have reviewed relevant statutes and found no such requirement. Can you please confirm if that is correct?

Joyce Elliott

Executive Director

Get Loud Arkansas

APP80



*Get Loud Arkansas is a nonprofit civic engagement organization working to fight voter suppression, register new voters, engage low turnout voters, and mobilize communities to use the power of their vote to shape the future of Arkansas.*

# Exhibit B

APP82



Kristin Foster <kristin@getloudarkansas.org>

## RE: Clarification Needed on Voter Registration Form Issues
1 message

**Josh Bridges** <josh.bridges@sos.arkansas.gov>                Wed, Feb 14, 2024 at 10:38 AM
To: Kristin Foster <kristin@getloudarkansas.org>
Cc: Joyce Elliott <joyce@getloudarkansas.org>, Shantell McGraw <shantell.mcgraw@sos.arkansas.gov>

Good Morning Kristin,

My responses to your questions are below. I do have a couple of friendly disclaimers:

• The information below should not be taken as a legal opinion, especially concerning ambiguities in law.

• When it comes to accepting or rejecting applications, the ultimate decision lies with the county clerk, as they are the official registrars.

Josh Bridges

Arkansas Secretary of State

Assistant Director of Elections

Phone: 501-682-3419

Cell: 501-414-1656

Fax: 501-682-3408

E-mail: **josh.bridges@sos.arkansas.gov**

Follow us on:

**Facebook** | **Instagram** | **Twitter** | **YouTube**

**From:** Kristin Foster <kristin@getloudarkansas.org>
**Sent:** Monday, February 12, 2024 12:31 PM
**To:** Josh Bridges <josh.bridges@sos.arkansas.gov>
**Cc:** Joyce Elliott <joyce@getloudarkansas.org>
**Subject:** Clarification Needed on Voter Registration Form Issues

APP83

# External Message

Good afternoon, Josh. I am writing to follow up on our previous email exchange concerning signature requirements for voter registration forms. Since then, we have identified additional discrepancies in some counties that appear to be disproportionately affecting young, first-time registrants. We are committed to ensuring every eligible voter can successfully register and appreciate your guidance on several issues.

- **Signature Variation on Registration Forms**

  - Is a form valid if it includes only the registrant's first or last name and not their full name? The full name is required, but not specifically defined in Amendment 51. As long as the first and last name are on the form, the application can be accepted.

  - Is a form valid if it is signed with a mark instead of a written signature? Amendment 51 § 6 says the required information from the applicant, in part, shall include a "signature or mark made under the penalty of perjury…"

  - For registration purposes, should digital signatures be treated differently than "wet" signatures? While this is a sensitive issue that is not clear in law, the Secretary of State does not see how a digital signature should be treated any differently than a wet signature. Again, this is a grey area in the law, so this should not be taken as an official legal opinion.

- **Identification Information for Registration**

  - Should the absence of a driver's license (DL) or undisclosed social security number (SSN) on the form be grounds for rejection? This should not be grounds for rejection, but will flag the registrant as a "first time voter." See Amendment 51 § 6 (a)(7)(C) for more information.

  - Many young voters have a SSN yet struggle to recall it from memory. What advice can you offer when a form is submitted with no DL or SSN under these circumstances? I would simply advise having a photo ID that meets the requirements under the law ready to go at the polls, since that is a requirement to vote anyway.

- **County of Residence Discrepancies**

  - If a registrant incorrectly specifies their county of residence but submits the form to the proper county, should this be cause for rejection? This would be a county-level decision. The law requires the application to be submitted in a "full and complete" manner, so if there are discrepancies, it would be up to the county to make the decision on that. I know sometimes, the county that received the application in error will forward the application to the proper county.

  - Conversely, what are the recommended actions if the form is submitted to an incorrect county? See above answer.

I apologize for the multitude of queries in this request, but we feel it is imperative we have a clear understanding of state guidelines. We are also hoping to share this guidance with local election officials as necessary. Thank you for your time and assistance on this. Please don't hesitate to reach out if you need any additional information.

**Kristin Foster**

**Deputy Director**

**Get Loud Arkansas**

p: 479.567.0042

e: kristin@getloudarkansas.org

w: www.getloudarkansas.org

a: P.O. Box 7652 Little Rock, AR 72217

To schedule a meeting with me, please use this link

*Get Loud Arkansas is a nonprofit civic engagement organization working to fight voter suppression, register new voters, engage low turnout voters, and mobilize communities to use the power of their vote to shape the future of Arkansas.*

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| GET LOUD ARKANSAS, et al., | |
| Plaintiffs, | Civil Action |
| *v.* | Case No. 5:24-cv-05121-TLB |
| JOHN THURSTON, et al., | |
| Defendants. | |

**DECLARATION OF ANDREA HAILEY**

I, Andrea Hailey, declare as follows:

1.     I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.     I am the Chief Executive Officer of Vote.org ("VDO"), a Plaintiff in this matter. I have served in my current role since October 2019. I had previously served as a member of VDO's Board of Directors since January 2018.

3.     VDO is the largest 501(c)(3) nonprofit, nonpartisan voter registration and get-out-the-vote technology platform in the county. VDO is a technology-first company with a mission of building best-in-class, culturally competent, cutting-edge digital tools to reach and empower voters across America. VDO uses technology to simplify political engagement, increase voter turnout, and strengthen American democracy. VDO works extensively to support low-propensity voters, including racial and ethnic minorities and younger voters, who tend to have lower registration and voter-turnout rates.

4.     VDO's website offers online tools that are calibrated to meet the needs and legal

1

requirements of each state we operate in, so as to facilitate the registration of voters nationwide, and these tools have proven very successful. In the 2022 calendar year, for example, VDO helped register more than 725,000 voters across the country.

5.     VDO also offers a voter registration tool in Arkansas, which helped more than 27,000 Arkansans register to vote between 2018 and 2022.

6.     VDO conducts other activities as well to promote voter participation in Arkansas. For example, VDO operates an election reminder program that sends Arkansas voters information and reminders about upcoming elections through email and text message. VDO implemented a radio program during the 2020 election cycle that delivered voting-related information to voters over Arkansas radio broadcasts. And VDO conducts college campus engagement campaigns, utilizing a series of tactics aimed at promoting registration and turnout among students, including text messaging, public awareness advertisements on transportation furniture, flyers, engagement of on-campus micro-influencers, and paid on-campus digital advertisements. In 2018, for example, VDO conducted campaigns at Arkansas State University, the University of Central Arkansas, John Brown University, and other universities across the state.

7.     Historically, we have provided Arkansas voters with an online tool on our website that allows the applicant to fill in prompts that populate the necessary information onto the voter registration application issued by the Arkansas Secretary of State. The applicant then may print, sign, and send that application to their county clerk.

8.     However, VDO has developed an e-sign function for its online tool that would streamline the application process. This feature permits applicants to digitally enter information into a voter registration application and sign the application by uploading an image of their original signature, review their signed voter registration application, and then have the completed

application submitted to the appropriate registration official. This function spares the voter from having to print out the form to sign it, which adds several additional steps to the application process and presents a serious obstacle for those applicants who do not own a printer.

9.      VDO invested significant resources in developing the e-sign function and intends to offer it to applicants in Arkansas, just as it has done successfully in several other states. But the wet signature rule effectively prevents the use of our e-sign function because any application signed with the tool will be rejected.

10.      By preventing the use of VDO's e-sign function, the wet signature requirement impedes VDO's voter registration activities and impairs the organization's ability to accomplish its mission by forcing VDO to rely on less effective means of assisting voters to register.

 I declare under penalty of perjury that the foregoing is true and correct.

7/11/2024

Executed on: _____

*Andrea Hailey*

_____
Andrea Hailey

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| GET LOUD ARKANSAS, et al., | |
| Plaintiffs, | Civil Action |
| *v.* | Case No. 5:24-cv-05121-TLB |
| JOHN THURSTON, et al., | |
| Defendants. | |

**DECLARATION OF NIKKI PASTOR**

I, Nikki Pastor, declare as follows:

1.      I am a plaintiff in the above-captioned action and have personal knowledge of the facts and information set forth in this declaration.

2.      I am a United States citizen and over the age of 18. I have never been convicted of a felony or adjudged as incompetent to vote by any court.

3.      I am currently enrolled as a full-time graduate student at the University of Arkansas, where I am pursuing a Master of Science in counseling and clinical mental health. I also work part-time as a qualified behavioral health provider at Arisa Health.

4.      I grew up in Clinton, Arkansas, in Van Buren County. I left Arkansas for several years for my undergraduate studies at Drury University in Springfield, Missouri. In August 2023, I moved back to Arkansas and currently reside in Fayetteville, Arkansas, in Washington County.

5.      After moving back to Arkansas to begin my graduate studies and part-time job, I wanted to register to vote in Arkansas.

6.      Voting is extremely important to me. I believe that at the heart of true activism lies

1

civic engagement and participation, and that real change can only come from representatives elected to serve the interests of their voters.

7.      On February 24, 2024, I attended the Black Owned Northwest Arkansas Business Expo in Fayetteville, an event where Get Loud Arkansas ("GLA") was helping people to register to vote.

8.      When I visited the GLA table at the Expo, I learned about its online voter registration tool. I scanned a QR code they provided me and saved the link on my phone, planning to complete the form later that day when I got home.

9.      Once I returned home, I used the link that I had saved on my phone to return to the tool and complete a voter registration application. As part of using the tool, I used an electronic signature to complete the form and authorized GLA to submit it on my behalf to the Washington County Clerk.

10.     I found GLA's online tool to be a very helpful and convenient way to complete a voter registration application.

11.     After the event, I regularly checked my mailbox for confirmation of my registration but did not receive any notification about the status of my application for some time. Nearly one month later, I received a letter stating that my application had been rejected.

12.     To this day, I am not registered to vote in Arkansas.

 I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____
7/10/2024

_____
Nikki Pastor

2

APP90

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

| | |
|---|---|
| GET LOUD ARKANSAS, et al., | |
| Plaintiffs, | Civil Action |
| *v.* | Case No. 5:24-cv-05121-TLB |
| JOHN THURSTON, et al., | |
| Defendants. | |

**DECLARATION OF TRINITY "BLAKE" LOPER**

I, Trinity "Blake" Loper, declare as follows:

1.      I am a plaintiff in the above-captioned action and have personal knowledge of the facts and information set forth in this declaration.

2.      I am a United States citizen and over the age of 18. I have never been convicted of a felony or adjudged as incompetent to vote by any court.

3.      I grew up in Dardanelle, Arkansas, in Yell County. In November 2022, I moved to Russellville, Arkansas, in Pope County. I continue to reside in Russellville.

4.      Prior to living in Russellville, I was registered to vote in Yell County. After moving to Russellville, I needed to complete a new voter registration application to update my voter registration to Pope County.

5.      In December 2023, I used Get Loud Arkansas's online tool to electronically complete and sign a voter registration application for Pope County. As part of the process of using that tool, I gave Get Loud Arkansas ("GLA") authorization to print and submit the application to the Pope County Clerk on my behalf.

1

APP91

6.     I found GLA's online tool to be a helpful and convenient way to update my voter registration. I shared the link to the online tool with several friends afterwards, thinking they would find it a helpful and convenient way to register too.

7.     Although GLA submitted my application to the Pope County Clerk on my behalf on December 11, 2023, I did not receive any confirmation that my registration status had been updated and did not believe I was successfully registered in Pope County.

8.     Accordingly, GLA resubmitted a copy of that electronically completed application on my behalf several months later, on May 1, 2024. I later received a written notice in the mail, dated May 2, 2024, informing me that my application had been rejected by the Pope County Clerk for its use of an electronic signature. A true and correct copy of the letter that I received from the Pope County Clerk is attached as **Exhibit A**.

9.     Around the same time, in early 2024, I also submitted a hand-signed application to the Pope County Clerk. Although that application appears to have been accepted, my name was entered incorrectly in the voter registration record, which currently lists my last name as "Lopez."

10.    I understand that I am required to verify my registration when I vote by presenting a document or identification card that shows my name. But my last name in my voter registration record does not match the name on my identification card. Thus, I will not be able to vote until I am correctly registered in Pope County under my legal name: Trinity Loper.

 I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _7/10/2024_____

_Trinity Loper_____

Trinity "Blake" Loper

# Exhibit A



PAM ENNIS
POPE COUNTY CLERK

100 West Main Street    Russellville, AR 72801
(479) 968-6064              Fax (479) 967-2291
clerk@popecountyar.org



May 2, 2024

Trinity Nykole Loper
1131 E 9th St-Apt D
Russellville AR 72801

Mrs. Loper,

Pursuant to Emergency Rule Regarding Voter Registration approved on May 2, 2024, a
signature "means a handwritten wet signature or handwritten wet mark made on a Registration
Application Form with a pen or other writing device that is physically moved across the form and
that forms the applicant's signature or mark on the paper form. A Signature or Mark that utilizes
a computer to generate or recreate the applicant's signature or mark is not an acceptable
signature or mark of the applicant for purposes of Amendment 51 §§ 6(a)(1) & (a)(3)(F)
Registration Application Form."
Please return the enclosed voter registration form with a signature that complies with this rule
and return to the county clerk's office.

Sincerely,

*Pam Ennis*

PAM ENNIS,
POPE COUNTY CLERK
100 WEST MAIN STREET
RUSSELLVILLE, AR 72801
PHONE: (479) 968-6064
FAX: (479) 967-2291
EMAIL: Clerk@PopeCountyAR.org

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| GET LOUD ARKANSAS, et al., | |
| Plaintiffs, | Civil Action |
| *v.* | Case No. 5:24-cv-05121-TLB |
| JOHN THURSTON, et al., | |
| Defendants. | |

**DECLARATION OF SUSAN INMAN**

I, Susan Inman, declare as follows:

1.     I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.     I was born and raised in Arkansas and have been a resident of Pulaski County for more than 35 years.

3.     From 1994 to 2022, I served in various positions related to overseeing elections and managing elections-related issues in Arkansas.

4.     From 1994 to 2000, and again from 2003 to 2009, I served as Pulaski County Elections Director.

5.     From 2000 to 2001, I served as the Voter Services Supervisor for the Arkansas Secretary of State's office. I was then promoted to Director of Elections in the same office. I held that position from 2001 to 2003.

6.     In 2009, I founded the Arkansas County Election Commissions Association. I served as that organization's President from 2009 to 2013 and again from 2015 to 2016.

7.      From 2012 to 2013, and again from 2021 to 2022, I served on the Pulaski County Board of Election Commissioners. This is a partisan position, and I was elected to the position by the Pulaski County Democratic Party.

8.      From 2013 to 2015, I served on the Arkansas State Board of Election Commissioners ("SBEC"). I was appointed to that position by the Republican Speaker of the Arkansas House of Representatives, Davy Carter.

9.      In 2014 and 2018, I was the Democratic nominee for Arkansas Secretary of State. I lost both times in the general election.

10.     In my 28 years of election-related experience, I have held multiple positions dealing with voter registration in Arkansas. For instance, my position as Voter Services Supervisor for the Secretary of State revolved around management of voter-registration issues. In that capacity, I constantly worked with county clerks on all major voter-registration issues. This included, among other actions, working with county clerks on the statewide voter-registration system and answering questions or discussing issues about voter registration that would arise.

11.     Similarly, as Director of Elections for the Secretary of State, I managed all voter-registration issues for the Secretary of State's office and was responsible for helping the Secretary of State perform her duties as Arkansas's chief election official. This involved overseeing voter-registration and other election-related issues.

12.     As an SBEC Commissioner, I was involved in approving rules and providing voter-registration-related training materials to county elections officials, among other duties.

13.     Through these governmental positions, I have been involved in numerous ways with voter-registration issues in Arkansas, including issues related to the qualifications of those attempting to register to vote.

14.     As explained above, I have also held numerous positions where I have reviewed voter registrations, trained officials on issues dealing with voter registrations, and dealt with issues relating to whether voter-registration applicants were qualified to vote. Through this experience, I have personal knowledge of how election officials determine whether a person is eligible to vote and how election officials decide whether to accept or reject voter-registration applications.

15.     In my experience, Arkansas election officials have not considered the type of instrument used in signing or marking a voter registration application as a factor in determining whether the applicant is or is not qualified to vote in Arkansas. I can demonstrate this in multiple ways.

16.     First, county clerks, who serve as the counties' permanent registrars and accept or reject voter registration applications, are advised to accept voter registration applications with any type of signature or mark. If, for instance, a person signs their name in an illegible fashion—or even just makes a mark—the county clerk is advised to, and should, accept the application. The purpose of the signature is to affirm under penalty of perjury that the information in the application is true and correct to the best of the applicant's knowledge.

17.     Second, while the county clerks have authority to remove voters from the voter rolls, it has not been the practice to do so based on the quality or method of the signature on voter registration applications. In my time as Voter Services Supervisor and Director of Elections in the Secretary of State's office I am not aware of this being done, and I am not aware of it being done at any other time.

18.     Third, many voter registration applications already include electronic signatures. When, for example, an Arkansan applies to vote through an agency, such as when registering to vote while applying for or renewing a driver's license at the Department of Motor Vehicles

3

("DMV"), the applicant usually signs the application electronically. The information on that application is entered into the same voter database as applications signed by a pen on a piece of paper.

19.     Fourth, a voter's absentee ballot application signature is to be compared to the voter's signature on their voter registration application, and much of the time the comparable signature—i.e., the signature on the voter registration application—is an electronic signature. This is because, as I have discussed, many voter registration applications come from agencies such as the DMV where applicants sign electronically. In other words, for this comparison, there is no wet signature requirement. Further, in trainings that I have reviewed and given to county officials as part of my SBEC duties, it is made clear to officials reviewing voter registrations for signature matches that they are not signature analysts, and they are taught to err on the side of the voter. Finally, I understand that when election officials are comparing signatures on voter registration applications, they generally are viewing PDF scans of the signatures. When looking at a PDF scan on a computer, it would be very difficult to tell the difference between a signature made by pen and a signature made by a stylus (with electronic ink) or a digital image of a handwritten signature that is then printed and submitted.

20.     Fifth, as an election official overseeing and dealing with voter-registration issues, I never told or trained anyone, was never told or trained myself, and never witnessed anyone being told or trained to remove any voter from the rolls or reject any voter-registration applicant because of the quality of signature or mark on a voter registration application or because of the type of instrument the person used to make a signature or mark.

Appellate Case: 24-2810   Page: 127   Date Filed: 09/06/2024 Entry ID: 5432887
APP98

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 7/10/2024 _____

_____
Susan Inman

Appellate Case: 24-2810   Page: 128   Date Filed: 09/06/2024   Entry ID: 5432887
APP99

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| GET LOUD ARKANSAS, et al., | |
| Plaintiffs, | Civil Action |
| v. | Case No. 5:24-cv-05121-TLB |
| JOHN THURSTON, et al., | |
| Defendants. | |

## DECLARATION OF CHRISTOPHER D. DODGE

I, Christopher D. Dodge, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am a Counsel at Elias Law Group LLP in Washington, DC. I am a member of the bar in the District of Columbia, the State of New York, and the Commonwealth of Massachusetts.

3.      I am counsel for Get Loud Arkansas ("GLA"), Vote.org ("VDO"), Nikki Pastor, and Blake Loper (collectively, "Plaintiffs") in this matter, and I have been admitted to practice before this Court *pro hac vice*.

4.      I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction in the above-captioned matter.

5.      Attached as **Exhibit A** are true and correct copies of Tables 4a, 4b, and 4c from the U.S. Census Bureau's data on voting and registration in the November 2020 election. *See Voting and Registration in the Election of November* 2020, U.S. Census Bureau, tbls. 4a, 4b, 4c, available at      https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-585.html

1

(Oct. 28, 2021).

6.     Attached as **Exhibit B** is a true and correct copy of the letter sent to all Arkansas county clerks by Arkansas Secretary of State John Thurston on February 28, 2024.

7.     Attached as **Exhibit C** is a true and correct copy of the Arkansas Secretary of State's request for an opinion from the Arkansas Attorney General on the validity of electronic means of completing voter registration applications.

8.     Attached as **Exhibit D** is a true and correct copy of the Arkansas Attorney General's response to Secretary of State John Thurston's request for an opinion on the validity of electronic means of completing voter registration applications. Ark. Att'y Gen. Op. No. 2024-049 at 3 (Apr. 10, 2024), available at: https://ag-opinions.s3.amazonaws.com/uploads/2024-049.pdf.

9.     Attached as **Exhibit E** is a true and correct copy of Arkansas State Board of Election Commissioners' request for an emergency rule prohibiting the use of electronic signatures on voter registration applications.

10.     Attached as **Exhibit F** is a true and correct copy of the State Board of Election Commissioners' Declaratory Order 2024-002, responding to a request from a former Pulaski County election commissioner, approved and adopted on April 23, 2024.

11.     Attached as **Exhibit G** is a true and correct copy of the Arkansas State Board of Election Commissioners' proposed final rule, mirroring the emergency rule, prohibiting the use of electronic signatures on voter registration applications.

12.     Attached as **Exhibit H** is a true and correct copy of the Arkansas Democrat-Gazette's article titled "Arkansas Board of Election Commissioners to open comment period for proposed rule on electronic signatures for voter registration," authored by Josh Snyder and published on June 12, 2024, available here: www.arkansasonline.com/news/2024/jun/12/arkansas-

Appellate Case: 24-2810   Page: 130   Date Filed: 09/06/2024 Entry ID: 5432887

board-of-election-commissioners-to-open/.

      13.    Attached as **Exhibit I** is a certified transcript of the Arkansas Legislative Council's Executive Subcommittee meeting held on May 2, 2024, excerpted in relevant part to the discussion of the emergency rule prohibiting the use of electronic signatures on voter registration applications.

  I declare under penalty of perjury that the foregoing is true and correct.

                         */s/ Christopher D. Dodge*
                         Christopher D. Dodge

# Exhibit A

Table 4a.  Reported Voting and Registration for States: November 2020
(In thousands)

| STATE | Total population | Total citizen population | Registered | | | | | | Voted | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Total registered | Percent registered (Total) | Margin of error [1] | Percent registered (Citizen) | Margin of error [1] | | Total voted | Percent voted (Total) | Margin of error [1] | Percent voted (Citizen) | Margin of error [1] |
| UNITED STATES | 252,274 | 231,593 | 168,308 | 66.7 | 0.4 | 72.7 | 0.4 | | 154,628 | 61.3 | 0.4 | 66.8 | 0.4 |
| ALABAMA | 3,769 | 3,716 | 2,527 | 67.0 | 3.1 | 68.0 | 3.1 | | 2,247 | 59.6 | 3.3 | 60.5 | 3.3 |
| ALASKA | 528 | 516 | 383 | 72.6 | 3.2 | 74.2 | 3.1 | | 330 | 62.4 | 3.4 | 63.8 | 3.4 |
| ARIZONA | 5,638 | 5,075 | 3,878 | 68.8 | 2.5 | 76.4 | 2.5 | | 3,649 | 64.7 | 2.6 | 71.9 | 2.6 |
| ARKANSAS | 2,283 | 2,195 | 1,361 | 59.6 | 3.4 | 62.0 | 3.4 | | 1,186 | 51.9 | 3.4 | 54.0 | 3.5 |
| CALIFORNIA | 30,342 | 25,946 | 18,001 | 59.3 | 1.2 | 69.4 | 1.2 | | 16,893 | 55.7 | 1.2 | 65.1 | 1.2 |
| COLORADO | 4,525 | 4,200 | 2,993 | 66.2 | 2.9 | 71.3 | 2.9 | | 2,837 | 62.7 | 3.0 | 67.6 | 3.0 |
| CONNECTICUT | 2,777 | 2,524 | 1,850 | 66.6 | 3.2 | 73.3 | 3.2 | | 1,681 | 60.5 | 3.3 | 66.6 | 3.4 |
| DELAWARE | 766 | 722 | 542 | 70.8 | 3.0 | 75.1 | 3.0 | | 489 | 63.8 | 3.2 | 67.7 | 3.2 |
| DISTRICT OF COLUMBIA | 576 | 534 | 464 | 80.5 | 2.7 | 86.9 | 2.4 | | 448 | 77.8 | 2.8 | 84.0 | 2.6 |
| FLORIDA | 17,244 | 15,645 | 10,495 | 60.9 | 1.5 | 67.1 | 1.5 | | 9,720 | 56.4 | 1.5 | 62.1 | 1.6 |
| GEORGIA | 8,032 | 7,400 | 5,233 | 65.2 | 2.2 | 70.7 | 2.2 | | 4,888 | 60.9 | 2.2 | 66.1 | 2.3 |
| HAWAII | 1,056 | 980 | 673 | 63.8 | 3.3 | 68.7 | 3.3 | | 630 | 59.7 | 3.3 | 64.3 | 3.4 |
| IDAHO | 1,370 | 1,299 | 900 | 65.7 | 3.1 | 69.3 | 3.1 | | 843 | 61.6 | 3.2 | 64.9 | 3.2 |
| ILLINOIS | 9,658 | 8,860 | 6,590 | 68.2 | 2.0 | 74.4 | 1.9 | | 6,058 | 62.7 | 2.0 | 68.4 | 2.0 |
| INDIANA | 5,096 | 4,921 | 3,412 | 67.0 | 2.7 | 69.3 | 2.7 | | 3,002 | 58.9 | 2.8 | 61.0 | 2.8 |
| IOWA | 2,361 | 2,293 | 1,742 | 73.8 | 3.1 | 76.0 | 3.0 | | 1,618 | 68.5 | 3.2 | 70.5 | 3.2 |
| KANSAS | 2,157 | 1,975 | 1,398 | 64.8 | 3.5 | 70.8 | 3.5 | | 1,297 | 60.1 | 3.6 | 65.7 | 3.7 |
| KENTUCKY | 3,384 | 3,227 | 2,450 | 72.4 | 3.2 | 75.9 | 3.1 | | 2,210 | 65.3 | 3.4 | 68.5 | 3.4 |
| LOUISIANA | 3,438 | 3,299 | 2,286 | 66.5 | 3.2 | 69.3 | 3.2 | | 2,041 | 59.4 | 3.3 | 61.9 | 3.3 |
| MAINE | 1,087 | 1,075 | 832 | 76.5 | 3.2 | 77.4 | 3.2 | | 766 | 70.5 | 3.4 | 71.3 | 3.4 |
| MARYLAND | 4,606 | 4,303 | 3,383 | 73.4 | 2.7 | 78.6 | 2.6 | | 3,166 | 68.7 | 2.9 | 73.6 | 2.8 |
| MASSACHUSETTS | 5,514 | 4,897 | 3,546 | 64.3 | 2.6 | 72.4 | 2.6 | | 3,249 | 58.9 | 2.7 | 66.3 | 2.7 |
| MICHIGAN | 7,790 | 7,467 | 5,513 | 70.8 | 2.1 | 73.8 | 2.1 | | 4,994 | 64.1 | 2.2 | 66.9 | 2.2 |
| MINNESOTA | 4,339 | 4,142 | 3,436 | 79.2 | 2.5 | 82.9 | 2.4 | | 3,225 | 74.3 | 2.7 | 77.9 | 2.7 |
| MISSISSIPPI | 2,212 | 2,177 | 1,749 | 79.1 | 2.8 | 80.4 | 2.7 | | 1,531 | 69.2 | 3.2 | 70.3 | 3.2 |
| MISSOURI | 4,637 | 4,475 | 3,388 | 73.1 | 2.7 | 75.7 | 2.7 | | 2,990 | 64.5 | 2.9 | 66.8 | 2.9 |
| MONTANA | 836 | 827 | 641 | 76.6 | 2.6 | 77.5 | 2.6 | | 607 | 72.6 | 2.8 | 73.5 | 2.8 |
| NEBRASKA | 1,435 | 1,369 | 971 | 67.7 | 3.4 | 70.9 | 3.4 | | 892 | 62.2 | 3.5 | 65.2 | 3.5 |
| NEVADA | 2,402 | 2,198 | 1,455 | 60.6 | 3.2 | 66.2 | 3.3 | | 1,351 | 56.3 | 3.3 | 61.5 | 3.4 |
| NEW HAMPSHIRE | 1,101 | 1,077 | 843 | 76.6 | 2.9 | 78.3 | 2.8 | | 797 | 72.4 | 3.0 | 74.0 | 3.0 |
| NEW JERSEY | 6,801 | 5,921 | 5,008 | 73.6 | 2.2 | 84.6 | 1.9 | | 4,638 | 68.2 | 2.3 | 78.3 | 2.2 |
| NEW MEXICO | 1,610 | 1,498 | 1,028 | 63.9 | 3.0 | 68.6 | 3.0 | | 938 | 58.3 | 3.1 | 62.6 | 3.2 |
| NEW YORK | 15,105 | 13,298 | 9,370 | 62.0 | 1.6 | 70.5 | 1.7 | | 8,609 | 57.0 | 1.7 | 64.7 | 1.7 |
| NORTH CAROLINA | 8,113 | 7,391 | 5,161 | 63.6 | 2.2 | 69.8 | 2.2 | | 4,780 | 58.9 | 2.3 | 64.7 | 2.3 |
| NORTH DAKOTA | 571 | 556 | 429 | 75.2 | 2.9 | 77.3 | 2.9 | | 373 | 65.3 | 3.2 | 67.1 | 3.2 |
| OHIO | 8,951 | 8,740 | 6,733 | 75.2 | 1.9 | 77.0 | 1.8 | | 6,128 | 68.5 | 2.0 | 70.1 | 2.0 |
| OKLAHOMA | 2,942 | 2,800 | 1,884 | 64.0 | 3.5 | 67.3 | 3.5 | | 1,631 | 55.5 | 3.6 | 58.3 | 3.7 |
| OREGON | 3,369 | 3,242 | 2,590 | 76.9 | 2.9 | 79.9 | 2.8 | | 2,402 | 71.3 | 3.1 | 74.1 | 3.0 |
| PENNSYLVANIA | 9,902 | 9,621 | 7,337 | 74.1 | 1.8 | 76.3 | 1.8 | | 6,756 | 68.2 | 1.9 | 70.2 | 1.9 |
| RHODE ISLAND | 840 | 776 | 575 | 68.5 | 3.2 | 74.1 | 3.2 | | 515 | 61.3 | 3.4 | 66.3 | 3.4 |
| SOUTH CAROLINA | 4,010 | 3,878 | 2,713 | 67.7 | 3.0 | 70.0 | 3.0 | | 2,459 | 61.3 | 3.1 | 63.4 | 3.1 |
| SOUTH DAKOTA | 659 | 649 | 437 | 66.3 | 3.4 | 67.4 | 3.4 | | 380 | 57.7 | 3.5 | 58.5 | 3.5 |
| TENNESSEE | 5,283 | 5,038 | 3,742 | 70.8 | 2.6 | 74.3 | 2.5 | | 3,346 | 63.3 | 2.7 | 66.4 | 2.7 |
| TEXAS | 21,485 | 18,581 | 13,343 | 62.1 | 1.4 | 71.8 | 1.4 | | 11,874 | 55.3 | 1.4 | 63.9 | 1.5 |
| UTAH | 2,320 | 2,178 | 1,468 | 63.3 | 2.7 | 67.4 | 2.7 | | 1,386 | 59.7 | 2.8 | 63.6 | 2.8 |
| VERMONT | 507 | 500 | 365 | 72.0 | 3.4 | 73.0 | 3.4 | | 342 | 67.5 | 3.6 | 68.4 | 3.6 |
| VIRGINIA | 6,481 | 5,974 | 4,541 | 70.1 | 2.4 | 76.0 | 2.3 | | 4,275 | 66.0 | 2.5 | 71.5 | 2.4 |
| WASHINGTON | 5,993 | 5,389 | 4,029 | 67.2 | 2.5 | 74.8 | 2.4 | | 3,854 | 64.3 | 2.6 | 71.5 | 2.5 |
| WEST VIRGINIA | 1,397 | 1,379 | 928 | 66.4 | 3.4 | 67.3 | 3.4 | | 773 | 55.3 | 3.6 | 56.1 | 3.6 |
| WISCONSIN | 4,538 | 4,421 | 3,391 | 74.7 | 2.7 | 76.7 | 2.6 | | 3,253 | 71.7 | 2.8 | 73.6 | 2.7 |
| WYOMING | 436 | 427 | 296 | 67.9 | 3.4 | 69.3 | 3.4 | | 280 | 64.1 | 3.5 | 65.5 | 3.5 |

[1] This figure added to or subtracted from the estimate provides the 90-percent confidence interval.

NOTES:

Estimates may not sum to totals due to rounding.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see https://www.census.gov/programs-surveys/cps/technical-documentation/complete.2020.html

Source: U.S. Census Bureau, Current Population Survey, November 2020

Table 4b.  Reported Voting and Registration, by Sex, Race and Hispanic Origin, for States: November 2020

(In thousands)

| STATE | Sex, Race, and Hispanic-Origin | Total population | Total citizen population | Registered | | | | | Voted | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Total registered | Percent registered (Total) | Margin of error¹ | Percent registered (Citizen) | Margin of error¹ | Total voted | Percent voted (Total) | Margin of error¹ | Percent voted (Citizen) | Margin of error¹ |
| US | Total | 252,274 | 231,593 | 168,308 | 66.7 | 0.4 | 72.7 | 0.4 | 154,628 | 61.3 | 0.4 | 66.8 | 0.4 |
| | Male | 121,870 | 111,485 | 79,340 | 65.1 | 0.5 | 71.2 | 0.5 | 72,474 | 59.5 | 0.5 | 65.0 | 0.5 |
| | Female | 130,404 | 120,108 | 88,968 | 68.2 | 0.5 | 74.1 | 0.5 | 82,154 | 63.0 | 0.5 | 68.4 | 0.5 |
| | White alone | 195,227 | 181,891 | 134,889 | 69.1 | 0.4 | 74.2 | 0.4 | 124,301 | 63.7 | 0.4 | 68.3 | 0.4 |
| | White non-Hispanic alone | 157,442 | 154,827 | 118,389 | 75.2 | 0.4 | 76.5 | 0.4 | 109,830 | 69.8 | 0.4 | 70.9 | 0.4 |
| | Black alone | 32,219 | 30,204 | 20,844 | 64.7 | 1.0 | 69.0 | 1.0 | 18,922 | 58.7 | 1.0 | 62.6 | 1.0 |
| | Asian alone | 16,094 | 11,530 | 7,354 | 45.7 | 1.5 | 63.8 | 1.7 | 6,881 | 42.8 | 1.5 | 59.7 | 1.7 |
| | Hispanic (of any race) | 42,468 | 30,627 | 18,719 | 44.1 | 1.0 | 61.1 | 1.1 | 16,459 | 38.8 | 0.9 | 53.7 | 1.1 |
| | White alone or in combination | 199,610 | 185,983 | 137,710 | 69.0 | 0.4 | 74.0 | 0.4 | 126,753 | 63.5 | 0.4 | 68.2 | 0.4 |
| | Black alone or in combination | 34,471 | 32,275 | 22,241 | 64.5 | 0.9 | 68.9 | 0.9 | 20,152 | 58.5 | 1.0 | 62.4 | 1.0 |
| | Asian alone or in combination | 17,273 | 12,641 | 8,157 | 47.2 | 1.4 | 64.5 | 1.6 | 7,593 | 44.0 | 1.4 | 60.1 | 1.6 |
| ALABAMA | Total | 3,769 | 3,716 | 2,527 | 67.0 | 3.1 | 68.0 | 3.1 | 2,247 | 59.6 | 3.3 | 60.5 | 3.3 |
| | Male | 1,780 | 1,755 | 1,187 | 66.7 | 4.5 | 67.6 | 4.5 | 1,038 | 58.4 | 4.8 | 59.2 | 4.8 |
| | Female | 1,990 | 1,960 | 1,340 | 67.3 | 4.3 | 68.4 | 4.3 | 1,209 | 60.7 | 4.5 | 61.6 | 4.5 |
| | White alone | 2,657 | 2,619 | 1,860 | 70.0 | 3.6 | 71.0 | 3.6 | 1,647 | 62.0 | 3.8 | 63.0 | 3.8 |
| | White non-Hispanic alone | 2,587 | 2,569 | 1,825 | 70.6 | 3.6 | 71.0 | 3.6 | 1,617 | 62.5 | 3.9 | 63.0 | 3.9 |
| | Black alone | 973 | 973 | 590 | 60.6 | 6.1 | 60.6 | 6.1 | 533 | 54.8 | 6.2 | 54.8 | 6.2 |
| | Asian alone | 55 | 45 | 23 | B | B | B | B | 21 | B | B | B | B |
| | Hispanic (of any race) | 79 | 53 | 35 | B | B | B | B | 30 | B | B | B | B |
| | White alone or in combination | 2,692 | 2,654 | 1,883 | 69.9 | 3.6 | 70.9 | 3.6 | 1,665 | 61.9 | 3.8 | 62.7 | 3.8 |
| | Black alone or in combination | 988 | 988 | 603 | 61.0 | 6.0 | 61.0 | 6.0 | 543 | 54.9 | 6.2 | 54.9 | 6.2 |
| | Asian alone or in combination | 58 | 48 | 26 | B | B | B | B | 21 | B | B | B | B |
| ALASKA | Total | 528 | 516 | 383 | 72.6 | 3.2 | 74.2 | 3.1 | 330 | 62.4 | 3.4 | 63.8 | 3.4 |
| | Male | 269 | 264 | 195 | 72.6 | 4.4 | 74.1 | 4.4 | 165 | 61.4 | 4.8 | 62.6 | 4.8 |
| | Female | 259 | 253 | 188 | 72.5 | 4.5 | 74.3 | 4.5 | 165 | 63.5 | 4.9 | 65.1 | 4.9 |
| | White alone | 345 | 343 | 265 | 76.7 | 3.7 | 77.3 | 3.7 | 243 | 70.3 | 4.0 | 70.9 | 4.0 |
| | White non-Hispanic alone | 325 | 323 | 251 | 77.2 | 3.8 | 77.5 | 3.8 | 230 | 70.6 | 4.1 | 71.0 | 4.1 |
| | Black alone | 17 | 16 | 11 | B | B | B | B | 8 | B | B | B | B |
| | Asian alone | 35 | 27 | 18 | B | B | B | B | 17 | B | B | B | B |
| | Hispanic (of any race) | 28 | 27 | 21 | B | B | B | B | 17 | B | B | B | B |
| | White alone or in combination | 375 | 372 | 287 | 76.6 | 3.5 | 77.1 | 3.5 | 259 | 69.2 | 3.9 | 69.7 | 3.9 |
| | Black alone or in combination | 28 | 17 | 12 | B | B | B | B | 8 | B | B | B | B |
| | Asian alone or in combination | 43 | 35 | 24 | B | B | B | B | 22 | B | B | B | B |
| ARIZONA | Total | 5,638 | 5,075 | 3,878 | 68.8 | 2.5 | 76.4 | 2.5 | 3,649 | 64.7 | 2.6 | 71.9 | 2.6 |
| | Male | 2,739 | 2,465 | 1,784 | 65.1 | 3.8 | 72.4 | 3.7 | 1,653 | 60.4 | 3.9 | 67.1 | 3.9 |
| | Female | 2,899 | 2,610 | 2,095 | 72.3 | 3.4 | 80.3 | 3.2 | 1,996 | 68.9 | 3.5 | 76.5 | 3.4 |
| | White alone | 4,840 | 4,365 | 3,328 | 68.8 | 2.7 | 76.3 | 2.7 | 3,152 | 65.1 | 2.8 | 72.2 | 2.8 |
| | White non-Hispanic alone | 3,140 | 3,096 | 2,480 | 79.0 | 3.0 | 80.1 | 3.0 | 2,385 | 76.0 | 3.1 | 77.0 | 3.1 |
| | Black alone | 279 | 259 | 205 | 73.3 | 10.4 | 79.2 | 9.9 | 179 | 63.9 | 11.3 | 69.1 | 11.3 |
| | Asian alone | 206 | 158 | 111 | 53.8 | 14.1 | 70.2 | 14.8 | 107 | 52.0 | 14.1 | 67.9 | 15.1 |
| | Hispanic (of any race) | 1,800 | 1,340 | 895 | 49.7 | 5.1 | 66.8 | 5.6 | 814 | 45.2 | 5.5 | 60.8 | 5.8 |
| | White alone or in combination | 4,966 | 4,472 | 3,422 | 68.9 | 2.7 | 76.5 | 2.6 | 3,243 | 65.3 | 2.8 | 72.5 | 2.8 |
| | Black alone or in combination | 344 | 323 | 266 | 77.3 | 8.9 | 82.2 | 8.4 | 235 | 68.3 | 9.9 | 72.7 | 9.8 |
| | Asian alone or in combination | 226 | 177 | 130 | 57.8 | 13.3 | 73.5 | 13.4 | 127 | 56.2 | 13.4 | 71.5 | 13.8 |
| ARKANSAS | Total | 2,283 | 2,195 | 1,361 | 59.6 | 3.4 | 62.0 | 3.4 | 1,186 | 51.9 | 3.4 | 54.0 | 3.5 |
| | Male | 1,101 | 1,057 | 641 | 58.2 | 4.9 | 60.6 | 4.9 | 546 | 49.6 | 4.9 | 51.6 | 5.0 |
| | Female | 1,182 | 1,138 | 720 | 60.9 | 4.6 | 63.3 | 4.7 | 640 | 54.1 | 4.7 | 56.2 | 4.8 |
| | White alone | 1,867 | 1,808 | 1,139 | 61.0 | 3.7 | 63.0 | 3.7 | 1,014 | 54.3 | 3.8 | 56.1 | 3.8 |
| | White non-Hispanic alone | 1,744 | 1,733 | 1,111 | 63.7 | 3.8 | 64.1 | 3.8 | 988 | 56.7 | 3.9 | 57.0 | 3.9 |
| | Black alone | 336 | 325 | 186 | 55.3 | 8.5 | 57.1 | 8.6 | 146 | 43.3 | 8.4 | 44.7 | 8.6 |
| | Asian alone | 24 | 18 | 14 | B | B | B | B | 8 | B | B | B | B |
| | Hispanic (of any race) | 134 | 83 | 30 | 22.6 | 12.4 | 36.4 | 18.1 | 29 | 21.4 | 12.1 | 34.6 | 17.9 |
| | White alone or in combination | 1,900 | 1,841 | 1,153 | 60.7 | 3.7 | 62.6 | 3.7 | 1,023 | 53.8 | 3.7 | 55.5 | 3.8 |
| | Black alone or in combination | 348 | 337 | 193 | 55.4 | 8.3 | 57.2 | 8.4 | 148 | 42.7 | 8.3 | 44.1 | 8.5 |
| | Asian alone or in combination | 25 | 19 | 16 | B | B | B | B | 12 | B | B | B | B |
| CALIFORNIA | Total | 30,342 | 25,946 | 18,001 | 59.3 | 1.2 | 69.4 | 1.2 | 16,893 | 55.7 | 1.2 | 65.1 | 1.2 |
| | Male | 14,786 | 12,580 | 8,549 | 57.8 | 1.7 | 68.0 | 1.7 | 8,012 | 54.2 | 1.7 | 63.7 | 1.8 |
| | Female | 15,556 | 13,366 | 9,452 | 60.8 | 1.6 | 70.7 | 1.6 | 8,882 | 57.1 | 1.6 | 66.5 | 1.7 |
| | White alone | 21,941 | 18,971 | 13,508 | 61.6 | 1.4 | 71.2 | 1.4 | 12,628 | 57.6 | 1.4 | 66.6 | 1.4 |
| | White non-Hispanic alone | 12,090 | 11,685 | 9,133 | 75.5 | 1.6 | 78.2 | 1.6 | 8,573 | 70.9 | 1.7 | 74.6 | 1.7 |
| | Black alone | 1,947 | 1,834 | 1,249 | 64.1 | 4.3 | 68.1 | 4.3 | 1,173 | 60.3 | 4.4 | 64.0 | 4.4 |
| | Asian alone | 5,072 | 3,958 | 2,491 | 49.1 | 2.8 | 62.9 | 3.1 | 2,370 | 46.7 | 2.8 | 59.9 | 3.2 |
| | Hispanic (of any race) | 11,165 | 8,305 | 5,014 | 44.9 | 2.0 | 60.4 | 2.3 | 4,539 | 40.7 | 2.0 | 54.6 | 2.4 |
| | White alone or in combination | 22,586 | 19,549 | 13,924 | 61.6 | 1.3 | 71.2 | 1.3 | 13,024 | 57.7 | 1.4 | 66.6 | 1.4 |
| | Black alone or in combination | 2,139 | 2,021 | 1,371 | 64.1 | 4.1 | 67.8 | 4.1 | 1,295 | 60.5 | 4.2 | 64.1 | 4.2 |
| | Asian alone or in combination | 5,405 | 4,250 | 2,665 | 49.3 | 2.8 | 62.7 | 3.0 | 2,529 | 46.8 | 2.8 | 59.5 | 3.1 |
| COLORADO | Total | 4,525 | 4,200 | 2,993 | 66.2 | 2.9 | 71.3 | 2.9 | 2,837 | 62.7 | 3.0 | 67.5 | 3.0 |
| | Male | 2,254 | 2,076 | 1,452 | 64.4 | 4.2 | 70.0 | 4.2 | 1,355 | 60.1 | 4.3 | 65.3 | 4.3 |
| | Female | 2,271 | 2,124 | 1,541 | 67.9 | 4.1 | 72.6 | 4.0 | 1,482 | 65.3 | 4.1 | 69.8 | 4.1 |
| | White alone | 4,001 | 3,751 | 2,733 | 68.3 | 3.0 | 72.9 | 3.0 | 2,606 | 65.1 | 3.1 | 69.5 | 3.1 |
| | White non-Hispanic alone | 3,267 | 3,220 | 2,396 | 73.3 | 3.2 | 74.4 | 3.2 | 2,316 | 70.9 | 3.3 | 71.9 | 3.3 |
| | Black alone | 186 | 181 | 102 | 54.5 | 14.4 | 56.0 | 14.6 | 96 | 51.6 | 14.5 | 53.1 | 14.7 |
| | Asian alone | 152 | 115 | 57 | 37.7 | 16.0 | 49.9 | 19.0 | 50 | 32.7 | 15.5 | 43.2 | 18.8 |
| | Hispanic (of any race) | 854 | 618 | 374 | 43.8 | 7.4 | 60.5 | 8.5 | 315 | 37.0 | 7.2 | 51.1 | 8.7 |
| | White alone or in combination | 4,123 | 3,858 | 2,801 | 67.9 | 3.0 | 72.6 | 3.0 | 2,658 | 64.5 | 3.1 | 68.9 | 3.1 |
| | Black alone or in combination | 203 | 198 | 118 | 58.3 | 13.7 | 59.7 | 13.8 | 113 | 55.6 | 13.8 | 57.0 | 13.9 |
| | Asian alone or in combination | 171 | 135 | 72 | 42.2 | 15.4 | 53.8 | 17.5 | 65 | 37.7 | 15.1 | 48.1 | 17.6 |
| CONNECTICUT | Total | 2,777 | 2,524 | 1,850 | 66.6 | 3.2 | 73.3 | 3.2 | 1,681 | 60.5 | 3.3 | 66.6 | 3.4 |
| | Male | 1,333 | 1,204 | 843 | 63.2 | 4.7 | 70.0 | 4.7 | 767 | 57.5 | 4.9 | 63.7 | 5.0 |
| | Female | 1,444 | 1,320 | 1,008 | 69.8 | 4.3 | 76.3 | 4.2 | 915 | 63.4 | 4.6 | 69.3 | 4.6 |
| | White alone | 2,197 | 2,043 | 1,543 | 70.2 | 3.5 | 75.5 | 3.4 | 1,392 | 63.4 | 3.7 | 68.1 | 3.7 |
| | White non-Hispanic alone | 1,841 | 1,788 | 1,381 | 75.0 | 3.6 | 77.3 | 3.6 | 1,270 | 69.0 | 3.9 | 71.0 | 3.9 |
| | Black alone | 323 | 282 | 190 | 58.9 | 9.5 | 67.4 | 9.6 | 184 | 56.8 | 9.4 | 65.2 | 9.7 |
| | Asian alone | 216 | 158 | 96 | 44.4 | 12.0 | 60.5 | 13.7 | 90 | 41.6 | 11.9 | 56.6 | 13.9 |
| | Hispanic (of any race) | 461 | 347 | 235 | 51.0 | 8.7 | 67.8 | 9.4 | 196 | 42.4 | 8.6 | 56.4 | 10.0 |
| | White alone or in combination | 2,211 | 2,058 | 1,548 | 70.0 | 3.5 | 75.2 | 3.4 | 1,395 | 63.1 | 3.7 | 67.8 | 3.7 |
| | Black alone or in combination | 325 | 285 | 195 | 59.9 | 9.3 | 68.4 | 9.5 | 184 | 56.5 | 9.4 | 64.5 | 9.7 |
| | Asian alone or in combination | 216 | 158 | 96 | 44.4 | 12.0 | 60.5 | 13.7 | 90 | 41.6 | 11.9 | 56.6 | 13.9 |
| DELAWARE | Total | 766 | 722 | 542 | 70.8 | 3.0 | 75.1 | 3.0 | 489 | 63.8 | 3.2 | 67.7 | 3.2 |
| | Male | 361 | 339 | 247 | 68.3 | 4.5 | 72.8 | 4.4 | 223 | 61.6 | 4.7 | 65.7 | 4.7 |
| | Female | 404 | 383 | 296 | 73.1 | 4.0 | 77.2 | 3.9 | 266 | 65.8 | 4.3 | 69.5 | 4.3 |
| | White alone | 540 | 519 | 392 | 72.6 | 3.5 | 75.5 | 3.5 | 348 | 64.4 | 3.8 | 67.0 | 3.8 |
| | White non-Hispanic alone | 495 | 490 | 378 | 76.3 | 3.5 | 77.1 | 3.5 | 335 | 67.8 | 3.9 | 68.4 | 3.9 |
| | Black alone | 172 | 164 | 114 | 66.6 | 6.3 | 69.8 | 6.3 | 106 | 61.7 | 6.5 | 64.7 | 6.6 |

1 This figure added to or subtracted from the estimate provides the 90-percent confidence interval.

Source: U.S. Census Bureau, Current Population Survey, November 2020

APP105

| STATE | Sex, Race, and Hispanic-Origin | Total population | Total citizen population | Total registered | Percent registered (Total) | Margin of error [1] | Percent registered (Citizen) | Margin of error [1] | Total voted | Percent voted (Total) | Margin of error [1] | Percent voted (Citizen) | Margin of error [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Asian alone | 31 | 21 | 18 | B | B | B | B | 18 | B | B | B | B |
| | Hispanic (of any race) | 57 | 37 | 22 | B | B | B | B | 20 | B | B | B | B |
| | White alone or in combination | 554 | 531 | 404 | 73.0 | 3.5 | 76.1 | 3.4 | 359 | 64.8 | 3.7 | 67.6 | 3.7 |
| | Black alone or in combination | 181 | 171 | 121 | 67.2 | 6.1 | 70.9 | 6.1 | 112 | 62.0 | 6.3 | 65.3 | 6.4 |
| | Asian alone or in combination | 36 | 26 | 23 | B | B | B | B | 23 | B | B | B | B |
| DISTRICT OF COLUMBIA | Total | 576 | 534 | 464 | 80.5 | 2.7 | 86.9 | 2.4 | 448 | 77.8 | 2.8 | 84.0 | 2.6 |
| | Male | 264 | 245 | 209 | 79.0 | 4.1 | 85.1 | 3.7 | 200 | 75.7 | 4.3 | 81.5 | 4.0 |
| | Female | 312 | 288 | 255 | 81.7 | 3.6 | 88.4 | 3.1 | 248 | 79.5 | 3.7 | 86.0 | 3.3 |
| | White alone | 278 | 253 | 229 | 82.5 | 3.7 | 90.5 | 3.0 | 223 | 80.3 | 3.9 | 88.1 | 3.3 |
| | White non-Hispanic alone | 243 | 232 | 213 | 87.5 | 3.4 | 91.5 | 3.0 | 206 | 84.9 | 3.7 | 88.8 | 3.4 |
| | Black alone | 251 | 243 | 202 | 80.4 | 3.9 | 83.2 | 3.7 | 193 | 76.7 | 4.1 | 79.3 | 4.0 |
| | Asian alone | 36 | 27 | 25 | B | B | B | B | 25 | B | B | B | B |
| | Hispanic (of any race) | 50 | 32 | 26 | B | B | B | B | 25 | B | B | B | B |
| | White alone or in combination | 285 | 259 | 234 | 82.3 | 3.7 | 90.4 | 3.0 | 228 | 80.2 | 3.8 | 88.0 | 3.3 |
| | Black alone or in combination | 256 | 248 | 207 | 80.6 | 3.8 | 83.3 | 3.7 | 197 | 76.6 | 4.1 | 79.5 | 4.0 |
| | Asian alone or in combination | 40 | 30 | 27 | B | B | B | B | 27 | B | B | B | B |
| FLORIDA | Total | 17,244 | 15,645 | 10,495 | 60.9 | 1.5 | 67.1 | 1.5 | 9,720 | 56.4 | 1.5 | 62.1 | 1.6 |
| | Male | 8,263 | 7,523 | 4,965 | 60.1 | 2.2 | 66.0 | 2.2 | 4,563 | 55.2 | 2.2 | 60.7 | 2.3 |
| | Female | 8,982 | 8,121 | 5,530 | 61.6 | 2.1 | 68.1 | 2.1 | 5,157 | 57.4 | 2.1 | 63.5 | 2.2 |
| | White alone | 13,675 | 12,515 | 8,468 | 61.9 | 1.7 | 67.7 | 1.7 | 7,887 | 57.7 | 1.7 | 63.0 | 1.7 |
| | Black alone | 2,652 | 2,344 | 1,533 | 57.8 | 3.7 | 65.4 | 3.8 | 1,375 | 51.8 | 3.8 | 58.7 | 3.9 |
| | Asian alone | 585 | 462 | 260 | 44.5 | 8.2 | 56.4 | 9.2 | 257 | 43.9 | 8.2 | 55.6 | 9.2 |
| | Hispanic (of any race) | 4,439 | 3,394 | 1,992 | 44.9 | 3.2 | 58.7 | 3.6 | 1,789 | 40.3 | 3.1 | 52.7 | 3.6 |
| | White alone or in combination | 13,843 | 12,675 | 8,569 | 61.9 | 1.7 | 67.6 | 1.7 | 7,982 | 57.7 | 1.7 | 63.0 | 1.7 |
| | Black alone or in combination | 2,819 | 2,504 | 1,624 | 57.6 | 3.6 | 64.9 | 3.7 | 1,460 | 51.8 | 3.6 | 58.3 | 3.8 |
| | Asian alone or in combination | 591 | 467 | 266 | 45.0 | 8.2 | 56.9 | 9.1 | 263 | 44.4 | 8.2 | 56.2 | 9.2 |
| GEORGIA | Total | 8,032 | 7,400 | 5,233 | 65.2 | 2.2 | 70.7 | 2.2 | 4,888 | 60.0 | 2.2 | 66.1 | 2.3 |
| | Male | 3,765 | 3,461 | 2,354 | 62.5 | 3.3 | 68.0 | 3.3 | 2,180 | 57.9 | 3.3 | 63.0 | 3.4 |
| | Female | 4,267 | 3,938 | 2,880 | 67.5 | 3.0 | 73.1 | 2.9 | 2,707 | 63.5 | 3.0 | 68.7 | 3.0 |
| | White alone | 4,785 | 4,521 | 3,297 | 68.9 | 2.8 | 72.9 | 2.7 | 3,079 | 64.3 | 2.9 | 68.1 | 2.8 |
| | White non-Hispanic alone | 4,239 | 4,194 | 3,152 | 74.3 | 2.8 | 75.1 | 2.8 | 2,947 | 69.5 | 2.9 | 70.3 | 2.9 |
| | Black alone | 2,569 | 2,513 | 1,721 | 67.0 | 3.7 | 68.5 | 3.6 | 1,608 | 62.6 | 3.8 | 64.0 | 3.8 |
| | Asian alone | 389 | 217 | 124 | 31.8 | 9.6 | 56.9 | 13.6 | 116 | 29.8 | 9.4 | 53.3 | 13.7 |
| | Hispanic (of any race) | 739 | 403 | 192 | 25.9 | 6.9 | 47.6 | 10.7 | 178 | 24.1 | 6.8 | 44.2 | 10.7 |
| | White alone or in combination | 4,857 | 4,593 | 3,351 | 69.0 | 2.7 | 73.0 | 2.7 | 3,127 | 64.4 | 2.8 | 68.1 | 2.8 |
| | Black alone or in combination | 2,702 | 2,597 | 1,776 | 65.7 | 3.6 | 68.4 | 3.6 | 1,657 | 61.3 | 3.7 | 63.8 | 3.7 |
| | Asian alone or in combination | 398 | 226 | 133 | 33.3 | 9.6 | 58.7 | 13.3 | 125 | 31.4 | 9.4 | 55.2 | 13.4 |
| HAWAII | Total | 1,056 | 980 | 673 | 63.8 | 3.3 | 68.7 | 3.3 | 630 | 59.7 | 3.3 | 64.3 | 3.4 |
| | Male | 509 | 481 | 333 | 65.4 | 4.6 | 69.3 | 4.6 | 313 | 61.5 | 4.7 | 65.2 | 4.8 |
| | Female | 546 | 499 | 340 | 62.3 | 4.6 | 68.2 | 4.6 | 317 | 57.9 | 4.6 | 63.5 | 4.7 |
| | White alone | 261 | 246 | 184 | 70.5 | 6.2 | 74.8 | 6.1 | 175 | 67.0 | 6.4 | 71.1 | 6.4 |
| | White non-Hispanic alone | 228 | 218 | 165 | 72.4 | 6.5 | 75.6 | 6.4 | 159 | 69.5 | 6.7 | 72.7 | 6.6 |
| | Black alone | 18 | 18 | 15 | B | B | B | B | B | B | B | B | B |
| | Asian alone | 489 | 436 | 291 | 59.5 | 4.8 | 66.7 | 4.9 | 268 | 54.8 | 4.9 | 61.4 | 5.0 |
| | Hispanic (of any race) | 71 | 66 | 35 | B | B | B | B | 30 | B | B | B | B |
| | White alone or in combination | 374 | 359 | 260 | 69.6 | 5.2 | 72.5 | 5.2 | 248 | 66.4 | 5.4 | 69.2 | 5.4 |
| | Black alone or in combination | 25 | 25 | 15 | B | B | B | B | 11 | B | B | B | B |
| | Asian alone or in combination | 613 | 561 | 377 | 61.4 | 4.3 | 67.2 | 4.3 | 351 | 57.3 | 4.3 | 62.7 | 4.4 |
| IDAHO | Total | 1,370 | 1,299 | 900 | 65.7 | 3.1 | 69.3 | 3.1 | 843 | 61.6 | 3.2 | 64.9 | 3.2 |
| | Male | 679 | 643 | 434 | 63.9 | 4.5 | 67.5 | 4.5 | 410 | 60.4 | 4.5 | 63.8 | 4.6 |
| | Female | 691 | 656 | 466 | 67.5 | 4.3 | 71.1 | 4.3 | 433 | 62.7 | 4.5 | 66.0 | 4.5 |
| | White alone | 1,279 | 1,227 | 857 | 67.0 | 3.2 | 69.8 | 3.2 | 806 | 63.0 | 3.3 | 65.6 | 3.3 |
| | White non-Hispanic alone | 1,130 | 1,119 | 800 | 70.8 | 3.3 | 71.5 | 3.3 | 755 | 66.8 | 3.4 | 67.5 | 3.4 |
| | Black alone | 17 | 7 | 5 | B | B | B | B | 5 | B | B | B | B |
| | Asian alone | 22 | 12 | 7 | B | B | B | B | 5 | B | B | B | B |
| | Hispanic (of any race) | 166 | 119 | 63 | 38.1 | 9.5 | 53.2 | 11.6 | 55 | 33.0 | 9.3 | 46.3 | 11.6 |
| | White alone or in combination | 1,303 | 1,252 | 873 | 67.0 | 3.2 | 69.8 | 3.1 | 822 | 63.0 | 3.2 | 65.6 | 3.2 |
| | Black alone or in combination | 16 | 13 | 8 | B | B | B | B | 7 | B | B | B | B |
| | Asian alone or in combination | 22 | 12 | 7 | B | B | B | B | 5 | B | B | B | B |
| ILLINOIS | Total | 9,658 | 8,860 | 6,590 | 68.2 | 2.0 | 74.4 | 1.9 | 6,058 | 62.7 | 2.0 | 68.4 | 2.0 |
| | Male | 4,671 | 4,281 | 3,098 | 66.3 | 2.8 | 72.4 | 2.8 | 2,876 | 61.6 | 2.9 | 67.2 | 3.0 |
| | Female | 4,987 | 4,579 | 3,492 | 70.0 | 2.7 | 76.3 | 2.6 | 3,182 | 63.8 | 2.8 | 69.5 | 2.8 |
| | White alone | 7,551 | 7,015 | 5,303 | 70.2 | 2.2 | 75.6 | 2.1 | 4,849 | 64.2 | 2.3 | 69.1 | 2.3 |
| | White non-Hispanic alone | 6,218 | 6,075 | 4,826 | 77.6 | 2.2 | 79.4 | 2.1 | 4,429 | 71.2 | 2.4 | 72.9 | 2.4 |
| | Black alone | 1,335 | 1,270 | 861 | 64.5 | 5.2 | 67.8 | 5.2 | 811 | 60.7 | 5.3 | 63.8 | 5.3 |
| | Asian alone | 643 | 452 | 331 | 51.5 | 8.0 | 73.3 | 8.4 | 313 | 48.7 | 8.0 | 69.3 | 8.6 |
| | Hispanic (of any race) | 1,421 | 1,016 | 532 | 37.4 | 5.5 | 52.4 | 6.8 | 475 | 33.4 | 5.4 | 46.8 | 6.8 |
| | White alone or in combination | 7,600 | 7,064 | 5,331 | 70.1 | 2.2 | 75.5 | 2.1 | 4,873 | 64.1 | 2.3 | 69.0 | 2.3 |
| | Black alone or in combination | 1,382 | 1,317 | 895 | 64.8 | 5.1 | 67.9 | 5.1 | 839 | 60.7 | 5.2 | 63.7 | 5.2 |
| | Asian alone or in combination | 652 | 461 | 340 | 52.2 | 7.9 | 73.8 | 8.3 | 322 | 49.4 | 7.9 | 69.9 | 8.7 |
| INDIANA | Total | 5,096 | 4,921 | 3,412 | 67.0 | 2.7 | 69.3 | 2.7 | 3,002 | 58.9 | 2.8 | 61.0 | 2.8 |
| | Male | 2,463 | 2,375 | 1,632 | 66.2 | 3.9 | 68.7 | 3.9 | 1,408 | 57.2 | 4.1 | 59.3 | 4.1 |
| | Female | 2,633 | 2,546 | 1,781 | 67.6 | 3.7 | 69.9 | 3.7 | 1,594 | 60.5 | 3.9 | 62.6 | 3.9 |
| | White alone | 4,318 | 4,219 | 2,967 | 68.7 | 2.9 | 70.3 | 2.9 | 2,601 | 60.2 | 3.0 | 61.7 | 3.1 |
| | White non-Hispanic alone | 4,122 | 4,107 | 2,904 | 70.5 | 2.9 | 70.7 | 2.9 | 2,546 | 61.8 | 3.1 | 62.0 | 3.1 |
| | Black alone | 473 | 467 | 306 | 64.7 | 8.6 | 65.5 | 8.6 | 281 | 59.5 | 8.8 | 60.2 | 8.8 |
| | Asian alone | 178 | 114 | 76 | 42.5 | 14.9 | 66.1 | 17.8 | 68 | 38.5 | 14.7 | 59.9 | 18.4 |
| | Hispanic (of any race) | 225 | 135 | 72 | 32.1 | 13.3 | 53.5 | 18.3 | 60 | 26.4 | 12.6 | 44.0 | 18.2 |
| | White alone or in combination | 4,420 | 4,315 | 3,010 | 68.1 | 2.9 | 69.8 | 2.9 | 2,632 | 59.5 | 3.0 | 61.0 | 3.0 |
| | Black alone or in combination | 532 | 520 | 333 | 62.7 | 8.2 | 64.2 | 8.2 | 299 | 56.3 | 8.8 | 57.6 | 8.5 |
| | Asian alone or in combination | 189 | 125 | 76 | 40.0 | 14.4 | 60.3 | 17.6 | 68 | 36.3 | 14.1 | 54.7 | 17.9 |
| IOWA | Total | 2,361 | 2,293 | 1,742 | 73.8 | 3.1 | 76.0 | 3.0 | 1,618 | 68.5 | 3.2 | 70.5 | 3.2 |
| | Male | 1,167 | 1,133 | 828 | 71.0 | 4.4 | 75.3 | 4.3 | 785 | 67.3 | 4.6 | 69.3 | 4.5 |
| | Female | 1,194 | 1,160 | 888 | 74.4 | 4.3 | 76.6 | 4.2 | 833 | 69.7 | 4.5 | 71.8 | 4.5 |
| | White alone | 2,160 | 2,125 | 1,630 | 75.4 | 3.1 | 76.7 | 3.1 | 1,521 | 70.4 | 3.3 | 71.5 | 3.3 |
| | White non-Hispanic alone | 2,068 | 2,050 | 1,603 | 77.5 | 3.1 | 78.2 | 3.1 | 1,496 | 72.3 | 3.3 | 73.0 | 3.3 |
| | Black alone | 95 | 87 | 55 | 58.6 | 16.4 | 63.5 | 16.6 | 40 | 42.6 | 16.4 | 46.2 | 17.2 |
| | Asian alone | 77 | 52 | 36 | B | B | B | B | 36 | B | B | B | B |
| | Hispanic (of any race) | 108 | 90 | 42 | 39.1 | 16.6 | 46.8 | 18.6 | 40 | 37.0 | 16.5 | 44.0 | 18.5 |
| | White alone or in combination | 2,176 | 2,141 | 1,645 | 75.6 | 3.1 | 76.9 | 3.1 | 1,536 | 70.6 | 3.3 | 71.8 | 3.3 |
| | Black alone or in combination | 110 | 103 | 71 | 64.4 | 14.7 | 69.0 | 14.7 | 56 | 50.7 | 15.4 | 54.2 | 15.9 |
| | Asian alone or in combination | 80 | 55 | 39 | B | B | B | B | 39 | B | B | B | B |
| KANSAS | Total | 2,157 | 1,975 | 1,398 | 64.8 | 3.5 | 70.8 | 3.5 | 1,297 | 60.1 | 3.6 | 65.7 | 3.7 |
| | Male | 1,057 | 969 | 667 | 63.1 | 5.1 | 68.9 | 5.1 | 621 | 58.7 | 5.2 | 64.0 | 5.3 |
| | Female | 1,101 | 1,006 | 731 | 66.4 | 4.9 | 72.7 | 4.8 | 676 | 61.4 | 5.1 | 67.2 | 5.1 |
| | White alone | 1,867 | 1,749 | 1,263 | 67.7 | 3.7 | 72.2 | 3.7 | 1,181 | 63.3 | 3.8 | 67.5 | 3.9 |
| | White non-Hispanic alone | 1,566 | 1,556 | 1,171 | 74.8 | 3.8 | 75.3 | 3.8 | 1,099 | 70.2 | 4.0 | 70.7 | 4.0 |

1 This figure added to or subtracted from the estimate provides the 90-percent confidence interval.
Source: U.S. Census Bureau, Current Population Survey, November 2020

| STATE | Sex, Race, and Hispanic-Origin | Total population | Total citizen population | Total registered | Percent registered (Total) | Margin of error [1] | Percent registered (Citizen) | Margin of error [1] | Total voted | Percent voted (Total) | Margin of error [1] | Percent voted (Citizen) | Margin of error [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Blac alone | 106 | 97 | 69 | 65.4 | 15.2 | 71.4 | 15.1 | 59 | 55.8 | 15.9 | 61.0 | 16.3 |
| | Asian alone | 86 | 54 | 13 | B | B | B | B | 11 | B | B | B | B |
| | Hispanic (of any race) | 317 | 210 | 108 | 34.1 | 9.6 | 51.5 | 12.4 | 96 | 30.1 | 9.3 | 45.5 | 12.4 |
| | White alone or in combination | 1,916 | 1,798 | 1,298 | 67.7 | 3.7 | 72.2 | 3.6 | 1,216 | 63.5 | 3.8 | 67.6 | 3.8 |
| | Blac alone or in combination | 121 | 112 | 82 | 67.9 | 14.0 | 73.3 | 13.7 | 72 | 59.6 | 14.7 | 64.3 | 14.9 |
| | Asian alone or in combination | 87 | 55 | 14 | B | B | B | B | 12 | B | B | B | B |
| KENTUCKY | Total | 3,384 | 3,227 | 2,450 | 72.4 | 3.2 | 75.9 | 3.1 | 2,210 | 65.3 | 3.4 | 68.5 | 3.4 |
| | Male | 1,616 | 1,524 | 1,159 | 71.7 | 4.6 | 76.0 | 4.5 | 1,057 | 65.4 | 4.9 | 69.4 | 4.9 |
| | Female | 1,768 | 1,703 | 1,291 | 73.0 | 4.4 | 75.8 | 4.3 | 1,153 | 65.2 | 4.7 | 67.7 | 4.7 |
| | White alone | 2,994 | 2,888 | 2,194 | 73.3 | 3.3 | 76.0 | 3.3 | 1,997 | 66.7 | 3.6 | 69.1 | 3.5 |
| | White non-Hispanic alone | 2,845 | 2,831 | 2,165 | 76.1 | 3.3 | 76.5 | 3.3 | 1,971 | 69.3 | 3.6 | 69.6 | 3.6 |
| | Blac alone | 259 | 224 | 167 | 64.5 | 11.7 | 74.6 | 11.5 | 140 | 54.0 | 12.2 | 62.5 | 12.7 |
| | Asian alone | 46 | 31 | 24 | B | B | B | B | 24 | B | B | B | B |
| | Hispanic (of any race) | 163 | 60 | 30 | B | B | B | B | 26 | B | B | B | B |
| | White alone or in combination | 3,063 | 2,957 | 2,243 | 73.2 | 3.3 | 75.8 | 3.2 | 2,035 | 66.4 | 3.5 | 68.8 | 3.5 |
| | Blac alone or in combination | 306 | 271 | 198 | 64.7 | 10.8 | 73.0 | 10.6 | 161 | 52.5 | 11.2 | 59.3 | 11.8 |
| | Asian alone or in combination | 49 | 35 | 24 | B | B | B | B | 24 | B | B | B | B |
| LOUISIANA | Total | 3,438 | 3,299 | 2,286 | 66.5 | 3.2 | 69.3 | 3.2 | 2,041 | 59.4 | 3.3 | 61.9 | 3.3 |
| | Male | 1,618 | 1,557 | 1,073 | 66.3 | 4.6 | 68.9 | 4.6 | 959 | 59.3 | 4.8 | 61.6 | 4.9 |
| | Female | 1,820 | 1,742 | 1,214 | 66.7 | 4.4 | 69.7 | 4.3 | 1,082 | 59.5 | 4.5 | 62.1 | 4.6 |
| | White alone | 2,212 | 2,120 | 1,486 | 67.2 | 3.9 | 70.1 | 3.9 | 1,362 | 61.6 | 4.1 | 64.2 | 4.1 |
| | White non-Hispanic alone | 2,048 | 2,022 | 1,426 | 69.6 | 4.0 | 70.5 | 4.0 | 1,309 | 63.9 | 4.2 | 64.7 | 4.2 |
| | Blac alone | 1,068 | 1,048 | 720 | 67.5 | 5.4 | 68.7 | 5.4 | 607 | 56.9 | 5.7 | 57.9 | 5.7 |
| | Asian alone | 84 | 57 | 23 | B | B | B | B | 23 | B | B | B | B |
| | Hispanic (of any race) | 210 | 131 | 84 | 40.0 | 13.9 | 64.3 | 17.3 | 72 | 34.3 | 13.5 | 55.1 | 17.9 |
| | White alone or in combination | 2,261 | 2,169 | 1,524 | 67.4 | 3.9 | 70.3 | 3.9 | 1,396 | 61.8 | 4.0 | 64.4 | 4.1 |
| | Blac alone or in combination | 1,092 | 1,072 | 737 | 67.5 | 5.3 | 68.8 | 5.3 | 624 | 57.2 | 5.6 | 58.2 | 5.7 |
| | Asian alone or in combination | 90 | 63 | 29 | B | B | B | B | 29 | B | B | B | B |
| MAINE | Total | 1,087 | 1,075 | 832 | 76.5 | 3.2 | 77.4 | 3.2 | 766 | 70.5 | 3.4 | 71.3 | 3.4 |
| | Male | 523 | 515 | 383 | 73.2 | 4.8 | 74.3 | 4.8 | 351 | 67.2 | 5.1 | 68.2 | 5.1 |
| | Female | 564 | 560 | 449 | 79.5 | 4.2 | 80.2 | 4.2 | 415 | 73.5 | 4.6 | 74.1 | 4.6 |
| | White alone | 1,036 | 1,031 | 803 | 77.5 | 3.2 | 77.9 | 3.2 | 739 | 71.3 | 3.5 | 71.7 | 3.5 |
| | White non-Hispanic alone | 1,027 | 1,022 | 798 | 77.7 | 3.2 | 78.1 | 3.2 | 734 | 71.5 | 3.5 | 71.8 | 3.5 |
| | Blac alone | 13 | 8 | 4 | B | B | B | B | 4 | B | B | B | B |
| | Asian alone | 10 | 7 | 6 | B | B | B | B | 6 | B | B | B | B |
| | Hispanic (of any race) | 11 | 11 | 7 | B | B | B | B | 6 | B | B | B | B |
| | White alone or in combination | 1,058 | 1,053 | 818 | 77.3 | 3.2 | 77.7 | 3.2 | 752 | 71.1 | 3.5 | 71.4 | 3.5 |
| | Blac alone or in combination | 15 | 10 | 6 | B | B | B | B | 6 | B | B | B | B |
| | Asian alone or in combination | 18 | 15 | 12 | B | B | B | B | 12 | B | B | B | B |
| MARYLAND | Total | 4,606 | 4,303 | 3,383 | 73.4 | 2.7 | 78.6 | 2.6 | 3,166 | 68.7 | 2.9 | 73.6 | 2.8 |
| | Male | 2,199 | 2,052 | 1,517 | 69.0 | 4.1 | 73.9 | 4.0 | 1,430 | 65.0 | 4.2 | 69.7 | 4.2 |
| | Female | 2,407 | 2,251 | 1,865 | 77.5 | 3.6 | 82.9 | 3.3 | 1,737 | 72.2 | 3.8 | 77.2 | 3.7 |
| | White alone | 2,757 | 2,650 | 2,069 | 75.0 | 3.4 | 78.1 | 3.4 | 1,917 | 69.5 | 3.7 | 72.3 | 3.6 |
| | White non-Hispanic alone | 2,487 | 2,469 | 1,934 | 77.8 | 3.5 | 78.3 | 3.5 | 1,786 | 71.8 | 3.8 | 72.3 | 3.8 |
| | Blac alone | 1,421 | 1,289 | 1,022 | 71.9 | 4.8 | 79.3 | 4.5 | 971 | 68.3 | 4.9 | 75.3 | 4.8 |
| | Asian alone | 302 | 239 | 166 | 55.0 | 11.8 | 69.7 | 12.2 | 153 | 50.6 | 11.8 | 64.1 | 12.8 |
| | Hispanic (of any race) | 323 | 195 | 150 | 46.2 | 12.1 | 76.7 | 13.2 | 145 | 44.9 | 12.1 | 74.4 | 13.6 |
| | White alone or in combination | 2,840 | 2,732 | 2,151 | 75.7 | 3.4 | 78.7 | 3.3 | 1,999 | 70.4 | 3.6 | 73.1 | 3.5 |
| | Blac alone or in combination | 1,482 | 1,350 | 1,083 | 73.1 | 4.6 | 80.2 | 4.3 | 1,032 | 69.6 | 4.8 | 76.4 | 4.6 |
| | Asian alone or in combination | 337 | 273 | 201 | 59.7 | 11.0 | 73.5 | 11.0 | 187 | 55.6 | 11.1 | 68.6 | 11.5 |
| MASSACHUSETTS | Total | 5,514 | 4,897 | 3,546 | 64.3 | 2.6 | 72.4 | 2.6 | 3,249 | 58.9 | 2.7 | 66.3 | 2.7 |
| | Male | 2,642 | 2,311 | 1,656 | 62.7 | 3.8 | 71.6 | 3.8 | 1,505 | 57.0 | 3.9 | 65.1 | 4.0 |
| | Female | 2,872 | 2,586 | 1,891 | 65.8 | 3.6 | 73.1 | 3.5 | 1,744 | 60.7 | 3.7 | 67.4 | 3.7 |
| | White alone | 4,429 | 4,140 | 3,174 | 71.7 | 2.8 | 76.7 | 2.7 | 2,936 | 66.3 | 2.9 | 70.9 | 2.9 |
| | White non-Hispanic alone | 3,953 | 3,799 | 2,949 | 74.6 | 2.8 | 77.6 | 2.8 | 2,749 | 69.6 | 3.0 | 72.4 | 3.0 |
| | Blac alone | 489 | 390 | 165 | 33.6 | 8.3 | 42.2 | 9.7 | 142 | 29.0 | 8.0 | 36.4 | 9.5 |
| | Asian alone | 415 | 244 | 139 | 33.5 | 9.3 | 57.1 | 12.7 | 109 | 26.3 | 8.7 | 44.9 | 12.8 |
| | Hispanic (of any race) | 636 | 449 | 271 | 42.6 | 8.3 | 60.4 | 9.8 | 227 | 35.8 | 8.1 | 50.7 | 10.0 |
| | White alone or in combination | 4,597 | 4,251 | 3,233 | 70.3 | 2.7 | 76.1 | 2.7 | 2,988 | 65.0 | 2.9 | 70.3 | 2.9 |
| | Blac alone or in combination | 640 | 484 | 211 | 32.9 | 7.2 | 43.5 | 8.8 | 181 | 28.3 | 6.9 | 37.4 | 8.5 |
| | Asian alone or in combination | 433 | 262 | 157 | 36.3 | 9.3 | 60.1 | 12.1 | 128 | 29.4 | 8.8 | 48.7 | 12.4 |
| MICHIGAN | Total | 7,790 | 7,467 | 5,513 | 70.8 | 2.1 | 73.8 | 2.1 | 4,994 | 64.1 | 2.2 | 66.9 | 2.2 |
| | Male | 3,795 | 3,616 | 2,648 | 69.8 | 3.1 | 73.2 | 3.0 | 2,378 | 62.7 | 3.2 | 65.8 | 3.2 |
| | Female | 3,995 | 3,851 | 2,865 | 71.7 | 2.9 | 74.4 | 2.9 | 2,616 | 65.5 | 3.1 | 67.9 | 3.1 |
| | White alone | 6,269 | 6,118 | 4,568 | 72.9 | 2.3 | 74.7 | 2.3 | 4,144 | 66.1 | 2.5 | 67.7 | 2.5 |
| | White non-Hispanic alone | 5,922 | 5,865 | 4,408 | 74.4 | 2.3 | 75.2 | 2.3 | 3,997 | 67.5 | 2.5 | 68.2 | 2.5 |
| | Blac alone | 1,021 | 984 | 713 | 69.8 | 5.6 | 72.4 | 5.6 | 628 | 61.5 | 6.0 | 63.8 | 6.0 |
| | Asian alone | 281 | 145 | 72 | 25.7 | 10.5 | 49.6 | 16.8 | 65 | 23.3 | 10.2 | 45.1 | 16.7 |
| | Hispanic (of any race) | 406 | 302 | 178 | 43.9 | 10.6 | 58.9 | 12.2 | 165 | 40.7 | 10.5 | 54.7 | 12.3 |
| | White alone or in combination | 6,374 | 6,223 | 4,649 | 72.9 | 2.3 | 74.7 | 2.3 | 4,225 | 66.3 | 2.4 | 67.9 | 2.4 |
| | Blac alone or in combination | 1,091 | 1,054 | 773 | 70.9 | 5.4 | 73.3 | 5.3 | 684 | 62.7 | 5.7 | 64.9 | 5.8 |
| | Asian alone or in combination | 309 | 173 | 90 | 29.3 | 10.5 | 52.1 | 15.3 | 84 | 27.1 | 10.2 | 48.3 | 15.3 |
| MINNESOTA | Total | 4,339 | 4,142 | 3,436 | 79.2 | 2.5 | 82.9 | 2.4 | 3,225 | 74.3 | 2.7 | 77.9 | 2.7 |
| | Male | 2,149 | 2,051 | 1,690 | 78.6 | 3.6 | 82.4 | 3.5 | 1,575 | 73.3 | 3.9 | 76.8 | 3.8 |
| | Female | 2,190 | 2,091 | 1,746 | 79.7 | 3.5 | 83.5 | 3.3 | 1,649 | 75.3 | 3.8 | 78.9 | 3.7 |
| | White alone | 3,744 | 3,678 | 3,086 | 82.4 | 2.6 | 83.9 | 2.5 | 2,918 | 77.9 | 2.8 | 79.3 | 2.8 |
| | White non-Hispanic alone | 3,573 | 3,555 | 2,990 | 83.7 | 2.5 | 84.1 | 2.5 | 2,840 | 79.5 | 2.8 | 79.9 | 2.8 |
| | Blac alone | 260 | 197 | 139 | 53.5 | 12.2 | 70.5 | 12.8 | 130 | 50.2 | 12.2 | 66.1 | 13.3 |
| | Asian alone | 179 | 115 | 91 | 51.2 | 15.2 | 79.4 | 15.3 | 74 | 41.3 | 15.0 | 64.0 | 18.2 |
| | Hispanic (of any race) | 209 | 156 | 116 | 55.8 | 14.8 | 74.7 | 15.0 | 98 | 46.8 | 14.9 | 62.7 | 16.9 |
| | White alone or in combination | 3,816 | 3,750 | 3,146 | 82.5 | 2.5 | 83.9 | 2.5 | 2,979 | 78.1 | 2.8 | 79.4 | 2.7 |
| | Blac alone or in combination | 299 | 236 | 170 | 56.9 | 11.3 | 72.0 | 11.5 | 161 | 54.0 | 11.4 | 68.3 | 11.9 |
| | Asian alone or in combination | 191 | 127 | 104 | 54.3 | 14.6 | 81.4 | 14.0 | 86 | 45.1 | 14.6 | 67.5 | 16.8 |
| MISSISSIPPI | Total | 2,212 | 2,177 | 1,749 | 79.1 | 2.8 | 80.4 | 2.7 | 1,531 | 69.2 | 3.2 | 70.3 | 3.2 |
| | Male | 1,029 | 1,015 | 792 | 76.9 | 4.2 | 78.0 | 4.2 | 680 | 66.1 | 4.8 | 67.0 | 4.8 |
| | Female | 1,182 | 1,162 | 957 | 81.0 | 3.7 | 82.4 | 3.6 | 850 | 71.9 | 4.2 | 73.2 | 4.2 |
| | White alone | 1,350 | 1,337 | 1,054 | 78.1 | 3.6 | 78.8 | 3.6 | 921 | 68.3 | 4.1 | 68.9 | 4.1 |
| | White non-Hispanic alone | 1,300 | 1,295 | 1,026 | 78.9 | 3.6 | 79.2 | 3.6 | 904 | 69.5 | 4.1 | 69.8 | 4.1 |
| | Blac alone | 792 | 787 | 654 | 82.5 | 4.2 | 83.1 | 4.1 | 573 | 72.3 | 4.9 | 72.8 | 4.9 |
| | Asian alone | 37 | 20 | 9 | B | B | B | B | 8 | B | B | B | B |
| | Hispanic (of any race) | 67 | 53 | 34 | B | B | B | B | 23 | B | B | B | B |
| | White alone or in combination | 1,375 | 1,363 | 1,079 | 78.5 | 3.6 | 79.2 | 3.5 | 942 | 68.5 | 4.0 | 69.1 | 4.0 |
| | Blac alone or in combination | 805 | 799 | 666 | 82.8 | 4.1 | 83.4 | 4.1 | 582 | 72.4 | 4.9 | 72.9 | 4.8 |
| | Asian alone or in combination | 41 | 24 | 13 | B | B | B | B | 11 | B | B | B | B |
| MISSOURI | Total | 4,637 | 4,475 | 3,388 | 73.1 | 2.7 | 75.7 | 2.7 | 2,990 | 64.5 | 2.9 | 66.8 | 2.9 |
| | Male | 2,205 | 2,136 | 1,556 | 70.5 | 4.0 | 72.8 | 4.0 | 1,361 | 61.7 | 4.3 | 63.7 | 4.3 |
| | Female | 2,432 | 2,340 | 1,832 | 75.3 | 3.6 | 78.3 | 3.5 | 1,629 | 67.0 | 4.0 | 69.6 | 4.0 |
| | White alone | 3,871 | 3,812 | 2,935 | 75.8 | 2.9 | 77.0 | 2.8 | 2,576 | 66.5 | 3.2 | 67.6 | 3.2 |

1 This figure added to or subtracted from the estimate provides the 90-percent confidence interval.
Source: U.S. Census Bureau, Current Population Survey, November 2020

Appellate Case: 24-2810   Page: 136   Date Filed: 09/06/2024   Entry ID: 5432887
APP.107

| STATE | Sex, Race, and Hispanic-Origin | Total population | Total citizen population | Total registered | Percent registered (Total) | Margin of error [1] | Percent registered (Citizen) | Margin of error [1] | Total voted | Percent voted (Total) | Margin of error [1] | Percent voted (Citizen) | Margin of error [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | White non-Hispanic alone | 3,687 | 3,664 | 2,816 | 76.4 | 2.9 | 76.8 | 2.9 | 2,488 | 67.5 | 3.2 | 67.9 | 3.2 |
| | Blac  alone | 518 | 507 | 373 | 72.1 | 7.8 | 73.6 | 7.8 | 351 | 67.8 | 8.2 | 69.2 | 8.1 |
| | Asian alone | 138 | 64 | 38 | B | | B | | 38 | B | | B | B |
| | Hispanic (of any race) | 232 | 178 | 127 | 54.8 | 14.2 | 71.3 | 14.7 | 95 | 40.9 | 14.0 | 53.3 | 16.3 |
| | White alone or in combination | 3,941 | 3,833 | 2,963 | 75.2 | 2.9 | 76.5 | 2.8 | 2,588 | 65.7 | 3.1 | 66.8 | 3.1 |
| | Blac  alone or in combination | 552 | 533 | 381 | 69.0 | 7.8 | 74.4 | 7.8 | 351 | 63.6 | 8.1 | 65.8 | 8.2 |
| | Asian alone or in combination | 146 | 72 | 46 | B | | B | | 46 | B | | B | B |
| MONTANA | Total | 836 | 827 | 641 | 76.6 | 2.6 | 77.5 | 2.6 | 607 | 72.6 | 2.8 | 73.5 | 2.8 |
| | Male | 415 | 411 | 322 | 77.8 | 3.7 | 78.4 | 3.6 | 299 | 72.0 | 4.0 | 72.5 | 3.9 |
| | Female | 422 | 415 | 318 | 75.5 | 3.8 | 76.7 | 3.7 | 309 | 73.2 | 3.9 | 74.4 | 3.8 |
| | White non-Hispanic alone | 772 | 765 | 597 | 77.3 | 2.7 | 78.0 | 2.7 | 572 | 74.0 | 2.8 | 74.7 | 2.8 |
| | White alone | 757 | 751 | 584 | 77.2 | 2.7 | 77.8 | 2.7 | 560 | 74.0 | 2.9 | 74.6 | 2.9 |
| | Blac  alone | 4 | 4 | 2 | B | | B | | 2 | B | | B | B |
| | Asian alone | 10 | 7 | 4 | B | | B | | B | B | | B | B |
| | Hispanic (of any race) | 20 | 15 | 15 | B | | B | | 14 | B | | B | B |
| | White alone or in combination | 791 | 784 | 609 | 77.0 | 2.7 | 77.7 | 2.7 | 582 | 73.6 | 2.8 | 74.3 | 2.8 |
| | Blac  alone or in combination | 6 | 6 | 4 | B | | B | | 3 | B | | B | B |
| | Asian alone or in combination | 13 | 10 | 5 | B | | B | | 5 | B | | B | B |
| NEBRASKA | Total | 1,435 | 1,369 | 971 | 67.7 | 3.4 | 70.9 | 3.4 | 892 | 62.2 | 3.5 | 65.2 | 3.5 |
| | Male | 708 | 674 | 464 | 65.6 | 4.9 | 68.9 | 4.9 | 421 | 59.6 | 5.0 | 62.5 | 5.1 |
| | Female | 728 | 695 | 507 | 69.7 | 4.7 | 73.0 | 4.6 | 471 | 64.7 | 4.8 | 67.8 | 4.8 |
| | White non-Hispanic alone | 1,301 | 1,255 | 903 | 69.4 | 3.5 | 71.9 | 3.5 | 826 | 63.5 | 3.6 | 65.8 | 3.7 |
| | White alone | 1,205 | 1,202 | 877 | 72.7 | 3.5 | 72.9 | 3.5 | 801 | 66.5 | 3.7 | 66.6 | 3.7 |
| | Blac  alone | 80 | 71 | 45 | B | | B | | 44 | B | | B | B |
| | Asian alone | 26 | 17 | 9 | B | | B | | 9 | B | | B | B |
| | Hispanic (of any race) | 98 | 55 | 28 | B | | B | | 27 | B | | B | B |
| | White alone or in combination | 1,307 | 1,261 | 907 | 69.4 | 3.5 | 71.9 | 3.5 | 830 | 63.5 | 3.6 | 65.8 | 3.7 |
| | Blac  alone or in combination | 82 | 73 | 47 | B | | B | | 46 | B | | B | B |
| | Asian alone or in combination | 26 | 17 | 9 | B | | B | | 9 | B | | B | B |
| NEVADA | Total | 2,402 | 2,198 | 1,455 | 60.6 | 3.2 | 66.2 | 3.3 | 1,351 | 56.3 | 3.3 | 61.5 | 3.4 |
| | Male | 1,192 | 1,088 | 698 | 58.6 | 4.6 | 64.1 | 4.7 | 649 | 54.5 | 4.7 | 59.7 | 4.8 |
| | Female | 1,210 | 1,110 | 757 | 62.6 | 4.5 | 68.2 | 4.5 | 702 | 58.0 | 4.6 | 63.2 | 4.7 |
| | White alone | 1,691 | 1,561 | 1,072 | 63.4 | 3.8 | 68.6 | 3.8 | 1,013 | 59.9 | 3.9 | 64.9 | 3.9 |
| | White non-Hispanic alone | 1,211 | 1,187 | 868 | 71.7 | 4.2 | 73.1 | 4.2 | 827 | 68.3 | 4.3 | 69.7 | 4.3 |
| | Blac  alone | 233 | 232 | 155 | 66.5 | 9.6 | 66.8 | 9.6 | 136 | 58.2 | 10.0 | 58.5 | 10.0 |
| | Asian alone | 230 | 195 | 136 | 59.0 | 10.4 | 69.7 | 10.5 | 134 | 58.4 | 10.4 | 68.9 | 10.6 |
| | Hispanic (of any race) | 654 | 515 | 268 | 41.0 | 6.5 | 52.0 | 7.5 | 239 | 36.6 | 6.4 | 46.4 | 7.5 |
| | White alone or in combination | 1,815 | 1,652 | 1,113 | 61.4 | 3.7 | 67.4 | 3.7 | 1,050 | 57.9 | 3.8 | 63.6 | 3.8 |
| | Blac  alone or in combination | 259 | 258 | 167 | 64.6 | 9.2 | 64.9 | 9.2 | 146 | 56.3 | 9.6 | 56.6 | 9.6 |
| | Asian alone or in combination | 252 | 217 | 146 | 57.8 | 10.0 | 67.2 | 10.2 | 144 | 57.2 | 10.0 | 66.5 | 10.3 |
| NEW HAMPSHIRE | Total | 1,101 | 1,077 | 843 | 76.6 | 2.9 | 78.3 | 2.8 | 797 | 72.4 | 3.0 | 74.0 | 3.0 |
| | Male | 542 | 531 | 401 | 74.1 | 4.3 | 75.5 | 4.2 | 375 | 69.2 | 4.5 | 70.5 | 4.5 |
| | Female | 559 | 546 | 442 | 78.9 | 3.9 | 80.9 | 3.8 | 423 | 75.5 | 4.1 | 77.4 | 4.1 |
| | White alone | 1,030 | 1,015 | 813 | 78.9 | 2.9 | 80.0 | 2.8 | 771 | 74.8 | 3.1 | 75.9 | 3.0 |
| | White non-Hispanic alone | 1,000 | 993 | 799 | 79.8 | 2.9 | 80.5 | 2.8 | 758 | 75.8 | 3.1 | 76.4 | 3.1 |
| | Blac  alone | 20 | 20 | 4 | B | | B | | B | B | | B | B |
| | Asian alone | 27 | 17 | 9 | B | | B | | B | B | | B | B |
| | Hispanic (of any race) | 38 | 31 | 19 | B | | B | | B | B | | B | B |
| | White alone or in combination | 1,045 | 1,030 | 823 | 78.8 | 2.9 | 79.9 | 2.8 | 782 | 74.8 | 3.0 | 75.9 | 3.0 |
| | Blac  alone or in combination | 32 | 32 | 14 | B | | B | | B | B | | B | B |
| | Asian alone or in combination | 27 | 17 | 9 | B | | B | | B | B | | B | B |
| NEW JERSEY | Total | 6,801 | 5,921 | 5,008 | 73.6 | 2.2 | 84.6 | 1.9 | 4,638 | 68.2 | 2.3 | 78.3 | 2.2 |
| | Male | 3,281 | 2,814 | 2,366 | 72.1 | 3.2 | 84.1 | 2.8 | 2,193 | 66.8 | 3.4 | 77.9 | 3.2 |
| | Female | 3,520 | 3,107 | 2,642 | 75.0 | 3.0 | 85.0 | 2.6 | 2,445 | 69.5 | 3.2 | 78.7 | 3.0 |
| | White alone | 4,900 | 4,462 | 3,826 | 78.1 | 2.4 | 85.7 | 2.1 | 3,543 | 72.3 | 2.6 | 79.4 | 2.5 |
| | White non-Hispanic alone | 3,755 | 3,636 | 3,134 | 83.5 | 2.5 | 86.2 | 2.3 | 2,950 | 78.6 | 2.7 | 81.1 | 2.7 |
| | Blac  alone | 994 | 850 | 658 | 66.2 | 5.9 | 77.5 | 5.6 | 606 | 60.9 | 6.1 | 71.3 | 6.0 |
| | Asian alone | 810 | 524 | 443 | 54.7 | 7.1 | 84.5 | 6.4 | 408 | 50.4 | 7.1 | 77.9 | 7.3 |
| | Hispanic (of any race) | 1,347 | 996 | 817 | 60.7 | 5.7 | 82.0 | 5.2 | 719 | 53.4 | 5.8 | 72.1 | 6.1 |
| | White alone or in combination | 4,971 | 4,520 | 3,884 | 78.1 | 2.4 | 85.9 | 2.1 | 3,602 | 72.5 | 2.6 | 79.7 | 2.5 |
| | Blac  alone or in combination | 1,064 | 907 | 716 | 67.2 | 5.6 | 78.9 | 5.3 | 663 | 62.3 | 5.8 | 73.1 | 5.8 |
| | Asian alone or in combination | 816 | 530 | 449 | 55.1 | 7.0 | 84.7 | 6.3 | 414 | 50.8 | 7.1 | 78.1 | 7.3 |
| NEW MEXICO | Total | 1,610 | 1,498 | 1,028 | 63.9 | 3.0 | 68.6 | 3.0 | 938 | 58.3 | 3.1 | 62.6 | 3.2 |
| | Male | 784 | 732 | 495 | 63.1 | 4.4 | 67.6 | 4.4 | 459 | 57.4 | 4.5 | 61.4 | 4.6 |
| | Female | 826 | 766 | 533 | 64.5 | 4.2 | 69.5 | 4.2 | 488 | 59.2 | 4.3 | 63.7 | 4.4 |
| | White non-Hispanic alone | 1,340 | 1,249 | 881 | 65.7 | 3.3 | 70.5 | 3.3 | 812 | 60.6 | 3.4 | 65.0 | 3.4 |
| | White alone | 745 | 741 | 578 | 77.5 | 3.9 | 78.0 | 3.9 | 542 | 72.7 | 4.1 | 73.1 | 4.1 |
| | Blac  alone | 34 | 32 | 24 | B | | B | | 21 | B | | B | B |
| | Asian alone | 28 | 15 | 12 | B | | B | | 12 | B | | B | B |
| | Hispanic (of any race) | 636 | 539 | 323 | 50.7 | 5.3 | 59.9 | 5.6 | 290 | 45.6 | 5.2 | 53.8 | 5.7 |
| | White alone or in combination | 1,384 | 1,288 | 911 | 65.8 | 3.2 | 70.7 | 3.2 | 840 | 60.7 | 3.3 | 65.2 | 3.4 |
| | Blac  alone or in combination | 46 | 44 | 34 | B | | B | | 29 | B | | B | B |
| | Asian alone or in combination | 38 | 25 | 22 | B | | B | | 22 | B | | B | B |
| NEW YORK | Total | 15,105 | 13,298 | 9,370 | 62.0 | 1.6 | 70.5 | 1.7 | 8,059 | 57.0 | 1.7 | 64.7 | 1.7 |
| | Male | 7,164 | 6,216 | 4,309 | 60.1 | 2.4 | 69.3 | 2.4 | 3,936 | 54.9 | 2.5 | 63.3 | 2.6 |
| | Female | 7,941 | 7,082 | 5,061 | 63.7 | 2.3 | 71.5 | 2.2 | 4,673 | 58.8 | 2.3 | 66.0 | 2.3 |
| | White alone | 10,551 | 9,556 | 6,933 | 65.7 | 1.9 | 72.5 | 1.9 | 6,443 | 61.1 | 2.0 | 69.0 | 2.1 |
| | White non-Hispanic alone | 8,764 | 8,365 | 6,188 | 70.6 | 2.0 | 74.0 | 2.0 | 5,775 | 65.9 | 2.1 | 69.0 | 2.1 |
| | Blac  alone | 2,554 | 2,329 | 1,598 | 62.6 | 3.8 | 68.6 | 3.8 | 1,459 | 57.1 | 3.9 | 62.7 | 4.0 |
| | Asian alone | 1,533 | 1,019 | 593 | 38.7 | 5.1 | 58.2 | 5.4 | 528 | 34.5 | 5.0 | 51.9 | 5.4 |
| | Hispanic (of any race) | 2,330 | 1,608 | 991 | 42.5 | 4.5 | 61.6 | 5.3 | 883 | 37.9 | 4.4 | 54.9 | 5.4 |
| | White alone or in combination | 10,786 | 9,748 | 7,086 | 65.7 | 1.9 | 72.7 | 1.9 | 6,543 | 60.7 | 2.0 | 67.1 | 2.0 |
| | Blac  alone or in combination | 2,722 | 2,464 | 1,694 | 62.2 | 3.7 | 68.7 | 3.7 | 1,523 | 55.9 | 3.8 | 61.8 | 3.9 |
| | Asian alone or in combination | 1,630 | 1,096 | 665 | 40.8 | 5.0 | 60.7 | 6.1 | 568 | 34.9 | 4.9 | 51.9 | 6.2 |
| NORTH CAROLINA | Total | 8,113 | 7,391 | 5,161 | 63.6 | 2.2 | 69.8 | 2.2 | 4,780 | 58.9 | 2.3 | 64.7 | 2.3 |
| | Male | 3,854 | 3,464 | 2,377 | 61.7 | 3.3 | 68.6 | 3.3 | 2,185 | 56.7 | 3.3 | 63.1 | 3.4 |
| | Female | 4,259 | 3,928 | 2,783 | 65.3 | 3.0 | 70.9 | 3.0 | 2,595 | 60.9 | 3.1 | 66.1 | 3.1 |
| | White alone | 5,775 | 5,194 | 3,638 | 63.0 | 2.6 | 70.0 | 2.6 | 3,379 | 58.5 | 2.7 | 65.1 | 2.8 |
| | White non-Hispanic alone | 4,859 | 4,765 | 3,418 | 70.4 | 2.7 | 71.7 | 2.7 | 3,173 | 65.3 | 2.8 | 66.6 | 2.8 |
| | Blac  alone | 1,752 | 1,707 | 1,166 | 66.6 | 4.5 | 68.3 | 4.5 | 1,083 | 61.8 | 4.6 | 63.4 | 4.6 |
| | Asian alone | 317 | 221 | 168 | 53.1 | 11.5 | 76.4 | 11.7 | 156 | 49.3 | 11.5 | 70.9 | 12.5 |
| | Hispanic (of any race) | 989 | 492 | 267 | 27.0 | 6.1 | 54.3 | 9.8 | 240 | 24.2 | 5.9 | 48.8 | 9.8 |
| | White alone or in combination | 5,894 | 5,313 | 3,725 | 63.2 | 2.6 | 70.1 | 2.6 | 3,449 | 58.5 | 2.7 | 64.9 | 2.7 |
| | Blac  alone or in combination | 1,802 | 1,757 | 1,209 | 67.1 | 4.4 | 68.8 | 4.4 | 1,118 | 62.0 | 4.5 | 63.6 | 4.6 |
| | Asian alone or in combination | 344 | 247 | 182 | 52.9 | 11.0 | 73.5 | 11.5 | 170 | 49.4 | 11.0 | 68.6 | 12.1 |
| NORTH DAKOTA | Total | 571 | 556 | 429 | 75.2 | 2.9 | 77.3 | 2.9 | 373 | 65.3 | 3.2 | 67.1 | 3.2 |
| | Male | 289 | 283 | 217 | 75.1 | 4.3 | 76.7 | 4.1 | 188 | 64.9 | 4.6 | 66.3 | 4.6 |
| | Female | 282 | 273 | 212 | 75.3 | 4.2 | 77.9 | 4.1 | 185 | 65.7 | 4.6 | 67.9 | 4.6 |

[1] This figure added to or subtracted from the estimate provides the 90-percent confidence interval.

Source: U.S. Census Bureau, Current Population Survey, November 2020

APP. 108

| STATE | Sex, Race, and Hispanic-Origin | Total population | Total citizen population | Total registered | Percent registered (Total) | Margin of error [1] | Percent registered (Citizen) | Margin of error [1] | Total voted | Percent voted (Total) | Margin of error [1] | Percent voted (Citizen) | Margin of error [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | White alone | 503 | 495 | 393 | 78.2 | 3.0 | 79.3 | 3.0 | 352 | 70.0 | 3.3 | 71.0 | 3.3 |
| | White non-Hispanic alone | 489 | 487 | 388 | 79.3 | 3.0 | 79.7 | 3.0 | 348 | 71.1 | 3.3 | 71.5 | 3.3 |
| | Black alone | 13 | 8 | 2 | B | B | B | B | 2 | B | B | B | B |
| | Asian alone | 10 | 7 | 3 | B | B | B | B | 3 | B | B | B | B |
| | Hispanic (of any race) | 16 | 11 | 6 | B | B | B | B | 5 | B | B | B | B |
| | White alone or in combination | 512 | 505 | 400 | 78.2 | 3.0 | 79.3 | 2.9 | 356 | 69.5 | 3.3 | 70.5 | 3.3 |
| | Black alone or in combination | 15 | 10 | 4 | B | B | B | B | 2 | B | B | B | B |
| | Asian alone or in combination | 12 | 8 | 4 | B | B | B | B | 3 | B | B | B | B |
| OHIO | Total | 8,951 | 8,740 | 6,733 | 75.2 | 1.9 | 77.0 | 1.8 | 6,128 | 68.5 | 2.0 | 70.1 | 2.0 |
| | Male | 4,311 | 4,211 | 3,219 | 74.7 | 2.7 | 76.4 | 2.7 | 2,913 | 67.6 | 2.9 | 69.2 | 2.9 |
| | Female | 4,640 | 4,529 | 3,514 | 75.7 | 2.6 | 77.6 | 2.5 | 3,216 | 69.3 | 2.8 | 71.0 | 2.8 |
| | White alone | 7,416 | 7,300 | 5,724 | 77.2 | 2.0 | 78.4 | 2.0 | 5,223 | 70.4 | 2.2 | 71.5 | 2.2 |
| | White non-Hispanic alone | 7,095 | 7,064 | 5,535 | 78.0 | 2.0 | 78.4 | 2.0 | 5,077 | 71.6 | 2.2 | 71.9 | 2.2 |
| | Black alone | 1,069 | 1,042 | 758 | 70.9 | 5.4 | 72.8 | 5.4 | 678 | 63.4 | 5.8 | 65.1 | 5.8 |
| | Asian alone | 234 | 167 | 101 | 43.2 | 13.1 | 60.6 | 15.3 | 96 | 41.0 | 13.0 | 57.5 | 15.5 |
| | Hispanic (of any race) | 383 | 299 | 226 | 59.0 | 10.8 | 75.8 | 10.6 | 175 | 45.7 | 10.9 | 58.7 | 12.2 |
| | White alone or in combination | 7,592 | 7,476 | 5,844 | 77.0 | 2.0 | 78.2 | 2.0 | 5,324 | 70.1 | 2.2 | 71.2 | 2.1 |
| | Black alone or in combination | 1,181 | 1,153 | 831 | 70.4 | 5.2 | 72.1 | 5.2 | 738 | 62.5 | 5.5 | 64.0 | 5.5 |
| | Asian alone or in combination | 260 | 192 | 126 | 48.7 | 12.5 | 65.8 | 13.8 | 121 | 46.7 | 12.5 | 63.1 | 14.1 |
| OKLAHOMA | Total | 2,942 | 2,800 | 1,884 | 64.0 | 3.5 | 67.3 | 3.5 | 1,631 | 55.5 | 3.6 | 58.3 | 3.7 |
| | Male | 1,434 | 1,367 | 856 | 59.7 | 5.1 | 62.6 | 5.2 | 741 | 51.7 | 5.2 | 54.2 | 5.3 |
| | Female | 1,508 | 1,433 | 1,028 | 68.2 | 4.7 | 71.7 | 4.7 | 890 | 59.0 | 5.0 | 62.1 | 5.1 |
| | White alone | 2,288 | 2,175 | 1,537 | 67.1 | 3.9 | 70.6 | 3.9 | 1,347 | 58.9 | 4.1 | 62.0 | 4.1 |
| | White non-Hispanic alone | 1,977 | 1,962 | 1,442 | 73.0 | 4.0 | 73.5 | 3.9 | 1,276 | 64.6 | 4.3 | 65.0 | 4.3 |
| | Black alone | 231 | 218 | 123 | 53.3 | 12.4 | 56.4 | 12.7 | 108 | 46.8 | 12.4 | 49.5 | 12.8 |
| | Asian alone | 26 | 19 | 4 | B | B | B | B | 4 | B | B | B | B |
| | Hispanic (of any race) | 348 | 248 | 106 | 30.6 | 10.2 | 42.8 | 13.0 | 75 | 21.6 | 9.1 | 30.3 | 12.1 |
| | White alone or in combination | 2,402 | 2,288 | 1,588 | 66.1 | 3.8 | 69.4 | 3.8 | 1,382 | 57.6 | 4.0 | 60.4 | 4.0 |
| | Black alone or in combination | 255 | 242 | 130 | 50.9 | 11.8 | 53.6 | 12.1 | 113 | 44.3 | 11.8 | 46.6 | 12.1 |
| | Asian alone or in combination | 43 | 36 | 9 | B | B | B | B | 4 | B | B | B | B |
| OREGON | Total | 3,369 | 3,242 | 2,590 | 76.9 | 2.9 | 79.9 | 2.8 | 2,402 | 71.3 | 3.1 | 74.1 | 3.0 |
| | Male | 1,645 | 1,572 | 1,245 | 75.7 | 4.2 | 79.2 | 4.0 | 1,144 | 69.5 | 4.5 | 72.8 | 4.4 |
| | Female | 1,724 | 1,670 | 1,345 | 78.0 | 3.9 | 80.5 | 3.8 | 1,258 | 73.0 | 4.2 | 75.3 | 4.2 |
| | White alone | 2,955 | 2,876 | 2,345 | 79.4 | 2.9 | 81.5 | 2.9 | 2,191 | 74.2 | 3.2 | 76.2 | 3.1 |
| | White non-Hispanic alone | 2,712 | 2,696 | 2,229 | 82.2 | 2.9 | 82.7 | 2.9 | 2,094 | 77.2 | 3.2 | 77.7 | 3.2 |
| | Black alone | 82 | 76 | 47 | 57.6 | 20.6 | 62.2 | 20.9 | 39 | 47.5 | 20.8 | 51.2 | 21.6 |
| | Asian alone | 143 | 109 | 70 | 49.4 | 16.3 | 64.8 | 17.8 | 66 | 46.2 | 16.2 | 60.6 | 18.2 |
| | Hispanic (of any race) | 281 | 201 | 122 | 43.6 | 12.2 | 60.8 | 14.2 | 105 | 37.3 | 11.9 | 52.1 | 14.5 |
| | White alone or in combination | 3,064 | 2,985 | 2,441 | 79.7 | 2.9 | 81.8 | 2.8 | 2,265 | 73.9 | 3.1 | 75.9 | 3.1 |
| | Black alone or in combination | 93 | 87 | 58 | 62.5 | 18.9 | 66.8 | 19.0 | 50 | 53.5 | 19.5 | 57.2 | 20.0 |
| | Asian alone or in combination | 179 | 145 | 101 | 56.6 | 14.4 | 69.8 | 14.8 | 84 | 47.3 | 14.5 | 58.3 | 15.9 |
| PENNSYLVANIA | Total | 9,902 | 9,621 | 7,337 | 74.1 | 1.8 | 76.3 | 1.8 | 6,756 | 68.2 | 1.9 | 70.2 | 1.9 |
| | Male | 4,787 | 4,638 | 3,489 | 72.9 | 2.6 | 75.2 | 2.6 | 3,192 | 66.7 | 2.8 | 68.8 | 2.8 |
| | Female | 5,115 | 4,983 | 3,848 | 75.2 | 2.5 | 77.2 | 2.4 | 3,564 | 69.7 | 2.6 | 71.5 | 2.6 |
| | White alone | 8,485 | 8,324 | 6,390 | 75.3 | 1.9 | 76.8 | 1.9 | 5,875 | 69.2 | 2.1 | 70.6 | 2.1 |
| | White non-Hispanic alone | 7,910 | 7,862 | 6,115 | 77.3 | 1.9 | 77.8 | 1.9 | 5,634 | 71.2 | 2.1 | 71.7 | 2.1 |
| | Black alone | 1,042 | 981 | 751 | 72.0 | 5.5 | 76.5 | 5.3 | 694 | 66.6 | 5.8 | 70.8 | 5.7 |
| | Asian alone | 231 | 171 | 88 | 38.0 | 13.0 | 51.4 | 15.5 | 84 | 36.3 | 12.8 | 49.1 | 15.3 |
| | Hispanic (of any race) | 618 | 497 | 305 | 49.3 | 8.7 | 61.4 | 9.4 | 270 | 43.6 | 8.6 | 54.3 | 9.6 |
| | White alone or in combination | 8,613 | 8,453 | 6,486 | 75.3 | 1.9 | 76.7 | 1.9 | 5,965 | 69.3 | 2.0 | 70.6 | 2.0 |
| | Black alone or in combination | 1,139 | 1,078 | 824 | 72.3 | 5.2 | 76.4 | 5.1 | 760 | 66.9 | 5.5 | 70.6 | 5.5 |
| | Asian alone or in combination | 246 | 186 | 103 | 41.8 | 12.8 | 55.4 | 14.8 | 99 | 40.3 | 12.7 | 53.2 | 14.8 |
| RHODE ISLAND | Total | 840 | 776 | 575 | 68.5 | 3.2 | 74.1 | 3.2 | 515 | 61.3 | 3.4 | 66.3 | 3.4 |
| | Male | 402 | 377 | 273 | 68.0 | 4.7 | 72.5 | 4.7 | 246 | 61.3 | 4.9 | 65.3 | 5.0 |
| | Female | 438 | 399 | 302 | 69.1 | 4.5 | 75.7 | 4.3 | 269 | 61.4 | 4.7 | 67.2 | 4.8 |
| | White alone | 742 | 698 | 519 | 69.9 | 3.4 | 74.3 | 3.3 | 462 | 62.2 | 3.6 | 66.1 | 3.6 |
| | White non-Hispanic alone | 659 | 642 | 484 | 73.4 | 3.5 | 75.4 | 3.4 | 429 | 65.1 | 3.8 | 66.8 | 3.8 |
| | Black alone | 61 | 53 | 39 | B | B | B | B | 37 | B | B | B | B |
| | Asian alone | 25 | 15 | 10 | B | B | B | B | 10 | B | B | B | B |
| | Hispanic (of any race) | 88 | 60 | 38 | B | B | B | B | 36 | B | B | B | B |
| | White alone or in combination | 750 | 706 | 525 | 70.0 | 3.4 | 74.4 | 3.3 | 466 | 62.2 | 3.6 | 66.0 | 3.6 |
| | Black alone or in combination | 68 | 60 | 45 | B | B | B | B | 41 | B | B | B | B |
| | Asian alone or in combination | 25 | 15 | 10 | B | B | B | B | 10 | B | B | B | B |
| SOUTH CAROLINA | Total | 4,010 | 3,878 | 2,713 | 67.7 | 3.0 | 70.0 | 3.0 | 2,459 | 61.3 | 3.1 | 63.4 | 3.1 |
| | Male | 1,887 | 1,820 | 1,266 | 67.1 | 4.4 | 69.5 | 4.4 | 1,158 | 61.3 | 4.5 | 63.6 | 4.6 |
| | Female | 2,123 | 2,058 | 1,447 | 68.2 | 4.1 | 70.3 | 4.1 | 1,302 | 61.3 | 4.3 | 63.3 | 4.3 |
| | White alone | 2,840 | 2,739 | 2,013 | 70.9 | 3.5 | 73.5 | 3.4 | 1,845 | 64.9 | 3.6 | 67.4 | 3.6 |
| | White non-Hispanic alone | 2,605 | 2,590 | 1,945 | 74.7 | 3.5 | 75.1 | 3.4 | 1,789 | 68.7 | 3.7 | 69.0 | 3.7 |
| | Black alone | 1,032 | 1,012 | 613 | 59.4 | 5.9 | 60.5 | 5.9 | 546 | 52.9 | 6.0 | 53.9 | 6.1 |
| | Asian alone | 50 | 40 | 37 | B | B | B | B | 34 | B | B | B | B |
| | Hispanic (of any race) | 257 | 163 | 77 | 30.1 | 12.1 | 47.5 | 16.6 | 62 | 24.3 | 11.3 | 38.3 | 16.1 |
| | White alone or in combination | 2,888 | 2,786 | 2,049 | 71.0 | 3.4 | 73.6 | 3.4 | 1,871 | 64.8 | 3.6 | 67.1 | 3.6 |
| | Black alone or in combination | 1,047 | 1,026 | 618 | 59.1 | 5.9 | 60.2 | 5.9 | 551 | 52.7 | 6.0 | 53.7 | 6.0 |
| | Asian alone or in combination | 70 | 59 | 53 | B | B | B | B | 51 | B | B | B | B |
| SOUTH DAKOTA | Total | 659 | 649 | 437 | 66.3 | 3.4 | 67.4 | 3.4 | 380 | 57.7 | 3.5 | 58.5 | 3.5 |
| | Male | 330 | 326 | 217 | 65.6 | 4.8 | 66.5 | 4.8 | 189 | 57.2 | 5.0 | 57.9 | 5.0 |
| | Female | 329 | 323 | 221 | 67.0 | 4.8 | 68.2 | 4.8 | 191 | 58.1 | 5.0 | 59.2 | 5.0 |
| | White alone | 587 | 585 | 401 | 68.3 | 3.5 | 68.5 | 3.5 | 351 | 59.7 | 3.7 | 59.9 | 3.7 |
| | White non-Hispanic alone | 577 | 577 | 397 | 68.8 | 3.5 | 68.8 | 3.5 | 348 | 60.3 | 3.7 | 60.3 | 3.7 |
| | Black alone | 18 | 13 | 5 | B | B | B | B | 4 | B | B | B | B |
| | Asian alone | 12 | 9 | 4 | B | B | B | B | 4 | B | B | B | B |
| | Hispanic (of any race) | 13 | 10 | 6 | B | B | B | B | 5 | B | B | B | B |
| | White alone or in combination | 600 | 598 | 411 | 68.5 | 3.5 | 68.7 | 3.5 | 360 | 60.0 | 3.7 | 60.2 | 3.7 |
| | Black alone or in combination | 18 | 13 | 5 | B | B | B | B | 4 | B | B | B | B |
| | Asian alone or in combination | 18 | 15 | 8 | B | B | B | B | 8 | B | B | B | B |
| TENNESSEE | Total | 5,283 | 5,038 | 3,742 | 70.8 | 2.6 | 74.3 | 2.5 | 3,346 | 63.3 | 2.7 | 66.4 | 2.7 |
| | Male | 2,544 | 2,409 | 1,766 | 69.4 | 3.7 | 73.3 | 3.7 | 1,563 | 61.4 | 3.9 | 64.9 | 4.0 |
| | Female | 2,738 | 2,629 | 1,976 | 72.2 | 3.5 | 75.2 | 3.4 | 1,783 | 65.1 | 3.7 | 67.8 | 3.7 |
| | White alone | 4,212 | 4,014 | 2,992 | 71.0 | 2.9 | 74.5 | 2.8 | 2,677 | 63.6 | 3.0 | 66.7 | 3.0 |
| | White non-Hispanic alone | 3,918 | 3,890 | 2,924 | 74.6 | 2.8 | 75.2 | 2.8 | 2,639 | 66.8 | 3.1 | 67.8 | 3.1 |
| | Black alone | 866 | 853 | 658 | 76.0 | 5.7 | 77.1 | 5.6 | 590 | 68.3 | 6.2 | 69.4 | 6.2 |
| | Asian alone | 99 | 65 | 37 | B | B | B | B | 34 | B | B | B | B |
| | Hispanic (of any race) | 329 | 152 | 72 | 22.0 | 9.8 | 47.6 | 17.3 | 63 | 19.1 | 9.3 | 41.4 | 17.1 |
| | White alone or in combination | 4,298 | 4,101 | 3,032 | 70.5 | 2.8 | 73.9 | 2.8 | 2,708 | 63.0 | 3.0 | 66.0 | 3.0 |
| | Black alone or in combination | 895 | 882 | 671 | 75.0 | 5.7 | 76.1 | 5.6 | 602 | 67.2 | 6.1 | 68.2 | 6.1 |
| | Asian alone or in combination | 111 | 76 | 49 | 43.9 | 19.0 | 63.7 | 22.1 | 46 | 41.3 | 18.8 | 59.9 | 22.6 |
| TEXAS | Total | 21,485 | 18,581 | 13,343 | 62.1 | 1.4 | 71.8 | 1.4 | 11,874 | 55.3 | 1.4 | 63.9 | 1.5 |
| | Male | 10,513 | 9,082 | 6,338 | 60.3 | 2.0 | 69.8 | 2.0 | 5,580 | 53.1 | 2.0 | 61.4 | 2.1 |

1 This figure added to or subtracted from the estimate provides the 90-percent confidence interval.
Source: U.S. Census Bureau, Current Population Survey, November 2020

| STATE | Sex, Race, and Hispanic-Origin | Total population | Total citizen population | Total registered | Percent registered (Total) | Margin of error [1] | Percent registered (Citizen) | Margin of error [1] | Total voted | Percent voted (Total) | Margin of error [1] | Percent voted (Citizen) | Margin of error [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Female | 10,972 | 9,500 | 7,005 | 63.8 | 1.9 | 73.7 | 1.9 | 6,295 | 57.4 | 2.0 | 66.3 | 2.0 |
| | White alone | 17,042 | 14,760 | 10,734 | 63.0 | 1.5 | 72.7 | 1.5 | 9,612 | 56.4 | 1.6 | 65.1 | 1.6 |
| | White non-Hispanic alone | 9,615 | 9,423 | 7,396 | 76.9 | 1.8 | 78.5 | 1.8 | 6,785 | 70.6 | 1.9 | 72.0 | 1.9 |
| | Blac  alone | 2,700 | 2,502 | 1,759 | 65.1 | 3.6 | 70.3 | 3.6 | 1,521 | 56.3 | 3.8 | 60.8 | 3.9 |
| | Asian alone | 1,239 | 821 | 521 | 42.1 | 5.7 | 63.5 | 6.8 | 482 | 38.9 | 5.6 | 58.7 | 7.0 |
| | Hispanic (of any race) | 7,730 | 5,599 | 3,538 | 45.8 | 2.5 | 63.2 | 2.8 | 2,972 | 38.4 | 2.4 | 53.1 | 2.9 |
| | White alone or in combination | 17,361 | 15,079 | 10,928 | 62.9 | 1.5 | 72.5 | 1.5 | 9,762 | 56.2 | 1.6 | 64.7 | 1.6 |
| | Blac  alone or in combination | 2,890 | 2,692 | 1,882 | 65.1 | 3.5 | 69.9 | 3.5 | 1,636 | 56.6 | 3.6 | 60.8 | 3.6 |
| | Asian alone or in combination | 1,355 | 937 | 601 | 44.4 | 5.5 | 64.2 | 6.4 | 546 | 40.3 | 5.4 | 58.3 | 6.6 |
| UTAH | Total | 2,320 | 2,178 | 1,468 | 63.3 | 2.7 | 67.4 | 2.7 | 1,386 | 59.7 | 2.8 | 63.6 | 2.8 |
| | Male | 1,146 | 1,068 | 699 | 61.0 | 3.9 | 65.5 | 4.0 | 647 | 56.5 | 4.0 | 60.6 | 4.1 |
| | Female | 1,174 | 1,110 | 769 | 65.5 | 3.8 | 69.3 | 3.8 | 739 | 62.9 | 3.9 | 66.6 | 3.9 |
| | White alone | 2,096 | 2,000 | 1,368 | 65.3 | 2.8 | 68.4 | 2.8 | 1,293 | 61.7 | 2.9 | 64.7 | 2.9 |
| | White non-Hispanic alone | 1,860 | 1,832 | 1,268 | 68.2 | 3.0 | 69.2 | 2.9 | 1,203 | 64.7 | 3.0 | 65.7 | 3.0 |
| | Blac  alone | 40 | 33 | 9 | B | B | B | B | 9 | B | B | B | B |
| | Asian alone | 51 | 18 | 10 | B | B | B | B | 10 | B | B | B | B |
| | Hispanic (of any race) | 253 | 180 | 100 | 39.4 | 8.8 | 55.4 | 10.6 | 89 | 35.3 | 8.6 | 49.6 | 10.6 |
| | White alone or in combination | 2,118 | 2,019 | 1,378 | 65.1 | 2.8 | 68.2 | 2.8 | 1,303 | 61.5 | 2.9 | 64.5 | 2.9 |
| | Blac  alone or in combination | 48 | 41 | 11 | B | B | B | B | 11 | B | B | B | B |
| | Asian alone or in combination | 55 | 20 | 13 | B | B | B | B | 13 | B | B | B | B |
| VERMONT | Total | 507 | 500 | 365 | 72.0 | 3.4 | 73.0 | 3.4 | 342 | 67.5 | 3.6 | 68.4 | 3.6 |
| | Male | 250 | 247 | 178 | 71.2 | 4.9 | 72.1 | 4.9 | 163 | 65.5 | 5.1 | 66.3 | 5.2 |
| | Female | 257 | 253 | 187 | 72.9 | 4.7 | 74.0 | 4.7 | 178 | 69.4 | 4.9 | 70.5 | 4.9 |
| | White alone | 477 | 474 | 354 | 74.3 | 3.4 | 74.8 | 3.4 | 332 | 69.7 | 3.6 | 70.3 | 3.6 |
| | White non-Hispanic alone | 474 | 470 | 351 | 74.1 | 3.4 | 74.6 | 3.4 | 329 | 69.4 | 3.6 | 69.9 | 3.6 |
| | Blac  alone | 8 | 5 | 1 | B | B | B | B | 1 | B | B | B | B |
| | Asian alone | 11 | 11 | 3 | B | B | B | B | 3 | B | B | B | B |
| | Hispanic (of any race) | 6 | 6 | 4 | B | B | B | B | 4 | B | B | B | B |
| | White alone or in combination | 485 | 482 | 360 | 74.1 | 3.4 | 74.7 | 3.4 | 337 | 69.4 | 3.6 | 69.9 | 3.6 |
| | Blac  alone or in combination | 10 | 7 | 1 | B | B | B | B | 1 | B | B | B | B |
| | Asian alone or in combination | 14 | 14 | 6 | B | B | B | B | 6 | B | B | B | B |
| VIRGINIA | Total | 6,481 | 5,974 | 4,541 | 70.1 | 2.4 | 76.0 | 2.3 | 4,275 | 66.0 | 2.5 | 71.5 | 2.4 |
| | Male | 3,084 | 2,842 | 2,092 | 67.8 | 3.5 | 73.6 | 3.5 | 1,981 | 64.2 | 3.6 | 69.7 | 3.6 |
| | Female | 3,396 | 3,132 | 2,449 | 72.1 | 3.2 | 78.2 | 3.1 | 2,293 | 67.5 | 3.4 | 73.2 | 3.3 |
| | White alone | 4,526 | 4,268 | 3,393 | 75.0 | 2.7 | 79.5 | 2.6 | 3,204 | 70.8 | 2.8 | 75.1 | 2.8 |
| | White non-Hispanic alone | 3,979 | 3,904 | 3,160 | 79.4 | 2.7 | 80.9 | 2.6 | 3,018 | 75.9 | 2.8 | 77.3 | 2.8 |
| | Blac  alone | 1,237 | 1,129 | 764 | 61.8 | 5.5 | 67.7 | 5.6 | 722 | 58.3 | 5.6 | 63.9 | 5.7 |
| | Asian alone | 512 | 409 | 271 | 52.9 | 9.1 | 66.1 | 9.6 | 253 | 49.4 | 9.1 | 61.8 | 9.9 |
| | Hispanic (of any race) | 678 | 425 | 271 | 39.9 | 8.2 | 63.8 | 10.2 | 218 | 32.1 | 7.8 | 51.3 | 10.6 |
| | White alone or in combination | 4,620 | 4,362 | 3,454 | 74.8 | 2.7 | 79.2 | 2.6 | 3,248 | 70.3 | 2.8 | 74.5 | 2.8 |
| | Blac  alone or in combination | 1,304 | 1,196 | 805 | 61.7 | 5.4 | 67.3 | 5.4 | 748 | 57.4 | 5.5 | 62.5 | 5.6 |
| | Asian alone or in combination | 535 | 432 | 287 | 53.6 | 8.9 | 66.4 | 9.3 | 269 | 50.3 | 8.9 | 62.3 | 9.6 |
| WASHINGTON | Total | 5,993 | 5,389 | 4,029 | 67.2 | 2.5 | 74.8 | 2.4 | 3,854 | 64.3 | 2.6 | 71.5 | 2.5 |
| | Male | 2,947 | 2,638 | 1,921 | 65.2 | 3.6 | 72.8 | 3.6 | 1,806 | 61.3 | 3.7 | 68.5 | 3.7 |
| | Female | 3,046 | 2,751 | 2,109 | 69.2 | 3.5 | 76.7 | 3.3 | 2,047 | 67.2 | 3.5 | 74.4 | 3.4 |
| | White alone | 4,735 | 4,413 | 3,452 | 72.9 | 2.7 | 78.2 | 2.6 | 3,309 | 69.9 | 2.8 | 75.0 | 2.7 |
| | White non-Hispanic alone | 4,122 | 3,985 | 3,177 | 77.1 | 2.7 | 79.7 | 2.6 | 3,070 | 74.5 | 2.8 | 77.0 | 2.8 |
| | Blac  alone | 257 | 210 | 136 | 53.1 | 12.3 | 64.7 | 13.0 | 130 | 50.8 | 12.3 | 61.9 | 13.2 |
| | Asian alone | 557 | 334 | 213 | 38.3 | 8.4 | 63.9 | 10.7 | 210 | 37.7 | 8.4 | 62.8 | 10.8 |
| | Hispanic (of any race) | 680 | 485 | 296 | 43.6 | 8.2 | 61.0 | 9.6 | 261 | 38.4 | 8.1 | 53.7 | 9.8 |
| | White alone or in combination | 4,928 | 4,593 | 3,573 | 72.5 | 2.6 | 77.8 | 2.5 | 3,426 | 69.5 | 2.7 | 74.6 | 2.7 |
| | Blac  alone or in combination | 331 | 285 | 170 | 51.2 | 10.9 | 59.5 | 11.5 | 164 | 49.4 | 10.9 | 57.4 | 11.6 |
| | Asian alone or in combination | 590 | 363 | 227 | 38.5 | 8.2 | 62.5 | 10.4 | 224 | 37.9 | 8.1 | 61.6 | 10.4 |
| WEST VIRGINIA | Total | 1,397 | 1,379 | 928 | 66.4 | 3.4 | 67.3 | 3.4 | 773 | 55.3 | 3.6 | 56.1 | 3.6 |
| | Male | 684 | 675 | 457 | 66.9 | 4.9 | 67.7 | 4.9 | 379 | 55.4 | 5.1 | 56.1 | 5.2 |
| | Female | 714 | 704 | 471 | 65.9 | 4.8 | 66.8 | 4.8 | 395 | 55.3 | 5.0 | 56.0 | 5.1 |
| | White alone | 1,324 | 1,314 | 879 | 66.4 | 3.5 | 66.9 | 3.5 | 735 | 55.5 | 3.7 | 56.0 | 3.7 |
| | White non-Hispanic alone | 1,303 | 1,301 | 871 | 66.9 | 3.5 | 67.0 | 3.5 | 729 | 56.0 | 3.7 | 56.1 | 3.7 |
| | Blac  alone | 45 | 42 | 26 | B | B | B | B | 18 | B | B | B | B |
| | Asian alone | 5 | 1 | 1 | B | B | B | B | 1 | B | B | B | B |
| | Hispanic (of any race) | 23 | 15 | 10 | B | B | B | B | 8 | B | B | B | B |
| | White alone or in combination | 1,346 | 1,336 | 900 | 66.9 | 3.5 | 67.4 | 3.5 | 754 | 56.0 | 3.7 | 56.5 | 3.7 |
| | Blac  alone or in combination | 54 | 50 | 34 | B | B | B | B | 25 | B | B | B | B |
| | Asian alone or in combination | 6 | 2 | 2 | B | B | B | B | 2 | B | B | B | B |
| WISCONSIN | Total | 4,538 | 4,421 | 3,391 | 74.7 | 2.7 | 76.7 | 2.6 | 3,253 | 71.7 | 2.8 | 73.6 | 2.7 |
| | Male | 2,223 | 2,158 | 1,616 | 72.7 | 3.9 | 74.9 | 3.8 | 1,533 | 68.9 | 4.0 | 71.0 | 4.0 |
| | Female | 2,315 | 2,263 | 1,775 | 76.7 | 3.6 | 78.5 | 3.6 | 1,720 | 74.3 | 3.7 | 76.0 | 3.7 |
| | White alone | 4,005 | 3,931 | 3,119 | 77.9 | 2.7 | 79.3 | 2.7 | 3,008 | 75.1 | 2.8 | 76.5 | 2.8 |
| | White non-Hispanic alone | 3,776 | 3,772 | 3,020 | 80.0 | 2.7 | 80.1 | 2.7 | 2,914 | 77.2 | 2.8 | 77.2 | 2.8 |
| | Blac  alone | 263 | 263 | 126 | 47.7 | 12.1 | 47.7 | 12.1 | 114 | 43.5 | 12.0 | 43.5 | 12.0 |
| | Asian alone | 117 | 73 | 44 | B | B | B | B | 44 | B | B | B | B |
| | Hispanic (of any race) | 242 | 173 | 105 | 43.3 | 13.7 | 61.0 | 16.0 | 101 | 41.7 | 13.7 | 58.4 | 16.2 |
| | White alone or in combination | 4,113 | 4,040 | 3,192 | 77.6 | 2.7 | 79.0 | 2.6 | 3,081 | 74.9 | 2.8 | 76.3 | 2.8 |
| | Blac  alone or in combination | 318 | 318 | 152 | 47.8 | 11.0 | 47.8 | 11.0 | 140 | 44.3 | 11.0 | 44.3 | 11.0 |
| | Asian alone or in combination | 138 | 94 | 59 | 42.4 | 17.1 | 62.0 | 20.3 | 59 | 42.4 | 17.1 | 62.0 | 20.3 |
| WYOMING | Total | 436 | 427 | 296 | 67.9 | 3.4 | 69.3 | 3.4 | 280 | 64.1 | 3.5 | 65.5 | 3.5 |
| | Male | 217 | 212 | 141 | 65.0 | 5.0 | 66.5 | 5.0 | 132 | 61.1 | 5.1 | 62.2 | 5.2 |
| | Female | 219 | 215 | 155 | 70.8 | 4.7 | 72.1 | 4.7 | 147 | 67.2 | 4.9 | 68.4 | 4.8 |
| | White alone | 410 | 405 | 280 | 68.3 | 3.5 | 69.3 | 3.5 | 265 | 64.5 | 3.6 | 65.4 | 3.6 |
| | White non-Hispanic alone | 379 | 376 | 265 | 70.0 | 3.6 | 70.6 | 3.6 | 251 | 66.2 | 3.7 | 66.8 | 3.7 |
| | Blac  alone | 2 | 2 | 1 | B | B | B | B | 1 | B | B | B | B |
| | Asian alone | 2 | - | - | B | B | B | B | - | B | B | B | B |
| | Hispanic (of any race) | 40 | 38 | 23 | B | B | B | B | 21 | B | B | B | B |
| | White alone or in combination | 422 | 416 | 290 | 68.6 | 3.5 | 69.6 | 3.5 | 273 | 64.7 | 3.6 | 65.7 | 3.6 |
| | Blac  alone or in combination | 4 | 3 | 3 | B | B | B | B | 3 | B | B | B | B |
| | Asian alone or in combination | 4 | 2 | 2 | B | B | B | B | 2 | B | B | B | B |

[1] This figure added to or subtracted from the estimate provides the 90-percent confidence interval.

NOTES:

A dash - represents zero or rounds to zero.

The symbol B means that the base is less than 75,000 and therefore too small to show the derived measure.

Estimates may not sum to totals due to rounding.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see https://www.census.gov/programs-surveys/cps/technical-documentation/complete.2020.html

Source: U.S. Census Bureau, Current Population Survey, November 2020

Table 4c.  Reported Voting and Registration, by Age, for States: November 2020
(In thousands)

| STATE | Age | Total population | Total citizen population | Registered | | | | | Voted | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Total registered | Percent registered (Total) | Margin of error[1] | Percent registered (Citizen) | Margin of error[1] | Total voted | Percent voted (Total) | Margin of error[1] | Percent voted (Citizen) | Margin of error[1] |
| US | Total | 252,274 | 231,593 | 168,308 | 66.7 | 0.4 | 72.7 | 0.4 | 154,628 | 61.3 | 0.4 | 66.8 | 0.4 |
| | 18 to 24 | 28,659 | 26,737 | 15,984 | 55.8 | 1.1 | 59.8 | 1.1 | 13,752 | 48.0 | 1.1 | 51.4 | 1.2 |
| | 25 to 34 | 44,871 | 39,962 | 27,351 | 61.0 | 0.9 | 68.4 | 0.9 | 24,091 | 53.7 | 0.9 | 60.3 | 0.9 |
| | 35 to 44 | 41,558 | 35,977 | 25,852 | 62.2 | 0.9 | 71.9 | 0.9 | 23,421 | 56.4 | 0.9 | 65.1 | 1.0 |
| | 45 to 64 | 81,912 | 75,590 | 57,226 | 69.9 | 0.6 | 75.7 | 0.6 | 53,646 | 65.5 | 0.6 | 71.0 | 0.6 |
| | 65 | 55,273 | 53,326 | 41,895 | 75.8 | 0.7 | 78.6 | 0.7 | 39,718 | 71.9 | 0.7 | 74.5 | 0.7 |
| ALABAMA | Total | 3,769 | 3,716 | 2,527 | 67.0 | 3.1 | 68.0 | 3.1 | 2,247 | 59.6 | 3.3 | 60.5 | 3.3 |
| | 18 to 24 | 431 | 427 | 218 | 50.6 | 9.8 | 51.1 | 9.8 | 194 | 44.9 | 9.7 | 45.4 | 9.8 |
| | 25 to 34 | 599 | 587 | 376 | 62.8 | 8.0 | 64.2 | 8.1 | 315 | 52.6 | 8.3 | 53.7 | 8.4 |
| | 35 to 44 | 626 | 608 | 415 | 66.3 | 7.7 | 68.2 | 7.7 | 365 | 58.3 | 8.0 | 60.0 | 8.1 |
| | 45 to 64 | 1,261 | 1,246 | 900 | 71.4 | 5.2 | 72.2 | 5.2 | 824 | 65.4 | 5.4 | 66.2 | 5.5 |
| | 65 | 852 | 848 | 618 | 72.5 | 6.2 | 72.9 | 6.2 | 549 | 64.5 | 6.7 | 64.8 | 6.7 |
| ALASKA | Total | 528 | 516 | 383 | 72.6 | 3.2 | 74.2 | 3.1 | 330 | 62.4 | 3.4 | 63.8 | 3.4 |
| | 18 to 24 | 60 | 59 | 38 | B | B | B | B | 29 | B | B | B | B |
| | 25 to 34 | 97 | 94 | 59 | 60.7 | 8.0 | 63.1 | 8.1 | 41 | 41.9 | 8.1 | 43.6 | 8.3 |
| | 35 to 44 | 102 | 99 | 74 | 72.5 | 7.2 | 75.1 | 7.1 | 62 | 60.5 | 7.8 | 62.6 | 7.9 |
| | 45 to 64 | 177 | 174 | 141 | 79.8 | 4.9 | 80.9 | 4.8 | 131 | 73.9 | 5.4 | 75.0 | 5.3 |
| | 65 | 92 | 91 | 71 | 77.0 | 7.1 | 77.7 | 7.1 | 67 | 73.0 | 7.5 | 73.6 | 7.5 |
| ARIZONA | Total | 5,638 | 5,075 | 3,878 | 68.8 | 2.5 | 76.4 | 2.5 | 3,649 | 64.7 | 2.6 | 71.9 | 2.6 |
| | 18 to 24 | 653 | 629 | 371 | 56.7 | 8.0 | 59.0 | 8.1 | 327 | 50.1 | 8.1 | 52.0 | 8.2 |
| | 25 to 34 | 941 | 850 | 619 | 65.8 | 6.4 | 72.9 | 6.3 | 579 | 61.6 | 6.5 | 68.2 | 6.6 |
| | 35 to 44 | 929 | 756 | 565 | 60.8 | 6.6 | 74.6 | 6.5 | 509 | 54.8 | 6.7 | 67.3 | 7.0 |
| | 45 to 64 | 1,833 | 1,627 | 1,301 | 70.9 | 4.4 | 79.9 | 4.1 | 1,242 | 67.8 | 4.5 | 76.4 | 4.3 |
| | 65 | 1,282 | 1,213 | 1,023 | 79.8 | 4.6 | 84.4 | 4.3 | 992 | 77.4 | 4.8 | 81.8 | 4.6 |
| ARKANSAS | Total | 2,283 | 2,195 | 1,361 | 59.6 | 3.4 | 62.0 | 3.4 | 1,186 | 51.9 | 3.4 | 54.0 | 3.5 |
| | 18 to 24 | 263 | 261 | 127 | 48.3 | 10.1 | 48.7 | 10.1 | 84 | 32.1 | 9.4 | 32.3 | 9.5 |
| | 25 to 34 | 420 | 389 | 217 | 51.7 | 8.0 | 55.8 | 8.2 | 176 | 41.8 | 7.9 | 45.1 | 8.2 |
| | 35 to 44 | 341 | 319 | 201 | 58.8 | 8.7 | 63.0 | 8.8 | 179 | 52.6 | 8.8 | 56.3 | 9.1 |
| | 45 to 64 | 706 | 680 | 446 | 63.2 | 5.9 | 65.7 | 6.0 | 401 | 56.8 | 6.1 | 59.0 | 6.2 |
| | 65 | 543 | 547 | 370 | 66.9 | 6.5 | 67.7 | 6.5 | 346 | 62.5 | 6.7 | 63.2 | 6.7 |
| CALIFORNIA | Total | 30,342 | 25,946 | 18,001 | 59.3 | 1.2 | 69.4 | 1.2 | 16,893 | 55.7 | 1.2 | 65.1 | 1.2 |
| | 18 to 24 | 3,685 | 3,334 | 1,974 | 53.6 | 3.4 | 59.2 | 3.5 | 1,786 | 48.5 | 3.4 | 53.6 | 3.6 |
| | 25 to 34 | 5,953 | 4,957 | 3,261 | 54.8 | 2.7 | 65.8 | 2.8 | 2,976 | 50.0 | 2.7 | 60.0 | 2.9 |
| | 35 to 44 | 5,090 | 4,016 | 2,759 | 54.2 | 2.9 | 68.7 | 3.0 | 2,554 | 50.2 | 2.9 | 63.6 | 3.1 |
| | 45 to 64 | 9,499 | 7,973 | 5,820 | 61.3 | 2.1 | 73.0 | 2.0 | 5,534 | 58.3 | 2.1 | 69.4 | 2.1 |
| | 65 | 6,117 | 5,666 | 4,187 | 68.4 | 2.4 | 73.9 | 2.4 | 4,044 | 66.1 | 2.5 | 71.4 | 2.5 |
| COLORADO | Total | 4,525 | 4,200 | 2,993 | 66.2 | 2.9 | 71.3 | 2.9 | 2,837 | 62.7 | 3.0 | 67.6 | 3.0 |
| | 18 to 24 | 528 | 481 | 293 | 55.6 | 9.0 | 60.9 | 9.2 | 257 | 48.6 | 9.0 | 53.3 | 9.4 |
| | 25 to 34 | 996 | 942 | 653 | 65.6 | 6.2 | 69.3 | 6.2 | 608 | 61.1 | 6.4 | 64.6 | 6.5 |
| | 35 to 44 | 717 | 629 | 442 | 61.7 | 7.5 | 70.3 | 7.5 | 420 | 58.5 | 7.6 | 66.7 | 7.8 |
| | 45 to 64 | 1,432 | 1,302 | 956 | 66.8 | 5.2 | 73.4 | 5.1 | 922 | 64.4 | 5.2 | 70.8 | 5.2 |
| | 65 | 852 | 845 | 648 | 76.0 | 6.1 | 76.7 | 6.0 | 631 | 74.1 | 6.2 | 74.7 | 6.2 |
| CONNECTICUT | Total | 2,777 | 2,524 | 1,850 | 66.6 | 3.2 | 73.3 | 3.2 | 1,681 | 60.5 | 3.3 | 66.6 | 3.4 |
| | 18 to 24 | 281 | 271 | 163 | 58.0 | 10.6 | 60.1 | 10.7 | 141 | 50.1 | 10.7 | 51.9 | 10.9 |
| | 25 to 34 | 442 | 372 | 259 | 58.5 | 8.4 | 69.5 | 8.6 | 225 | 50.9 | 8.5 | 60.5 | 9.1 |
| | 35 to 44 | 456 | 366 | 245 | 53.7 | 8.4 | 66.9 | 8.8 | 228 | 49.9 | 8.4 | 62.2 | 9.1 |
| | 45 to 64 | 994 | 942 | 726 | 73.1 | 5.0 | 77.1 | 4.9 | 660 | 66.4 | 5.4 | 70.0 | 5.4 |
| | 65 | 603 | 573 | 457 | 75.8 | 6.3 | 79.8 | 6.0 | 428 | 70.9 | 6.6 | 74.7 | 6.5 |
| DELAWARE | Total | 766 | 722 | 542 | 70.8 | 3.0 | 75.1 | 3.0 | 489 | 63.8 | 3.2 | 67.7 | 3.2 |
| | 18 to 24 | 84 | 81 | 54 | 64.9 | 9.6 | 67.2 | 9.6 | 43 | 51.8 | 10.0 | 53.6 | 10.2 |
| | 25 to 34 | 119 | 104 | 71 | 59.7 | 8.2 | 68.5 | 8.4 | 58 | 49.0 | 8.4 | 56.2 | 8.9 |
| | 35 to 44 | 113 | 102 | 79 | 69.9 | 7.9 | 77.6 | 7.6 | 71 | 62.8 | 8.3 | 69.7 | 8.3 |
| | 45 to 64 | 257 | 245 | 183 | 71.4 | 5.2 | 74.7 | 5.1 | 168 | 65.6 | 5.4 | 68.6 | 5.4 |
| | 65 | 192 | 189 | 154 | 79.9 | 5.2 | 81.3 | 5.0 | 147 | 76.4 | 5.6 | 77.8 | 5.6 |
| DISTRICT OF COLUMBIA | Total | 576 | 534 | 464 | 80.5 | 2.7 | 86.9 | 2.4 | 448 | 77.8 | 2.8 | 84.0 | 2.6 |
| | 18 to 24 | 63 | 56 | 48 | B | B | B | B | 47 | B | B | B | B |
| | 25 to 34 | 159 | 148 | 132 | 83.1 | 4.8 | 89.1 | 4.2 | 127 | 80.1 | 5.1 | 85.9 | 4.6 |
| | 35 to 44 | 126 | 115 | 100 | 79.1 | 5.9 | 86.5 | 5.2 | 95 | 75.5 | 6.2 | 82.6 | 5.7 |
| | 45 to 64 | 136 | 124 | 108 | 79.9 | 5.6 | 87.1 | 4.9 | 106 | 78.4 | 5.7 | 85.4 | 5.1 |
| | 65 | 93 | 89 | 76 | 81.3 | 6.6 | 84.6 | 6.2 | 72 | 78.0 | 7.0 | 81.1 | 6.7 |
| FLORIDA | Total | 17,244 | 15,645 | 10,495 | 60.9 | 1.5 | 67.1 | 1.5 | 9,720 | 56.4 | 1.5 | 62.1 | 1.6 |
| | 18 to 24 | 1,556 | 1,391 | 775 | 49.8 | 5.1 | 55.7 | 5.4 | 648 | 41.6 | 5.1 | 46.6 | 5.4 |
| | 25 to 34 | 2,713 | 2,397 | 1,476 | 54.4 | 3.9 | 61.6 | 4.0 | 1,302 | 48.0 | 3.9 | 54.3 | 4.1 |
| | 35 to 44 | 2,732 | 2,336 | 1,514 | 55.4 | 3.9 | 64.8 | 4.0 | 1,370 | 50.1 | 3.9 | 58.6 | 4.1 |
| | 45 to 64 | 5,776 | 5,253 | 3,520 | 60.9 | 2.6 | 67.0 | 2.6 | 3,325 | 57.6 | 2.6 | 63.3 | 2.7 |
| | 65 | 4,468 | 4,267 | 3,210 | 71.9 | 2.7 | 75.2 | 2.7 | 3,076 | 68.8 | 2.8 | 72.1 | 2.8 |
| GEORGIA | Total | 8,032 | 7,400 | 5,233 | 65.2 | 2.2 | 70.7 | 2.2 | 4,888 | 60.9 | 2.2 | 66.1 | 2.3 |
| | 18 to 24 | 990 | 925 | 556 | 56.1 | 6.5 | 60.1 | 6.6 | 489 | 49.4 | 6.5 | 52.9 | 6.8 |
| | 25 to 34 | 1,496 | 1,354 | 913 | 61.0 | 5.2 | 67.4 | 5.2 | 794 | 53.1 | 5.3 | 58.6 | 5.5 |
| | 35 to 44 | 1,287 | 1,083 | 723 | 56.2 | 5.7 | 66.8 | 5.9 | 690 | 53.6 | 5.7 | 63.7 | 6.0 |
| | 45 to 64 | 2,634 | 2,454 | 1,854 | 70.4 | 3.7 | 75.6 | 3.6 | 1,783 | 67.7 | 3.8 | 72.6 | 3.7 |
| | 65 | 1,625 | 1,584 | 1,187 | 73.1 | 4.5 | 75.0 | 4.5 | 1,132 | 69.6 | 4.7 | 71.4 | 4.7 |
| HAWAII | Total | 1,056 | 980 | 673 | 63.8 | 3.3 | 68.7 | 3.3 | 630 | 59.7 | 3.3 | 64.3 | 3.4 |
| | 18 to 24 | 107 | 93 | 46 | 43.4 | 10.6 | 49.6 | 11.4 | 41 | 38.8 | 10.4 | 44.4 | 11.3 |
| | 25 to 34 | 170 | 156 | 88 | 51.9 | 8.4 | 56.7 | 8.7 | 80 | 47.3 | 8.4 | 51.7 | 8.8 |
| | 35 to 44 | 170 | 156 | 110 | 65.0 | 8.0 | 70.5 | 8.0 | 103 | 60.4 | 8.3 | 65.6 | 8.4 |
| | 45 to 64 | 332 | 311 | 244 | 73.5 | 5.3 | 78.3 | 5.1 | 230 | 69.4 | 5.6 | 73.9 | 5.5 |
| | 65 | 278 | 263 | 185 | 66.5 | 6.2 | 70.2 | 6.2 | 175 | 63.2 | 6.4 | 66.6 | 6.4 |
| IDAHO | Total | 1,370 | 1,299 | 900 | 65.7 | 3.1 | 69.3 | 3.1 | 843 | 61.6 | 3.2 | 64.9 | 3.2 |
| | 18 to 24 | 182 | 177 | 102 | 55.8 | 8.9 | 57.6 | 9.0 | 95 | 52.1 | 9.0 | 53.9 | 9.1 |
| | 25 to 34 | 253 | 235 | 151 | 59.8 | 7.5 | 64.5 | 7.6 | 140 | 55.4 | 7.6 | 59.7 | 7.7 |
| | 35 to 44 | 203 | 185 | 132 | 65.0 | 8.1 | 71.3 | 8.0 | 123 | 60.4 | 8.3 | 66.2 | 8.4 |
| | 45 to 64 | 418 | 398 | 278 | 66.6 | 5.6 | 69.9 | 5.6 | 262 | 62.7 | 5.7 | 65.8 | 5.8 |
| | 65 | 313 | 304 | 237 | 75.7 | 5.9 | 77.9 | 5.8 | 223 | 71.3 | 6.2 | 73.4 | 6.1 |
| ILLINOIS | Total | 9,658 | 8,760 | | | | | | | 62.7 | 2.0 | 68.4 | 2.0 |

[1]The figure added to or subtracted from the estimate provides the 90-percent confidence interval.

APP. 111

| STATE | Age | Total population | Total citizen population | Total registered | Percent registered (Total) | Margin of error [1] | Percent registered (Citizen) | Margin of error [1] | Total voted | Percent voted (Total) | Margin of error [1] | Percent voted (Citizen) | Margin of error [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 18 to 24 | 1,135 | 1,060 | 664 | 58.5 | 6.0 | 62.7 | 6.1 | 583 | 51.4 | 6.1 | 55.0 | 6.3 |
| | 25 to 34 | 1,703 | 1,525 | 1,010 | 59.3 | 4.9 | 66.2 | 5.0 | 892 | 52.4 | 5.0 | 58.5 | 5.2 |
| | 35 to 44 | 1,598 | 1,418 | 1,069 | 66.9 | 4.9 | 75.4 | 4.7 | 985 | 61.7 | 5.0 | 69.5 | 5.0 |
| | 45 to 64 | 3,196 | 2,937 | 2,310 | 72.3 | 3.3 | 78.7 | 3.1 | 2,153 | 67.4 | 3.4 | 73.3 | 3.4 |
| | 65 | 2,027 | 1,920 | 1,537 | 75.8 | 3.9 | 80.0 | 3.8 | 1,444 | 71.2 | 4.1 | 75.2 | 4.1 |
| INDIANA | Total | 5,096 | 4,921 | 3,412 | 67.0 | 2.7 | 69.3 | 2.7 | 3,002 | 58.9 | 2.8 | 61.0 | 2.8 |
| | 18 to 24 | 587 | 571 | 276 | 47.0 | 8.4 | 48.3 | 8.5 | 221 | 37.7 | 8.2 | 38.8 | 8.3 |
| | 25 to 34 | 799 | 760 | 493 | 61.7 | 7.0 | 64.8 | 7.1 | 401 | 50.2 | 7.2 | 52.8 | 7.4 |
| | 35 to 44 | 946 | 888 | 611 | 64.5 | 6.4 | 68.8 | 6.4 | 515 | 54.4 | 6.6 | 58.0 | 6.8 |
| | 45 to 64 | 1,642 | 1,609 | 1,155 | 70.3 | 4.6 | 71.8 | 4.6 | 1,045 | 63.6 | 4.9 | 64.9 | 4.9 |
| | 65 | 1,121 | 1,092 | 878 | 78.3 | 5.0 | 80.4 | 4.9 | 820 | 73.2 | 5.4 | 75.1 | 5.3 |
| IOWA | Total | 2,361 | 2,293 | 1,742 | 73.8 | 3.1 | 76.0 | 3.0 | 1,618 | 68.5 | 3.2 | 70.5 | 3.2 |
| | 18 to 24 | 260 | 248 | 169 | 65.2 | 10.0 | 68.3 | 10.0 | 157 | 60.5 | 10.3 | 63.3 | 10.3 |
| | 25 to 34 | 377 | 356 | 248 | 65.7 | 8.3 | 69.5 | 8.2 | 223 | 59.2 | 8.6 | 62.7 | 8.7 |
| | 35 to 44 | 412 | 395 | 307 | 74.5 | 7.3 | 77.8 | 7.1 | 276 | 66.8 | 7.8 | 69.8 | 7.8 |
| | 45 to 64 | 722 | 707 | 545 | 75.4 | 5.4 | 77.0 | 5.3 | 511 | 70.7 | 5.7 | 72.3 | 5.7 |
| | 65 | 590 | 587 | 473 | 80.2 | 5.5 | 80.5 | 5.5 | 451 | 76.5 | 5.9 | 76.8 | 5.9 |
| KANSAS | Total | 2,157 | 1,975 | 1,398 | 64.8 | 3.5 | 70.8 | 3.5 | 1,297 | 60.1 | 3.6 | 65.7 | 3.7 |
| | 18 to 24 | 264 | 240 | 149 | 56.5 | 10.5 | 62.3 | 10.8 | 128 | 48.4 | 10.6 | 53.4 | 11.1 |
| | 25 to 34 | 392 | 331 | 210 | 53.5 | 8.7 | 63.5 | 9.1 | 191 | 48.7 | 8.7 | 57.8 | 9.4 |
| | 35 to 44 | 343 | 304 | 221 | 64.4 | 8.9 | 72.6 | 8.8 | 204 | 59.4 | 9.1 | 67.0 | 9.3 |
| | 45 to 64 | 659 | 607 | 424 | 64.4 | 6.4 | 69.9 | 6.4 | 392 | 59.5 | 6.6 | 64.6 | 6.7 |
| | 65 | 499 | 493 | 394 | 78.9 | 6.3 | 79.9 | 6.2 | 382 | 76.5 | 6.5 | 77.5 | 6.5 |
| KENTUCKY | Total | 3,384 | 3,227 | 2,450 | 72.4 | 3.2 | 75.9 | 3.1 | 2,210 | 65.3 | 3.4 | 68.5 | 3.4 |
| | 18 to 24 | 281 | 265 | 172 | 61.3 | 12.0 | 65.2 | 12.1 | 157 | 55.8 | 12.2 | 59.3 | 12.4 |
| | 25 to 34 | 570 | 498 | 330 | 57.8 | 8.5 | 66.2 | 8.7 | 271 | 47.4 | 8.6 | 54.3 | 9.2 |
| | 35 to 44 | 640 | 606 | 479 | 74.8 | 7.1 | 79.0 | 6.8 | 439 | 68.6 | 7.6 | 72.5 | 7.5 |
| | 45 to 64 | 1,141 | 1,111 | 874 | 76.6 | 5.2 | 78.7 | 5.1 | 787 | 68.9 | 5.6 | 70.8 | 5.6 |
| | 65 | 751 | 748 | 595 | 79.2 | 6.1 | 79.5 | 6.1 | 557 | 74.1 | 6.6 | 74.4 | 6.6 |
| LOUISIANA | Total | 3,438 | 3,299 | 2,286 | 66.5 | 3.2 | 69.3 | 3.2 | 2,041 | 59.4 | 3.3 | 61.9 | 3.3 |
| | 18 to 24 | 389 | 370 | 207 | 53.1 | 10.0 | 55.9 | 10.2 | 173 | 44.5 | 9.9 | 46.9 | 10.2 |
| | 25 to 34 | 598 | 563 | 358 | 59.8 | 7.9 | 63.6 | 8.0 | 290 | 48.5 | 8.1 | 51.5 | 8.3 |
| | 35 to 44 | 587 | 563 | 391 | 66.7 | 7.7 | 69.5 | 7.6 | 356 | 60.7 | 7.9 | 63.2 | 8.0 |
| | 45 to 64 | 1,089 | 1,043 | 744 | 68.3 | 5.6 | 71.3 | 5.5 | 688 | 63.1 | 5.8 | 65.9 | 5.8 |
| | 65 | 775 | 760 | 586 | 75.7 | 6.1 | 77.1 | 6.0 | 535 | 69.0 | 6.5 | 70.4 | 6.5 |
| MAINE | Total | 1,087 | 1,075 | 832 | 76.5 | 3.2 | 77.4 | 3.2 | 766 | 70.5 | 3.4 | 71.3 | 3.4 |
| | 18 to 24 | 93 | 90 | 60 | 64.6 | 12.3 | 66.4 | 12.3 | 57 | 61.4 | 12.5 | 63.1 | 12.6 |
| | 25 to 34 | 158 | 157 | 116 | 73.3 | 8.7 | 74.1 | 8.7 | 102 | 64.3 | 9.4 | 65.0 | 9.5 |
| | 35 to 44 | 170 | 170 | 136 | 79.8 | 7.6 | 79.8 | 7.6 | 120 | 70.8 | 8.6 | 70.8 | 8.6 |
| | 45 to 64 | 367 | 361 | 285 | 77.7 | 5.4 | 78.8 | 5.3 | 263 | 71.7 | 5.8 | 72.7 | 5.8 |
| | 65 | 300 | 296 | 236 | 78.6 | 5.9 | 79.5 | 5.8 | 224 | 74.9 | 6.2 | 75.7 | 6.2 |
| MARYLAND | Total | 4,606 | 4,303 | 3,383 | 73.4 | 2.7 | 78.6 | 2.6 | 3,166 | 68.7 | 2.9 | 73.6 | 2.8 |
| | 18 to 24 | 573 | 530 | 413 | 72.0 | 7.8 | 77.8 | 7.5 | 375 | 65.4 | 8.3 | 70.7 | 8.3 |
| | 25 to 34 | 754 | 684 | 517 | 68.6 | 7.1 | 75.6 | 6.9 | 460 | 61.0 | 7.4 | 67.3 | 7.5 |
| | 35 to 44 | 726 | 655 | 534 | 73.5 | 6.8 | 81.5 | 6.3 | 498 | 68.6 | 7.1 | 76.0 | 7.0 |
| | 45 to 64 | 1,542 | 1,447 | 1,125 | 72.9 | 4.7 | 77.7 | 4.6 | 1,080 | 70.0 | 4.9 | 74.6 | 4.8 |
| | 65 | 1,010 | 986 | 794 | 78.6 | 5.4 | 80.5 | 5.3 | 753 | 74.5 | 5.7 | 76.4 | 5.6 |
| MASSACHUSETTS | Total | 5,514 | 4,897 | 3,546 | 64.3 | 2.6 | 72.4 | 2.6 | 3,249 | 58.9 | 2.7 | 66.3 | 2.7 |
| | 18 to 24 | 562 | 469 | 303 | 54.0 | 8.6 | 64.7 | 9.0 | 259 | 46.1 | 8.6 | 55.2 | 9.3 |
| | 25 to 34 | 1,142 | 939 | 647 | 56.7 | 6.0 | 68.9 | 6.1 | 566 | 49.6 | 6.0 | 60.3 | 6.5 |
| | 35 to 44 | 830 | 696 | 492 | 59.2 | 6.9 | 70.6 | 7.0 | 433 | 52.2 | 7.1 | 62.2 | 7.5 |
| | 45 to 64 | 1,845 | 1,713 | 1,247 | 67.6 | 4.4 | 72.8 | 4.4 | 1,171 | 63.4 | 4.6 | 68.3 | 4.6 |
| | 65 | 1,135 | 1,081 | 857 | 75.5 | 5.2 | 79.2 | 5.0 | 820 | 72.2 | 5.4 | 75.8 | 5.3 |
| MICHIGAN | Total | 7,790 | 7,467 | 5,513 | 70.8 | 2.1 | 73.8 | 2.1 | 4,994 | 64.1 | 2.2 | 66.9 | 2.2 |
| | 18 to 24 | 932 | 887 | 546 | 58.5 | 6.6 | 61.5 | 6.7 | 469 | 50.3 | 6.7 | 52.9 | 6.9 |
| | 25 to 34 | 1,344 | 1,257 | 910 | 67.8 | 5.2 | 72.4 | 5.2 | 777 | 57.8 | 5.5 | 61.8 | 5.6 |
| | 35 to 44 | 1,130 | 1,063 | 764 | 67.6 | 5.7 | 71.8 | 5.7 | 666 | 58.9 | 6.0 | 62.6 | 6.1 |
| | 45 to 64 | 2,663 | 2,547 | 1,969 | 74.0 | 3.5 | 77.3 | 3.4 | 1,798 | 67.5 | 3.7 | 70.6 | 3.7 |
| | 65 | 1,721 | 1,713 | 1,324 | 76.9 | 4.2 | 77.3 | 4.2 | 1,284 | 74.6 | 4.3 | 75.0 | 4.3 |
| MINNESOTA | Total | 4,339 | 4,142 | 3,436 | 79.2 | 2.5 | 82.9 | 2.4 | 3,225 | 74.3 | 2.7 | 77.9 | 2.7 |
| | 18 to 24 | 440 | 430 | 317 | 72.0 | 8.8 | 73.8 | 8.7 | 297 | 67.5 | 9.2 | 69.2 | 9.2 |
| | 25 to 34 | 787 | 772 | 595 | 75.6 | 6.3 | 77.1 | 6.2 | 541 | 68.7 | 6.8 | 70.0 | 6.8 |
| | 35 to 44 | 771 | 672 | 539 | 69.9 | 6.8 | 80.2 | 6.3 | 503 | 65.3 | 7.1 | 74.9 | 6.9 |
| | 45 to 64 | 1,431 | 1,379 | 1,199 | 83.8 | 4.0 | 86.9 | 3.7 | 1,134 | 79.2 | 4.4 | 82.2 | 4.2 |
| | 65 | 909 | 889 | 785 | 86.4 | 4.7 | 88.4 | 4.4 | 749 | 82.5 | 5.2 | 84.3 | 5.0 |
| MISSISSIPPI | Total | 2,212 | 2,177 | 1,749 | 79.1 | 2.8 | 80.4 | 2.7 | 1,531 | 69.2 | 3.2 | 70.3 | 3.2 |
| | 18 to 24 | 249 | 249 | 154 | 61.9 | 9.9 | 61.9 | 9.9 | 105 | 42.3 | 10.1 | 42.3 | 10.1 |
| | 25 to 34 | 376 | 365 | 288 | 76.5 | 7.0 | 78.8 | 6.9 | 250 | 66.3 | 7.9 | 68.3 | 7.8 |
| | 35 to 44 | 366 | 354 | 288 | 78.8 | 6.9 | 81.3 | 6.7 | 249 | 68.2 | 7.9 | 70.4 | 7.8 |
| | 45 to 64 | 734 | 723 | 611 | 83.2 | 4.5 | 84.4 | 4.4 | 542 | 76.5 | 5.0 | 77.7 | 5.0 |
| | 65 | 486 | 485 | 408 | 84.0 | 5.4 | 84.2 | 5.3 | 365 | 75.0 | 6.3 | 75.2 | 6.3 |
| MISSOURI | Total | 4,637 | 4,475 | 3,388 | 73.1 | 2.7 | 75.7 | 2.7 | 2,990 | 64.5 | 2.9 | 66.8 | 2.9 |
| | 18 to 24 | 587 | 563 | 382 | 65.0 | 8.2 | 67.7 | 8.2 | 313 | 53.3 | 8.6 | 55.5 | 8.7 |
| | 25 to 34 | 716 | 697 | 474 | 66.2 | 7.3 | 68.1 | 7.3 | 418 | 58.3 | 7.7 | 60.0 | 7.7 |
| | 35 to 44 | 743 | 682 | 465 | 62.7 | 7.4 | 68.3 | 7.4 | 368 | 49.5 | 7.6 | 53.9 | 7.9 |
| | 45 to 64 | 1,596 | 1,542 | 1,222 | 76.6 | 4.4 | 79.3 | 4.3 | 1,124 | 70.5 | 4.7 | 72.9 | 4.7 |
| | 65 | 995 | 992 | 844 | 84.9 | 4.7 | 85.1 | 4.7 | 768 | 77.2 | 5.5 | 77.4 | 5.5 |
| MONTANA | Total | 836 | 827 | 641 | 76.6 | 2.6 | 77.5 | 2.6 | 607 | 72.6 | 2.8 | 73.5 | 2.8 |
| | 18 to 24 | 107 | 104 | 69 | 65.0 | 8.3 | 66.6 | 8.3 | 60 | 56.2 | 8.6 | 57.6 | 8.7 |
| | 25 to 34 | 128 | 126 | 89 | 69.4 | 7.3 | 70.3 | 7.3 | 83 | 65.2 | 7.6 | 66.1 | 7.6 |
| | 35 to 44 | 128 | 127 | 105 | 82.4 | 6.1 | 82.7 | 6.0 | 97 | 75.6 | 6.8 | 75.9 | 6.8 |
| | 45 to 64 | 253 | 251 | 201 | 79.3 | 4.6 | 79.9 | 4.5 | 193 | 76.2 | 4.8 | 76.9 | 4.8 |
| | 65 | 221 | 218 | 177 | 80.0 | 4.8 | 81.1 | 4.8 | 175 | 78.9 | 4.9 | 80.0 | 4.9 |
| NEBRASKA | Total | 1,435 | 1,369 | 971 | 67.7 | 3.4 | 70.9 | 3.4 | 892 | 62.2 | 3.5 | 65.2 | 3.5 |
| | 18 to 24 | 123 | 117 | 59 | 47.5 | 12.3 | 50.1 | 12.6 | 49 | 40.1 | 12.1 | 42.3 | 12.5 |
| | 25 to 34 | 301 | 281 | 190 | 63.0 | 7.6 | 67.6 | 7.4 | 152 | 50.7 | 7.8 | 54.3 | 8.0 |
| | 35 to 44 | 246 | 217 | 147 | 59.6 | 8.5 | 67.6 | 8.7 | 138 | 55.9 | 8.6 | 63.3 | 8.9 |
| | 45 to 64 | 465 | 457 | 338 | 72.7 | 5.6 | 74.0 | 5.6 | 311 | 66.9 | 6.0 | 68.2 | 6.0 |
| | 65 | 299 | 297 | 236 | 78.9 | | 80.0 | | | 75.5 | 6.8 | 76.0 | 6.8 |

[1] The figure added to or subtracted from the estimate provides the 90-percent confidence interval.

Source: U.S. Census Bureau, Current Population Survey, November 2020

APP. 112

| STATE | Age | Total population | Total citizen population | Total registered | Percent registered (Total) | Margin of error [1] | Percent registered (Citizen) | Margin of error [1] | Total voted | Percent voted (Total) | Margin of error [1] | Percent voted (Citizen) | Margin of error [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NEVADA | Total | 2,402 | 2,198 | 1,455 | 60.6 | 3.2 | 66.2 | 3.3 | 1,351 | 56.3 | 3.3 | 61.5 | 3.4 |
| | 18 to 24 | 284 | 262 | 110 | 38.7 | 9.4 | 41.9 | 9.9 | 96 | 33.9 | 9.1 | 36.7 | 9.7 |
| | 25 to 34 | 463 | 415 | 275 | 59.4 | 7.4 | 66.2 | 7.5 | 236 | 51.1 | 7.5 | 57.0 | 7.9 |
| | 35 to 44 | 352 | 310 | 193 | 54.8 | 8.6 | 62.2 | 8.9 | 176 | 50.0 | 8.7 | 56.7 | 9.1 |
| | 45 to 64 | 804 | 734 | 505 | 62.8 | 5.5 | 68.8 | 5.6 | 481 | 59.8 | 5.6 | 65.5 | 5.7 |
| | 65 | 500 | 477 | 373 | 74.5 | 6.3 | 78.1 | 6.1 | 363 | 72.4 | 6.5 | 76.0 | 6.4 |
| NEW HAMPSHIRE | Total | 1,101 | 1,077 | 843 | 76.6 | 2.9 | 78.3 | 2.8 | 797 | 72.4 | 3.0 | 74.0 | 3.0 |
| | 18 to 24 | 110 | 108 | 74 | 67.7 | 10.1 | 69.1 | 10.1 | 67 | 61.1 | 10.5 | 62.3 | 10.6 |
| | 25 to 34 | 176 | 166 | 123 | 69.6 | 7.8 | 73.8 | 7.7 | 111 | 63.0 | 8.2 | 66.7 | 8.3 |
| | 35 to 44 | 167 | 163 | 126 | 75.8 | 7.5 | 77.3 | 7.4 | 118 | 70.9 | 8.0 | 72.4 | 7.9 |
| | 45 to 64 | 383 | 375 | 289 | 75.4 | 5.0 | 77.0 | 4.9 | 278 | 72.7 | 5.2 | 74.2 | 5.1 |
| | 65 | 265 | 264 | 231 | 87.1 | 4.7 | 87.3 | 4.6 | 223 | 84.0 | 5.1 | 84.2 | 5.1 |
| NEW JERSEY | Total | 6,801 | 5,921 | 5,008 | 73.6 | 2.2 | 84.6 | 1.9 | 4,638 | 68.2 | 2.3 | 78.3 | 2.2 |
| | 18 to 24 | 783 | 706 | 613 | 78.3 | 6.0 | 86.9 | 5.2 | 532 | 67.9 | 6.8 | 75.3 | 6.7 |
| | 25 to 34 | 1,125 | 885 | 708 | 62.9 | 5.9 | 79.9 | 5.5 | 619 | 55.0 | 6.1 | 69.9 | 6.3 |
| | 35 to 44 | 1,032 | 813 | 678 | 65.7 | 6.1 | 83.4 | 5.4 | 624 | 60.5 | 6.2 | 76.8 | 6.1 |
| | 45 to 64 | 2,408 | 2,134 | 1,807 | 75.1 | 3.6 | 84.7 | 3.2 | 1,720 | 71.4 | 3.8 | 80.6 | 3.5 |
| | 65 | 1,453 | 1,383 | 1,202 | 82.7 | 4.1 | 86.9 | 3.7 | 1,143 | 78.6 | 4.4 | 82.6 | 4.2 |
| NEW MEXICO | Total | 1,610 | 1,498 | 1,028 | 63.9 | 3.0 | 68.6 | 3.0 | 938 | 58.3 | 3.1 | 62.6 | 3.2 |
| | 18 to 24 | 184 | 177 | 88 | 48.0 | 9.3 | 49.9 | 9.5 | 76 | 41.3 | 9.2 | 42.9 | 9.4 |
| | 25 to 34 | 284 | 269 | 175 | 61.7 | 7.3 | 65.2 | 7.4 | 143 | 50.3 | 7.5 | 53.1 | 7.7 |
| | 35 to 44 | 254 | 231 | 144 | 56.6 | 7.9 | 62.2 | 8.1 | 132 | 52.2 | 8.0 | 57.3 | 8.3 |
| | 45 to 64 | 504 | 455 | 329 | 65.4 | 5.4 | 72.4 | 5.3 | 312 | 62.0 | 5.5 | 68.7 | 5.5 |
| | 65 | 384 | 366 | 291 | 75.8 | 5.5 | 79.5 | 5.4 | 274 | 71.4 | 5.9 | 74.9 | 5.4 |
| NEW YORK | Total | 15,105 | 13,298 | 9,370 | 62.0 | 1.6 | 70.5 | 1.7 | 8,609 | 57.0 | 1.7 | 64.7 | 1.7 |
| | 18 to 24 | 1,613 | 1,461 | 816 | 50.6 | 5.2 | 55.9 | 5.4 | 698 | 43.3 | 5.2 | 47.8 | 5.5 |
| | 25 to 34 | 2,568 | 2,171 | 1,463 | 57.0 | 4.1 | 67.4 | 4.2 | 1,371 | 53.4 | 4.1 | 63.2 | 4.3 |
| | 35 to 44 | 2,677 | 2,191 | 1,563 | 58.4 | 4.0 | 71.3 | 4.0 | 1,457 | 54.4 | 4.0 | 66.5 | 4.2 |
| | 45 to 64 | 4,737 | 4,197 | 3,085 | 65.1 | 2.9 | 73.5 | 2.8 | 2,856 | 60.3 | 3.0 | 68.0 | 3.0 |
| | 65 | 3,511 | 3,279 | 2,442 | 69.6 | 3.2 | 74.5 | 3.2 | 2,226 | 63.4 | 3.4 | 67.9 | 3.4 |
| NORTH CAROLINA | Total | 8,113 | 7,391 | 5,161 | 63.6 | 2.2 | 69.8 | 2.2 | 4,780 | 58.9 | 2.3 | 64.7 | 2.3 |
| | 18 to 24 | 872 | 820 | 465 | 53.3 | 7.0 | 56.7 | 7.2 | 404 | 46.4 | 7.0 | 49.3 | 7.3 |
| | 25 to 34 | 1,412 | 1,259 | 809 | 57.3 | 5.5 | 64.2 | 5.6 | 706 | 50.0 | 5.5 | 56.0 | 5.8 |
| | 35 to 44 | 1,315 | 1,068 | 705 | 53.6 | 5.7 | 66.0 | 6.0 | 637 | 48.4 | 5.7 | 59.6 | 6.2 |
| | 45 to 64 | 2,524 | 2,303 | 1,699 | 67.3 | 3.9 | 73.8 | 3.8 | 1,638 | 64.9 | 3.9 | 71.1 | 3.9 |
| | 65 | 1,992 | 1,941 | 1,483 | 74.5 | 4.1 | 76.4 | 4.0 | 1,396 | 70.1 | 4.3 | 71.9 | 4.2 |
| NORTH DAKOTA | Total | 571 | 556 | 429 | 75.2 | 2.9 | 77.3 | 2.9 | 373 | 65.3 | 3.2 | 67.1 | 3.2 |
| | 18 to 24 | 68 | 64 | 42 | B | B | B | B | 30 | B | B | B | B |
| | 25 to 34 | 120 | 114 | 82 | 68.2 | 6.9 | 71.7 | 6.8 | 69 | 56.9 | 7.3 | 59.9 | 7.4 |
| | 35 to 44 | 96 | 93 | 74 | 76.4 | 7.0 | 79.0 | 6.9 | 63 | 65.7 | 7.9 | 69.9 | 7.9 |
| | 45 to 64 | 175 | 173 | 143 | 81.4 | 4.8 | 82.3 | 4.7 | 129 | 73.7 | 5.4 | 74.6 | 5.4 |
| | 65 | 111 | 111 | 89 | 80.6 | 6.1 | 80.9 | 6.1 | 82 | 73.9 | 6.8 | 74.2 | 6.8 |
| OHIO | Total | 8,951 | 8,740 | 6,733 | 75.2 | 1.9 | 77.0 | 1.8 | 6,128 | 68.5 | 2.0 | 70.1 | 2.0 |
| | 18 to 24 | 1,072 | 1,049 | 635 | 59.2 | 6.2 | 60.6 | 6.2 | 556 | 51.8 | 6.3 | 53.0 | 6.3 |
| | 25 to 34 | 1,551 | 1,465 | 1,077 | 69.5 | 4.8 | 73.5 | 4.7 | 898 | 57.9 | 5.1 | 61.3 | 5.2 |
| | 35 to 44 | 1,307 | 1,245 | 958 | 73.3 | 5.0 | 77.0 | 4.9 | 839 | 64.2 | 5.4 | 67.4 | 5.5 |
| | 45 to 64 | 2,978 | 2,952 | 2,348 | 78.8 | 3.1 | 79.5 | 3.0 | 2,186 | 73.4 | 3.3 | 74.1 | 3.3 |
| | 65 | 2,042 | 2,030 | 1,715 | 84.0 | 3.3 | 84.5 | 3.3 | 1,650 | 80.8 | 3.6 | 81.3 | 3.6 |
| OKLAHOMA | Total | 2,942 | 2,800 | 1,884 | 64.0 | 3.5 | 67.3 | 3.5 | 1,631 | 55.5 | 3.6 | 58.3 | 3.7 |
| | 18 to 24 | 343 | 333 | 150 | 43.7 | 10.6 | 44.9 | 10.8 | 102 | 29.7 | 9.8 | 30.5 | 10.0 |
| | 25 to 34 | 481 | 431 | 260 | 54.1 | 9.0 | 60.4 | 9.3 | 212 | 44.1 | 9.0 | 49.2 | 9.5 |
| | 35 to 44 | 550 | 501 | 314 | 57.1 | 8.4 | 62.6 | 8.6 | 258 | 47.0 | 8.4 | 51.5 | 8.8 |
| | 45 to 64 | 950 | 917 | 677 | 71.2 | 5.8 | 73.8 | 5.7 | 624 | 65.7 | 6.1 | 68.1 | 6.1 |
| | 65 | 618 | 618 | 484 | 78.3 | 6.6 | 78.3 | 6.6 | 435 | 70.3 | 7.3 | 70.3 | 7.3 |
| OREGON | Total | 3,369 | 3,242 | 2,590 | 76.9 | 2.9 | 79.9 | 2.8 | 2,402 | 71.3 | 3.1 | 74.1 | 3.0 |
| | 18 to 24 | 388 | 373 | 253 | 65.2 | 9.5 | 68.0 | 9.5 | 209 | 53.8 | 10.0 | 56.1 | 10.1 |
| | 25 to 34 | 576 | 550 | 439 | 76.1 | 7.0 | 79.7 | 6.8 | 381 | 66.1 | 7.8 | 69.2 | 7.8 |
| | 35 to 44 | 573 | 539 | 464 | 80.9 | 6.5 | 86.0 | 5.9 | 418 | 72.9 | 7.3 | 77.5 | 7.1 |
| | 45 to 64 | 1,030 | 984 | 785 | 76.3 | 5.2 | 79.8 | 5.0 | 761 | 73.9 | 5.4 | 77.4 | 5.3 |
| | 65 | 801 | 796 | 649 | 81.1 | 5.5 | 81.6 | 5.4 | 633 | 79.0 | 5.7 | 79.5 | 5.6 |
| PENNSYLVANIA | Total | 9,902 | 9,621 | 7,337 | 74.1 | 1.8 | 76.3 | 1.8 | 6,756 | 68.2 | 1.9 | 70.2 | 1.9 |
| | 18 to 24 | 1,049 | 1,017 | 601 | 57.3 | 6.3 | 59.1 | 6.4 | 519 | 49.4 | 6.4 | 51.0 | 6.5 |
| | 25 to 34 | 1,789 | 1,747 | 1,354 | 75.7 | 4.2 | 77.5 | 4.1 | 1,207 | 67.4 | 4.6 | 69.0 | 4.6 |
| | 35 to 44 | 1,360 | 1,281 | 948 | 69.7 | 5.1 | 74.0 | 5.0 | 866 | 63.6 | 5.4 | 67.6 | 5.4 |
| | 45 to 64 | 3,212 | 3,122 | 2,491 | 77.6 | 3.0 | 79.8 | 3.0 | 2,315 | 72.1 | 3.3 | 74.1 | 3.2 |
| | 65 | 2,492 | 2,453 | 1,943 | 78.0 | 3.4 | 79.2 | 3.4 | 1,850 | 74.2 | 3.6 | 75.4 | 3.6 |
| RHODE ISLAND | Total | 840 | 776 | 575 | 68.5 | 3.2 | 74.1 | 3.2 | 515 | 61.3 | 3.4 | 66.3 | 3.4 |
| | 18 to 24 | 101 | 96 | 59 | 58.1 | 9.9 | 61.1 | 10.1 | 50 | 49.0 | 10.1 | 51.6 | 10.3 |
| | 25 to 34 | 143 | 135 | 96 | 66.8 | 8.0 | 70.9 | 7.9 | 80 | 56.1 | 8.4 | 59.5 | 8.6 |
| | 35 to 44 | 138 | 111 | 79 | 60.6 | 8.7 | 71.1 | 8.5 | 71 | 54.5 | 8.8 | 64.0 | 8.7 |
| | 45 to 64 | 291 | 268 | 207 | 71.4 | 5.4 | 77.4 | 5.2 | 187 | 64.5 | 5.7 | 69.9 | 5.7 |
| | 65 | 174 | 166 | 135 | 77.3 | 6.4 | 81.0 | 6.2 | 126 | 72.6 | 6.8 | 76.1 | 6.7 |
| SOUTH CAROLINA | Total | 4,010 | 3,878 | 2,713 | 67.7 | 3.0 | 70.0 | 3.0 | 2,459 | 61.3 | 3.1 | 63.4 | 3.1 |
| | 18 to 24 | 438 | 421 | 269 | 61.4 | 9.4 | 63.9 | 9.5 | 225 | 51.4 | 9.7 | 53.4 | 9.0 |
| | 25 to 34 | 697 | 673 | 390 | 56.0 | 7.6 | 58.0 | 7.7 | 329 | 47.2 | 7.7 | 49.0 | 7.8 |
| | 35 to 44 | 577 | 543 | 375 | 65.1 | 8.0 | 69.1 | 8.0 | 326 | 56.6 | 8.4 | 60.1 | 8.5 |
| | 45 to 64 | 1,277 | 1,227 | 892 | 69.9 | 5.2 | 72.8 | 5.1 | 844 | 66.1 | 5.4 | 68.8 | 5.4 |
| | 65 | 1,022 | 1,015 | 786 | 76.9 | 5.3 | 77.5 | 5.3 | 735 | 71.9 | 5.7 | 72.5 | 5.6 |
| SOUTH DAKOTA | Total | 659 | 649 | 437 | 66.3 | 3.4 | 67.4 | 3.4 | 380 | 57.7 | 3.5 | 58.5 | 3.5 |
| | 18 to 24 | 79 | 77 | 40 | 50.5 | 10.3 | 52.0 | 10.5 | 34 | 42.7 | 10.2 | 43.9 | 10.4 |
| | 25 to 34 | 120 | 117 | 67 | 56.2 | 8.3 | 57.4 | 8.4 | 53 | 44.3 | 8.3 | 45.2 | 8.4 |
| | 35 to 44 | 99 | 95 | 59 | 59.8 | 9.0 | 62.4 | 9.1 | 50 | 50.7 | 9.2 | 52.9 | 9.4 |
| | 45 to 64 | 210 | 208 | 155 | 73.7 | 5.6 | 74.2 | 5.6 | 138 | 65.6 | 6.0 | 66.0 | 6.0 |
| | 65 | 152 | 152 | 116 | 76.5 | 6.3 | 76.5 | 6.3 | 106 | 69.5 | 6.9 | 69.5 | 6.9 |
| TENNESSEE | Total | 5,283 | 5,038 | 3,742 | 70.8 | 2.6 | 74.3 | 2.5 | 3,346 | 63.3 | 2.7 | 66.4 | 2.7 |
| | 18 to 24 | 641 | 611 | 372 | 58.1 | 8.0 | 60.9 | 8.1 | 290 | 45.2 | 7.8 | 47.5 | 8.0 |
| | 25 to 34 | 818 | 761 | 521 | 63.7 | 6.9 | 68.5 | 6.9 | 428 | 52.3 | 7.1 | 56.3 | 7.3 |
| | 35 to 44 | 911 | 829 | 618 | 67.9 | 6.3 | 74.5 | 6.2 | 549 | 60.3 | 6.6 | 66.3 | 6.7 |
| | 45 to 64 | 1,765 | 1,698 | 1,270 | 72.0 | 4.3 | 74.8 | 4.3 | 1,245 | 70.6 | 4.4 | 73.4 | 4.4 |

[1] figure added to or subtracted from the estimate provides the 90-percent confidence interval.

Source: U.S. Census Bureau, Current Population Survey, November 2020

| STATE | Age | Total population | Total citizen population | Total registered | Percent registered (Total) | Margin of error [1] | Percent registered (Citizen) | Margin of error [1] | Total voted | Percent voted (Total) | Margin of error [1] | Percent voted (Citizen) | Margin of error [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 65 | 1,148 | 1,138 | 891 | 77.6 | 5.0 | 78.2 | 5.0 | 822 | 71.6 | 5.4 | 72.2 | 5.4 |
| TEXAS | Total | 21,485 | 18,581 | 13,343 | 62.1 | 1.4 | 71.8 | 1.4 | 11,874 | 55.3 | 1.4 | 63.9 | 1.5 |
| | 18 to 24 | 2,617 | 2,366 | 1,311 | 50.1 | 4.0 | 55.4 | 4.2 | 1,024 | 39.1 | 3.9 | 43.3 | 4.2 |
| | 25 to 34 | 4,189 | 3,491 | 2,275 | 54.3 | 3.2 | 65.2 | 3.3 | 1,912 | 45.6 | 3.2 | 54.8 | 3.5 |
| | 35 to 44 | 3,989 | 3,124 | 2,249 | 56.4 | 3.2 | 72.0 | 3.3 | 1,983 | 49.7 | 3.3 | 63.5 | 3.6 |
| | 45 to 64 | 6,827 | 5,988 | 4,585 | 67.2 | 2.4 | 76.6 | 2.3 | 4,201 | 61.5 | 2.4 | 70.2 | 2.4 |
| | 65 | 3,862 | 3,613 | 2,923 | 75.7 | 2.9 | 80.9 | 2.7 | 2,755 | 71.3 | 3.0 | 76.3 | 2.9 |
| UTAH | Total | 2,320 | 2,178 | 1,468 | 63.3 | 2.7 | 67.4 | 2.7 | 1,386 | 59.7 | 2.8 | 63.6 | 2.8 |
| | 18 to 24 | 425 | 401 | 225 | 52.9 | 6.6 | 56.2 | 6.8 | 201 | 47.3 | 6.6 | 50.1 | 6.8 |
| | 25 to 34 | 459 | 416 | 273 | 59.4 | 6.3 | 65.5 | 6.4 | 247 | 53.8 | 6.4 | 59.3 | 6.6 |
| | 35 to 44 | 407 | 382 | 252 | 61.9 | 6.6 | 66.0 | 6.6 | 236 | 57.9 | 6.7 | 61.8 | 6.8 |
| | 45 to 64 | 661 | 622 | 444 | 67.1 | 5.0 | 71.3 | 5.0 | 432 | 65.4 | 5.1 | 69.5 | 5.0 |
| | 65 | 367 | 357 | 274 | 74.6 | 6.2 | 76.9 | 6.1 | 269 | 73.3 | 6.3 | 75.6 | 6.2 |
| VERMONT | Total | 507 | 500 | 365 | 72.0 | 3.4 | 73.0 | 3.4 | 342 | 67.5 | 3.6 | 68.4 | 3.6 |
| | 18 to 24 | 54 | 53 | 29 | B | B | B | B | 26 | B | B | B | B |
| | 25 to 34 | 81 | 81 | 51 | 62.6 | 9.2 | 63.1 | 9.2 | 43 | 52.3 | 9.5 | 52.8 | 9.5 |
| | 35 to 44 | 76 | 72 | 54 | B | B | B | B | 49 | B | B | B | B |
| | 45 to 64 | 155 | 154 | 117 | 75.6 | 5.9 | 76.1 | 5.9 | 113 | 72.8 | 6.1 | 73.4 | 6.1 |
| | 65 | 140 | 140 | 114 | 81.3 | 5.6 | 81.8 | 5.6 | 111 | 79.2 | 5.9 | 79.6 | 5.8 |
| VIRGINIA | Total | 6,481 | 5,974 | 4,541 | 70.1 | 2.4 | 76.0 | 2.3 | 4,275 | 66.0 | 2.5 | 71.5 | 2.4 |
| | 18 to 24 | 730 | 668 | 405 | 55.5 | 7.7 | 60.6 | 7.9 | 346 | 47.4 | 7.7 | 51.8 | 8.1 |
| | 25 to 34 | 1,112 | 956 | 726 | 65.3 | 6.0 | 75.9 | 5.8 | 666 | 59.9 | 6.1 | 69.7 | 6.2 |
| | 35 to 44 | 1,078 | 925 | 732 | 67.9 | 5.9 | 79.1 | 5.6 | 671 | 62.2 | 6.2 | 72.5 | 6.1 |
| | 45 to 64 | 2,176 | 2,084 | 1,609 | 74.0 | 3.9 | 77.2 | 3.8 | 1,570 | 72.2 | 4.0 | 75.3 | 3.9 |
| | 65 | 1,385 | 1,341 | 1,069 | 77.2 | 4.7 | 79.7 | 4.6 | 1,022 | 73.8 | 4.9 | 76.2 | 4.9 |
| WASHINGTON | Total | 5,993 | 5,389 | 4,029 | 67.2 | 2.5 | 74.8 | 2.4 | 3,854 | 64.3 | 2.6 | 71.5 | 2.5 |
| | 18 to 24 | 556 | 516 | 287 | 51.6 | 8.8 | 55.6 | 9.1 | 271 | 48.6 | 8.8 | 52.4 | 9.1 |
| | 25 to 34 | 1,169 | 989 | 697 | 59.6 | 5.9 | 70.5 | 6.0 | 654 | 56.0 | 6.0 | 66.1 | 6.2 |
| | 35 to 44 | 1,148 | 983 | 739 | 64.4 | 5.9 | 75.1 | 5.7 | 698 | 60.8 | 6.0 | 71.0 | 6.0 |
| | 45 to 64 | 1,828 | 1,650 | 1,319 | 72.2 | 4.3 | 79.9 | 4.1 | 1,264 | 69.1 | 4.5 | 76.6 | 4.3 |
| | 65 | 1,292 | 1,250 | 987 | 76.4 | 4.9 | 79.0 | 4.8 | 967 | 74.8 | 5.0 | 77.3 | 4.9 |
| WEST VIRGINIA | Total | 1,397 | 1,379 | 928 | 66.4 | 3.4 | 67.3 | 3.4 | 773 | 55.3 | 3.6 | 56.1 | 3.6 |
| | 18 to 24 | 155 | 153 | 71 | 46.1 | 10.8 | 46.7 | 10.9 | 53 | 34.2 | 10.3 | 34.6 | 10.4 |
| | 25 to 34 | 195 | 191 | 117 | 60.1 | 9.5 | 61.3 | 9.5 | 79 | 40.7 | 9.5 | 41.5 | 9.6 |
| | 35 to 44 | 213 | 209 | 144 | 67.6 | 8.7 | 68.7 | 8.7 | 119 | 56.2 | 9.2 | 57.1 | 9.3 |
| | 45 to 64 | 471 | 462 | 319 | 67.9 | 5.8 | 69.1 | 5.8 | 274 | 58.3 | 6.2 | 59.3 | 6.2 |
| | 65 | 365 | 364 | 276 | 75.7 | 6.1 | 75.9 | 6.1 | 247 | 67.8 | 6.6 | 68.0 | 6.6 |
| WISCONSIN | Total | 4,538 | 4,421 | 3,391 | 74.7 | 2.7 | 76.7 | 2.6 | 3,253 | 71.7 | 2.8 | 73.6 | 2.7 |
| | 18 to 24 | 581 | 577 | 333 | 57.4 | 8.5 | 57.8 | 8.5 | 323 | 55.6 | 8.5 | 56.0 | 8.5 |
| | 25 to 34 | 762 | 714 | 582 | 76.4 | 6.3 | 81.5 | 6.0 | 557 | 73.1 | 6.6 | 78.0 | 6.4 |
| | 35 to 44 | 650 | 617 | 437 | 67.2 | 7.6 | 70.8 | 7.5 | 426 | 65.5 | 7.7 | 69.1 | 7.7 |
| | 45 to 64 | 1,604 | 1,572 | 1,241 | 77.4 | 4.3 | 79.0 | 4.2 | 1,171 | 73.0 | 4.6 | 74.5 | 4.5 |
| | 65 | 941 | 941 | 797 | 84.8 | 4.8 | 84.8 | 4.8 | 776 | 82.4 | 5.1 | 82.4 | 5.1 |
| WYOMING | Total | 436 | 427 | 296 | 67.9 | 3.4 | 69.3 | 3.4 | 280 | 64.1 | 3.5 | 65.5 | 3.5 |
| | 18 to 24 | 52 | 51 | 28 | B | B | B | B | 25 | B | B | B | B |
| | 25 to 34 | 74 | 69 | 41 | B | B | B | B | 36 | B | B | B | B |
| | 35 to 44 | 70 | 69 | 41 | B | B | B | B | 39 | B | B | B | B |
| | 45 to 64 | 145 | 143 | 110 | 75.7 | 5.5 | 76.8 | 5.4 | 106 | 73.0 | 5.6 | 74.1 | 5.6 |
| | 65 | 96 | 95 | 76 | 79.5 | 6.3 | 80.1 | 6.3 | 73 | 76.0 | 6.7 | 76.6 | 6.6 |

[1] This figure added to or subtracted from the estimate provides the 90-percent confidence interval.

NOTES:

The symbol B means that the base is less than 75,000 and therefore too small to show the derived measure.

Estimates may not sum to totals due to rounding.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see hthttps://www.census.gov/programs-surveys/cps/technical-documentation/complete.2020.html

Source: U.S. Census Bureau, Current Population Survey, November 2020

1 This figure added to or subtracted from the estimate provides the 90-percent confidence interval.

Source: U.S. Census Bureau, Current Population Survey, November 2020

Appellate Case: 24-2810     Page: 143     Date Filed: 09/06/2024  Entry ID: 5432887

APP 114

# Exhibit B

APP115





## JOHN THURSTON

### ARKANSAS SECRETARY OF STATE

February 28, 2024

To All Arkansas County Clerks:

It has come to my attention that there have been some entities registering citizens to vote by electronic applications and signature. And I have received numerous inquiries from counties over the last few weeks regarding these voter registration applications. My position regarding electronic signatures on voter registration applications remains unchanged.

As Secretary of State, in an effort to maintain our strong election integrity that we have in the Arkansas election process, I strongly recommend that counties do not accept voter registration applications executed by electronic signature.

Sincerely,

*John Thurston*

Hon. John Thurston
Arkansas Secretary of State

# Exhibit C

APP147





# JOHN THURSTON

### ARKANSAS SECRETARY OF STATE

March 12, 2024

The Honorable Tim Griffin
Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201

Re:    Electronic Voter Applications and Electronic Signatures

Dear Attorney General Griffin:

My office has received inquiries regarding the use of electronic voter registration applications, created by a third-party non-governmental agency, that include an electronic signature. These applications are then either printed out and turned in or sent electronically to county clerks. I'm asking for a formal opinion from your office as to whether this practice is allowed under Arkansas law.

Thank you for your continued support and efforts on behalf of the State of Arkansas and our fellow citizens.

Respectfully yours,

*John Thurston*

John Thurston
Arkansas Secretary of State

State Capitol • Suite 256 • 500 Woodlane Street • Little Rock, Arkansas 72201-1094
501-682-1010 • Fax 501-682-3510
e-mail: arsos@sos.arkansas.gov • www.sos.arkansas.gov

Appellate Case: 24-2810    Page: 147    Date Filed: 09/06/2024 Entry ID: 5432887
APP118

# Exhibit D

APP119



# TIM GRIFFIN
## ATTORNEY GENERAL

Opinion No. 2024-049

April 10, 2024

The Honorable John Thurston
Secretary of State
500 Woodlane Street
State Capitol, Room 256
Little Rock, Arkansas 72201

Dear Secretary Thurston:

I am writing in response to your request for my opinion on a particular means of registering voters. You state that your office has received inquiries regarding the use of electronic voter registration applications, created by a third-party non-government agency, that include an electronic signature. These applications are then either printed out and turned in or sent electronically to county clerks. You ask whether this practice is allowed under Arkansas law.

**RESPONSE**

While an electronic signature or mark is generally valid under Arkansas law, the registration form must be created and distributed by the Secretary of State. A third-party organization cannot create and use a different form of its own to register voters.

**DISCUSSION**

Because this office is not a factfinder when issuing opinions, I cannot opine on whether any specific form was lawfully submitted or whether any specific signature was lawfully obtained. I can, however, explain the constitutional principles that govern voter registration and respond to your question in a general manner.

Amendment 51 of the Arkansas Constitution "establish[es] a system of personal registration as a means of determining that all who cast ballots in general, special and primary elections in this State are legally qualified to vote in such elections."[1] Amendment 51 also "provides a comprehensive regulatory scheme governing the registration of voters."[2] Unless a person has been "registered in a manner provided for by this

---

[1] Ark. Const. amend. 51, § 1.

[2] *Martin v. Haas*, 2018 Ark. 283, at 10, 556 S.W.3d 509, 516.

The Honorable John Thurston
Secretary of State
Opinion No. 2024-049
Page 2

amendment," he or she shall not be "permitted to vote in any election."[3] Thus, any system for registering voters must comply with Amendment 51.

The Arkansas Constitution allows a person to register to vote in one of three ways:

- In person;[4]

- Using a "mail voter registration application form";[5] or

- Through a "computer process" when registering to vote through the Office of Driver Services and State Revenue Offices, "public assistance agencies," or "disabilities agencies."[6]

The registration process you have described does not fall into the first category for in-person registration. And because the registering entity is a "third-party non-governmental agency," it does not fall into the third category either. This means that in order for the process you have described to be legally effective, it could only fall into the second category, which requires use of the "mail voter registration application form."

The mail voter registration application form and its requirements are described in detail in § 6(a) of Amendment 51. These requirements include informative statements directed to the applicant; certain information required of the applicant; information that may be requested but is not required; a list of "yes" or "no" questions; and statements following those questions.[7]

Among the information required of the applicant is "[a] signature or mark made under penalty of perjury that the applicant meets each requirement for voter registration."[8] The Arkansas Constitution does not define a "signature or mark," nor does it specify how a signature or mark may be made. But courts have long recognized the effectiveness of signatures produced through a variety of means, including telegram, pasting, engraving,

---

[3] Ark. Const. amend. 51, § 3.

[4] *See* Ark. Const. amend. 51, § 9(h).

[5] Ark. Const. amend. 51, §§ 5(a)–(b)(1), 6.

[6] Ark. Const. amend. 51, § 5(a), (b)(2)–(4). The "mail voter registration application form" is also available at the Office of Driver Services and State Revenue Offices upon request or when the computer process is not available. The form is available at public assistance agencies and disabilities agencies as part of the intake process or as a combined computer process when a computer process is available. These agencies also use forms that combine the application for assistance or services with the voter registration application when available. Ark. Const. amend. 51, § 5(b)(2)–(4).

[7] Information required for the voter registration application used by the Office of Driver Services and state revenue offices can be found in § 6(b) of Amendment 51.

[8] Ark. Const. amend. 51, § 6(a)(3)(f).

The Honorable John Thurston
Secretary of State
Opinion No. 2024-049
Page 3

lithography, and wet ink.[9] If the requisite intent is present, a signature marked by many means is valid.[10] And over the past few decades, with the rise of electronic records and electronic signatures, new state and federal statutes have been passed recognizing the legitimacy of electronic signatures. In 2000, Congress passed legislation federally recognizing the validity of electronic signatures in interstate and foreign commerce transactions.[11] In 2001, the Arkansas General Assembly adopted the Uniform Electronic Transactions Act (UETA), which affirms the validity and legal effect of electronic signatures in certain transactions.[12] The UETA provides, "If a law requires a signature, an electronic signature satisfies the law."[13] Consequently, given the historical acceptance of signatures produced through a variety of means, the widespread acceptance of electronic signatures, and the fact that Amendment 51 does not contain any restrictions on how a "signature or mark" may be made, I believe that an electronic signature satisfies Amendment 51's "signature or mark" requirement. But regardless of whether the applicant's signature is electronic, typed, or made by penned ink, the application itself must still meet the requirements of Amendment 51.

You report that this third-party non-governmental agency has "created" its own "electronic voter registration application." The "mail voter registration application form" described in § 6(a) of Amendment 51 must be prepared and distributed by the Secretary of State.[14] Although any person may distribute these registration forms, the Secretary of State, as the chief election official, initially creates the forms and makes them available for organized

---

[9] *See Hillstrom v. Gosnay,* 188 Mont. 388, 394, 614 P.2d 466, 469 (1980) ("Provided the necessary intent to authenticate is shown, the typewritten 'signature' on a telegram is a proper subscription…."); *Ferguson v. Stilwill*, 224 N.W.2d 11, 13 (1974) ("In the absence of a statute prescribing the method of affixing a signature, it may be affixed in many different ways … We believe the signature was sufficient when pasted to this document in the absence of some showing the act of pasting was not authorized."); *Smith v. Greenville County*, 188 S.C. 349, 199 S.E. 416, 418 (1938) ("[A] signature may be written by hand, or printed, or stamped, or typewritten, or engraved, or photographed, or cut from one instrument and attached to another. A signature lithographed on an instrument by a party is sufficient for the purposes of signing it, and it has been held that it is immaterial with what kind of instrument a signature is made."); *Howley v. Whipple*, 48 N.H. 487, 488 (1869) ("[I]t makes no difference … that in one case common record ink is used, while in the other case a more subtle fluid, known as electricity, performs the same office.").

[10] *See Ragge v. Bryan*, 249 Ark. 164, 170, 458 S.W.2d 403, 407 (1970) ("Printing, typing or stamping a name in the place where a signature should appear is sufficient, if it is intended as a signature.").

[11] *See* Electronic Signatures in Global and National Commerce Act, 15 U.S.C. §§ 7001–7006.

[12] *See* Uniform Electronic Transactions Act, A.C.A. § 25-32-101 *et seq.*

[13] A.C.A. § 25-32-107(d); *see also* A.C.A. § 25-32-107(a) ("A record or signature may not be denied legal effect or enforceability solely because it is in electronic form."); *Barwick v. Government Employee Ins. Co., Inc.*, 2011 Ark. 128, at 7 (holding that an electronic signature on an online application qualified as a "written" rejection of medical benefits coverage).

[14] Ark. Const. amend. 51, § 5(b)(1).

The Honorable John Thurston
Secretary of State
Opinion No. 2024-049
Page 4

voter registration programs.[15] In other words, a third-party non-governmental agency cannot create and use a different form of its own to register voters. Instead, the official mail voter registration application form created by the Secretary of State must be used to register voters. These completed voter registration application forms are then transmitted to the appropriate permanent registrar via the Secretary of State.[16]

Senior Assistant Attorney General Kelly Summerside prepared this opinion, which I hereby approve.

Sincerely,

TIM GRIFFIN
Attorney General

---

[15] *Id.*

[16] Ark. Const. amend. 51, § 5(a).

# Exhibit E

**B.1**

Revised May 2023



### STATE OF ARKANSAS
### SARAH HUCKABEE SANDERS GOVERNOR

**Request for Governor's Approval of Proposed Rule or Regulation**

**Department /Agency:** <u>State Board of Election Commissioners</u>

**Short Title of Rule:** <u> Rule Regarding Voter Registration</u>

  **New Rule:** <u>X Yes</u>      **Amendment to Existing Rule:** No

  **State Mandate:** <u>X Yes</u>      **Federal Mandate:** <u>X No</u>

If yes, please provide the legal citation of the mandate: <u>Ark. Const. Amend. 51 § 5(e).</u>

**Legal Authority for Rule:** <u>Arkansas Constitution Amendment 51 § 5(e).</u>

**Proposed Effective Date:** <u>May ???, 2024 (As soon as approved by Legislature)</u>

**Emergency Rule:** <u>X Yes</u>   **Expedited Rule Requested:** <u>X Yes</u>

**Summary of Proposed New Rule or Proposed Amendment to Existing Rule:**

<u>Current confusion between County Clerks.  Some clerks are accepting electronically signed voter registration applications that are submitted by third-party registration organizations.  There are other county clerks, however, that are not accepting electronically signed voter registration applications.  Historically, electronically signed applications were only permitted through DMV processes as a Registration Agency.  The State Board, recognizing this differential treatment of voters exercised its authority under Amendment 51 § 5(e) to propose a Rule to create uniformity for all county clerks.  That rule is the proposal. It permits electronically signed applications only from those entities identified in Amendment 51 § 5(b)(2)-(4).</u>

**Financial Impact:** ☐ Yes **X No** ☐ Unknown; If yes or unknown, please explain:

**Public Hearing Occurred on Rule:** ☐ Yes **X No**

<u>This is an emergency rule request.  A permanent rule will be promulgated which will include public comment and public hearing.</u>

APP125

Revised May 2023

**Controversial: <u>X</u> Yes**

If yes, please explain and provide detail of expected opposition.

**<u>Third-party voter registration organizations have alleged that the action of the State Board is a form of voter suppression.  They have held press conferences and public rallies on the Capital Steps expressing opposition to the State Board's proposed emergency rule.  State Board expects comment and testimony during the permanent rule promulgation process.  In the short term, however, the Board is seeking to provide uniform processes for all county clerks, pending the adoption of a permanent rule regarding voter registration application processes and electronic signatures submitted by third-party registration organizations.</u>**

**Two Rules Repealed: <u>No</u>      Exception from the Governor: <u>Yes</u>**

**First Rule Repealed:**
Brief explanation of why repeal is appropriate:

**Second Rule Repealed:**
Brief explanation of why repeal is appropriate:

**Documents Required for Approval Process**

Please note that the Governor's office will not begin the approval process if any of the following applicable documents are not enclosed with the approval request.

X        BLR Questionnaire
X        BLR Financial Impact Statement
X        Proposed Rule - clean version
X        Mark-Up of Rule, if amended from previous version
X        Copy of Act or Regulation, if Rule is pursuant to State or Federal mandate

**<u>Contact Information</u>**

Department POC for Rules Process: Chris Madison – Director
Chris.Madison@Arkansas.gov

Department POC for this Rule:  Chris Madison – Director
Chris.Madison@Arkansas.gov

**<u>NOTE: All documents must be returned to the Governor's Counsel as a single PDF file.</u>**

Revised May 2023

## QUESTIONNAIRE FOR FILING PROPOSED RULES
## WITH THE ARKANSAS LEGISLATIVE COUNCIL

**DEPARTMENT: Independent Agency**

**BOARD/COMMISSION: State Board of Election Commissioners**

**BOARD/COMMISSION DIRECTOR: Chris Madison**

**CONTACT PERSON: Chris Madison**

**ADDRESS: 501 Woodlane Street, Ste. 122S, Little Rock, Arkansas, 72201**

**PHONE NO.: 501-682-1447 EMAIL: Chris.Madison@Arkansas.gov**

**NAME OF PRESENTER(S) AT SUBCOMMITTEE MEETING: Director Chris Madison**

**PRESENTER EMAIL(S): Chris.Madison@Arkansas.gov**

### INSTRUCTIONS

**In order to file a proposed rule for legislative review and approval, please submit this Legislative Questionnaire and Financial Impact Statement, and attach:**
**X       (1) a summary of the rule, describing what the rule does, the rule changes being proposed, and the reason for those changes;**
**X       (2) both a markup and clean copy of the rule; and**
**X       (3) all documents required by the Questionnaire.**

**If the rule is being filed for permanent promulgation, please email these items to the attention of Rebecca Miller-Rice, miller-ricer@blr.arkansas.gov, for submission to the Administrative Rules Subcommittee.**
**If the rule is being filed for <mark>emergency promulgation</mark>, please email these items to the attention of Director Marty Garrity, garritym@blr.arkansas.gov, for submission to the Executive Subcommittee.**

**Please answer each question completely using layman terms.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\* 1.    What is the official title of this rule?
**Rule Regarding Voter Registration**

2.      What is the subject of the proposed rule? **The Rule provides clarity regarding the acceptance of voter registration applications, specifically, that electronic signatures are only permitted by those agencies identified in Ark. Const. Amend. 51 § 5(b)(2)-(4), and that other submissions must have a wet signature or wet mark on the paper form to be a complete application.**

3.      Is this rule being filed under the emergency provisions of the Arkansas Administrative Procedure Act? **YES**

APP127

Revised May 2023

*If yes, please attach the statement required by Ark. Code Ann. § 25-15-204(c)(1).*

**See attached document – Justification of Emergency Rule**

If yes, will this emergency rule be promulgated under the permanent provisions of the Arkansas Administrative Procedure Act?  **YES.**

4.      Is this rule being filed for permanent promulgation?  **Yes. A permanent Rule will be proposed to replace the emergency rule.  The permanent rule will have public comment and public hearing before completion and adoption.**

If yes, was this rule previously reviewed and approved under the emergency provisions of the Arkansas Administrative Procedure Act? **No**

If yes, what was the effective date of the emergency rule? **As soon as approved by the Legislature per § 10-3-309 procedures.**

On what date does the emergency rule expire? **120 days after enactment, or upon completion, approval, and adoption of a permanent replacement rule.**

5.      Is this rule required to comply with a *federal* statute, rule, or regulation?  **No.**

If yes, please provide the federal statute, rule, and/or regulation citation.

6.      Is this rule required to comply with a *state* statute or rule?  **Yes.  Arkansas Constitutional Amendment 51.**

If yes, please provide the state statute and/or rule citation. **This Rule is necessary to clarify the procedures for accepting voter registration applications. The State Board is authorized under Ark. Const. amend 51 § 5(e) to prepare and publish rules governing the administration of Amendment 51 for uniformity across the state.  The Board is aware that some county clerks are accepting voter registration applications that are electronically signed, whereas other county clerks are not accepting electronically signed voter registration applications.  This difference in treatment has caused a difference in treatment for voter applicants, depending on which county they reside.  As such, under Amendment 51, the Board is adopting the proposed emergency rule to provide clarity, and will seek to promulgate a permanent rule, with public comment and public hearing, to resolve this issue for applicants, clerks, and voters going forward.**

7.      Are two (2) rules being repealed in accord with Executive Order 23-02?  **No.**

If yes, please list the rules being repealed.

If no, please explain.
**This is a new rule to resolve a conflict among county clerks.  Some of which are accepting voter registration applications from third-party registration organizations that are signed by**

APP 128

Revised May 2023

**the applicant electronically and other county clerks that are not accepting electronically signed applications.  The rule is provided to require only wet signatures or wet marks from applicants pending promulgation of a permanent rule.**

8.  Is this a new rule?  **Yes.**

Does this repeal an existing rule?  **No.**
If yes, the proposed repeal should be designated by strikethrough.  If it is being replaced with a new rule, please attach both the proposed rule to be repealed and the replacement rule.

Is this an amendment to an existing rule?  **No.**
If yes, all changes should be indicated by strikethrough and underline.  In addition, please be sure to label the markup copy clearly as the markup **See attached Proposed Rule – Rule Regarding Voter Registration.**

9.  What is the state law that grants the agency its rulemaking authority for the proposed rule, outside of the Arkansas Administrative Procedure Act?  Please provide the specific Arkansas Code citation(s), including subsection(s).  **Ark. Const. amend. 51 § 5(e) ("The State Board of Election Commissioners is authorized, and as soon as possible after the effective date of this amendment, directed to prescribe, adopt, publish and distribute: (1) such Rules and Regulations supplementary to this amendment and consistent with this amendment and other laws of Arkansas as are necessary to secure uniform and efficient procedures in the administration of this amendment throughout the State….").**

10.  Is the proposed rule the result of any recent legislation by the Arkansas General Assembly?  **No.**

If yes, please provide the year of the act(s) and act number(s).

11.  What is the reason for this proposed rule?  Why is it necessary?  **This Rule is necessary to clarify the procedures for accepting voter registration applications. The State Board is authorized under Ark. Const. amend 51 § 5(e) to prepare and publish rules governing the administration of Amendment 51 for uniformity across the state.  The Board is aware that some county clerks are accepting voter registration applications that are electronically signed, whereas other county clerks are not accepting electronically signed voter registration applications.  This difference in treatment has caused a difference in treatment for voter applicants, depending on which county they reside.  As such, under Amendment 51, the Board is adopting the proposed emergency rule to provide clarity, and will seek to promulgate a permanent rule, with public comment and public hearing, to resolve this issue for applicants, clerks, and voters going forward.**

12.  Please provide the web address by which the proposed rule can be accessed by the public as provided in Ark. Code Ann. § 25-19-108(b)(1).  **https://www.arkansas.gov/sbec/rules/**

APP129

Revised May 2023

13.     Will a public hearing be held on this proposed rule? **No for the Emergency Rule.  For permanent rule, yes along with public comment.  The timing of those are not identified at this point.  The public comment period and public hearing will be determined as part of the permanent rule process.**

        If yes, please complete the following:

        Date:_____

        Time:_____

        Place:_____

*Please be sure to advise Bureau Staff if this information changes for any reason.*

14.     On what date does the public comment period expire for the permanent promulgation of the rule? Please provide the specific date.  This is a request for an emergency rule.  **No public comment period is proposed as part of the emergency rule process.  The emergency rule is to provide immediate guidance to County Clerks, voter registration applicants, and third-party voter registration organizations while a permanent rule is processed and promulgated.**

15.     What is the proposed effective date for this rule? **As soon as possible following the requirements of Ark. Code Ann. § 10-3-309.**

16.     Please attach (1) a copy of the notice required under Ark. Code Ann. § 25-15-204(a)(1) and (2) proof of the publication of that notice. See Attached.
        **Copy of the Notice.**
        **Proof of Publication will be added following publication on April 28th, 29th and 30th, 2024.**

        Please attach proof of filing the rule with the Secretary of State, as required by Ark. Code Ann. § 25-15-204(e)(1)(A). **See Attached "Arkansas Register – Proposed Rule Cover Sheet"**

17.     Please give the names of persons, groups, or organizations that you anticipate will comment on these rules.  Please also provide their position (for or against), if known. **Get Loud Arkansas, has commented through press conferences and public rallies regarding this action.  State Board would anticipate representatives of that group will comment on the permanent rule. Similarly, the ACLU has inquired about the emergency rule and the State Board anticipates representatives of that organization commenting on the permanent rule proposal.**

18.     Is the rule expected to be controversial?  **Yes.**

        If yes, please explain. **Get Loud Arkansas representatives have held press conferences and public rallies alleging that the emergency rule is a form of voter suppression by denying the ability of third-party registration organizations, such as them, from utilizing electronic signatures for voter registration applications.  State Board understands these organizations view the State Board's action as targeted towards their vote registration efforts.  State Board's action, with the emergency rule and future permanent rule is to provide uniformity in the**

Revised May 2023

**administration of Amendment 51 across the State as required by Amendment 51 § (5)(e). By adopting the emergency rule, the Board seeks to prevent ongoing improper registration and allow curing of improperly submitted registrations before the November election process.**

Revised May 2023

## FINANCIAL IMPACT STATEMENT

### PLEASE ANSWER ALL QUESTIONS COMPLETELY.

**DEPARTMENT:**     **Independent Agency**
**BOARD/COMMISSION:**   **State Board of Election Commissioners**
**PERSON COMPLETING THIS STATEMENT:** **Chris Madison - Director**
**TELEPHONE NO.:**      **501-682-1407**
**EMAIL:**       **Chris.Madison@Arkansas.gov**
To comply with Ark. Code Ann. § 25-15-204(e), please complete the Financial Impact Statement and email it with the questionnaire, summary, markup and clean copy of the rule, and other documents. Please attach additional pages, if necessary.

**TITLE OF THIS RULE:** **Rule Regarding Voter Registration**

1.      Does this proposed, amended, or repealed rule have a financial impact?
       **No.**

2.      Is the rule based on the best reasonably obtainable scientific, technical, economic, or other evidence and information available concerning the need for, consequences of, and alternatives to the rule?
       **Yes.**

3.      In consideration of the alternatives to this rule, was this rule determined by the agency to be the least costly rule considered?  **Yes.**

       If no, please explain:

       (a) how the additional benefits of the more costly rule justify its additional cost;

       (b) the reason for adoption of the more costly rule;

       (c) whether the reason for adoption of the more costly rule is based on the interests of public health, safety, or welfare, and if so, how; and

       (d) whether the reason for adoption of the more costly rule is within the scope of the agency's statutory authority, and if so, how.

4.      If the purpose of this rule is to implement a *federal* rule or regulation, please state the following:
       **N/A.**

       (a) What is the cost to implement the federal rule or regulation?

| **Current Fiscal Year** | **Next Fiscal Year** |
|---|---|
| General Revenue_____ | General Revenue_____ |
| Federal Funds_____ | Federal Funds_____ |
| Cash Funds_____ | Cash Funds_____ |
| Special Revenue_____ | Special Revenue_____ |

APP 132

Revised May 2023

Other (Identify)_____          Other (Identify)_____

Total: **$0**                                Total: **$0**


(b) What is the additional cost of the state rule? **None**

**Current Fiscal Year**                      **Next Fiscal Year**

General Revenue: **$0**                      General Revenue: **$0**
Federal Funds_____             Federal Funds_____
Cash Funds_____                Cash Funds_____
Special Revenue_____           Special Revenue_____
Other (Identify)_____          Other (Identify)_____

Total: **$0**                                Total: **$0**

5.     What is the total estimated cost by fiscal year to any private individual, private entity, or private business subject to the proposed, amended, or repealed rule?  Please identify those subject to the rule, and explain how they are affected.

**Current Fiscal Year**                      **Next Fiscal Year**
**$0**                                       **$0**

6.     What is the total estimated cost by fiscal year to a state, county, or municipal government to implement this rule?  Is this the cost of the program or grant?  Please explain how the government is affected.

**Current Fiscal Year**                      **Next Fiscal Year**
**$0**                                       **$0**

7.     With respect to the agency's answers to Questions #5 and #6 above, is there a new or increased cost or obligation of at least one hundred thousand dollars ($100,000) per year to a private individual, private entity, private business, state government, county government, municipal government, or to two (2) or more of those entities combined?

**No**.

If yes, the agency is required by Ark. Code Ann. § 25-15-204(e)(4) to file written findings at the time of filing the financial impact statement.  The written findings shall be filed simultaneously with the financial impact statement and shall include, without limitation, the following:

(1) a statement of the rule's basis and purpose;

(2) the problem the agency seeks to address with the proposed rule, including a statement of whether a rule is required by statute;

(3) a description of the factual evidence that:

    (a) justifies the agency's need for the proposed rule; and

Revised May 2023

(b) describes how the benefits of the rule meet the relevant statutory objectives and justify the rule's costs;

(4) a list of less costly alternatives to the proposed rule and the reasons why the alternatives do not adequately address the problem to be solved by the proposed rule;

(5) a list of alternatives to the proposed rule that were suggested as a result of public comment and the reasons why the alternatives do not adequately address the problem to be solved by the proposed rule;

(6) a statement of whether existing rules have created or contributed to the problem the agency seeks to address with the proposed rule and, if existing rules have created or contributed to the problem, an explanation of why amendment or repeal of the rule creating or contributing to the problem is not a sufficient response; and

(7) an agency plan for review of the rule no less than every ten (10) years to determine whether, based upon the evidence, there remains a need for the rule including, without limitation, whether:
    (a) the rule is achieving the statutory objectives;
    (b) the benefits of the rule continue to justify its costs; and
    (c) the rule can be amended or repealed to reduce costs while continuing to achieve the statutory objectives.

**Agency #108.00**

# RULE REGARDING

# VOTER REGISTRATION

## (Effective_____)



**STATE BOARD OF ELECTION COMMISSIONERS**
501 Woodlane, Suite 122 South
Little Rock, Arkansas 72201
(501) 682-1834 or (800) 411-6996

**Scope of Rules**

These rules are to supplement and provide consistency with Arkansas Constitution Amendment 51 and other laws of Arkansas to secure uniform and efficient procedures in the administration of Amendment 51 throughout the State. Ark. Const. Amend. 51 § 5(e).

**§ 1400 Definitions**

(1) "Authorized Computer Voter Registration Agency" – means those Voter Registration Agencies identified in Arkansas Constitution Amendment 51 §§ 5(b)(2)-(4) that are specifically authorized to utilize computer processes as part of the agency's interaction with its customers, program recipients, or participants of disability programs. These Voter Registration Agencies are:

    a. The Office of Driver Services of the Revenue Division of the Department of Finance and Administration;

    b. State Revenue Offices;

    c. Public assistance agencies that provide services under:

        i. Food Stamps,
        ii. Medicaid,
        iii. Aid to Families with Dependent Children (AFDC),
        iv. Special Supplement Food Program for Women, Infants and Children (WIC);

    d. Disability agencies that offer state-funded programs that primarily provide services to persons with disabilities.

(2) "Federal Mail Voter Registration Application Form" – means the Voter Registration Application form prepared and made available by the Election Assistance Commission.

(3) "Mail Voter Registration Application Form" – means a document approved by the State Board of Election Commissioners for voter registration applicants to apply for voter registration.

(4) "Registration Application Form" – means a Mail Voter Registration Form or a Federal Mail Voter Registration Form.

(5) "Third-Party Registration Organization" – means a person or group of people who collect, gather, or submit Registration Application Forms to the Secretary of State or the permanent registrar of a county.

(6) "Voter Registration Agency" – means those agencies identified in Amendment 51 § 5(a)(1)-(5) and include:

a.  Office of Driver Services of the Revenue Division of the Department of Finance and Administration;

b.  State Revenue Offices;

c.  Public assistance agencies that provide services under:

  i.  Food Stamps,
  ii.  Medicaid,
  iii.  Aid to Families with Dependent Children (AFDC),
  iv.  Special Supplement Food Program for Women, Infants and Children (WIC);

d.  Disability agencies that offer state-funded programs that primarily provide services to persons with disabilities;

e.  Public library; and

f.  Arkansas National Guard.

(7)  "Signature or Mark" – means a handwritten wet signature or handwritten wet mark made on a Registration Application Form with a pen or other writing device that is physically moved across the form and that forms the applicant's signature or mark on the paper form. A Signature or Mark that utilizes a computer to generate or recreate the applicant's signature or mark is not an acceptable signature or mark of the applicant for purposes of Amendment 51 §§ 6(a)(1) & (a)(3)(F) Registration Application Form.

**§ 1401 Requirements to accept Registration Application Forms and Applications from Authorized Computer Voter Registration Agencies.**

(1)  A permanent registrar shall accept a Registration Application Form that is:

a.  complete and legible;

b.  is executed with a Signature or Mark made by the voter registration applicant; and

c.  is submitted to the permanent registrar by mail, delivered in-person by the voter, or is delivered by a Third-Party Registration Organization.

(2)  A permanent registrar shall accept legible and properly completed applications submitted by Authorized Computer Voter Registration Agencies as set forth in Amendment 51, § 5(b)(2)-(4)of the Arkansas Constitution.

Page 3 of 3

# STATE BOARD OF ELECTION COMMISSIONERS

**Secretary of State**
**John Thurston**
Chairman

**Sharon Brooks**
**Jamie Clemmer**
**Bilenda Harris-Ritter**
**William Luther**
**J. Harmon Smith**
**Johnathan Williams**
Commissioners

**501 Woodlane Street – Suite 122 South**
**Little Rock, Arkansas 72201**
**(501)682-1834 or (800)411-6996**



**Chris Madison**
Director

**Waylan Cooper**
Legal Counsel

**Charlie Morris**
Election Administration Supervisor

**Jon Davidson**
Educational Services Manager

April 24, 2024

Bureau of Legislative Research
Attn: Director Marty Garrity
1 Capital Mall, Fifth Floor
Little Rock, Arkansas, 72201

### Re: Justification of Emergency Rule – *Rule Regarding Voter Registration*

Director Garrity:

Per Question 3 of the BLR Questionnaire, the Board provides the following:

The State Board of Election Commissioners finds that an emergency rule is necessary to resolve conflicting procedures for the acceptance of voter registration applications. The State Board finds that the emergency rule is necessary because electronically signed voter registration applications are being accepted by some county clerks, whereas electronically signed voter registration applications are not being accepted by other county clerks.

Voter registration is an ongoing and continuous process. The State Board, when posed the question of whether electronically signed applications are permissible under Ark. Const. Amend 51, found that electronically signed applications are only permitted when submitted by an identified and authorized voter registration agency, such as the Department of Motor Vehicles as specifically stated in Ark. Const. Amend. 51 § 5(b)(2). Other identified agencies may incorporate computer processes as part of the voter registration process if their system is capable. See Ark. Const. Amend. 51 § 5(b)(3)-(4). Applications submitted by the voter himself or herself or submitted by a third-party voter registration agency are not eligible to utilize electronic signatures.

The Board found that computer processes to capture a voter applicant's signature is specifically authorized under Amendment 51 § 5(b)(2)-(4), but not authorized for other means of submission. The Emergency rule is to provide immediate clarity to

Appellate Case: 24-2810    Page: 167    Date Filed: 09/06/2024   Entry ID: 5432887
APP 138

county clerks, applicants, and third-party registration organizations pending the promulgation of a permanent rule. The Board will proceed with a permanent rule that will permit public comments and a public hearing to receive and take into consideration concerns of county clerks, election officials, voters, applicants, and third-party voter registration organizations and other organizations or interested parties.


Respectfully yours,



Richard Chris Madison
Director – State Board of Election Commissioners

APP139

# ARKANSAS   REGISTER

## Proposed Rule Cover Sheet



**Secretary of State**
**John Thurston**
500  Woodlane   Street , Suite 026
Little Rock, Arkansas 72201    -1094
(501) 682 -5070
www.sos.arkansas.gov



Name of Department _State Board of Election Commissioners_

Agency or Division Name _N/A/_

Other Subdivision or Department, If Applicable _N/A_

Previous Agency Name, If Applicable  _N/A_

Contact Person _Chris Madison - Director_

Contact E-mail _Chris.Madison@Arkansas.gov_

Contact Phone _501-682-1447_

Name of Rule  _Rule Regarding Voter Registration_

Newspaper Name  _Arkansas Democrat Gazette_

Date of Publishing _April 28, 29, and 30th of 2024._

Final Date for Public Comment _Emergency Rule- No public Comment_

Location and Time of Public Meeting: _N/A_

APP140

Case 5:24-cv-05121-TLB   Document 46-7   Filed 07/11/24   Page 42 of 93 PageID #: 299
Page: 663 Date: 06/10/24 Time: 6:17:14
Path: @psc3913/nep_usa_pri/XPRIMARY/STATUTES/AR_123/PRIMARYar_statutes_ar_election_and_const_080323102300054

663                          VOTER REGISTRATION                     Amend. 51

## AMEND. 49. [REPEALED.]

**Publisher's Notes.** This amendment, concerning industrial development bonds authority, was repealed by Const. Amend. 62, § 11.

## AMEND. 50. ELECTIONS CONDUCTED BY BALLOT OR VOTING MACHINE (CONST., ART. 3, § 3, REPEALED AND NEW SECTIONS ADDED).

**Publisher's Notes.** This amendment was proposed by initiative petition and adopted at the general election on Nov. 6, 1962, by a vote of 134,782 for and 132,123 against.

**Effective Dates.**
Const. Amend. 50, § 5: Jan. 15, 1963.

### § 1. Repeal of Article III, Section 3.

Article III, Section 3, of the Constitution of the State of Arkansas is hereby repealed and the following section is substituted therefor.

### § 2. Elections by ballot or voting machines authorized.

All elections by the people shall be by ballot or by voting machines which insure the secrecy of individual votes.

### § 3. [Repealed.]

**Publisher's Notes.** This section was repealed by Ark. Const. Amend. 81, which was proposed by H.J.R. 1004 during the 2001 Regular Session and adopted at the November 2002 general election. The former section provided: "In elections by ballot every ballot shall be numbered in the order in which it is received, the number shall be recorded by the election officers on the list of voters opposite the name of the elector who presents the ballot, and the election officers shall be sworn or affirmed not to disclose how any elector voted unless required to do so as witnesses in a judicial proceeding or a proceeding to contest an election."

### § 4. Voting machines.

Voting machines may be used to such extent and under such rules as may be prescribed by the General Assembly.

## AMEND. 51. VOTER REGISTRATION

**Publisher's Notes.** This amendment was proposed by initiative petition and approved at the general election on Nov. 3, 1964, by a vote of 277,087 for and 218,681 against.
**Effective Dates.**
Const. Amend. 51, § 21: Jan. 1, 1965.
Acts 1987, No. 800, § 3: Apr. 8, 1987. Emergency clause provided: "It is hereby found and determined by the General Assembly that Section 11 of Amendment 51 to the Arkansas Constitution requires the Permanent Registrar to cancel without prior notice, the voter registration of persons who have failed to vote within four (4) consecutive years; that it is preferable that voters be notified prior to cancellation so that they may avoid the cancellation of their voter registration; that this Act amends Amendment 51 to provide such prior notice and that unless it is given immediate effect, some voter registration affidavits may be cancelled without prior notice. Therefore, an emergency is hereby declared to exist and this Act being necessary for the preservation of the public peace, health and safety shall be in full force and effect from and after its passage and approval."
Identical Acts 1995, Nos. 947 and 964, § 13: Jan. 1, 1996.
Acts 2003 (2nd Ex. Sess.), No. 8, § 4: Dec. 22, 2003. Emergency clause provided: "It is found and determined by the General Assembly of the State of Arkansas that the federal Help America Vote Act establishes deadlines for the state's compliance with the act's voter registration requirements; and that the immediate passage of this act is necessary to ensure the state meets its deadlines. Therefore, an emergency is declared to exist and this act being immediately necessary for the preservation of the public peace, health, and safety shall become effective on: (1) The date of its approval by the Governor; (2) If the bill is neither approved nor vetoed by the Governor, the expiration of the period of time during which the Governor may veto the bill; or (3) If the bill is vetoed by the Governor and the veto is overridden, the date the last house overrides the veto."

Case 5:24-cv-05121-TLB   Document 46-7   Filed 07/11/24   Page 43 of 93 PageID #: 300

Amend. 51, § 1         CONSTITUTION OF ARKANSAS         664

### § 1. Statement of policy.

The purpose of this amendment is to establish a system of permanent personal registration as a means of determining that all who cast ballots in general, special and primary elections in this State are legally qualified to vote in such elections, in accordance with the Constitution of Arkansas and the Constitution of the United States.

### § 2. Definitions.

As used in this amendment, the terms:

(a) "County Board of Registration" means the County Board of Election Commissioners in each of the several counties of this State.

(b) "Permanent Registrar" means the County Clerk in each of the several counties of this State.

(c) "Deputy Registrar" means the Deputy County Clerk or clerical assistants appointed by the County Clerk.

(d) "Election" means any general, special or primary election held pursuant to any provisions of the Constitution or statutes of the State of Arkansas; provided, that this amendment shall not apply to selection of delegates to party conventions by party committees or to selection of party committeemen by party conventions.

### § 3. Application.

No person shall vote or be permitted to vote in any election unless registered in a manner provided for by this amendment.

### § 4. Permanent registration.

When a voter is once registered under the provisions of this amendment, it is unnecessary for such voter again to register unless such registration is cancelled or subject to cancellation in a manner provided for by this amendment.

### § 5. Duties of registration officials.

(a) Voter registration agencies shall distribute mail voter registration applications, provide assistance to applicants in completing voter registration application forms, unless the applicant refuses assistance, and accept completed voter registration application forms for transmittal to the appropriate permanent registrar via the Secretary of State. Voter registration agencies include the following:

(1) The Office of Driver Services of the Revenue Division of the Department of Finance and Administration and all State Revenue Offices;

(2) Public assistance agencies, which shall mean those agencies that provide services under the Food Stamps, Medicaid, Aid to Families with Dependent Children (AFDC), and the Special Supplemental Food Program for Women, Infants and Children (WIC) programs;

(3) Disabilities agencies, which shall mean agencies that offer state-funded programs primarily engaged in providing services to persons with disabilities;

(4) Public libraries; and

(5) The Arkansas National Guard.

(b)(1) The Secretary of State is designated as the chief election official. The Secretary shall prepare and distribute the pre-addressed postcard mail voter registration application forms described in 51-6 [section 6] of this amendment. Mail registration application forms shall serve for purposes of initial applications to register and shall also serve for changes of name, address, or party affiliation. Bilingual (Spanish/English) forms, braille forms, and large print forms shall be available upon request. The Secretary of State shall make the state mail voter registration application form available for distribution through governmental and private entities with

Appellate Case: 24-2810    Page: 171    Date Filed: 09/06/2024    Entry ID: 5432887

Page: 665
Case 5:24-cv-05121-TLB   Document 46-7   Filed 07/11/24   Page 44 of 93 PageID #: 301
Path: @psc3913/nep_usa_pri/XPRIMARY/STATUTES/AR_123/PRIMARYar_statutes_ar_election_and_const_080323102300054

665                              VOTER REGISTRATION                    Amend. 51, § 5

particular emphasis on making them available for organized voter registration programs. Any person may distribute state registration cards. All registration cards shall be distributed to the public without charge.

(2) The Office of Driver Services and State Revenue Offices shall provide voter registration opportunities to those obtaining or renewing drivers licenses, personal identification cards, duplicate or corrected licenses or cards, or changing address or name whether in person or by mail. The Office of Driver Services and State Revenue Offices shall use a computer process, which combines the drivers license and voter registration applications, minimizing duplicative information, and shall have available the federal or state mail voter registration application form, which may be used upon request or when the computer process is not available. If a person declines to apply to register to vote, the Office of Driver Services or State Revenue Office shall retain the record of declination for two (2) years.

(3) All public assistance agencies shall provide a federal or state mail voter registration application form with each application for assistance, and with each recertification, renewal or change of address or name relating to such assistance. Public assistance agencies shall provide voter registration application forms as part of the intake process, or as a combined computer process when a computer process is available. Public assistance agencies shall use a process or form that combines the application for assistance with the voter registration application when available. Public assistance agencies shall also provide declination forms as described in 51-6 [section 6] of this amendment, which shall be retained for two (2) years if an applicant declines to apply to register to vote.

(4) All disabilities agencies shall provide a federal or state mail voter registration application form with each application for services and with each recertification, renewal or change of address or name relating to such services. Disabilities agencies shall provide voter registration application forms as part of the intake process, or as a combined computer process when a computer process is available. Disabilities agencies may use a form that combines the application for services or assistance with the voter registration application when available. If the disabilities agency provides services in a person's home, then the agency shall also provide voter registration services at the person's home. Disabilities agencies shall also provide declination forms as described in 51-6 [section 6] of this amendment, which shall be retained for two (2) years if an applicant declines to apply to register to vote.

(c)(1) Employees of the Office of Driver Services and State Revenue Offices shall provide appropriate nonpartisan voter registration assistance and provide all applicants with a receipt containing the applicant's name and the date of the submission.

(2) Public assistance agencies and disabilities agencies shall train agency employees to provide the same degree of assistance in completing voter registration forms as is provided with regard to the completion of agency forms, unless the applicant refuses such assistance.

(3) Each revenue office, public assistance agency and disabilities agency shall provide ongoing training for employees who will be assisting persons with voter registration applications and shall include information regarding training procedures in the report filed with the Secretary of State pursuant to § 51-8(d) [section 8(d)] of this amendment.

(4) A person who provides voter registration assistance through any voter registration agency shall not:

(A) Seek to influence an applicant's political preference or party registration;

(B) Display any such political preference or party allegiance;

(C) Make any statement to an applicant or take any action to the purpose or effect of discouraging the applicant from registering to vote;

(D) Make any statement to an applicant or take any action to the purpose or effect of leading the applicant to believe that a decision to register or not to register has any bearing on the availability of services or benefits; or

(E) Disclose any applicant's voter registration information, except as necessary for the administration of voter registration.

(d) The Permanent Registrar shall provide office and clerical facilities and may employ such clerical assistants which he may deem necessary to fulfill the duties imposed by this amendment;

Case 5:24-cv-05121-TLB   Document 46-7   Filed 07/11/24   Page 45 of 93 PageID #: 302

Amend. 51, § 6          CONSTITUTION OF ARKANSAS                    666

provided, that all clerical assistants so employed shall have the qualifications required by law of eligible voters and shall be selected on the basis of competence and without reference to political affiliation.

(e) The State Board of Election Commissioners is authorized and, as soon as is possible after the effective date of this amendment, directed to prescribe, adopt, publish and distribute:

(1) such Rules and Regulations supplementary to this amendment and consistent with this amendment and other laws of Arkansas as are necessary to secure uniform and efficient procedures in the administration of this amendment throughout the State;

(2) a Manual of instruction for the information, guidance and direction of election officials within the state; and

(3) detailed specifications of the registration record files, the voter registration application forms and other registration forms, including voter registration list maintenance forms, all of which shall be consistent with this amendment and uniform throughout the State. [As amended by Acts 1995, No. 599, § 1; 1995, No. 947, § 1; 1995, No. 964, § 1.]

## § 6. Voter registration application forms.

(a)(1) The mail voter registration application form may only require identifying information, including signature or mark, and other information, including data relating to previous registration by the applicant, as is necessary to assess the applicant's eligibility and to administer voter registration and other parts of the election process.

(2) Such forms shall include, in identical print, statements that:

(A) Specify voter eligibility requirements;

(B) Contain an attestation that the applicant meets all voter eligibility requirements and that the applicant does not claim the right to vote in another county or state;

(C) Specify the penalties provided by law for submission of a false voter registration application;

(D) Inform applicants that where they register to vote will be kept confidential;

(E) Inform applicants that declining to register will also be kept confidential; and

(F) Inform applicants that they will be required to verify their registration when voting in person or by absentee ballot by providing a required document or identification card as provided in Arkansas Constitution, Amendment 51, § 13.

(G) Inform the applicant that if the voter registration application is being collected by a third-party voter registration organization, the third-party voter registration organization may be unable to deliver the application to the permanent registrar in the county in which the applicant resides before the thirty-day voter registration deadline to vote in the next election and that the applicant may elect to deliver the application in person or by mail; and

(H) Inform the applicant of the process to determine if the application has been received by the Secretary of State.

(3) The following information will be required of the applicant:

(A) Full name;

(B) Mailing address;

(C) Residence address and any other information necessary to identify the residence of the applicant;

(D) If previously registered, the name then supplied by the applicant, and the previous address, county, and state;

(E) Date of birth;

(F) A signature or mark made under penalty of perjury that the applicant meets each requirement for voter registration;

(G) If the applicant is unable to sign his or her name, the name, address, and telephone number of the person providing assistance;

(H) If the applicant has a current and valid driver's license, the applicant's driver's license number;

667                              VOTER REGISTRATION                    Amend. 51, § 6

(I) If the applicant does not have a current and valid driver's license, the last four (4) digits of the applicant's social security number; and

(J) If the applicant does not have a current and valid driver's license number or social security number, the Secretary of State will assign the applicant a number which will serve to identify the applicant for voter registration purposes, and this number shall be placed on the application.

(4) The following information may be requested on the registration card, but it shall not be required:

(A) Telephone number where the applicant may be contacted; and

(B) Political party with which the applicant wishes to be affiliated, if any.

(5) The mail voter registration application shall not include any requirement for notarization or other formal authentication.

(6) The mail voter registration application form shall include the following questions along with boxes for the applicant to check "yes" or "no" in response:

(A) "Are you a citizen of the United States of America and an Arkansas resident?";

(B) "Will you be eighteen (18) years of age on or before election day?";

(C) "Are you presently adjudged mentally incompetent by a court of competent jurisdiction?"; and

(D) "Have you ever been convicted of a felony without your sentence having been discharged or pardoned?".

(7) The mail voter registration application form shall include the following statements immediately following the questions asked in subdivision (a)(6) of this section:

(A) "If you checked 'No' in response to either questions A or B, do not complete this form.";

(B) "If you checked 'Yes' in response to either questions C or D, do not complete this form."; and

(C) The mail-in voter registration application form shall include the following statement:

"If your voter registration application form is submitted by mail and you are registering for the first time, and you do not have a valid driver's license number or Social Security number, in order to avoid the additional identification requirements upon voting for the first time you must submit with the mailed registration form: (a) a current and valid photo identification; or (b) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows your name and address."

(8) If an applicant for voter registration fails to provide any of the information required by this section, the permanent registrar shall notify the applicant of the failure and provide the applicant with an opportunity to complete the form in a timely manner to allow for its completion before the next election for federal office.

(9) The mail voter registration application shall be pre-addressed to the Secretary of State.

(b)(1) The voter registration application portion of the process used by the Office of Driver Services and state revenue offices shall include:

(A) The question: "If you are not registered to vote where you live now, would you like to apply to register to vote here today?";

(B) A statement that if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes;

(C) A statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes;

(D) Voter registration eligibility requirements;

(E) Penalties provided by law for providing false information;

(F) An attestation that the applicant meets each eligibility requirement and that the applicant does not claim the right to vote in any other county or state; and

(G) A space for the applicant's signature or mark.

(2) The voter registration application portion shall require the signature of the applicant under penalty of perjury, but shall not require notarization or other formal authentication.

Page: 668 Date: 06/06/24 Time: 16:17:45
Path: @psc3913/nep_usa_pri/XPRIMARY/STATUTES/AR_123/PRIMARYar_statutes_ar_election_and_const_080323102300054

Case 5:24-cv-05121-TLB   Document 46-7   Filed 07/11/24   Page 47 of 93 PageID #: 304

Amend. 51, § 7 CONSTITUTION OF ARKANSAS 668

(c) Public assistance agencies and disabilities agencies shall provide, in addition to the federal or state mail voter registration application form, a declination form, to be approved by the State Board of Election Commissioners, which includes the following question and statements:

(1) The question in prominent type, "IF YOU ARE NOT REGISTERED TO VOTE WHERE YOU LIVE NOW, WOULD YOU LIKE TO APPLY TO REGISTER TO VOTE HERE TODAY? YES …. NO ….";

(2) The statement in close proximity to the question above and in equally prominent type, "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME.";

(3) The statement, "APPLYING TO REGISTER OR DECLINING TO REGISTER TO VOTE WILL NOT AFFECT THE AMOUNT OF ASSISTANCE THAT YOU WILL BE PROVIDED BY THIS AGENCY.";

(4) The statement, "IF YOU WOULD LIKE HELP IN FILLING OUT THE VOTER REGISTRATION APPLICATION FORM, WE WILL HELP YOU. THE DECISION WHETHER TO SEEK OR ACCEPT HELP IS YOURS. YOU MAY FILL OUT THE APPLICATION FORM IN PRIVATE.";

(5) The statement, "IF YOU BELIEVE THAT SOMEONE HAS INTERFERED WITH YOUR RIGHT TO REGISTER OR TO DECLINE TO REGISTER TO VOTE, YOUR RIGHT TO PRIVACY IN DECIDING WHETHER TO REGISTER OR IN APPLYING TO REGISTER TO VOTE, OR YOUR RIGHT TO CHOOSE YOUR OWN POLITICAL PARTY OR OTHER POLITICAL PREFERENCE, YOU MAY FILE A COMPLAINT WITH THE SECRETARY OF STATE AT ……..." (filled in with the address and telephone number of the Secretary of State's office);

(6) The statement, "IF YOU DECLINE TO REGISTER TO VOTE, THE FACT THAT YOU HAVE DECLINED TO REGISTER WILL REMAIN CONFIDENTIAL AND WILL BE USED ONLY FOR VOTER REGISTRATION PURPOSES."; and

(7) The statement, "IF YOU DO REGISTER TO VOTE, THE OFFICE AT WHICH YOU SUBMIT A VOTER REGISTRATION APPLICATION WILL REMAIN CONFIDENTIAL AND WILL BE USED ONLY FOR VOTER REGISTRATION PURPOSES.".

[As amended by Acts 1971, No. 828, § 1; 1995, No. 947, § 2; 1995, No. 964, § 2; 2003, No. 995, § 1; 2003 (2nd Ex. Sess.), No. 8, § 1; 2009, No. 659, § 1; 2017, No. 633, § 1; 2023, No. 441, § 2.]

**Publisher's Notes.** Before amendment by Acts 1971, No. 828, subdivision (8) read: "number or name of the voter's school district and number or name of the voter's precinct."

The proviso to subdivision (a)(8)(b) read exactly as it appeared in the 1971 amendment prior to further amendment in 1995.

Acts 1971, No. 828, § 2 read: "The amendment of Sub-

section (8) of Section 6 of Amendment 51 of the Constitution of the State of Arkansas, as provided in Section 1 hereof, is hereby made in conformance with the provisions of Section 19 of said Amendment 51 to the Constitution of the State of Arkansas, it being the determination of the General Assembly that said Amendment is germane to Amendment 51 and is consistent with its policy and purposes."

## § 7. Registration record files.

(a) By the deadline to establish a computerized statewide voter registration database under the federal Help America Vote Act of 2002, including any waivers or extensions of that deadline, the Secretary of State shall define, maintain, and administer the official, centralized, and interactive computerized voter registration list for all voters legally residing within the State. The list shall include:

(1) The name, address, county, precinct, assigned unique identifier and registration information of every legally registered voter in the state;

(2) The inactive registration records of persons who have failed to respond to address confirmation mailings described in § 10 of this amendment;

(3) List maintenance information for each person receiving address confirmation notices or final address confirmation notices, or both, and the person's response; and

(4) Cancelled voter registration records and documentation noting the reason for cancellation.

(b) The computerized list shall serve as the single system for storing and managing the official list of registered voters throughout the state.

Page: 69 Date: 06/10/23 Time: 8:17:13
Path: @psc3913/nep_usa_pri/XPRIMARY/STATUTES/AR_123/PRIMARYar_statutes_ar_election_and_const_080323102300054
Case 5:24-cv-05121-TLB   Document 46-7   Filed 07/11/24   Page 48 of 93 PageID #: 305

669                    VOTER REGISTRATION                Amend. 51, § 7

(c) The computerized list shall serve as the official voter registration list for the conduct of all elections for federal, state, county, municipal, school, or other office in the state.

(d) The permanent registrar of each county shall maintain copies of that county's precinct voter registration list from the statewide computerized list as necessary for holding elections.

(e) The computerized list shall be coordinated with other state agency records on felony status as maintained by the Arkansas Crime Information Center, records on death as maintained by the State Department of Health, and driver's license records maintained by the Office of Driver Services, according to § 9 of Amendment 51 to the Arkansas Constitution.

(f) A person with an inactive voter registration status may activate his or her voting status by appearing to vote at the precinct in which he or she currently resides or by updating his or her voter registration records with the permanent registrar of the county in which he or she resides.

(g) The county board of election commissioners or other lawfully designated election officials shall cause the appropriate precinct voter registration lists to be at the polling places on the date of elections, and shall return them at the close of the election to the office of the permanent registrar with the ballot boxes.

(h) If the legal residence of a voter is renamed, renumbered, or annexed, the permanent registrar or any local election official may change the name or number of the legal residence on the voter's registration record and any other voting records. Within fifteen (15) days after the records are changed to reflect the new name or number of the residence, the permanent registrar shall notify the voter by mail that the change has been made.

(i)(1) The Secretary of State and any permanent registrar in the state, may obtain immediate electronic access to the information contained in the computerized list.

(2) All voter registration information obtained by any local election official in the state shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official.

(3) The Secretary of State shall provide the support as may be required so that local election officials are able to enter the information.

(j)(1) The Secretary of State shall ensure the security and accuracy of the statewide voter registration list.

(2) To ensure the security and accuracy of the statewide voter registration list maintained by the Secretary of State, the Secretary of State shall:

(A) Cooperate with other states and jurisdictions to compare registered voters, voter history, and voter registration lists to:

(i) Ensure the accuracy of the voter registration rolls;

(ii) Identify voters whose addresses have changed;

(iii) Prevent registration in more than one (1) state; and

(iv) Determine eligibility of individuals to vote in Arkansas;

(B) Have the authority to utilize any services available to establish and implement a system for the verification of citizenship status for a person registering to vote;

(C) Regularly and before each election identify registered voters who are deceased by comparing the information received from the Social Security Administration, including without limitation a master death file or index compiled by the Social Security Administration;

(D) Establish and implement a process for the verification of address information:

(i) Submitted by a person registering to vote;

(ii) Submitted by a registered voter updating his or her address; and

(iii) Provided through undeliverable mail by the United States Postal Service concerning a person registering to vote or a registered voter;

(E) Ensure all confidential voter registration information and data remains confidential and protected under state and federal law;

(F) Allow view-only access to the voter registration record files and data to all county boards of election commissioners to carry out the county board of election commissioners' election administration responsibilities; and

(G) Provide annual reports to the Joint Performance Review Committee of the General Assembly concerning the accuracy of the voter registration record files.

Case 5:24-cv-05121-TLB   Document 46-7   Filed 07/11/24   Page 49 of 93 PageID #: 306

(3) The Secretary of State shall promulgate rules under the Arkansas Administrative Procedure Act, § 25-15-201 et seq., necessary to:

(A) Implement the requirements of this section; and

(B) Ensure the security, accuracy, and integrity of the:

(i) Statewide voter registration system;

(ii) Supporting technologies utilized by the counties to maintain and record voter registration information;

(iii) Secure user access requirements established by the Secretary of State; and

(iv) Election audit logs.

[As amended by Acts 1971, No. 299, § 1; 1973, No. 149, §§ 1-4; 1977, No. 563, § 1; 1991, No. 410, § 1; 1995, No. 947, § 3; 1995, No. 964, § 3; 2003, No. 995, § 2; 2003 (2nd Ex. Sess.), No. 8, §§ 2, 3; 2023, No. 441, § 3.]

## § 8. Voter registration application records and reports.

(a)(1) The Office of Driver Services, State Revenue Offices, public assistance agencies, disabilities agencies, and other voter registration agencies shall transmit all completed voter registration applications to the Secretary of State in sufficient time to allow the Secretary of State to transmit the applications to the appropriate permanent registrar no later than ten (10) days after the date of acceptance by the assisting agency. When applications are accepted within five (5) days before the last day of registration for an election, they must be transmitted no later than five (5) days after the date of acceptance at the assisting agency.

(2) The Secretary of State shall transmit all mail voter registration applications to the appropriate permanent registrar no later than ten (10) days after the date of receipt. When applications are received within five (5) days before the last day of registration for an election, they must be transmitted no later than five (5) days after date of receipt. If forms are received by the wrong election office, they shall be forwarded to the appropriate permanent registrar not later than the fifth day after receipt.

(b) The Office of Driver Services, State Revenue Offices, public assistance agencies, disabilities and other voter registration agencies shall collect data on the number of voter registration applications completed or declined at each agency, and any additional statistical evidence that the Secretary of State or the State Board of Election Commissioners deems necessary for program evaluation and shall retain such voter registration data for a period of two (2) years.

(c)(1) The Secretary of State shall collect, maintain, and publish monthly statistical data reflecting the number of new voter registration applications, changes of address, name, and party affiliation, and declinations received by mail and in:

(A) state revenue offices;

(B) public assistance agencies;

(C) disabilities agencies;

(D) recruitment offices of the Armed Forces of the United States;

(E) public libraries; and

(F) offices of the Arkansas National Guard.

(2) Every six (6) months the Secretary of State shall compile a statewide report available to the public reflecting the statistical data collected pursuant to subsection (a) of this section. This report shall be submitted to the United States Election Assistance Commission for the national report pursuant to the National Voter Registration Act of 1993, United States Code 52 USC § 20508. The state report shall also include:

(A) Numbers of and descriptions of the agencies, and the method of integrating voter registration in the agencies, disaggregated by agency;

(B) Numbers and descriptions of the public assistance programs and the method of integrating voter registration, disaggregated by program;

(C) An assessment of the impact of the National Voter Registration Act of 1993, United States Code 52 USC § 20508, on the administration of elections; and

Page: 67-Date: 06/10/24 Time: 8:17:15
Case 5:24-cv-05121-TLB    Document 46-7    Filed 07/11/24    Page 50 of 93 PageID #: 307
Path: @psc3913/nep_usa_pri/XPRIMARY/STATUTES/AR_123/PRIMARYar_statutes_ar_election_and_const_080323102300054

(D)  Recommendations for improvements in procedures, forms, and other matters affected by the National Voter Registration Act of 1993, United States Code 52 USC § 20508.

(d)  Every six (6) months the state-level administration of each voter registration agency shall issue a report to the Legislative Council and the Secretary of State containing:

(1)  The statistical and other information collected in each voter registration agency office, including the:

(A)  Number of and description of each voter registration agency;

(B)  Method of integrating voter registration in the voter registration agency; and

(C)  Total number of registration application forms transmitted to the Secretary of State, disaggregated by month by the voter registration agency;

(2)  The statistical and other information collected in each public assistance agency, including the:

(A)  Number of and description of each voter registration agency;

(B)  Method of integrating voter registration in the voter registration agency; and

(C)  Number of registration application forms transmitted to the Secretary of State, disaggregated by month by the voter registration agency; and

(3)  Recommendations for improvements in procedures, forms, and other matters, including training.

(e)  Information relating to the place where a person registered to vote, submitted a voter registration application, or updated voter registration records, and information relating to declination forms is confidential and exempt from the Freedom of Information Act, § 25-19-101, et seq. [As amended by Acts 1989, No. 540, § 1; 1995, No. 947, § 4; 1995, No. 964, § 4; 2023, No. 441, §§ 4, 5.]

### § 9. Application to register.

(a)  All persons may register who:

(1)  Have not been convicted of a felony unless the person's sentence has been discharged or the person has been pardoned;

(2)  Have not been adjudged mentally incompetent by a court of competent jurisdiction; and

(3)  Meet one (1) of the following requirements:

(A)  Are qualified electors who have not previously registered;

(B)  Will become qualified electors during the thirty-day period immediately prior to the next election scheduled within the county; or

(C)  Are otherwise qualified electors but whose registration has been cancelled in a manner provided for by this amendment.

(4)  Are citizens of the United States.

(b)  Registration shall be in progress at all times except during the thirty-day period immediately prior to any election scheduled within the county, during which period registration of voters shall cease for that election, but registration during such period shall be effective for subsequent elections.

(c)(1)  The permanent registrar shall register qualified applicants when a legible and complete voter registration application is received and acknowledged by the permanent registrar.

(2)  Any person who assists applicants with a voter registration application as part of a voter registration drive or who, in furtherance of a voter registration drive, gathers or possesses completed applications for submission to the permanent registrar or Secretary of State shall deliver all applications in his or her possession to the permanent registrar or Secretary of State within twenty-one (21) days of the date on the voter registration application and, in any event, no later than the deadline for voter registration for the next election.

(3)  The permanent registrar shall register qualified applicants who apply to register to vote by mail using the state or federal mail voter registration application form if:

(A)  A legible and complete voter registration application form is postmarked not later than thirty (30) days before the date of the election, or, if the form is received by mail without a postmark, not later than twenty-five (25) days before the date of an election; and

Case 5:24-cv-05121-TLB   Document 46-7   Filed 07/11/24   Page 51 of 93 PageID #: 308
Page: 672 Date: 06/06/23 Time: 6:17:16
Path: @psc3913/nep_usa_pri/XPRIMARY/STATUTES/AR_123/PRIMARYar_statutes_ar_election_and_const_080323102300054

Amend. 51, § 9        CONSTITUTION OF ARKANSAS        672

(B)(i) The applicant provides a current valid driver's license number or the last four (4) digits of the applicant's social security number; or

(ii) If an applicant for voter registration does not have a valid driver's license or a social security number, the Secretary of State shall assign the applicant a number that will serve as a unique identifier of the applicant for voter registration purposes.

(d) The permanent registrar shall notify applicants whether their applications are accepted or rejected or are incomplete. If information required by the permanent registrar is missing from the voter registration application, the permanent registrar shall contact the applicant to obtain the missing information.

(e) The Secretary of State and the Director of the Office of Driver Services shall enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the Office of Driver Services to the extent required to enable each official to verify the accuracy of the information provided on applications for voter registration. The Director of the Office of Driver Services shall enter into an agreement with the Commissioner of Social Security to verify driver's license information according to § 303 of the Federal Help America Vote Act of 2002.

(f) Registration records shall be entered promptly in the computerized statewide registration record files. If the applicant lacks one (1) or more of the qualifications required by law of voters in this state, the permanent registrar shall not register the applicant, but shall document the reason for denying the applicant's registration and promptly file or enter the application and the documented reason for denying registration in the statewide registration record files.

(g) If the permanent registrar has any reason to doubt the qualifications of an applicant for registration, he or she shall submit such application to the county board of election commissioners, and such board shall make a determination with respect to such qualifications and shall instruct the permanent registrar regarding the same.

(h) If any person eligible to register as a voter is unable to register in person at the permanent registrar's office by reason of sickness or physical disability, the permanent registrar shall register the applicant at his or her place of abode within such county, if practicable, in the same manner as if he or she had appeared at the permanent registrar's office.

(i) Notwithstanding other provisions of this amendment, every person in any of the following categories who is absent from the place of his or her voting residence may vote without prior registration by absentee ballot by submission of a federal postal card application as provided for in the Uniformed and Overseas Citizens Absentee Voting Act in any primary, special, school, or general election held in his or her election precinct if he or she is otherwise eligible to vote in that election:

(1) Members of the uniformed services of the United States while in active duty or service, and their spouses and dependents who, by reason of the active duty or service of the member, are absent from the place of residence where the spouse or dependent is otherwise qualified to vote;

(2) Members of the Merchant Marine while in active duty or service, and their spouses and dependents who, by reason of the active duty or service of the member, are absent from the place of residence where the spouse or dependent is otherwise qualified to vote; and

(3) Citizens of the United States residing or temporarily outside the territorial limits of the United States and the District of Columbia.

(j)(1) The Secretary of State shall be responsible for providing to all absent uniformed services voters and overseas voters who wish to register to vote or vote in any jurisdiction in the state, information regarding voter registration procedures and absentee ballot procedures.

(2) No later than ninety (90) days after the date of each regularly scheduled general election for federal office, the Secretary of State shall submit a report, based on information submitted to him or her by the permanent registrars of each county, to the Election Assistance Commission on the combined number of absentee ballots transmitted to absent uniformed services voters and overseas voters for the election and the combined number of the ballots which were returned by the voters and cast in the election.

(3) The Secretary of State shall make the report available to the general public.

Case 5:24-cv-05121-TLB   Document 46-7   Filed 07/11/24   Page 52 of 93 PageID #: 309

(k) Any person whose registration status or voting eligibility is affected adversely by an administrative determination under this amendment may appeal such adverse determination within five (5) days of receipt of notice thereof to the county board of election commissioners. The county board of election commissioners shall act on such appeal and render its decision within ten (10) days of its receipt. Within thirty (30) days after receipt of such decision, any aggrieved party may appeal further to the circuit court of the county.

(l) If an election law deadline occurs on a Saturday, Sunday, or legal holiday, the deadline shall be the next day which is not a Saturday, Sunday, or legal holiday. [As amended by Acts 1971, No. 184, § 1; 1993, No. 561, § 1; 1995, No. 947, § 5; 1995, No. 964, § 5; 1999, No. 654, § 1; 2003, No. 995, § 3; 2005, No. 1952, § 1; 2009, No. 659, § 2; 2023, No. 441, § 6.]

**Publisher's Notes.** The Election Assistance Commission, referred to in subdivision (j)(2), is a federal commission.

Before the 1971 amendment, subsection (f) read: "Notwithstanding other provisions of this amendment, all members of the armed forces of the United States and their spouses when residing with or accompanying them, who are otherwise eligible, may vote without registration by absentee ballot in accordance with the laws of this State".

Section 9 of Amendment 51 to the Arkansas Constitution was amended by the General Assembly pursuant to the authority granted in Section 19 of that Amendment.

### § 10. Transfer and change of status.

(a) Upon a change of legal residence within the county, or a change of name, any registered voter may cause his or her registration to be transferred to his or her new address or new name by completing and mailing a federal or state mail voter registration application form, by updating his or her address at the Office of Driver Services, any state revenue office, public assistance agency, disabilities agency, or other voter registration agency, by signing a mailed request to the permanent registrar, giving his or her present address and the address at which he or she was last registered or his or her present name and the name under which he or she was last registered, or by applying in person at the office of the permanent registrar.

(b)(1) Upon a change of legal residence from one (1) county within the state to another county within the state, any registered voter may cause his or her registration to be transferred to the new county at his or her new address by:

(A) Completing and mailing a federal or state mail voter registration application form;

(B) Updating his or her new address at a voter registration agency, including without limitation the Office of Driver Services or a state revenue office, public assistance agency, or disabilities agency;

(C) Signing a mailed request to the permanent registrar giving the voter's present address and the address at which the voter was last registered; or

(D) Applying in person for the transfer at the office of the permanent registrar.

(2)(A) If the updated registration information is actually received in the office of the county clerk of the voter's new county not later than four (4) days before a scheduled election, the voter shall have the right to vote in the scheduled election in the precinct into which the voter just moved in the new county.

(B) If the updated registration information is not actually received by the fourth day before a scheduled election, the voter shall not be eligible to vote in the scheduled election.

(c) If the change of legal residence is made pursuant to subsection (a) or subdivision (d)(1) of this section during the thirty-day administrative cut-off period immediately prior to any election scheduled within the county, the registered voter shall retain his or her right to vote in the scheduled election in the precinct to which he or she just moved.

(d) The permanent registrar shall conduct a uniform, nondiscriminatory address confirmation program during each odd-numbered year to ensure that voter registration lists are accurate and current. The address confirmation program shall be completed not later than ninety (90) days prior to a primary or general election for federal office. Based on change of address data received from the United States Postal Service or its licensees, or other unconfirmed data indicating that a registered voter no longer resides at his or her registered address, the permanent registrar shall send a forwardable address confirmation notice, including a postage-paid and preaddressed return card, to enable the voter to verify or correct the address information.

Page: 674 Date: 08/03/2012 Time: 13:17:16
Path: @psc3913/nep_usa_pri/XPRIMARY/STATUTES/AR_123/PRIMARYar_statutes_ar_election_and_const_080323102300054

Case 5:24-cv-05121-TLB    Document 46-7    Filed 07/11/24    Page 53 of 93 PageID #: 310

Amend. 51, § 11                CONSTITUTION OF ARKANSAS                            674

(1) If change of address data indicate that the voter has moved to a new residence address in the same county and, if the county is divided into more than one (1) congressional district, the same congressional district, the address confirmation notice shall contain the following statement:

"We have received notification that you have moved to a new address in _____ County (or in the _____ Congressional District). We will reregister you at your new address unless, within ten (10) days, you notify us that your change of address is not a change of your permanent residence. You may notify us by returning the attached postage-paid postcard or by calling (_____) _____-_____. If this is not a permanent change of residence and if you do not notify us within ten (10) days you may be required to update your residence address in order to vote at future elections."

(2) If the change of address data indicates that the voter has moved to a new address in another county or, if a county is divided into more than one (1) congressional district, to a new address in the same county but in a new congressional district, the notice shall include the following statement:

"We have received notification that you have moved to a new address not in _____ County (or not in the _____ Congressional District). If you no longer live in _____ County (or in the _____ Congressional District), you must transfer your registration to your new residence address in order to vote in the next election. If you are still an Arkansas resident, you may obtain a form to transfer your registration by calling your county clerk's office or the Secretary of State. If your change of address is not a change of your permanent residence, you must return the attached postage-paid postcard. If you do not return this card and continue to reside in _____ County (and in the _____ Congressional District), you may be required to provide identification and update your residence address in order to vote at future elections, and if you do not vote at any election in the period between the date of this notice and the second federal general election after the date of this notice, your voter registration will be cancelled and you will have to reregister in order to vote. If the change of address is permanent, please return the attached postage-paid postcard which will assist us in keeping our voter registration records accurate."

(e) The county clerk may send out an address confirmation to any voter when he or she receives unconfirmed information that the voter no longer resides at the address on the voter registration records. The county clerk shall follow the same confirmation procedure as set forth in subsection (d) of this section.

(f) Based on change of address information received pursuant to subsections (a) and (d) of this section, the permanent registrar shall:

(1) Update and correct the voter's registration if the information indicates that the voter has moved to a new address within the same county and the same congressional district;

(2) Designate the voter as inactive if the information indicates the voter has moved to a new address in another county or to a new address in another congressional district in the same county or if the address confirmation notices have been returned as undeliverable; or

(3) Cancel the voter registration in the county from which the voter has moved if the voter verifies in writing that he or she has moved to a residence address in another county. [As amended by Acts 1977, No. 882, § 1; 1991, No. 581, § 1; 1995, No. 947, § 6; 1995, No. 964, § 6; 1999, No. 1108, § 1; 2007, No. 560, § 1; 2009, No. 659, § 3.]

## § 11. Cancellation of registration.

(a) It shall be the duty of the permanent registrar to cancel the registration of voters:

(1) Who have failed to respond to address confirmation mailings described in section 10 of this amendment and have not voted or appeared to vote in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for federal office that occurs after the date of the address confirmation notice;

(2) Who have changed their residence to an address outside the county;

Page: 676 Date: 06/10/2024 Time: 8:17:13

Case 5:24-cv-05121-TLB   Document 46-7   Filed 07/11/24   Page 54 of 93 PageID #: 311
Path: @psc3913/nep_usa_pri/XPRIMARY/STATUTES/AR_123/PRIMARYar_statutes_ar_election_and_const_080323102300054

(3) Who have died;

(4) Who have been convicted of a felony and have not discharged their sentence or been pardoned;

(5) Who are not lawfully qualified or registered electors of this state or of the county; or

(6) Who have been adjudged mentally incompetent by a court of competent jurisdiction.

(7) Who are not citizens of the United States.

(b) It shall be the duty of the permanent registrar of each county upon the registration of a person who has been registered previously in another county or state to notify promptly the permanent registrar of such other county or state of the new registration.

(c)(1) It shall be the duty of the State Registrar of Vital Records to notify promptly the Secretary of State of the death of all residents of this state.

(2)(A) The Secretary of State shall compile a listing of the deceased residents of this state and shall promptly provide this listing to the permanent registrar of each county.

(B) The deceased voter registration shall be cancelled by the permanent registrar.

(d)(1) It shall be the duty of the circuit clerk of each county upon the conviction of any person of a felony to notify promptly the permanent registrar of the county of residence of such convicted felon.

(2)(A) It is the duty of any convicted felon who desires to register to vote to provide the county clerk with proof from the appropriate state or local agency, or office that the felon has been discharged from probation or parole, has paid all probation or parole fees, or has satisfied all terms of imprisonment, and paid all applicable court costs, fines, or restitution.

(B) Proof that the felon has been discharged from probation or parole, paid all probation or parole fees, or satisfied all terms of imprisonment, and paid all applicable court costs, fines, or restitution shall be provided to the felon after completion of the probation, parole, or sentence by the Department of Correction, the Department of Community Correction, the appropriate probation office or the circuit clerk as applicable.

(C) The circuit clerk or any other entity responsible for collection shall provide proof to the Department of Correction, the Department of Community Correction, or the appropriate probation office that the felon has paid all applicable court costs, fines, or restitution.

(D) Upon compliance with subdivision (d)(2)(A) of this section, the felon shall be deemed eligible to vote.

(e)(1)(A) If upon inquiry an individual is found by a court to be unfit and disqualified to act as a grand or petit juror because the person is not a citizen of the United States:

(i) The name of the individual shall be put aside and not used; and

(ii) A notation of the dismissal of the name and reason for dismissal of the name shall be made in the jury book.

(B) The circuit clerk shall promptly notify the permanent registrar of the county of residence of an individual who is disqualified from serving as a juror under subdivision (e)(1)(A) of this section.

(C) After receiving the notice from the circuit clerk, the permanent registrar shall promptly cancel the dismissed juror's voter registration, update the voter registry, and send the dismissed juror notice under subsection (f) of this section.

(2)(A) It is the duty of any person whose registration has been cancelled under subsection (e) of this section to provide the permanent registrar with proof from the appropriate federal, state, or local agency that he or she is a citizen of the United States.

(B) Upon complying with subdivision (e)(2)(A) of this section the person shall be deemed eligible to vote and the permanent registrar shall add the citizen to the voter registry upon the citizen's application for voter registration.

(f) Within ten (10) days following the receipt or possession of information requiring any cancellation of registration, the permanent registrar shall cancel the registration and note the date of the cancellation, the reason for the cancellation, and the person cancelling the registration in the voter registration system.

(g)(1) The permanent registrar shall, thirty (30) days before cancellation, notify all persons whose registration records are to be cancelled in accordance with section 11(a)(1) of this

Page: 676 Date: 08/30/23 Time: 6:27:16

Case 5:24-cv-05121-TLB   Document 46-7   Filed 07/11/24   Page 55 of 93 PageID #: 312
Path: @psc3913/nep_usa_pri/XPRIMARY/STATUTES/AR_123/PRIMARYar_statutes_ar_election_and_const_080323102300054

amendment. The notice may be either by publication or by first class mail. The notice by mail shall be as follows:

"NOTICE OF IMPENDING CANCELLATION OF VOTER REGISTRATION.

According to our records you have not responded to our address confirmation notice and you have not voted in any election during the period beginning on the date of the notice and ending on the day after the date of the second general election for federal office after the date of the first notice. This may indicate that you no longer live at the residence address printed on the postcard. If your permanent residence address is still the same as the printed address on this postcard YOU MUST CONFIRM YOUR RESIDENCE ADDRESS in order to remain on the voter registration list. If you do not return the attached postcard within thirty (30) days after the date postmarked on this card YOUR REGISTRATION WILL BE CANCELLED and you will have to re-register to vote."

(2) When, in response to the notice, a qualified voter requests the permanent registrar not to cancel the voter registration, the voter registration shall not be cancelled under section 11(a)(1) of this amendment.

(h) The permanent registrar is authorized, and may be directed by the county board of registration, to determine by mail check, house to house canvass, or any other reasonable means at any time within the whole or any part of the county whether active record registration files contain the names of any persons not qualified by law to vote. Further, upon application based upon affidavits of one (1) or more qualified voters by the prosecuting attorney for the county, the circuit judge of the county, for good cause shown, may order the permanent registrar to make sure determination or to cancel the registration of such unqualified persons. [As amended by Acts 1977, No. 744, § 1; 1983, No. 11, § 1; 1987, No. 800, § 1; 1991, No. 581, § 2; 1995, No. 947, § 7; 1995, No. 964, § 7; 2001, No. 560, § 7; 2003, No. 271, § 1; 2003, No. 375, § 1; 2003, No. 1451, § 1; 2009, No. 659, § 4; 2019, No. 290, § 1; 2023, No. 441, §§ 7, 8.]

**Publisher's Notes.** This section was amended by two 1987 acts which conflict and cannot be codified together. Acts 1987, No. 800, was the last-enacted amendment and is set out above. Acts 1987, No. 597, § 1, would have amended subsections (a) and (f) to read as follows:

"(a) It shall be the duty of the Permanent Registrar to cancel the registration of voters:

"(1) Who have failed to vote in any election during four (4) successive calendar years immediately preceding the first of January of any year. Provided, the registration of a person who is in the active military service of the United States shall be cancelled for failure to vote only if such person has failed to vote in any election during six (6) successive calendar years immediately preceding the first of January of any year;

"(2) Who have changed their residence to an address outside the county;

"(3) Who have died or changed their name;

"(4) Who have been convicted of felonies and have not discharged their sentence or been pardoned; or

"(5) Who are not lawfully qualified or registered electors of this State, or of the county.

"(f) The Permanent Registrar may send all persons whose Affidavits of Registration are cancelled in accordance with Section 11(a)(1) of this amendment the follow-ing notice by first-class mail within ten (10) days after such cancellation: 'NOTICE OF CANCELLATION OF VOTER REGISTRATION. Notice is hereby given that due to your failure to vote in any election in this county during the preceding four (4) calendar years, (six (6) calendar years in the case of persons in active military service of the United States) under the laws of this State your voter registration has been cancelled. If you are still a qualified voter, you may register again at any time.' Alternatively, the Permanent Registrar may publish a list of the names of all persons whose Affidavits of Registration are cancelled in the previous calendar year in accordance with Section 11(a)(1) of this amendment on or before the 31st day of January of each year in a legal newspaper. To assure proper identification, the name of the person's street or route and the name of the city, town, or community in which the person lives shall be included. The following notice shall be given and shall be followed by the list of names: 'NOTICE OF CANCELLATION OF VOTER REGISTRATION. Notice is hereby given that due to your failure to vote in any election in this county during the preceding four (4) calendar years, (six (6) calendar years in case of persons in active military service of the United States) under the laws of this State your voter registration has been cancelled. If you are still a qualified voter, you may register again at any time.'"

## § 12. Loss or destruction of voter registration records.

In the event any Registration Record or File shall become lost or destroyed, the Permanent Registrar shall prepare, from the remaining Files, temporary copies of the registration records if necessary for the conduct of any election. The Permanent Registrar shall send notice of such fact by first-class mail to any voter whose registration record has been lost, destroyed or mutilated in order that such voter may register again. The previous registration shall be cancelled at the time

677                     VOTER REGISTRATION              Amend. 51, § 13

of the new registration, and in any event within sixty (60) days after mailing of such notice. [As amended by Acts 1995, No. 947, § 9; 1995, No. 964, § 9.]

### § 13. Fail-safe voting — Verification of voter registration.

(a) If a voter presents himself or herself at a polling place on the date of an election but no record of his or her voter registration can be located by the judges of the election on the precinct voter registration list, the voter shall be permitted to vote only under the conditions set forth in § 7-5-306 or § 7-7-308.

(b)(1)(A) In order to determine that all who cast a ballot in an election, a runoff election, or a school election in this state are legally qualified to vote in that election, each voter shall verify his or her registration by:

(i) Presenting to the election official when appearing to vote in person either early or at the polls on election day in an election, a runoff election, or a school election verification of registration in the form of a document or identification card that:

(a) Shows the legal name of the person to whom the document or identification card was issued;

(b) Shows a photograph of the person to whom the document or identification card was issued;

(c) Is issued by the United States, the State of Arkansas, an accredited postsecondary educational institution in the State of Arkansas, or a trade school in the State of Arkansas; and

(d) If displaying an expiration date, is not expired or expired no more than four (4) years before the date of the election in which the voter seeks to vote; or

(ii) Submitting with an absentee ballot in an election, a runoff election, or a school election a copy of a document or identification card that complies with the requirements of subdivision (b)(1)(A)(i) of this section.

(B) A document or identification card may be presented in a digital format on an electronic device if the document or identification card:

(1) Complies with the requirements of subdivision (b)(1)(A) of this section; and

(2) The digital format has been approved or issued by the United States, the State of Arkansas, or an accredited postsecondary educational institution in the State of Arkansas.

(C) Documents and identification cards that comply with the requirements of subdivision (b)(1)(A) of this section include without limitation:

(i) A driver's license;

(ii) A photo identification card;

(iii) A concealed handgun carry license;

(iv) A United States passport;

(v) An employee badge or identification document issued by an accredited postsecondary educational institution in the State of Arkansas;

(vi) A United States military identification document;

(vii) A public assistance identification card if the card shows a photograph of the person to whom the document or identification card was issued; and

(viii) A voter verification card under Arkansas Code § 7-5-324.

(2)(A) Except as provided in subdivision (b)(2)(B) of this section, if a voter is unable to verify his or her registration when voting in person by presenting a document or identification card that complies with subdivision (b)(1)(A)(i) of this section, the election official shall:

(i) Indicate on the precinct voter registration list that the voter did not present a required document or identification card; and

(ii) Permit the voter to cast a provisional ballot and inform the voter of the requirements under subdivision (b)(4) of this section.

(B)(i) A person who is a resident of a long-term care or residential care facility licensed by the state of Arkansas is not required to verify his or her registration by presenting a document or identification card that complies with subdivision (b)(1)(A)(i) of this section when voting in person.

(ii) A person not required to present a document or identification card under subdivision (b)(2)(B)(i) of this section shall provide documentation from the administrator of the facility attesting that the person is a resident of the facility.

(3)(A) Except as provided in subdivision (b)(3)(B) of this section, if a voter voting by absentee ballot fails to submit with the ballot documentation that complies with subdivision (b)(1)(A)(ii) of this section, the absentee ballot shall be considered a provisional ballot.

(B) The following persons shall not be required to submit with his or her absentee ballot documentation that complies with subdivision (b)(1)(A)(ii) of this section:

(i) An active duty member of the uniformed services of the United States or United States Merchant Marine who is absent from the country on election day because of his or her service;

(ii) The spouse or dependant of an active duty member of the uniformed services of the United States or United States Merchant Marine under subdivision (b)(3)(B)(i) of this section who is absent from the country on election day because of the service of the member; or

(iii)*(a)* A resident of a long-term care or residential care facility licensed by the state of Arkansas.

*(b)* A person not required to submit a document or identification card under subdivision (b)(3)(B)(iii)*(a)* of this section shall provide documentation from the administrator of the facility attesting that the person is a resident of the facility.

(4) A provisional ballot cast by a voter who did not present a required document or identification card shall be counted if:

(A) The voter returns to the county board of election commissioners or the county clerk by 12:00 noon on the Monday following the election and presents a document or identification card that complies with the requirements of subdivision (b)(1)(A)(i) of this section; and

(B) The county board of election commissioners does not determine that the provisional ballot is invalid and should not be counted based on other grounds.

(5) A provisional ballot cast by an absentee voter who failed to submit with an absentee ballot documentation that complies with subdivision (b)(1)(A)(ii) of this section shall be counted if:

(A) The voter returns to the county board of election commissioners or the county clerk by 12:00 noon on the Monday following the election and presents a copy of a document or identification card that complies with the requirements of subdivision (b)(1)(A)(i) of this section; and

(B) The county board of election commissioners does not determine that the provisional ballot is invalid and should not be counted based on other grounds.

(6) A person registering to vote by mail and who has not previously voted in a federal election in this state shall only be required to comply with § 7-5-201(e).

(7) The State Board of Election Commissioners shall promulgate rules necessary to implement subsection (b) of this section.

(8)(A) Following each election, the county board of election commissioners may review the precinct voter registration lists and may provide the information of each voter not presenting a document or identification card necessary to verify his or her voter registration when voting in person or by absentee ballot to the prosecuting attorney.

(B) The county board of election commissioners shall refer suspected instances of voter fraud to the prosecuting attorney.

(C) The prosecuting attorney or a state entity authorized by the General Assembly may investigate possible voter fraud.

(D) Upon application based upon affidavits of one (1) or more qualified voters by the appropriate prosecuting attorney alleging possible voter fraud, the appropriate circuit judge, for good cause shown, may order the permanent registrar to cancel the registration of the voter failing to verify his or her registration as provided by this subsection. [As amended by Acts 1973, No. 149, §§ 5, 6; 1995, No. 947, § 10; 1995, No. 964, § 10; 2017, No. 633, § 2; 2019, No. 684, § 1; 2021, No. 249, §§ 1, 2; 2023, No. 441, §§ 9-11.]

Case 5:24-cv-05121-TLB   Document 46-7   Filed 07/11/24   Page 58 of 93 PageID #: 315
Page: 679 Date: 06/10/23 Time: 8:17:11
Path: @psc3913/nep_usa_pri/XPRIMARY/STATUTES/AR_123/PRIMARYar_statutes_ar_election_and_const_080323102300054

679                          COMMUNITY COLLEGES                    Amend. 52

**§ 14. Voter registration lists.**

(a) By the first day of June of each year, and at such other times as may be practicable, all Permanent Registrars shall, and at their discretion at other times may, print or otherwise duplicate and publish lists of registered voters by precincts, and may distribute such lists pursuant to §§ 7-5-105 and 7-5-109. A copy of the most current such list in each precinct shall be furnished the election officials at each precinct at the time the ballot boxes are delivered and such election officials shall post said list at a conspicuous place in the polling area.

(b) By the first day of June of each year, the Permanent Registrar shall certify to the Secretary of State the total number of registered voters in the county. The Secretary of State shall tabulate the total number of registered voters in the state and shall make such information available to interested persons upon request. [As amended by Acts 1995, No. 947, § 11; 1995, No. 964, § 11.]

**§ 15. Penalties.**

(a) Any person who shall maliciously and intentionally destroy, steal, mutilate or unlawfully detain or obtain any voter registration form or any Registration Record Files shall be guilty of a felony, and upon conviction thereof shall be fined in the sum of not less than one hundred dollars ($100.00) nor more than one thousand dollars ($1,000.00), or be imprisoned in the State Penitentiary for a period of not less than one (1) year nor more than five (5) years, or both.

(b) Any public official, election official, or public employee who wilfully violates any provision of this amendment shall be guilty of a misdemeanor, and upon conviction thereof shall also be removed from such office or position.

(c) Any other person who wilfully violates any provision of this amendment shall be guilty of a misdemeanor. [As amended by Acts 1995, No. 947, § 12; 1995, No. 964, § 12; 2023, No. 441, § 12.]

**§ 16. Severability.**

If any provision of this amendment or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of the amendment which can be given effect without the invalid provision or application, and to this end the provisions of this amendment are declared to be severable.

**§ 17. Effect on other laws.**

This amendment supersedes and repeals the requirement of Amendment No. 8 that a poll tax receipt be presented prior to registration or voting, and further supersedes and repeals Act 19 of 1964 and all other laws or parts of laws in conflict herewith.

**§ 18. Appropriations.**

The General Assembly shall make such appropriations as may be required for the effectuation of this amendment.

**§ 19. Amendment.**

The General Assembly may, in the same manner as required for amendment of laws initiated by the people, amend Sections 5 through 15 of this amendment, so long as such amendments are germane to this amendment, and consistent with its policy and purposes.

**§ 20. Short title.**

This amendment shall be known as the "Arkansas Amendment for Voter Registration without Poll Tax Payment."

## AMEND. 52. COMMUNITY COLLEGES.



Marty Garrity, Director
Kevin Anderson, Assistant Director
    for Fiscal Services
Matthew Miller, Assistant Director
    for Legal Services
Jessica Whittaker, Assistant Director
    for Research Services
Eric Sanders, Assistant Director
    for Information Technology Services

# STATE OF ARKANSAS
# BUREAU OF
# LEGISLATIVE RESEARCH

---

## Memorandum

---

**TO:**       **Members, ALC – Executive Subcommittee**

**CC:**       **Marty Garrity, Director, Bureau of Legislative Research;**
              **Rebecca Miller-Rice, Administrator, Administrative Rules Review Section,**
              **Legal Services Division**

**FROM:**     **Suba Desikan, Legislative Attorney, Administrative Rules Review Section,**
              **Legal Services Division**

**DATE:**     **April 25, 2024**

**SUBJECT:**  **Legal Authorization for the Emergency Promulgation of the Proposed State**
              **Board of Election Commissioners' Rule Regarding Voter Registration**

---

The State Board of Election Commissioners seeks legislative review and approval of the emergency promulgation of its proposed rule regarding voter registration. Pursuant to Arkansas Constitution Amendment 51, § 5(e), the State Board of Election Commissioners is authorized and, as soon as is possible after the effective date of this amendment, directed to prescribe, adopt, publish and distribute:

(1) such Rules and Regulations supplementary to this amendment and consistent with this amendment and other laws of Arkansas as are necessary to secure uniform and efficient procedures in the administration of this amendment throughout the State;

(2) a Manual of instruction for the information, guidance and direction of election officials within the state; and

(3) detailed specifications of the registration record files, the voter registration application forms and other registration forms, including voter registration list maintenance forms, all of which shall be consistent with this amendment and uniform throughout the State.

*See* Ark. Const. Amendment 51, §5(e).

In addition, the State Board of Election Commissioners shall have the authority to formulate, adopt, and promulgate all necessary rules to assure even and consistent application of voter registration laws and fair and orderly election procedures. *See* Ark. Code Ann. § 7-4-101(f)(5).

Appellate Case: 24-2810    Page: 187    Date Filed: 09/06/2024 Entry ID: 5432887

APP158

# Exhibit F

**Agency #108.00**

# RULE REGARDING

# VOTER REGISTRATION

## (Effective May 4, 2024)



**STATE BOARD OF ELECTION COMMISSIONERS**
501 Woodlane, Suite 122 South
Little Rock, Arkansas 72201
(501) 682-1834 or (800) 411-6996

**Scope of Rules**

These rules are to supplement and provide consistency with Arkansas Constitution Amendment 51 and other laws of Arkansas to secure uniform and efficient procedures in the administration of Amendment 51 throughout the State. Ark. Const. Amend. 51 § 5(e).

**§ 1400 Definitions**

(1) "Authorized Computer Voter Registration Agency" – means those Voter Registration Agencies identified in Arkansas Constitution Amendment 51 §§ 5(b)(2)-(4) that are specifically authorized to utilize computer processes as part of the agency's interaction with its customers, program recipients, or participants of disability programs. These Voter Registration Agencies are:

   a. The Office of Driver Services of the Revenue Division of the Department of Finance and Administration;

   b. State Revenue Offices;

   c. Public assistance agencies that provide services under:

      i. Food Stamps,
      ii. Medicaid,
      iii. Aid to Families with Dependent Children (AFDC),
      iv. Special Supplement Food Program for Women, Infants and Children (WIC);

   d. Disability agencies that offer state-funded programs that primarily provide services to persons with disabilities.

(2) "Federal Mail Voter Registration Application Form" – means the Voter Registration Application form prepared and made available by the Election Assistance Commission.

(3) "Mail Voter Registration Application Form" – means a document approved by the State Board of Election Commissioners for voter registration applicants to apply for voter registration.

(4) "Registration Application Form" – means a Mail Voter Registration Form or a Federal Mail Voter Registration Form.

(5) "Third-Party Registration Organization" – means a person or group of people who collect, gather, or submit Registration Application Forms to the Secretary of State or the permanent registrar of a county.

(6) "Voter Registration Agency" – means those agencies identified in Amendment 51 § 5(a)(1)-(5) and include:

Page 2 of 3

    a.  Office of Driver Services of the Revenue Division of the Department of Finance and Administration;

    b.  State Revenue Offices;

    c.  Public assistance agencies that provide services under:

> i.   Food Stamps,
> ii.  Medicaid,
> iii. Aid to Families with Dependent Children (AFDC),
> iv. Special Supplement Food Program for Women, Infants and Children (WIC);

    d.  Disability agencies that offer state-funded programs that primarily provide services to persons with disabilities;

    e.  Public library; and

    f.  Arkansas National Guard.

(7) "Signature or Mark" – means a handwritten wet signature or handwritten wet mark made on a Registration Application Form with a pen or other writing device that is physically moved across the form and that forms the applicant's signature or mark on the paper form. A Signature or Mark that utilizes a computer to generate or recreate the applicant's signature or mark is not an acceptable signature or mark of the applicant for purposes of Amendment 51 §§ 6(a)(1) & (a)(3)(F) Registration Application Form.

## § 1401 Requirements to accept Registration Application Forms and Applications from Authorized Computer Voter Registration Agencies.

(1) A permanent registrar shall accept a Registration Application Form that is:

    a.  complete and legible;

    b.  is executed with a Signature or Mark made by the voter registration applicant; and

    c.  is submitted to the permanent registrar by mail, delivered in-person by the voter, or is delivered by a Third-Party Registration Organization.

(2) A permanent registrar shall accept legible and properly completed applications submitted by Authorized Computer Voter Registration Agencies as set forth in Amendment 51, § 5(b)(2)-(4)of the Arkansas Constitution.

# Exhibit G

APP163

**STATE BOARD OF ELECTION COMMISSIONERS**

**Secretary of State**
**John Thurston**
Chairman

**Sharon Brooks**
**Jamie Clemmer**
**Bilenda Harris-Ritter**
**William Luther**
**J. Harmon Smith**
**Johnathan Williams**
Commissioners

501 Woodlane Street – Suite 122 South
Little Rock, Arkansas 72201
(501)682-1834 or (800)411-6996

**Chris Madison**
Director

**Waylan Cooper**
Legal Counsel

**Charlie Morris**
Election Administration Supervisor

**Jon Davidson**
Educational Services Manager



# DECLARATORY ORDER
## 2024-002

The State Board of Election Commissioners (SBEC) received a Declaratory Order Request from a Mr. Michael J. Massucco, a Pulaski County registered voter. The SBEC may issue a Declaratory Order pursuant to authority granted by Ark. Code Ann. § 25-15-206 and SBEC Board Rule § 1104.  The SBEC hereby states the following:

## I.   JURISDICTION TO ISSUE A DECLARATORY ORDER

1. The State Board finds that it has the authority to issue the requested order based on the fact the controlling sections of law are election law and voter registration law.

2. The State Board is empowered to enforce election and voter registration laws.  Ark. Code Ann. § 7-4-120(a).

3. State agencies are required to hear petitions for declaratory orders regarding the applicability of any rule, statute, or order enforced by that agency. Ark. Code Ann. § 25-15-206.

## II.   QUESTIONS PRESENTED BY THE PETITION

**Question Number 1:**

Does Arkansas Constitutional Amendment 51 permit electronic signatures for voter registration applications that are not processed through the Department of Motor Vehicles?

**Holding of the SBEC:** No. As discussed below, voter registrations that are completed using a computerized process are only permitted when made a part of the processes implemented by identified Registration Agencies, as those are listed in Amendment 51 §§ 5(b)(2)-(4). The Uniform Electronic Transaction Act, codified at § 25-32-101 *et.* seq. is inapplicable to the mandates of Amendment 51.

**Question Number 2:**

Does a county clerk have the authority to accept voter registration applications completed with electronic signatures that are not submitted by identified Registration Agencies listed in Amendment 51 §§ 5(b)(2)-(4)?

**Holding of the SBEC:** No. A county clerk as the permanent registrar is tasked with recording in the centralized system voter registration applications for lawfully completed and submitted applications.  A county clerk does not have discretion to accept an application that is signed with a computer process, unless the application comes from an identified Registration Agency.

**Question Number 3:**

Are voter registration application forms that have been submitted with electronic signatures, but not received from an identified Registration Agency valid?

**Holding of the SBEC:** No. A registration application is either complete and valid or incomplete and invalid.  A registration application submitted with an electronic signature, that did not originate from an identified Registration Agency, is invalid because it fails to include the required signature of the applicant.

## <u>Question Number 4</u>:

Are electronically signed voter registration applications received by a county clerk, but which did not originate from an identified Registration Agency valid if the voter moves to another county in Arkansas?

**Holding of the SBEC:**  No. As stated in response to Question 3 above, a registration is either complete and valid or incomplete and invalid.  An application submitted with an electronic signature, and not received from an identified Registration Agency, is invalid and cannot be cured by subsequently transferring the registration to another county.  If the registration is invalid at the time of its submission, it remains invalid for that voter until cured by submission of a complete and valid voter registration application that includes a wet signature on a paper form or is submitted by an identified Registration Agency.

# III.   ANALYSIS

**A.   Does Arkansas Constitutional Amendment 51 permit electronic signatures for voter registration applications that are not processed through the Department of Motor Vehicles?**

1. Arkansas Constitutional Amendment 51 establishes the current system of permanent personal voter registration in Arkansas. Ark. Const. amend. 51, § 1.  The amendment further provides that "No person shall vote or be permitted to vote in any election unless registered in a manner provided for by this amendment." *Id.* at § 3. A voter who is registered according to the requirements of Amendment 51 does not have to register to vote again, unless "such registration is cancelled or subject to cancellation in a manner provided for by this amendment." *Id.* at § 4.

2. The County Clerk is the permanent registrar for each county in the state. *Id.* at § 2(b). A voter may register in-person by appearing at the County Clerk's office and completing the necessary form in the presence of the Clerk. *Id.* at § 9(h).

3. An applicant may utilize application services provided by State authorized and identified "Registration Agencies."  *Id.* § 5(a). Registration Agencies are identified as the "Office of Driver Services of the Revenue Division of the Department of Finance and Administration and all State Revenue Offices; Public assistance agencies, which shall mean those agencies that provide services under the Food Stamps, Medicaid, Aid to Families with Dependent Children (AFDC), and the Special Supplemental Food Program for Women, Infants and Children (WIC) programs; Disabilities agencies, which shall mean agencies that offer state-funded programs primarily engaged in providing services to persons with disabilities; Public Libraries; and the Arkansas National Guard." *Id.* at §§ 5(a)(1)-(5).

4. Of these Registration Agencies, only certain ones are designated as eligible to utilize a "computer process" as part of their voter registration applications.  *Id.* at §§ 5(b)(2)-(4). The Office of Driver

Appellate Case: 24-2810     Page: 196     Date Filed: 09/06/2024 Entry ID: 5432887
APP. 167

Services and State Revenue Offices, public assistance agencies, and disability agencies may each use "**a computer process**" when computer process is available as part of the agencies' interactions with an applicant. *Id*. at §§ 5(b)(2)-(4) (emphasis added).

5. A voter may also mail a "state or federal mail voter registration application form" to register. *Id*. at § 9(c)(2).  Furthermore, "[a]ny person may distribute state registration cards." *Id*. at § 5 (b)(1).

6. The voter registration card "may only require identifying information, including **signature or mark**, and other information, including data relating to previous registration by the applicant, as is necessary to assess the applicant's eligibility and to **administer voter registration** and **other parts of the election process**." *Id*. at § 6(a)(1) (emphasis added).  The voter must include his or her "signature or mark made under penalty of perjury that the applicant meets each requirement for voter registration. *Id*. at § 6(a)(3)(F).

7. A voter registration application that is submitted in-person by the voter, mailed, or delivered by a third-party registration organization must be signed by the applicant, thus meeting the Signature or Mark requirement of Amendment 51 §§ 6(a)(1) & 6(a)(3)(F).

8. The Arkansas Supreme Court provides that when construing "a provision of the Arkansas Constitution, if the language of the provision is plain and unambiguous, each word must be given its obvious and common meaning, and neither rules of construction nor rules of interpretation may be used to defeat the clear and certain meaning of a constitutional provision. *Buonauito v. Gibson*, 2020 Ark. 352, 6, 609 S.W.3d 381, 385 (2020) (citing Ghegan & Ghegan, Inc., v. Weiss, 338 Ark. 9, 991 S.W.2d 536 (1999)).

9. The Arkansas Supreme Court also utilizes the statutory construction principle of "expressio unius est exclusio alterius" that means the express designation of one thing may properly be construed to mean the exclusion of another." *Id*. at 6, 609 S.W.3d at 386. This term is described as "negative implication." *State ex. Rel.*

*Rutledge v. Purdue Pharma*, 2021 Ark. 133, 624 S.W.3d 106, 111 (2021) (citing Antonin Scalia & Byan A. Garner, Reading Law: *The Interpretation of Legal Texts*, 107 (2012)).

10.     Amendment 51 refers to "Computer Process" only regarding "Registration Agencies." The term "Computer Process" is unambiguous and is described within Amendment 51 for those identified "Registration Agencies."

11.     The use of a computer process for voter registration applications is limited to the identified "Registration Agencies." The Office of Driver Services and State Revenue offices may use a computer process when assisting a citizen with voter registration when the computer system minimizes duplicative information. Ark. Const. amed. 51 § 5(b)(2). They must also have "available the federal or state mail voter registration application form" for customers. *Id*.

12.     Public assistance agencies and disabilities agencies can use "computer process when a computer process is available." *Id*. at §§ (b)(3) & (4). Public assistance and disabilities agencies must use a form or process that combines the application for their services with voter registration when available.

13.     The inclusion of "Computer Process" with one avenue of voter registration application, while not including that term in other voter registration application processes means that the drafters of the Amendment recognized the distinction between Registration Agencies and other means of registration when a registration application form is used. The inclusion of "Computer Process" for one group of registration methods means the exclusion of "Computer Processes" in the other methods of voter registration application.

14.     A voter's signature or mark is required as part of the voter registration process. *Id*. at § 6(a)(1). The voter's signature or mark is more than a just the applicant's affirmation of the responses provided on the application. The signature or mark provided by a

voter is a necessary component for the verification of the voter's identity.

15.     A voter who submits a request for an absentee ballot, for example, must sign the absentee ballot application. The signature of the voter is compared between a voter's registration application and the voter's absentee ballot application. Ark. Code Ann. § 7-5-404(a)(2)(A). If the two submissions are "not similar, the county clerk shall not provide an absentee ballot to the voter." *Id*. This signature comparison is one of the "**other parts of the election process**" referenced in Amendment 51. Ark. Const. amend. 51 § 6(a)(1) (emphasis added).

16.     Ensuring that lawfully registered voters sign or mark their documents is further supported by the criminal penalties associated with signature forgery. Forging the "signature of a voter on an absentee ballot application, absentee ballot voter statement, or voter registration application," is a felony.  Ark. Code Ann. § 7-1-105(a)(19).

17.     The Uniform Electronic Transaction Act of 2001 (codified at Ark. Code Ann. § 25-32-101, *et seq*.) is an Arkansas statute which allows, but does not require, under certain circumstances, "electronic signatures" to be a valid legal signature for purposes of many business, commercial, and governmental affairs transactions. Ark. Code Ann. §§ 25-32-102(8), (9) & (17).  The statute defines what is an "electronic signature" and when such an electronic signature may be substituted for an actual physical signature. *Id*.

18.     The scope of this statute is limited by its terms in stating that its provisions are "subject to other applicable substantive law." Ark. Code Ann. § 25-32-103(d).   Additionally, its construction and application are further limited to be "consistent with other applicable law." Ark. Code Ann. § 25-32-106(1).

19.     The substantive and applicable law regarding voter registration in the State of Arkansas is Amendment 51.  Computer Processes are expressly permitted for identified Registration Agencies.  Computer Processes are not permitted for other means

of voter registration applications. The inclusion of the term "Computer Process" for Registration Agencies is an express authorization of computer processes as part of the completion of voter registration while engaging with those identified Registration Agencies on other matters.

20.     A voter registration application completed and submitted, other than through an identified Registration Agency, cannot include the use of computerized signatures or marks. The Uniform Electronic Transaction Act of 2001 is self-limiting in its applicability by its terms. Accordingly, the provisions of the Uniform Electronic Transaction Act of 2001 do not apply to the current voter registration system prescribed by Amendment 51.

21.     The signature or mark requirement must be made by a wet signature or wet mark applied to the paper form by the voter without the use of a computer-generated signature or mark or computer reproduced signature or mark.

22.     A disabled voter may receive assistance in making his or her signature or mark by another person who provides the name, address, and telephone number of the assistor.

23.     A voter registration application that is submitted by an identified Registration Agency, listed in Amendment 51 § 5(b)(2)-(4) may utilize a computer process for the voter registration application. All other voter registration applications must be submitted with a wet signature or wet mark made on the paper form that is transmitted to the permanent registrar.

**B.    Does a county clerk have the authority to accept voter registration applications completed with electronic signatures that are not submitted by identified Registration Agencies listed in Amendment 51 §§ 5(b)(2)-(4)?**

24.    The permanent registrar for a county "shall register qualified applicants when a legible and complete voter registration application is received and acknowledged by the permanent registrar." *Id*. at § 9(c)(1).

25.    When a voter submits his or her voter registration by mail, it will be accepted by the permanent registrar when "[a] legible and complete voter registration application form is postmarked not later than thirty (30) days before the election…." *Id*. at § 9(c)(3).

26.    If an application is missing required information, then the "permanent registrar **shall** contact the applicant to obtain the missing information." *Id*. at § 9(d) (emphasis added). Furthermore, when an "applicant lacks one (1) or more of the qualifications required by law of voters in this state, the permanent registrar **shall not** register the applicant, but **shall** document the reason for denying the applicant's registration and promptly file or enter the application and the documented reason for denying registration in the statewide registration record files." *Id*. at § 9(f) (emphasis added).

27.    A county clerk, as the permanent registrar, does not have the authority to accept a voter registration application that is signed with a computer processed or computer-generated signature or mark unless the application is submitted by an identified Registration Agency. A paper voter registration application that is submitted by a voter in-person, mailed, or delivered by a third-party registration organization must be signed with a wet signature or wet mark made by the voter applicant.

**C.** **Are voter registration application forms that have been submitted with electronic signatures, but not received from identified Registration Agency valid?**

28.     As discussed in response to **Sections A** and **B** above, a voter's registration application that is signed with an electronic signature and delivered by the voter, mailed by the voter, or submitted on behalf of the voter by a third-party registration organization is not complete and, therefore, not valid.

29.     Electronic or computer processed voter registration applications are only permitted when submitted by an identified Registration Agency listed in Amendment 51 § 5(b)(2)-(4).

**D.** **Are electronically signed voter registration applications received by a county clerk, but which did not originate from an identified Registration Agency valid if the voter moves to another county in Arkansas?**

30.     A voter, who is properly registered, "may cause his or her registration to be transferred to his or her new address or new name by completing and mailing a federal or state mail voter registration application form." *Id*. at § 10(a).

31.     The voter may also update his or her address at the Office of Driver Services, state revenue offices, public assistance agencies, disabilities agency, or other voter registration agency, "by signing a mailed request to the permanent registrar, giving his or her present address and the address at which he or she was last registered or his or her present name and the name under which he or she last registered, or by applying in person at the office of the permanent registrar." *Id*.

32.     A registered voter may also update his or her address when moving from one county to another county by completing a mail voter registration application form, updating at a Registration Agency, signing a mailed request to the permanent registrar, or by applying in person at the new county's permanent registrar's office. *Id*. at §§ 10(b)(1)(A)-(D).

33.      A voter who is registered by an application that included an electronic signature that was created or duplicated through the use of a computer process and was delivered by the voter, mailed by the voter, or delivered on behalf of the voter by a third-party registration organization is not valid at the time of the original submission. An invalid registration cannot be cured by subsequently moving, unless the applicant completes a new voter registration application that includes a wet signature or wet mark or is submitted on behalf of the voter by an identified Registration Agency listed in Amendment 51 § 5(b)(2)-(4).

The forgoing Order is approved and adopted by the State Board of Election Commissioners on April 23, 2024.

As evidence of its adoption, the State Board instructs the Director of the SBEC to affix his signature to this Order.

**IT IS SO ORDERED.**

_____
Richard Chris Madison
SBEC Director

# Exhibit H

APP175



ADVERTISEMENT

# Arkansas Board of Election Commissioners to open comment period for proposed rule on electronic signatures for voter registration

June 12, 2024 at 6:19 p.m.

by Josh Snyder



Follow





Harry McCraney of Little Rock fills out a voter registration form on Tuesday, Oct. 11, 2022, at the Pulaski County Courthouse in Little Rock. Tuesday was the last day to register to vote in the November election. .(Arkansas Democrat-Gazette/Thomas Metthe)

The State Board of Election Commissioners voted Wednesday to open up to public comment a proposed permanent version of an emergency rule that bars election officials from accepting voter registration forms signed with an electronic signature.

ADVERTISEMENT

The 30-day public comment period will begin Friday and run through July 14. While comments can be submitted to the board through email and physical mail, the board also plans to hold a public hearing July 11.

The process is a required step in the board's effort to make permanent the <u>emergency rule</u> that is set to last until last until Sept. 1. The emergency rule requires "wet," or handwritten, signatures on paper voter registration applications.

ADVERTISEMENT

Chris Madison, director of the State Board of Election Commissioners, said after the meeting that public comment is "an important part of the whole process."

"The people out in the field, the people that are doing this, are going to have different perspectives than we are," he said. "They're going to raise an issue that we may not think about, and so that's an opportunity for the public to come in and say, 'Hey, have you thought about this? The rule doesn't address this,' or, 'the rule does this, and (these are) the negative implications of that.'"

ADVERTISEMENT

During Wednesday's meeting, Madison recommended the board plan to meet the day after the public comment period closes to address the comments and determine whether adjustments to the rule are needed. The board must submit the rule to the Bureau of Legislative Research by the end of that day for it to be considered by the Arkansas Legislative Council during its Aug. 16 meeting.

The seven-member board agreed to Madison's recommendations in a unanimous vote.

ADVERTISEMENT

APP179

The emergency rule is the subject of <u>a federal lawsuit</u> filed in U.S. District Court in Fayetteville by Get Loud Arkansas and Vote.org. The lawsuit argues the rule is arbitrary and violates civil rights law. Secretary of State John Thurston and members of the State Board of Election Commissioners are named as defendants.

Madison said he is aware of the lawsuit and that the board was working on filing an answer to the plaintiffs' complaint, but that he couldn't speak further on behalf of the board regarding the case. He had previously described the purpose of the rule as providing clarity to the state's 75 county clerks so they could follow one policy.

Get Loud Arkansas Executive Director and former state Sen. Joyce Elliott, who also attended the meeting, likewise declined to comment on the lawsuit. However, she encouraged the public to attend the public hearing and to read up on the rule before getting there.

"One of the things that we do at Get Loud Arkansas, in a general way, is encourage people to be civically involved," she said. "And for somebody who's never bothered to do that, this would be a very good time to come to the meeting. Even if you're not going to make a statement, come and understand how the process works."

Members of the public can email comments to the board at <u>info.sbec@arkansas.gov</u>. Comments also can be physically mailed to 501 Woodlane Drive, Suite 122 South, Little Rock, Ark., 72201.

Madison said the board hasn't finalized the location for the July 11 public hearing, though it will "most likely" occur at the State Board of Election Commissioners office.

# Exhibit I

1

TRANSCRIPT OF VIDEO-RECORDED

MEETING OF THE

ARKANSAS LEGISLATURE ALC EXECUTIVE SUBCOMMITTEE

MAY 2, 2024

Job No.: 540606

Pages: 1 - 78

Transcribed by: Christian Naaden

2

P R O C E E D I N G S

MR. MADISON: Set up here. Good morning, Mr. Chair. My name is Chris Madison. I'm the Director for the State Board of Election Commissioners, and with me is our attorney for the State Board, Waylon Cooper.

MR. CHAIR: Great to have both of you. Now, you are recognized to present, if you will pull that microphone just a little closer to you, and that way we'll be plenty loud.

MR. MADISON: Yeah. This right here. All right.

MR. CHAIR: Whenever you're ready.

MR. MADISON: Thank you, Mr. Chair. The emergency rule that is proposed to you, we've completed the packet and submitted it. But fundamentally, the issue is, there was some -- there's been some county clerks who were accepting electronically signed voter registration applications from third party groups.

People standing out, hey, you want to register to vote that kind of stuff. There were other county clerks that were not accepting electronically signed applications. And the State Board had the issue come

3

before them because of a request for declaratory order because we have the enforcement authority, registration, and election laws.

The declaratory order came before the board. Through that, the board directed staff to prepare an emergency rule and to respond to the declaratory order request. The emergency rule was drafted, and last Tuesday, the board adopted it and submitted it for promulgation.

The emergency rule is proposed. It -- it basically does what the Constitution has -- says to do and what we've been doing for the last 20 years on how voter registration applications are submitted. There's categories of voter registration agencies, DMV, state revenue office, public assistance agencies, disability agencies, National Guard, public library.

Those are registration agencies. Of those five, three are allowed to have computer processes. That would be the disability agencies, the public assistance agencies, and DMV stuff. DMV, for example, are specifically required to include computers as part of their processing.

4

The other two are allowed to if their systems are up for that. What this rule does is it requires if you submit a voter registration application, other than through the DMV or those that are allowed by computer processes, is that a wet signature is needed on -- on the application form which is what we have been doing for the last 20 years.

The purpose of the emergency rules, because we had voters that were being treated -- we -- the -- the election administrators, we had voters that were being treated differently in one county than in another county.

And under Amendment 51, we have expressed authority to all propagate rules for the Uniform Application Administration of Amendment 51. That's what this rule is under. What will happen is if the emergency rule is adopted, we will then work on promulgating a permanent rule that will allow for public comment, public hearing, all of that input that we'll respond to.

But right now, we just wanted everybody treated the same so that an applicant in one county is

**5**

1 treated the same as an applicant in another county. And
2 with that, I'll be happy to answer any questions.
3    MR. CHAIR: Any statement you want to make
4 first?
5    MR. COOPER: No, Mr. Chairman.
6    MR. CHAIR: Okay. Questions, we are allowing
7 questions from non-members, so if you have a question,
8 Representative Springer, you're recognized for
9 question.
10    REP. SPRINGER: Thank you, Mr. Chair. Good
11 morning. Thank you. Mr. --
12    MR. CHAIR: Hang on.
13    REP. SPRINGER: Good morning. Thank you, Mr.
14 Chair. I see the clerk for Pulaski County here. Maybe
15 she would want to come and speak to this. She has
16 additional information that may be helpful to us or one
17 of the persons here.
18    MR. CHAIR: This is an executive subcommittee,
19 will be for questions from legislators. I'm allowing
20 non-members, but we won't be hearing from the audits
21 that will be in the public comment.
22    REP. SPRINGER: We- -- well, okay. Well, then

**6**

1 I'll just ask the question then of --
2    MR. CHAIR: Okay. Go ahead. All right. So it
3 seems to me, and -- and I -- and I -- I was wanting to
4 get an opinion from -- I see what some of the clerks
5 that are here, would -- would you not agree that the
6 rule that you're pro- -- that's proposing to be
7 promulgated will keep folks from being able to progress
8 and be able to vote as they see fit and that sort of
9 thing? Do you think that it's going to be a deterrent
10 to voting?
11    MR. MADISON: Not at all.
12    REP. SPRINGER: And why is that?
13    MR. MADISON: Because basically the rule
14 adopts what we have been doing for the last 20 years
15 for voter registration applications which requires --
16 it -- it has required a wet signature. It doesn't
17 affect the ability to register through DMV which is
18 quite frankly the largest area that we get
19 registrations from.
20    This rule doesn't prevent a voter applicant
21 from contacting a county clerk and completing their
22 application with the county clerk. This doesn't

**7**

1 prohibit an applicant from filling it out, printing it,
2 and signing it, and sending it in. And this is just so
3 that voter applicants in each county are treated the
4 same.
5    REP. SPRINGER: Follow up, Mr. Chair. But
6 aren't you given special favor to certain groups,
7 though? And it seems like to me there needs to be
8 equity with respect to everyone that's involved in this
9 process. I think you indicated that you only allow
10 people from -- that do through the DMV. What was the
11 other category? You named two others.
12    MR. MADISON: So under Amendment 51,
13 everything that's -- that is in this rule is based on
14 Amendment 51.
15    REP. SPRINGER: I understand, but name the
16 categories. You -- you give three groups of -- you give
17 three groups of people the ability to do it
18 electronically. However, you're not letting other
19 groups to do it so it -- to me, that limits certain
20 persons from being -- having that same capability as
21 others. So wh- -- name, again, the three groups that
22 are limited in the process.

**8**

1    MR. MADISON: So what I said in my opening was
2 there's five groups that are identified as voter
3 registration agencies under Amendment 51.
4    REP. SPRINGER: Okay.
5    MR. MADISON: Of those five, three are
6 permitted to use computer processes.
7    REP. SPRINGER: That's right.
8    MR. MADISON: Of those three, the DMV is
9 required to use computer processes, but also all of
10 them have the paper form available also as part of the
11 rule. So what the rule is doing is doing what the
12 constitution says.
13    That those five entities are the registration
14 agencies. Of those five, three are allowed to use
15 computers. The three that are allowed to use computers
16 are DMV and state revenue, public assistance agencies,
17 WIC, tho- -- those type things, and disability agencies
18 that receive funding.
19    Of those, the public assistance and disability
20 agencies can use computers but are not required to.
21 Only if it's part of their process. The DMV is required
22 to. Like if you go renew your driver's license, they

Appellate Case: 24-2810    Page: 212    Date Filed: 09/06/2024 Entry ID: 5432887
APP183

**9**

1  ask if you want to update your voter registration and
2  then you get to sign through there. That system is set
3  up. What this rule does is keeps the status quo.
4  REP. SPRINGER: F- -- final question, Mr. --
5  Mr. Chair.
6  MR. CHAIR: I'm -- I'm [inaudible] I've got
7  five other members. I'll -- if you'll get back in the
8  queue, I'll come back to you.
9  REP. SPRINGER: Okay. Thank you.
10  MR. CHAIR: Committee Member Representative
11  Ferguson, you're recognized.
12  REP. FERGUSON: Yeah. Thank you, Mr. Chair. I
13  heard you mention rehabilitation agencies. Are we
14  talking about state rehabilitation agencies or rehabil-
15  -- rehabilitation agencies that are nonprofit?
16  MR. MADISON: I'm trying to find it in
17  Amendment 51 to answer your question. So it's under
18  Amendment 51, section five, subsection B1-4, B2, says
19  Office of Driver Services State Revenue Offices. Under
20  three it says, all public assistance agencies shall
21  provide federal or state mail voter registration
22  application form and with each recertification renewal,

**10**

1  change of address, name relating to such assistance,
2  public assistance or provide voter registration
3  applications.
4  And public assistance agency also provide --
5  forms of the people are declined. So these are public
6  assistance agencies that are -- I don't know if that
7  term's defined anywhere or not. And then the same thing
8  for disability agencies.
9  It talks about those that are providing --
10  they have to provide the paper form and whereas a
11  combined computer process for their intake is one of
12  the things that the public assistance agencies can do.
13  I don't know if that's specifically defined anywhere or
14  not, sir. I -- I don't know.
15  REP. FERGUSON: Yeah. One follow-up question
16  regarding that, Mr. Chair. I did a little research and
17  got in contact with the Attorney General's office, but
18  in his opinion, they don't define what that means
19  either.
20  And that's why I was asking the question
21  because you do have some non-profit organizations that
22  do assist, they do receive federal funds and state

**11**

1  funds. And so I was wondering, would they be allowed to
2  use this process? So you can't answer that question
3  though, can you?
4  MR. MADISON: I -- I'm not sure I can answer
5  that question. The approach to this on the emergency
6  rule is to maintain the status quo and process.
7  REP. FERGUSON: Yeah. I understand that.
8  MR. MADISON: So if the agencies were doing
9  that beforehand, before in the last -- over the last 20
10  years, and they're receiving public funding as part of
11  their assistance, they may fall into that category if
12  they have that as part of their computer processes.
13  That would be one of the issues to bring up through the
14  permanent -- permanent rule promulgation process and
15  identify that as an area that needs clarity or
16  definition.
17  REP. FERGUSON: Yeah. One other question, Mr.
18  Chair, then I'll get back in the queue if I got another
19  question. Now, would -- would this prohibit individuals
20  from using their electronic signature through the
21  Secretary of State's office?
22  MR. MADISON: Yes.

**12**

1  REP. FERGUSON: So it would prohibit an
2  individual if an individual wanted to do it?
3  MR. MADISON: Correct. And -- and the reason
4  is, is under Amendment 51, the signature of an
5  applicant is more than just an affirmation that I'm
6  qualified to be a voter. It's also used for purposes of
7  identification.
8  In the absentee voting process, when you
9  submit an application for an absentee ballot, the clerk
10  is to compare the signature on the application to the
11  signature on the voter registration application to
12  satisfy himself or herself that the person that's
13  requesting the ballot is that person.
14  And this comes from, quite frankly, we've done
15  some investigations where those have been forged in
16  fraud and where we caught it was in the signatures. And
17  so it's more than just affirmation. It's part of the
18  electoral process and Amendment 51 talks about that as
19  part of one of the requirements of the signature mark
20  as part of the election process.
21  REP. FERGUSON: So in my district, I have --
22  and this is final; I just want to make this comment. So

13

1  in my district, I have some subsidized housing units.
2  So for these individuals who don't have proper
3  transportation, if they wanted to do an electronic
4  signature, this rule -- this rule would prohibit them
5  from doing it, right?
6      MR. MADISON:  I believe they were prohibited
7  before this rule. This rule just clarifies that but
8  yes, sir.
9      REP. FERGUSON:  Okay. So you- -- you're saying
10 that they were prohibited before this rule?
11     MR. MADISON:  I- -- if they're doing it
12 themselves, yes, sir. Now, if they're going through one
13 of the three categories of entities that are allowed to
14 use computer processes and electronic signatures, for
15 example, you have a disability agency that receive
16 state fundings as state recognized like rehabilitation
17 services, and they have that as part of their computer
18 process, then they would fall under that exception.
19     REP. FERGUSON:  So the Secretary of State
20 can't -- they can't do it.
21     MR. MADISON:  In fact, there's an AG opinion
22 from 2020 where the A- -- the Secretary of State

14

1  requested that specific question and was told without
2  changing the Amendment 51, the Secretary of State could
3  not set up its own online portal for people to log in
4  and electronically sign their applicants --
5  applications.
6      REP. FERGUSON:  Hmm. I'll get back in the
7  queue. Thank you.
8      MR. CHAIR:  Thank you. I'm going to go into
9  committee member Senator Gilmore.
10     SEN. GILMORE:  Thank you, Mr. Chair. So I -- I
11 just -- to clarify, basically this rule is to clarify
12 the practice that has been in place for a long time,
13 correct?
14     MR. MADISON:  Yes, sir. Yes, sir.
15     SEN. GILMORE:  Okay. And so as I understand
16 it, you know, clearly there are state agencies that
17 have the authorization to do this, but these are
18 agencies who are in the process of verifying identity
19 anyway, correct?
20     MR. MADISON:  Yes, Senator.
21     SEN. GILMORE:  Okay. So I guess with that, the
22 purpose as I understand it, would be for, you know,

15

1  election integrity purposes to make sure that the
2  people who were showing up to vote are actually the
3  people whose names appear, you know, on their driver's
4  license and verified with their signature and all of
5  those things; is that not correct?
6      MR. MADISON:  Yes, Senator. That's it.
7      SEN. GILMORE:  Okay. Final question, Mr.
8  Chair. How many counties are not conforming to this
9  rule as it's in place now? Because we're just
10 clarifying, right?
11     MR. MADISON:  I don't know specifically. I
12 haven't surveyed the counties. What I had seen in media
13 reports were that there were six or seven counties that
14 were accepting electronic signatures which means
15 there's, you know, 60 something counties that are not.
16 And what the purpose of this rule that the board
17 adopted was to create uniformity across the state which
18 is what we're mandated to do under Amendment 51,
19 section five subsection E.
20     SEN. GILMORE:  Yeah. To -- to make sure that
21 we have secure and safe and fair elections?
22     MR. MADISON:  Absolutely. And -- and part of

16

1  it is also, Senator is, the board nor us as election
2  officials want registrants who are registering through
3  this process to have problems when they go vote in
4  November.
5      So part of the emergency rule is, let's put a
6  stop to it, we can go through the promulgation process,
7  we'll come back before the legislator, input that,
8  we'll get public comment, input that, but so that
9  everybody's playing by the same set of rules. And what
10 we as election administrators don't want are voters
11 that have signed up this way to have problems when they
12 go vote in November. That's what we're trying to avoid
13 also.
14     SEN. GILMORE:  Yeah. Co- -- yeah, because I --
15 I mean, and I agree because I think at the end of the
16 day, we want more Arkansans voting, and I think that's
17 the goal. And I, you know, happy for any organization
18 that's trying to register more voters, but we just have
19 to make sure we're doing it in a proper and correct
20 way. So, thank you Mr. Chair.
21     MR. CHAIR:  Representative McCullough, you're
22 recognized [??].

Appellate Case: 24-2810   Page: 214  Date Filed: 09/06/2024 Entry ID: 5432887

APP185

17

1    REP. MCCULLOUGH: Thank you, Mr. Chair. Thank
2  you, Mr. Chair. I -- can you tell me where exactly is
3  that requires a wet signature?
4    MR. MADISON: So the analysis that came about
5  that is actually written out in the declaratory order
6  that came along with the adoption of the rule. When the
7  board was proposed with the declaratory order because
8  our board has the authority to enforce voter
9  registration and election laws. We -- that's one of the
10 responsibilities we have.
11    We have that -- since we do have authority
12 under the Administrative Procedures Act, we have the
13 responsibility to declaratory orders. Through that is
14 where we develop the rule. The declaratory order looked
15 at it and the analysis, quite frankly, was, there's a
16 statutory construction rule where if you say it in one
17 place that you can do X, but you don't say X in another
18 place, then that means that it was prohibited in the
19 other place. And that was the analysis that the board
20 adopted in determining that the signatures or marks of
21 applicants has to be a wet signature. And quite
22 frankly, that's how it's been for the last 20 years.

18

1    REP. MCCULLOUGH: May I have a follow up, Mr.
2  Chair? So can voters submit updates to their voter
3  registrations via email?
4    MR. MADISON: I don't know the answer to that.
5  I think you still have to sub- -- I know in the poll,
6  when a person wants to change their address, they fill
7  out a new voter registration card and sign it. I'm not
8  sure if you can do that via email. I -- I would have to
9  get back to you on that. I don't know that answer.
10    REP. MCCULLOUGH: Well, I -- I just want to
11 follow up on that. I don't know now what the answer is
12 exactly, but if the answer is no, that would seem to
13 contradict state law that governs how county clerk
14 offices accept absentee applications.
15    If voters are allowed to mail, email, fax
16 their absentee applications, then why can't they email
17 or fax their voter registration application to the
18 clerk's office? It seems to be an inconsistency that
19 could be resolved by accepting digital signatures which
20 would not only be more convenient for voters, but
21 create some kind of consistency for our county clerks.
22 So I g- -- I guess if you don't know the answer to

19

1  that, I was going to ask if you could explain the
2  rationale behind the decision, but.
3    MR. MADISON: Well, I -- I can say that I have
4  actually seen absentee ballots that have been rejected
5  because one, the application that was submitted for the
6  original voter registration or the -- for the applica-
7  -- I'm sorry, the abs- -- the absentee ballot
8  application was not signed, okay.
9    But it was -- they were sent a ballot anyway.
10 That's where the clerk failed to recognize that and
11 they're supposed to check the signature. I've seen
12 other absentee ballots that were rejected because when
13 they did the application for the absentee ballot, they
14 did -- you've done e-sign where you type your name in
15 and it writes it cursively and pretty.
16    Well, then when they did their voter
17 statement, they signed it with an ink pen. Well, if I
18 type my name in, Richard Christopher Madison, you can
19 read it. If I sign, you can't read it. And those two
20 signatures did not compare and their absentee ballots
21 were rejected.
22    Part of my maintaining this sequence of events

20

1  is it protects the voter from when they submit their
2  application to be a vote -- a registered voter when
3  they submit their application for an absentee ballot,
4  and when they submit their voter statement that all
5  three of those signatures are by the hand and are
6  comparable. Because that's one of the things that we do
7  for the election administration process is to ensure
8  that your voting, your ballot, and you are the one that
9  is registered to vote.
10    REP. MCCULLOUGH: Okay. I'll get back in the
11 queue. Thank you.
12    MR. CHAIR: Representative -- I had
13 Representative Garner. She's off now. Representative
14 Scott, you're recognized.
15    REP. SCOTT: Thank you, Mr. Chair. Quick
16 question about the number of rejections that were seen
17 in Ben County. I think there were 7,500 that were
18 rejected from the DMV. And so I hear a lot of what
19 you're saying is we're trying to maintain the status
20 quo and that we do want people to vote.
21    But if 7,500 residents in Ben County were
22 rejected last year from the DMV office, to my

21

1 knowledge, what is being done to correct because
2 they're doing the information in the office, to my
3 understanding. And so what kind of things are being
4 done to -- because to my understanding, that's the
5 highest county that's seeing that number of rejections.
6        MR. MADISON:  So I'm not familiar with that
7 statistic or what specifically you're referencing. I
8 know there was some media reports following the either
9 2020 or the 2022 that related to absentee voting
10 rejections.
11       And when we dug into it, it was material that
12 was reported to the national that you do for absentee
13 voting and come to find out that the numbers were just
14 wrong. As far as voter registrations, the 7,500, that's
15 the first I've heard of that.
16       I know that we do have challenges with DMV
17 registration. It is often a matter of them not putting
18 the right information in when they're submitting the
19 application. But any of those can be cured by the voter
20 filling out a new voter registration card and sending
21 it in.
22       And so if any voter has a question about their

22

1 voter registration status, contact their county clerk
2 and submit a new card with their new signature and that
3 would resolve that. I'll have to check into the 7,500.
4 That's the first I've heard that statistic.
5        REP. SCOTT:  Okay.
6        MR. MADISON:  And that was in Benton County?
7        REP. SCOTT:  Yeah.
8        MR. MADISON:  Okay. I'll check on that.
9        MR. CHAIR:  Senator Gilmore, you're
10 recognized.
11       SEN. GILMORE:  Thank you, Mr. Chair. So there
12 -- there was a question a second ago about absentee
13 applications. So if someone's filling out an absentee
14 application or whatever the terminology is there, are -
15 - they're are -- they're already a registered voter,
16 correct?
17       MR. MADISON:  Yes. They're re- --
18       SEN. GILMORE:  So -- so their signature's
19 already on file, correct?
20       MR. MADISON:  Correct. Yes.
21       SEN. GILMORE:  So they would be validating the
22 signature on that absentee with the signature that's

23

1 already on file?
2        MR. MADISON:  Correct.
3        SEN. GILMORE:  Thank you.
4        MR. CHAIR:  Representative Ferguson, you're
5 recognized.
6        REP. FERGUSON:  Thank you, Mr. Chair. One
7 final question. It's something that Representative
8 McCullough said. Something that you said about an
9 Attorney General's opinion in 2020. And I'm looking at
10 a recent Attorney General's opinion 2024 April of this
11 year and it says, while an electronic signature or mark
12 is generally valid under Arkansas law, the registration
13 form must be created and distributed by the Secretary
14 of State's office.
15       Now, the other part of that, he says a third-
16 party organization cannot create and use a different
17 form of its own to register voters. I get that part.
18 But if electronic signature or mark is valid under
19 Arkansas State law, then if an individual wanted to
20 amend or make corrections to their registration form
21 with the Arkansas Secretary of State's office via fax
22 or email, what this rule says is the individual

24

1 couldn't do it.
2        I get the part about the third-party person.
3 But you're saying, under this rule, the individual
4 couldn't do it, but it appears that the Attorney
5 General is saying that electronic signature or mark is
6 generally valid on Arkansas State law. That's different
7 from the opinion in 2020.
8        MR. MADISON:  So I think there's a couple of
9 things that you've said in your question, sir. So first
10 is the 2020 Attorney General's opinion. The question
11 that was posed was whether the Secretary of State had
12 the authority to create an online portal where you
13 could just go in and type in your stuff.
14       And the AG in that opinion said, no, not
15 without amending -- Amendment 51. This recent opinion
16 that you're discussing, the Attorney General was asked
17 related to this, the circumstance. And the Attorney
18 General used a different statutory construction. A
19 moment ago, I said, there's a principle, a statutory
20 construction where if you say it in one place, but you
21 don't say it in another, that means it's excluded in
22 the other.

Appellate Case: 24-2810    Page: 216    Date Filed: 09/06/2024 Entry ID: 5432887
APP187

25

1    The Attorney General, as I understand their
2  opinion in the April one was, they said, because it
3  didn't say anything here, the question is not answered
4  so then you can go to, excuse me, then you can go to
5  state law to answer that question.
6    That's a different statutory construction.
7  Quite frankly, under Amendment 51, the State Board of
8  Election commissioners is delegated the responsibility
9  for the uniform application of a -- an administration
10 of Amendment 51.
11    So the board, under their analysis, they took
12 this statutory construction where if you say computer
13 processes and shall use in DMV, but you don't say it
14 elsewhere, that means you can't do it elsewhere which
15 is somewhat different than what the analysis that the
16 AG opinion was on it.
17    And quite frankly, that's the analysis that
18 the board took is what the analysis has been or what
19 the process has been for the last 20 years. As far as
20 the updating, I don't know the email process, partly
21 because you should have the handwritten or the ink
22 signature on file if you're updating your information

27

1    REP. FERGUSON:  -- is -- is it -- is it -- is
2  it concerns an individual tha- -- ;is that correct? Am
3  I saying that right?
4    MR. MADISON:  I think there were two separate
5  questions posed to the Attorney General. The first was
6  whether the Secretary of State, in its own authority,
7  had the ability to set up an online portal -- portal so
8  that a person could apply to register to vote.
9    And there, the AG said no, not without
10 amendment -- amending 51. The recent opinion, the
11 question related to the signature application and in
12 that case, in -- in the recent one, the Attorney
13 General took the statutory construction of, it doesn't
14 say therefore it's unanswered and then you can go to
15 state law to fill in the gap.
16    And that's where the Attorney General went and
17 said, electronically signatures are generally accepted
18 and could be used. Didn't say they had to be used. The
19 state board, when it had this issue come before it with
20 a declaratory order which has the statutory authority
21 to adopt rules of this, went and said, this is the way
22 that this is to be applied.

26

1  which means you were a qualified applicant at one time
2  previously and we have your ink signature on -- on file
3  whereas if you're just updating it.
4    I don't know if you can submit an original
5  first time application via email. I -- I don't believe
6  so, but I don't know for certainty that I could answer
7  that question because I didn't think to look that up
8  but I will.
9    REP. FERGUSON:  So I think I understand what
10 you're saying. In one case, the attorney general
11 referenced Amendment 51, but in another case, he
12 referenced another part of the law different from
13 Amendment 51.
14    MR. MADISON:  That -- that's correct, sir.
15 Yes. And -- and --
16    REP. FERGUSON:  So in one case, you're saying,
17 the Attorney General earlier this month, hey, this is
18 legal, but two years ago, if you look at Amendment 51,
19 you're saying it's not.
20    MR. MADISON:  There are actually --
21    REP. FERGUSON:  Is it --
22    MR. MADISON:  I'm sorry.

28

1    And that's how we got this rule, is the board
2  under their authority delegated to them under 51 says,
3  we're going to apply this statutory construction to
4  determine that an electronic signature outside of those
5  identified groups is not acceptable.
6    REP. FERGUSON:  Okay. Thank you.
7    MR. CHAIR:  Representative Flowers [ph],
8  you're recognized.
9    REP. FLOWERS:  Thank you, Mr. Chairman. So can
10 you give us -- can you clarify for us who would
11 determine whether or not voter registration signatures
12 are wet or not?
13    MR. MADISON:  The paper showing up to the
14 county clerk's office. The county clerk is the
15 permanent registrar and is the one that is going to be
16 receiving those. If you submit it, for example, to the
17 Secretary of State's office, secretary of State's
18 office turns around and mails it to the specific clerk.
19    So if I'm registering in Saline County and my
20 application gets to the Secretary of State's office,
21 they have a time period that they have to turn it
22 around back to the county clerk in Saline County. And

1 the clerk is the one that would be looking at the form
2 and saying, do I have wet signature on here or is this
3 electronically created one? It's -- that's the -- where
4 it -- the first decision point is, is at the county
5 clerk level.
6     REP. FLOWERS: So the county clerks. Are there
7 other decision points?
8     MR. MADISON: Not really. I mean, it's -- you
9 submit the application and if -- and if -- and as the
10 declaratory order said, the com- -- application is
11 either com- -- legible and complete or not complete.
12 And it's either, if it's legible and complete, then
13 it's acceptable. If it's not, it's not.
14     It'd be much like if I submitted an
15 application, filled all the boxes in, checked
16 everything I'm supposed to, but I don't sign it. Well
17 the clerk can't register me because it's -- the form's
18 not complete. And the clerk can contact me and say,
19 hey, you forgot to sign this. You know, mail it to me
20 for me to sign it and send back. Those are kind of the
21 analysis that the board went through on this.
22     REP. FLOWERS: Well, and this is -- this is

1 why I'm wondering this. So I know that aside from the
2 Secretary of State's printed official forms, one can go
3 to the website and print off a copy, a PDF. And if I'm
4 not mistaken, it would be allowable for me to format
5 that so that I could type in the answers to the
6 questions, right?
7     MR. MADISON: Mm-hmm.
8     REP. FLOWERS: Now, for me, I, all the time
9 use Adobe or even Word and scan my signature and apply
10 it to letters. So if I'm doing, you know, what if I did
11 that to my own application that I'm downloading as the
12 official downloadable form and using a computer
13 generated, you know, text to answer the questions, and
14 then I use my signature and apply it. So it's not a wet
15 signature, but it's -- I'm using my signature and I'm
16 printing it off and I take it, or I email it, or fax
17 it, or whatever the law may allow. Is that not
18 allowable?
19     MR. MADISON: Under the current rule, no
20 because the definition of a wet signature is included
21 in the rule that talks about moving a pen across the
22 piece of paper. You know, because the -- the term wet

1 signature has a specific meaning in the world, and
2 that's what the rule is, and that's what the board
3 adopted under their authority under Amendment 51.
4     The question you raise is a perfectly
5 legitimate question and something we absolutely can
6 address through the permanent rule promulgation process
7 is, if I have an iPad pencil and I stylus sign it, is
8 that acceptable?
9     That's a question that can be resolved in the
10 permanent rule. What this rule right now is doing is
11 trying to apply the way it has been done so that we
12 have uniformity while we work through the due process
13 portion of resolving some of these questions with a
14 more permanent rule.
15     REP. FLOWERS: And -- and, I guess, and -- and
16 I understand that. I just wanted to make sure of that.
17 When I use that signature mark or that scanned
18 signature, sometimes peop- --, I mean, I use it because
19 you can't tell.
20     I use it because I can have -- take it and if
21 it's clean, I can apply it and it looks like I signed
22 it. So what kind of training would be necessary for

1 someone to be able to -- for a county clerk to be able
2 to determine whether or not the signature is wet? I
3 mean, is -- would there be tr-- -- would there be
4 training to determine that to make sure that someone
5 was not erroneously rejected because it looked like it
6 wasn't wet, but it is wet.
7     MR. MADISON: So yes, under Amendment 51,
8 also, the State Board has responsibility to adopt the
9 rules and regulations and documents related to this.
10 And that would be part of the process of determining
11 whether a stylist, created signature is sufficient for
12 purposes of a wet signature.
13     And I -- we don't know that. When I say we,
14 that -- that question hasn't been answered at this
15 point because we haven't gone through the whole
16 process. The purpose of the rule adopted by the board
17 is, this is the way we've been doing it. Let's continue
18 doing it the way we've been doing it.
19     Let's go through the due process steps so we
20 can answer those questions and determine whether or not
21 -- whether when the board adopts a permanent rule, is
22 an iPad pencil or a stylus signature sufficient? The

33

1 key is, is that you want the signature to be comparable
2 for the voter through all the phases of the process.
3        Because at certain points, if those signatures
4 are not comparable, you lose your vote. So, for
5 example, if I sign and then I sign, but then I type my
6 signature on the voter statement and it did a cursive
7 writing that's legible, then that -- my vote will be
8 rejected because the signatures do not compare between
9 the R scribble, C scribble, and the Richard Christopher
10 Madison that you can read.
11        So the purpose of this, as I understand the
12 board's position is, let's make sure everybody is doing
13 a wet signature. A hand signed signature. While we work
14 through the rule and then we can absolutely take those
15 -- that comment into effect and determine whether or
16 not it's appropriate to allow a stylus. Is that a wet
17 signature?
18        This is an area of law that's not specifically
19 clarified. It would require more work, but in the short
20 term, the emergency rule is just, hey, let's all keep
21 doing what we've been doing and work through these --
22 these nuanced issues.

34

1        REP. FLOWERS:  Well, finally, Mr. Chair for
2 now, you know, when many voters go to the polls, they
3 digitally sign to get their ballot? And so if I'm
4 required to sign with a wet signature as the standard,
5 but then I'm sign- -- I'm not signing with a wet -- wet
6 signature, wouldn't that be inconsistent and subject
7 that person for their vote not being counted? And
8 what's -- what's the difference if you're -- you're not
9 allowing it in one area, but in the other?
10        MR. MADISON:  So the signature, when you vote,
11 when you show up to vote in person, that signature is,
12 you're affirming that I'm qualified to vote. That's
13 what you're doing. The signature is never compared when
14 you're voting in person. So the signature on the
15 stylist doesn't -- it's not compared to anything for
16 purposes of counting your vote.
17        Also, when you check in to vote, you show your
18 ID. You state your name, your address, your date of
19 birth. You have identified yourself to the poll worker
20 during the check-in process. So the identification
21 aspect of you voting is resolved by your in-voting
22 person presence.

35

1        The absentee process, you're not there. And so
2 one of the ways of determining are you the voter who's
3 requesting the absentee ballot, are you the voter who's
4 voted the absentee ballot, is the comparison of the
5 signature. And we have had cases where they had forged
6 the applications, forged the voter statements and what
7 cau- -- the forgery, what caught the criminal activity
8 was the signatures were not comparable.
9        There was one signature, it's really tiny and
10 compressive. Another one's very flowing and that
11 flagged it to start looking into. So the signature on
12 the paperwork for voter registration application is
13 part of your identification.
14        When you show up to vote in person, you're
15 identifying yourself the name, address, date of birth,
16 and showing your ID. The signature on the stylus pad is
17 never looked at for purposes of counting your vote or
18 not. Unlike absentee voting where it's absolutely a
19 step that's required to be able to count your vote.
20 Does that answer your question?
21        MR. CHAIR:  Rep- -- Representative Garner,
22 you're recognized.

36

1        REP. GARNER:  Thank you, Mr. Chair. I just
2 have a quick question about, if we -- if -- if the
3 emergency rule is passed today, what happens to the
4 voters who have registered with e-signatures in 60-
5 some-odd counties now?
6        MR. MADISON:  So as I understand that there's
7 only been six or so counties that have accepted
8 electronically signed registrations. It's -- as I un- -
9 - from third party organizations, as I understand it.
10 I'm relying on media reports that there were six or so
11 counties that were accepting the electronically signed
12 ones.
13        The 60 or so counties were not accepting the
14 electronically signed ones. So those 60 or so counties
15 aren't in our analysis. The six counties that are, the
16 question is quite frankly, is can you identify who
17 those registrants were, whether or not it's a type
18 precursive signature or is it -- is we go pull the
19 card, can you tell whether it's a wet or not.
20        And if you have a question about it, any voter
21 has a question about it, they're more than welcome to
22 submit a new voter registration card with a wet

37

1  signature and it solves it, and so that would be the
2  step. Is if we identify those that could, for example,
3  have a typed in signature that types your name pretty,
4  we can identify that, mail you out a new voter
5  registration card, you sign it and send it back in and
6  that's cured.
7       And we're -- one of the reasons we're wanting
8  to do that, that we as the board and election
9  administrators is we need to resolve these issues now
10 so that we're not running up into the November election
11 and trying to resolve these issues then and causing
12 voters problems.
13      REP. GARNER: Okay. It's my understanding that
14 the six counties that were accepted were after the
15 Secretary of State's opinion, but before that there
16 were 60-some-odd counties. So I -- I guess we just need
17 clarification on that and -- and what happe-- -- I mean,
18 that's a lot of voter registers [talking over each
19 other].
20      MR. MADISON: And that's the first -- that's
21 the first I've heard that there were that many counties
22 that were accepting electronically signed things. I --

38

1  I don't know. Quite frankly, you know, the -- the
2  emergency rule at this point of court to the board is,
3  here is a line, let's all follow this rule, and then we
4  can solve the next problems which are, okay, what do we
5  do for those that have submitted and what do we do
6  going forward.
7       REP. GARNER: Thank you.
8       MR. MADISON: Thank you.
9       MR. CHAIR: Committee Member, Senator Irvin
10 [ph], you're recognized.
11      SEN. IRVIN: Thank you, Mr. Chair. I -- I
12 appreciate the questions and I appreciate the
13 clarification on the -- I know a lot of the county
14 clerks that feel like they need clarification on this.
15 The majority of them across the state appreciate this
16 emergency rule to provide that level of clarification
17 for them as they're doing a very difficult job.
18      And so I just -- I know that there's other
19 folks in the -- in the queue, but I think everybody's
20 been able to ask questions. So I'll defer to the chair,
21 but I -- I, you know, I would -- I'd like to go ahead
22 and make a motion at the proper time to review this

39

1  emergency rule.
2       MR. CHAIR: If you'll hold that motion, in
3  fairness, I'm -- I've got one person on here that
4  hasn't asked a question. I'm going to allow
5  Representative Collins.
6       REP. GARNER: Yes, sir.
7       MR. CHAIR: If you will, and then I'll come
8  back to you, Senator Irvin.
9       REP. COLLINS: Thank you, Mr. Chair and thank
10 you Senator Irvin. So I -- I apologize if this has been
11 answered indirectly, but I -- I don't think I quite am
12 clear so I -- I want to ask it. So I understand that
13 this emergency rule indicates that only an authorized
14 computer voter registration agency can use a computer
15 process as part of the registration process.
16      Okay. So then when a person uses the Secretary
17 of State's voter registration application, does this
18 mean that a person is prohibited from music -- using a
19 computer to fill in any of the forms or is it just the
20 signature part?
21      MR. MADISON: It's targeted to just the
22 signature part.

40

1       REP. COLLINS: Okay. So they can put their
2  address, type their address in using a computer process
3  that's not restricted at all here?
4       MR. MADISON: As I -- as I understand the rule
5  and the direction of the board, it was focused on the
6  signature because the signature serves that reoccurring
7  purpose throughout the election administration process.
8       REP. COLLINS: Okay. Thank you.
9       MR. CHAIR: Back to you, Senator Irvin. Sorry,
10 [inaudible] here.
11      SEN. IRVIN: Thank you. I actually appreciated
12 the question. Representative Collins, I appreciate
13 that. So you could fill that all out, print it, and
14 then sign it. Okay, perfect. All right. With -- with
15 that, I would just make a motion to approve this
16 emergency rule.
17      MALE 7: Second.
18      MR. CHAIR: Okay. I've got a motion and a
19 second to approve the emergency rule. All in favor,
20 aye?
21      ALL: Aye.
22      MR. CHAIR: Opposed? Okay. The proposed

Appellate Case: 24-2810     Page: 220     Date Filed: 09/06/2024 Entry ID: 5432887
APP 191

**41**

1  emergency rule is reviewed and approved, and the review
2  and approval shall be effective at 12:01 a.m. Saturday
3  May 4th, 2024. Thank you for the questions. Thank you,
4  gentlemen, for being here.
5      Next up we have some presenters for our audio
6  visual and I'm going to -- do we need to recess for
7  five -- five minutes.
8      FEMALE 3:  [Inaudible], yeah, just -- yeah,
9  just [inaudible].
10      MR. CHAIR:  We're -- we're going to -- we're
11  going to take a five-minute break to allow set up for a
12  presentation. We'll be back in just a minute.
13      [recess]
14      MR. CHAIR:  -- back active if you'll take your
15  seats. Next, the -- on the audio visual proposals for
16  big Mac. We first have CTI, if you gentlemen, want to
17  identify yourself and we'll let you make your
18  presentation. Thank you for being here.
19      MR. PARKER:  Okay. My name is Jonathan Parker,
20  I'm the branch director for the local conference
21  technologies office here in Little Rock. Richard
22  Millott is next to me. He's our engineer. You guys have

**42**

1  a mic?
2      MR. MILLOTT:  Oh, we are from the Televic and
3  with the CTI for the project manager here and with me,
4  Darren.
5      MR. KIMSEY:  Only two mikes. Yeah. I'm Darren
6  Kimsey. I'm the sales manager for Televic.
7      MR. PARKER:  So Televic is one of the main
8  technologies that we're proposing. We have a few other
9  items here to show off. Time seems to be a little tight
10  for us today, so we'll try to keep it quick. CTI is a
11  national company, we have 40 branches around the
12  country. Started in 1988, we have close to a thousand
13  employees, lots and lots of jobs.
14      We have lots of certifications, all the groups
15  that matter for AV, Avixa, NSCA we're certified in all
16  the major brands, Crestron, Harmon, AMX, Extron, Cisco,
17  Polycom, on and on. We belong to the groups, all the
18  groups that matter, AIA is a big one and MPI.
19      Jumping right into the schedule, I think is
20  kind of a -- a big topic of discussion here. So, the
21  date that was proposed to us that you'd like to have at
22  least something up and running is August the ninth. We

**43**

1  are kind of proposing two completion dates.
2      So August the ninth, we think we can -- we're
3  going to propose that we'd have committee room A, the
4  production studio, which supports that room, and then
5  the conference room behind committee room A.
6      And then a couple weeks after that, we think
7  we could complete committee room B, conference room B,
8  and all the common spaces. The common spaces being the
9  hallways and the lobby out the front.
10      What that looks like on a specific work
11  breakdown structure is pretty hard to read on a slide.
12  I have printouts of that if anybody wants to kind of
13  see the phases as we're seeing it but the dates that
14  are important are trying to get this thing started as
15  soon as possible. So this is an 80-day timeline based
16  on starting on May the sixth, which is Monday.
17      The CTI would need a few weeks to go through
18  internal documentation, creation processes,
19  engineering, site visits to look above ceiling, to find
20  cable paths, basically identify any challenges and
21  obstructions. On July 12th, we would actually begin
22  demoing the existing equipment.

**44**

1      Through the 29th to August the 9th we would
2  focus our efforts on committee room A, the production
3  studio and conference room A. Get that room up and
4  running and then over the next couple of weeks, by the
5  23rd finish out to having everything completed. The
6  risks to that, because that timeline is tight.
7      So the risks involved in that is Monday is
8  very soon to get a contract and start a project so that
9  would be the first challenge to overcome. Another risk
10  would be unknown obstructions that are going to occur.
11      So the conversation has come up about building
12  a new rack room, relocating equipment, different things
13  like that because that work has not been defined fully
14  because there's not a contractor in place. There's risk
15  inherent to who's available? What's that going to cost?
16      Is it in budget? Is it feasible? Is it
17  realistic? So unknowns around building new rack room.
18  Equipment availability is always a risk until we have a
19  PO in hand.
20      We did do our due diligence, we spoke with all
21  the manufacturers involved, and, you know, right now
22  things are shipping again, until they have a PO. You

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| GET LOUD ARKANSAS, et al., | |
| Plaintiffs, | Civil Action |
| *v.* | Case No. 5:24-cv-05121-TLB |
| JOHN THURSTON, et al., | |
| Defendants. | |

**BRIEF IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 2

I.    Amendment 51 governs voter registration in Arkansas and does not impose a wet signature requirement ..................................................................................... 2

II.   GLA and VDO develop innovative tools to help Arkansans register to vote .................... 3

III.  State officials repeatedly assured GLA that electronic signatures comply with Arkansas law. .............................................................................................. 4

IV.  Weeks later, state officials issued the wet signature rule despite the Attorney General's confirmation that electronic signatures are permitted. ....................... 6

V.   The wet signature rule impedes GLA's and VDO's registration efforts while also denying Arkansans the right to register and vote. ........................................... 8

LEGAL STANDARD ....................................................................................................... 11

ARGUMENT ................................................................................................................... 12

I.    The Civil Rights Act of 1964 prohibits state officials from rejecting voter registration applications for errors that are immaterial in determining a person's qualifications to vote. ........................................................................................ 12

II.   Plaintiffs are likely to succeed on their claim that the wet signature rule violates the materiality provision of the Civil Rights Act. ................................................... 14

      A.   Rejecting an applicant's registration form constitutes a denial of the right to vote under the Civil Rights Act. .................................................. 14

      B.   The wet signature rule renders the use of an electronic signature an error or omission on a record related to registration. ..................................... 15

      C.   The use of a wet signature is immaterial in determining whether an individual is qualified to vote under Arkansas law. ........................................... 16

III.  Absent relief, Plaintiffs will face continued and ongoing irreparable harm because of the wet signature rule. ................................................................................. 24

IV.  The remaining equitable factors strongly favor granting a preliminary injunction. ......... 26

CONCLUSION ................................................................................................................ 27

CERTIFICATE OF SERVICE ....................................................................................... 29

Appellate Case: 24-2810   Page: 223   Date Filed: 09/06/2024 Entry ID: 5432887
APP 194

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Awad v. Ziriax,*
  670 F.3d 1111 (10th Cir. 2012) ................................................................27

*Brandt by & through Brandt v. Rutledge,*
  47 F.4th 661 (8th Cir. 2022) ....................................................................27

*Cigna Corp. v. Bricker,*
  103 F.4th 1336 (8th Cir. 2024) ................................................................24

*Condon v. Reno,*
  913 F. Supp. 946 (D.S.C. 1995).........................................................12, 13

*D.M. by Bao Xiong v. Minn. State High Sch. League,*
  917 F.3d 994 (8th Cir. 2019) ....................................................................27

*Eggers v. Evnen,*
  48 F.4th 561 (8th Cir. 2022) ....................................................................26

*Emineth v. Jaeger,*
  901 F. Supp. 2d 1138 (D.N.D. 2012)........................................................25

*Fayetteville Pub. Libr. v. Crawford County,*
  684 F. Supp. 3d 879 (W.D. Ark. 2023)....................................................26

*In re Georgia Senate Bill 202,*
  No. 1:21-CV-01259-JPB, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) ...............................25

*Holbrook v. Healthport, Inc.,*
  432 S.W.3d 593 (Ark. 2014)................................................................18, 19

*La Unión del Pueblo Entero v. Abbott,*
  No. 5:21-CV-0844-XR, 2023 WL 8263348 (W.D. Tex. Nov. 29, 2023)....................... *passim*

*League of Women Voters of Ark. v. Thurston,*
  No. 5:20-CV-05174, 2023 WL 6446015 (W.D. Ark. Sept. 29, 2023) ...................................14

*League of Women Voters of Mo. v. Ashcroft,*
  336 F. Supp. 3d 998 (W.D. Mo. 2018) ..............................................25, 27

*League of Women Voters of N.C. v. North Carolina,*
  769 F.3d 224 (4th Cir. 2014) ..............................................................25, 26

*Martin v. Crittenden,*
  347 F. Supp. 3d 1302 (N.D. Ga. 2018)....................................................16

*Martin v. Haas*,
   556 S.W.3d 509 (Ark. 2018)......................................................................2

*Martin v. Kohls*,
   444 S.W.3d 844 (Ark. 2014)......................................................................2

*Mi Familia Vota v. Fontes*,
   No. CV-22-00509-PHX-SRB, 2024 WL 862406 (D. Ariz. Feb. 29, 2024) ...............14, 16, 17

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012) ..................................................................26

*Reynolds v. Sims*,
   377 U.S. 533 (1964)................................................................................26

*Schwier v. Cox*,
   340 F.3d 1284 (11th Cir. 2003) ...................................................14, 15, 16

*Schwier v. Cox*,
   412 F. Supp. 2d 1266 (N.D. Ga. 2005) ...................................................21

*Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*,
   574 F. Supp. 3d 1260 (N.D. Ga. 2021) ...................................................15

*Sleep No. Corp. v. Young*,
   33 F.4th 1012 (8th Cir. 2022) ...........................................................11, 12

*United States v. Georgia*,
   892 F. Supp. 2d 1367 (N.D. Ga. 2012) ...................................................26

*United States v. Mississippi*,
   380 U.S. 128 (1965)................................................................................17

*United States v. Pulsifer*,
   39 F.4th 1018 (8th Cir. 2022) .................................................................19

*Vote.org v. Byrd*,
   No. 4:23-CV-111-AW-MAF, 2023 WL 7169095 (N.D. Fla. Oct. 30, 2023)...................22, 23

*Vote.org v. Callanen*,
   89 F.4th 459 (5th Cir. 2023) ............................................................22, 24

*Vote.org v. Ga. State Election Bd.*,
   661 F. Supp. 3d 1329 (N.D. Ga. 2023) ...................................................15

*Williams v. Salerno*,
   792 F.2d 323 (2d Cir. 1986)....................................................................26

**Statutes**

1964 Civil Rights Act, 52 U.S.C. § 10101................................................................. *passim*

Ark. Code Ann. § 25-16-702(a).....................................................................................20

**Constitutional Provisions**

Ark. Const. art 3, § 1...........................................................................................2, 16, 17

Ark. Const. amend. 51, § 2 ...........................................................................................3

Ark. Const. amend. 51, § 5 ................................................................................3, 17, 20

Ark. Const. amend. 51, § 6 ..........................................................................3, 5, 18, 19

Ark. Const. amend. 51, § 9 ..........................................................................3, 8, 18, 22

Ark. Const. amend. 51 § 11 ........................................................................................16

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading the Law: The Interpretation of Legal
Texts* 170 (2012) ......................................................................................................19

Ark. Att'y Gen. Op. No. 2024-049 (Apr. 10, 2024) .......................................................7

Calvin R. Ledbetter, Jr., *Arkansas Amendment for Voter Registration Without Poll
Tax Payment*, 54 Ark. Hist. Q. 134 (1995) ................................................................2

H.B. 1407, 94th Gen. Assemb., Reg. Sess. (Ark. 2023)..................................................2

H.B. 1606, 80th Gen. Assemb., Reg. Sess. (Ark. 1995).................................................2

H.R. Rep. No. 88-914 (1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391 ............................2, 12, 27

Justin Levitt, *Resolving Election Error: The Dynamic Assessment of Materiality*,
54 Wm. & Mary L. Rev. 83, 147–48 (2012) ............................................................12

S.B. 271, 84th Gen. Assemb., Reg. Sess. (Ark. 2003)....................................................2

S.B. 353, 87th Gen. Assemb., Reg. Sess. (Ark. 2009)....................................................2

*Voting: 1961 Commission on Civil Rights Report, Book 1*, U.S. Comm'n on C.R.
(Sept. 9, 1961), https://perma.cc/CC7B-T888 .......................................................13

APP197

## INTRODUCTION

In early 2024, Plaintiff Get Loud Arkansas ("GLA") launched an online tool to combat Arkansas's historically low rates of voter registration, particularly among young and minority voters. The tool allowed an applicant to complete and sign their voter registration application electronically, after which the applicant could authorize GLA to print their completed application and submit it directly on the applicant's behalf. State officials agreed that this process was perfectly lawful: GLA repeatedly sought and received assurances from the Arkansas Secretary of State's office that the tool complied with existing Arkansas law—a position confirmed by the Attorney General of Arkansas in a formal opinion.

But once the media reported on GLA's success in registering new voters, the Secretary of State abruptly reversed course. In a short letter to county officials, the Secretary advised that they should reject electronically signed applications, without any explanation as to why Arkansas law required such rejection. Just a few weeks later, the State Board of Election Commissioners ("SBEC")—which the Secretary chairs as an *ex officio* member—issued the emergency wet signature rule formalizing the Secretary's about-face, despite the absence of any wet signature requirement in Arkansas law. As a result, many qualified Arkansas voters, including Plaintiffs Nikki Pastor and Blake Loper, have had their voter registration applications rejected simply because they affirmed—under penalty of perjury—the accuracy of their applications with an electronic signature, as thousands of other Arkansans are permitted to do when they register to vote at agencies like the Office of Driver Services ("ODS").

Although the wet signature rule is new to Arkansas, it bears a striking resemblance to the suppressive tactics that spurred Congress to enact the materiality provision in the landmark Civil Rights Act of 1964. The provision seeks to eliminate opportunities for arbitrary and discriminatory practices "in the registration of voters for Federal elections . . . by prohibiting the disqualification

of an individual because of immaterial errors or omissions in papers or acts" requisite to voting. H.R. Rep. No. 88-914 (1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391, 2394. Yet more than half a century later, the wet signature rule has made it so that Arkansas's election officials must reject mail voter registration applications simply because the applicants signed with the "wrong" instrument—a meaningless technicality that creates unlawful barriers to the franchise.

Plaintiffs move for a preliminary injunction to enforce the guarantees of the Civil Rights Act and to immediately enjoin the enforcement of Arkansas's wet signature rule.

## BACKGROUND

**I.      Amendment 51 governs voter registration in Arkansas and does not impose a wet signature requirement.**

Under the Arkansas Constitution, any person may vote in an election if they are: a U.S. citizen; a resident of Arkansas; at least eighteen 18 years of age; and "[l]awfully registered to vote in the election." Ark. Const. art. 3, § 1; *see also Martin v. Haas*, 556 S.W.3d 509, 512 (Ark. 2018). The voter registration process in Arkansas is governed by Amendment 51 to the Arkansas Constitution, *see Martin v. Kohls*, 444 S.W.3d 844, 850 (Ark. 2014), which was originally added by citizen initiative to replace the state's poll tax with a modern voter registration system, *see generally* Calvin R. Ledbetter, Jr., *Arkansas Amendment for Voter Registration Without Poll Tax Payment*, 54 Ark. Hist. Q. 134 (1995), and was amended several times by the Legislature in the intervening decades. *See, e.g.*, H.B. 1606, 80th Gen. Assemb., Reg. Sess. (Ark. 1995); S.B. 271, 84th Gen. Assemb., Reg. Sess. (Ark. 2003); S.B. 353, 87th Gen. Assemb., Reg. Sess. (Ark. 2009); H.B. 1407, 94th Gen. Assemb., Reg. Sess. (Ark. 2023). Today, under Amendment 51, a person may register to vote in several ways. First, they may submit a voter registration application created

2

by the Secretary of State to their respective county clerk in person, by mail,[1] *see* Ark. Const. amend. 51, §§ 6(a), 9(c)(1), or through a third-party organization authorized to submit mail applications on the voter's behalf. *E.g.*, *id.* § 6(a)(2)(G). An applicant may also register to vote at ODS or at state public assistance offices. *Id.* § 5(a).

Although it requires applicants to provide a "signature or mark made under penalty of perjury that the applicant meets each requirement for voter registration," *id.* § 6(a)(3)(F), Amendment 51 does not mandate the use of any specific method or instrument in entering that signature or mark, *see id.* § 6(b)(1), and state agencies often register voters using a digital application process that requires electronic signatures, *id.* § 5(b)(1)–(4). Once a county clerk receives a voter registration application, the clerk "shall register qualified applicants" if the application is "legible and complete." *Id.* § 9(c)(1); *see also id.* § 9(c)(3)(A).

## II.     GLA and VDO develop innovative tools to help Arkansans register to vote.

Plaintiff Get Loud Arkansas ("GLA") was founded in 2021 to address Arkansas's lowest-in-the-nation rates of voter registration and voter turnout.[2] *See generally* Declaration of Kristin Foster ("Foster Decl.") ¶ 3. In its first few years of existence, GLA pursued its voter registration mission by distributing paper applications to register new voters, but it quickly realized the limitations of this approach. *Id.* ¶ 9. As a result, it committed significant effort and resources towards developing and launching an online tool that allows Arkansans to complete and sign a

---

[1] Each county in Arkansas has a county clerk who serves as the "Permanent Registrar" of that county. Ark. Const. amend. 51, § 2(b).

[2] According to the U.S. Census Bureau, only 62 percent of Arkansas citizens were registered to vote during the November 2020 election, and only 54 percent of Arkansas citizens voted in that election. Declaration of Christopher D. Dodge ("Dodge Decl."), Ex. A (tbl. 4a). In contrast, the nationwide averages for voter registration and voter turnout during that election were 73 percent and 67 percent, respectively. *Id.*, Ex. A (tbl. 4a). Unfortunately, these disparities are even more severe for minority and young voters in Arkansas. *Id.*, Ex. A. (tbls. 4b & 4c).

APP200

voter registration application on their phone, tablet, or computer in a process that takes less than two minutes. *Id.* ¶¶ 10–13, 19. To use the online tool, an applicant enters the information necessary to complete the voter registration application prescribed by the Secretary of State, in accordance with Amendment 51, and then uses their finger, stylus, or mouse to sign their name confirming the accuracy of the application under penalty of perjury. *Id.* ¶ 14. Once the application is complete, the applicant may review their application and then authorize GLA to print and submit it to their county clerk. *Id.* GLA released this online tool in January 2024, and almost immediately saw a rapid increase in the rate at which it registered new voters. *Id.* ¶¶ 13, 15.

Plaintiff Vote.org ("VDO") is a nationwide organization that also develops online voter registration tools with electronic signature options and offers them to voters in states across the country. Declaration of Andrea Hailey ("Hailey Decl.") ¶¶ 3, 8. VDO's online tools are specifically designed to meet the needs and legal requirements of each state in which it offers them. *Id.* ¶ 4. And one of the most effective features of its online tools is the e-sign function, which allows applicants to upload an image of their handwritten signature into VDO's web application and have their completed voter registration application sent to the appropriate officials. *Id.* ¶ 8. Currently, however, VDO is not able to use its e-sign function in Arkansas; applicants must still print, physically sign, and then submit their application to their county clerk. *Id.* ¶ 8–10. But for the wet signature rule, VDO would utilize its e-sign function for upcoming elections in Arkansas. *Id.* ¶ 9.

### III.    State officials repeatedly assured GLA that electronic signatures comply with Arkansas law.

In early 2024, as GLA began to promote its new online voter registration tool at events across Arkansas, it sought assurance from the Secretary of State's office that the tool complies with Arkansas law. Foster Decl. ¶ 21. GLA had every reason to believe that it did, as Arkansas

4

law does not require that a voter registration applicant's "signature or mark" be made with any particular instrument, so long as it is "made under penalty of perjury that the applicant meets each requirement for voter registration." Ark. Const. amend. 51, § 6(a)(3)(F). And GLA's tool requires applicants to review and affirm the identical sworn statement prescribed by the Secretary. Foster Decl. ¶ 14. Nevertheless, GLA sought the Secretary's opinion on its new online tool. *Id.* ¶ 21. And, on no fewer than *three occasions*, the Secretary's office expressly stated that the electronic signature function on GLA's new tool complies with Arkansas law.

First, on February 5, 2024, GLA's founder and executive director, former State Senator Joyce Elliott, emailed the Secretary of State's office to confirm GLA's understanding that there was no wet signature requirement in Arkansas law for voter registration applications. *Id.* ¶ 22, Ex. A. Within 30 minutes, the Secretary of State's office responded, "our attorneys looked into this last week and came to the same conclusion [as GLA] about the wet signature." *Id.* ¶ 22, Ex. A.

Later that same afternoon, GLA's Deputy Director, Kristin Foster, contacted the Secretary's office once again, explaining that, when applying to register with GLA's tool, applicants sometimes sign the touchscreen with a stylus and sometimes with their finger, and asked: "So just to make sure I'm understanding correctly – the registrations we submit right now are not going to be rejected based on the signature. . . . Is that correct?" *Id.* ¶ 22, Ex. A. The Secretary of State's office replied that, while it could not "officially speak on the acceptance or rejection of applications" because the "authority lies solely with the county clerk's office," its "unofficial, non-attorney, advice to the county clerks would be to err on the side of the voter and accept the registrations." *Id.* ¶ 22, Ex. A.

Finally, on February 12, 2024, Ms. Foster again wrote to the Secretary of State's office and asked, among other questions: "For registration purposes, should digital signatures be treated

5

differently than 'wet' signatures?" *Id.* ¶ 22, Ex. B. On February 14, 2024, the Secretary of State's office stated: "[T]he Secretary of State does not see how a digital signature should be treated any differently than a wet signature." *Id.* ¶ 22, Ex. B.

Based on these repeated assurances, GLA invested time and resources in rolling out and promoting its new voter registration tool at community events, schools, and other places where it seeks to register voters. *Id.* ¶ 16–18. And it set a goal of registering over 9,000 voters—nearly quadruple its goal for 2023—which seemed easily attainable given the efficiency and reach of its new voter registration tool. *See id.* ¶¶ 8, 31.

## IV. Weeks later, state officials issued the wet signature rule despite the Attorney General's confirmation that electronic signatures are permitted.

Despite its earlier representations to GLA, the Secretary of State's office abruptly reversed course just weeks later. On February 28, 2024—two days after the Arkansas Times reported on GLA's success registering new voters, "especially young ones" with its online tool[3]—the Secretary wrote a letter to all county clerks, stating: "It has come to my attention that there have been some entities registering citizens to vote by electronic applications and signature. . . . I strongly recommend that counties do not accept voter registration applications executed by electronic signature." Dodge Decl., Ex. B. The Secretary's two-paragraph letter provided no explanation or legal basis for his sudden shift in position. *Id.*, Ex. B.

On March 12, 2024—having already advised county clerks to reject applications with electronic signatures—the Secretary of State belatedly asked the Attorney General for an opinion on the lawfulness of such signatures on voter registration applications. The Secretary wrote:

---

[3] Mary Hennigan, *Get Loud Arkansas sees success in new voter registration strategy*, Ark. Times (Feb. 26, 2024), https://arktimes.com/news/2024/02/26/get-loud-arkansas-sees-success-in-new-voter-registration-strategy/.

APP203

My office has received inquiries regarding the use of electronic voter registration applications, created by a third-party non-governmental agency, that include an electronic signature. These applications are then either printed out and turned in or sent electronically to county clerks. I'm asking for a formal opinion from your office as to whether this practice is allowed under Arkansas law.

*Id.*, Ex. C. And, on April 10, 2024, the Attorney General issued an opinion stating that "an electronic signature or mark is generally valid under Arkansas law" and that:

Consequently, given the historical acceptance of signatures produced through a variety of means, the widespread acceptance of electronic signatures, and the fact that Amendment 51 does not contain any restrictions on how a "signature or mark" may be made, I believe that an electronic signature satisfies Amendment 51's "signature or mark" requirement.

*Id.*, Ex. D at 1, 3 (Ark. Att'y Gen. Op. No. 2024-049 at 1, 3 (Apr. 10, 2024)). In other words, the Attorney General's opinion *confirmed* the Secretary's initial position that electronic signatures satisfy Amendment 51 and that GLA's tool complied with Arkansas law.

Nonetheless, after the Attorney General issued his opinion approving of electronic signatures, the SBEC, led by the Secretary, proceeded to issue an emergency rule prohibiting electronic signatures on voter registration applications. *See id.*, Ex. E.[4] The SBEC explained that its motivation for the emergency rule was to address a "difference in treatment for voter applicants, depending on which county they reside." *Id.*, Ex. E at 4–5, 14. The SBEC acknowledged the rule was issued in response to "third-party registration organizations" (*i.e.*, GLA) that had been assisting voters in submitting applications signed under penalty of perjury with an electronic signature. *Id.*, Ex. E at 4–5. And it repeatedly identified GLA as an organization likely to be impacted by the new rule, all but admitting the emergency rulemaking was specifically targeting GLA's new voter registration tool. *Id.*, Ex. E at 6–7.

---

[4] Before promulgating the emergency rule, the SBEC issued a declaratory order interpreting Amendment 51 to permit electronic signatures for voter registration applications that are processed through identified voter registration agencies, but not for mail applications. Dodge Decl., Ex. G.

7

The resulting "wet signature rule" bans electronic signatures on mail registration applications in three ways: First, it grafts non-textual language onto the term "signature or mark" in Amendment 51, redefining it to mean "a handwritten wet signature or handwritten wet mark made on a Registration Application Form with a pen or other writing device that is physically moved across the form and that forms the applicant's signature or mark on the paper form." *Id.*, Ex. F. Second, the wet signature rule provides that "[a] Signature or Mark that utilizes a computer to generate or recreate the applicant's signature or mark" is not acceptable, even though Amendment 51 imposes no such prohibition. *Id.*, Ex. F. Third, while Amendment 51 requires county clerks to accept voter registration applications that are "legible and complete," *see* Ark. Const. amend. 51 § 9(c)(1), (c)(3)(A), the wet signature rule adds that voter registration applications must also be "executed" with a "Signature or Mark" as defined by the rule—in other words, with a pen or other physical writing device. Dodge Decl., Ex. F.

Although the emergency rule expires on September 1, 2024, *id.*, Ex. E at 4, the SBEC has proposed a final rule that mirrors the text of the emergency rule.[5]

### V.    The wet signature rule impedes GLA's and VDO's registration efforts while also denying Arkansans the right to register and vote.

***Get Loud Arkansas.*** In pursuit of its mission to improve civic engagement in Arkansas, GLA's first and highest priority is to register new voters, and particularly young and minority Arkansans. Foster Decl. ¶¶ 8–9. During its brief time operating, GLA's tool achieved remarkable success; it not only helped GLA register an unprecedented number of voters, but also made GLA's

---

[5] Per procedures adopted on June 12, 2024, the SBEC opened a comment period on the proposed final rule on June 14, concluding on July 14, and with a public hearing scheduled for July 11. Dodge Decl., Ex. H. The SBEC plans to meet on July 15 such that public comments can be addressed before the Arkansas Legislative Council can consider and approve the final rule at its August 16, 2024 meeting. *Id.*, Ex. H.

8

own outreach efforts more effective and cost-efficient. *Id.* ¶¶ 15–16. For example, it became easier for GLA to disseminate the application electronically using QR codes and text messages, as compared to traditional paper forms. *Id.* ¶¶ 17–19. Indeed, many people who registered through GLA's online tool forwarded the link to friends and family—something that cannot be done with paper applications—which helped further GLA's reach to all 75 counties in Arkansas. *Id.* ¶ 19; *see also* Declaration of Blake Loper ("Loper Decl.") ¶¶ 5–6. In the short time the online tool was available, GLA saw significantly higher rates of successful voter registration. Foster Decl. ¶ 20.

The Secretary of State's about-face and the SBEC's subsequent issuance of the wet signature rule have seriously harmed GLA and continue to do so. After taking it offline for weeks, GLA was forced to redesign its online tool to account for the prohibition on the use of electronic signatures, rendering it far less effective. *Id.* ¶¶ 29–30. While applicants may still prefill their application with personal information, they now must print it out themselves, sign it with a wet signature, and mail or deliver it to their county clerk. *Id.* ¶ 30. Not only does this take far longer than the two minutes required by the original tool, it renders the tool useless to those without ready access to a printer. *Id.* ¶ 30. Unsurprisingly, GLA has seen its success rate at registering voters plummet. *Id.* ¶ 31. With the original tool in place, nearly 100 percent of applicants fully completed the application and had it submitted; but without the electronic signature option, that rate stands closer to 33 percent. *Id.* ¶ 20. At the same time, the wet signature rule has made it far more difficult to reach potential voters beyond those 15 counties on which GLA traditionally focused its efforts, especially in rural counties. *Id.* ¶ 18.

Because it may not rely on the tool to achieve its voter registration goals, GLA has also been forced to divert its limited staff and financial resources towards less efficient means of registering voters, including renewed use of paper registration applications and more staff-

9

intensive efforts for engaging voters, encouraging them to register, and subsequently reminding them to complete and submit their applicants. *Id.* ¶ 32. This unexpected pivot has come at the expense of GLA's other programming, as GLA has been forced to redirect significant staff time and financial resources away from other initiatives, including its GOTV campaign and its efforts to assist individuals who may have been incorrectly purged from the voter rolls. *Id.* ¶¶ 33–34.

**Vote.org.** The wet signature rule has similarly impaired VDO's efforts in Arkansas. Nationwide, one of the most effective features of VDO's tools has been the e-sign function, which allows qualified voters in states across the country to digitally enter information into a voter registration application, sign the application by uploading an image of their original signature, review their signed voter registration application, and then have the completed application sent to the appropriate registration official. Hailey Decl. ¶ 8. VDO has invested significant resources in developing this e-sign function and would like to offer it to applicants in Arkansas, just as it has done in other states. *Id.* ¶ 9. But it cannot do so for the upcoming 2024 elections and beyond because of the wet signature rule. *Id.*

Consequently, the wet signature rule impedes VDO's voter registration activities and impairs its ability to accomplish its mission by forcing it to rely on less effective means of assisting voters to register. *Id.* ¶ 10.

**Individual Voters.** Many otherwise qualified Arkansans have had their voter registration applications rejected for using an electronic signature, including Plaintiffs Nikki Pastor and Blake Loper.

Nikki Pastor, who grew up in Clinton, Arkansas, has been a resident of Washington County, Arkansas since August 2023. Declaration of Nikki Pastor ("Pastor Decl.") ¶ 4. On February 24, 2024, Pastor completed a registration application using GLA's online tool. *Id.* ¶¶ 7–

APP207

9. Pastor gave GLA approval to print the application and submit it to the Washington County Clerk, which GLA did. *Id.* ¶ 9. But Pastor's application was rejected by the Washington County Clerk for its use of an electronic signature. *Id.* ¶ 11.

Blake Loper grew up in Dardanelle, Arkansas, in Yell County, and has been a resident of Russellville, in Pope County, since November 2022. Loper Decl. ¶ 3. After moving to Pope County from Yell County, Loper used GLA's online tool to complete and sign a voter registration application to match their new address. *Id.* ¶¶ 4–5. Loper authorized GLA to print and submit the application to the Pope County Clerk, which GLA did. *Id.* ¶¶ 5, 7. But in a notice dated May 2, 2024, Loper was informed by the Pope County Clerk that the application was rejected for its use of an electronic signature. *Id.* ¶ 8, Ex. A.

In addition to Pastor and Loper, many other Arkansans have similarly had their registration applications denied after using GLA's online tool. For example, dozens of high school students in Camden, Arkansas, in Ouachita County, used GLA's online tool to complete and sign applications that were subsequently rejected. Foster Decl. ¶ 27. Absent relief here, any other Arkansan who submits an otherwise legible and complete mail application with an electronic signature will suffer the same rejection.

## LEGAL STANDARD

In determining whether to issue a preliminary injunction, a district court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (alteration in original) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). "Although no single factor

11

is dispositive, and the district court must balance all factors to determine whether the injunction should issue, the third factor—probability of success—is the most significant." *Id.* (cleaned up).

## ARGUMENT

**I.     The Civil Rights Act of 1964 prohibits state officials from rejecting voter registration applications for errors that are immaterial in determining a person's qualifications to vote.**

Congress enacted the Civil Rights Act of 1964 "to protect and provide more effective means to enforce the civil rights of persons within the jurisdiction of the United States," and particularly to reduce "obstacles to the exercise of the right to vote and provide means of expediting the vindication of that right." H.R. Rep. No. 88-914, *as reprinted in* 1964 U.S.C.C.A.N. 2391, 2391. In Title I of the Act, Congress sought to eliminate arbitrary denials of the right to vote based on irrelevant paperwork errors that election officials often used to the disenfranchise Black citizens. *See id*. at 2393.

Congress had good reason to be concerned about such methods of disenfranchisement. Extensive testimony showed that many local registrars rejected Black applicants based on hyper-technical or entirely invented errors, while they ignored more substantive errors when the applicants were white. *See* Justin Levitt, *Resolving Election Error: The Dynamic Assessment of Materiality*, 54 Wm. & Mary L. Rev. 83, 147–48 (2012). One infamous example was an application that was rejected because the applicant failed to properly calculate her age in years, months, and days; she missed the mark by one day because the day had not yet ended. *Id.* at 148 (citing legislative record); *see also Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995). Similarly, during this same period, an application in Louisiana was rejected because the applicant misspelled their state as "Louiseana." Levitt, *supra*, at 148 (citing legislative record). Other applications were rejected because the applicant identified their skin color as "Negro" instead of

12

"brown" or "brown" instead of "Negro," and because an applicant underlined "Mr." when he should have circled it. *Id.* (citing legislative record).

These practices resulted in disparate voting opportunities for non-white voters in many states, including in Arkansas. In 1961, for example, the U.S. Commission on Civil Rights observed that Black Arkansans remained disproportionately unregistered to vote compared to white Arkansans. *See Voting: 1961 Commission on Civil Rights Report, Book 1* at 105, U.S. Comm'n on C.R. (Sept. 9, 1961).[6] As arbitrary barriers continued to disenfranchise voters, Congress determined that national legislation was necessary to extinguish election officials' persistent attempts to evade civil rights protections.

In the 1964 Civil Rights Act, Congress, in its effort to eradicate persistent voter suppression tactics, prohibited state officials from using trivial paperwork errors to deny *any* citizen the right to vote. Specifically, Section 101 of the Act states in part:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]

52 U.S.C. § 10101(a)(2)(B). Under this statute—often referred to as the materiality provision— states can no longer use arcane rules and administrative traps to prevent qualified voters from exercising their fundamental right to vote.

The materiality provision's text prescribes three elements for a claim under the law: (1) the denial of any individual's right to vote, as the Civil Rights Act defines that term; (2) because of an error or omission on any paper relating to registration or other act requisite to voting; (3) where such error or omission is not material in determining whether an individual is qualified to vote

---

[6] Available at https://perma.cc/CC7B-T888.

under state law. *Id.*; *see also League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2023 WL 6446015, at *16–18 (W.D. Ark. Sept. 29, 2023). Plaintiffs are likely to succeed in establishing those elements here.

**II.     Plaintiffs are likely to succeed on their claim that the wet signature rule violates the materiality provision of the Civil Rights Act.**

Rejecting a voter registration application based on the instrument an applicant uses to sign their registration form is precisely the kind of disenfranchisement that Congress sought to prevent when it enacted the Civil Rights Act of 1964. A straightforward application of the materiality provision compels the conclusion that the wet signature rule cannot pass muster, and Plaintiffs are likely to succeed on the merits of their claim.

**A.     Rejecting an applicant's registration form constitutes a denial of the right to vote under the Civil Rights Act.**

The first element of a materiality provision claim is whether a challenged state law or practice "den[ies] the right of any individual to vote in any election." 52 U.S.C. § 10101(a)(2)(B). The Civil Rights Act defines "vote," as used in the materiality provision, to include "all action necessary to make a vote effective including . . . *registration*." *Id.* § 10101(e) (emphasis added); *see also id.* § 10101(a)(3) (incorporating definition for purposes of materiality provision). Thus, when Arkansas election officials reject voter registration applications under the wet signature rule, they deny Arkansans the statutory right to vote.

Federal courts have uniformly recognized that the term "vote" as used in the materiality provision includes not only the ultimate act of casting a ballot, but also successfully registering to vote in the first place. *See, e.g.*, *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003); *Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *37 (D. Ariz. Feb. 29, 2024).

It makes no difference that a prospective voter whose application is rejected under the wet signature rule may be able to submit a new application before the registration deadline. "Denial of

14

APP211

the statutory right to vote under Section 101 is complete when a particular application . . . is rejected; an opportunity to cure the rejection[ or] submit another application . . . does not negate the denial of the statutory right to vote." *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2023 WL 8263348, at *22 (W.D. Tex. Nov. 29, 2023) ("*LUPE*"), *stayed pending appeal sub nom. United States v. Paxton*, No. 23-50885 (5th Cir. Dec. 15, 2023) (per curiam); *see also Vote.org v. Ga. State Election Bd.*, 661 F. Supp. 3d 1329, 1339 (N.D. Ga. 2023) (rejecting "argument that the opportunity to cure an error rehabilitates any potential violation"); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1282 (N.D. Ga. 2021) (same).

Because the plain text of the Civil Rights Act is clear that rejecting a registration application denies individuals the right to vote for purposes of the materiality provision, Plaintiffs satisfy the first element of their claim.

### B.    The wet signature rule renders the use of an electronic signature an error or omission on a record related to registration.

Once a plaintiff has shown that a challenged state rule denies the right to vote, they next must show that it does so because "of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). The wet signature rule is a requirement that applies to the signature or mark "made on a Registration Application Form," Dodge Decl., Ex. F, and thus straightforwardly concerns a "record or paper relating to any application [or] registration," 52 U.S.C. § 10101(a)(2)(B), satisfying the second element of the materiality provision. Indeed, federal courts have further uniformly agreed that the materiality provision applies to requirements about how to complete the information requested on voter registration forms. *See, e.g.*, *Schwier*, 340 F.3d at 1294.

The wet signature rule also makes it an "error or omission" to sign a voter registration application with anything other than a "handwritten wet mark made . . . with a pen or other writing

device that is physically moved across the form and that forms the applicant's signature or mark."
Dodge Decl., Ex. F. Thus, even when an otherwise qualified applicant uses an electronic signature
(or any other instrument) to sign the mail voter registration form, their application will be rejected
for the omission of a wet signature. Plaintiffs therefore satisfy the second element of their
materiality provision claim.

### C.    The use of a wet signature is immaterial in determining whether an individual is qualified to vote under Arkansas law.

A wet signature on a voter registration application is not material in determining voter
qualifications. The rule simply "increase[s] the number of errors or omissions on the application
forms, thus providing an excuse to disqualify potential voters," *Schwier*, 340 F.3d at 1294, and is
precisely the type of practice the materiality provision was enacted to prevent. *Id.* This is clear
from a review of Arkansas's substantive qualifications for voting; the State's acceptance of
electronic signatures for *other* kinds of voter registration applications; and from the plain text of
Arkansas's voter registration laws.

### 1.    The wet signature rule is immaterial on its face because it bears no relationship to Arkansas's substantive voter qualifications.

"To determine whether an error or omission is material, the information required must be
compared to state-law qualifications to vote." *LUPE*, 2023 WL 8263348, at *14; *see also Martin
v. Crittenden*, 347 F. Supp. 3d 1302, 1308 (N.D. Ga. 2018); *Mi Familia Vota*, 2024 WL 862406,
at *37. The qualifications to vote under Arkansas law consist of: (1) U.S. citizenship, (2) Arkansas
residency, (3) being at least eighteen years old, (4) not having been convicted of a felony, and (5)
not having been adjudged mentally incompetent by a court. *See* Ark. Const. art. 3, § 1(a); Ark.

Const. amend. 51 § 11(a).[7] The instrument a prospective voter uses to sign their registration application bears no relationship to any of these qualifications. Tellingly, when issuing the wet signature rule, the SBEC nowhere explained how the use of a wet signature is even "useful or minimally relevant"—never mind "material"—in "determining a person's eligibility to vote." *Mi Familia Vota*, 2024 WL 862406, at *37 (explaining that required information be "*more* than useful or minimally relevant" to survive scrutiny under materiality provision (emphasis added)). And critically, county election officials do not consider the type of instrument used in signing or marking a voter registration application as a factor in determining whether the applicant is or is not qualified to vote in Arkansas. *See* Declaration of Susan Inman ("Inman Decl.") ¶¶ 15–20.

> **2.  The wet signature rule cannot be material in determining voter qualifications because the Arkansas Constitution explicitly allows for electronically signed voter registration applications.**

Arkansas's voter registration procedures also confirm that a wet signature is immaterial in determining voter qualifications. As explained, *supra* Background Part I, Arkansas permits a person to register to vote at various state agencies, like ODS. *See* Ark. Const. amend. 51 § 5(a). These agencies may employ a "computer process" to register applicants, which permits use of an electronic signature on digital applications. *Id.* § 5(b)(1)–(4). In other words, many of the registration applications received and approved by Arkansas's election officials—either through ODS or another state agency—are signed with electronic signatures. *See* Inman Decl. ¶¶ 18–19.

---

[7] Although Arkansas also requires voters to be "[l]awfully registered to vote in the election," Ark. Const. art. 3, § 1, it does not follow that every state registration requirement is, *ipso facto*, material. That logic "would erase the Materiality Provision from existence, by defining *whatever* requirements might be imposed by state law in order to vote, no matter how trivial, as being material in determining whether such individual is qualified under State law to vote in such election." *LUPE*, 2023 WL 8263348, at *14 (quotation marks omitted); *cf. United States v. Mississippi*, 380 U.S. 128, 137–38 (1965) (phrase "otherwise qualified by law" in Section 10101(a)(1) cannot include invalid statutes; Congress "obviously" meant "qualifications required of all voters by valid state or federal laws").

That forecloses any argument that a wet signature is necessary to determine voter qualifications. The SBEC's rulemaking nowhere explained why an electronic signature is material in one context, but not another.

### 3.     The wet signature rule is contrary to the Arkansas Constitution and thus does not serve any conceivable legislative purpose.

The wet signature rule also cannot be rationalized by any legislative judgment that a handwritten signature is material in determining voter qualifications (even assuming such judgment matters for purposes of satisfying a federal law). On the contrary, Amendment 51 provides that election officials "shall register" qualified applicants who submit "a legible and complete voter registration application." Ark. Const. amend. 51 § 9(c)(1). And while a signature or mark is required to complete an application, there is no requirement that the signature be applied with any specific instrument. Indeed, the only express requirement is that the signature or mark be "made under penalty of perjury" and affirm "that the applicant meets each requirement for voter registration." *Id.* § 6(a)(3)(F). Although the Arkansas Legislature has frequently modernized Amendment 51 in the last three decades, it has never added any further qualification, reflecting the legislative intent that a voter registration application is complete—and must be accepted by a county clerk—with *any* signature made under penalty of perjury that affirms the accuracy of the application. The SBEC's wet signature rule attempts to supplement the Constitution's text with additional requirements—that the signature is "wet."

Indeed, the SBEC's effort to graft language onto Amendment 51 violates basic rules of statutory construction, including that statutory terms must be read in a "consistent, harmonious, and sensible" manner in view of the "act in its entirety." *Holbrook v. Healthport, Inc.*, 432 S.W.3d 593, 597 (Ark. 2014). Section 6 of Amendment 51 uses the phrase "signature or mark" twice to explain what is required on (1) the mail application form, and (2) in the process used by the ODS

18

and other qualified voter registration agencies that indisputably allow use of an electronic signature. Ark. Const. amend. 51 § 6(a)(3)(F), (b)(1)(G). That phrase—"signature or mark"—presumably has the same meaning in each case. After all, courts presume "that identical words used in different parts of the same statute have the same meaning." *United States v. Pulsifer*, 39 F.4th 1018, 1022 (8th Cir. 2022), *aff'd*, 601 U.S. 124 (2024); *accord* Antonin Scalia & Bryan A. Garner, *Reading the Law: The Interpretation of Legal Texts* 170 (2012). And here the phrase "signature or mark" is used twice not merely in the same statute, but in the very same subsection of the Arkansas Constitution.

The SBEC's interpretation of the term "signature or mark" turns this fundamental rule of statutory construction on its head. It is undisputed that the term "signature or mark" includes electronic signatures when used in reference to the computer process employed by ODS and certain other public agencies. Ark. Const. amend. 51 § 6(b)(1)(G); *see also* Dodge Decl., Ex. G at 2 (SBEC explaining that a county clerk may accept an application that is electronically signed if it comes from an identified registration agency). But according to the SBEC, the very same term, used in the very same section, *excludes* electronic signatures when used in the context of the mail form. Dodge Decl., Ex. G at 9–10; *see also* Ark. Const. amend. 51 § 6(a)(3)(F). Nothing in the text of Amendment 51 supports providing such disparate meanings to the same terms, as employed in the same section. In contrast, giving a consistent definition to the term "signature or mark"—text which on its face includes electronic signatures—harmonizes the two uses of the term in Amendment 51, making clear that county clerks "shall" accept any complete and legible application made with a signature under penalty of perjury. *See Holbrook*, 432 S.W.3d at 597.

That plain text reading of Amendment 51 is bolstered by the Attorney General's advisory opinion, which similarly explained that "[t]he Arkansas Constitution does not define a 'signature

APP216

or mark,' nor does it specify how a signature or mark may be made," and accordingly, "an electronic signature satisfies Amendment 51's 'signature or mark' requirement." Dodge Decl., Ex. D at 2–3. These acknowledgments from "the attorney for all state officials," Ark. Code Ann. § 25-16-702(a) (describing duties of Attorney General), and the State's "chief election official," Ark. Const. amend. 51, § 5(b)(1) (duties of Secretary), further confirm that a wet signature is not material in determining voter qualifications in Arkansas. And the Secretary's own representations to GLA make clear that, before the wet signature rule, it was uncontroversial that electronic signatures satisfied Amendment 51. While the Secretary later sent a letter—bereft of legal analysis—reversing his office's earlier opinion, his own "attorneys [previously] came to the same conclusion [as GLA] about the" meaning of Amendment 51. Foster Decl. ¶ 22, Ex. A. And the Secretary himself "d[id] not see how a digital signature should be treated any differently than a wet signature." *Id.*, Ex. B.

### 4. Other purported state interests in enforcing the wet signature rule do not make wet signatures material in determining voter qualifications.

Defendants also cannot try to rationalize the wet signature rule by pointing to some other purpose apart from determining voter eligibility. As the plain text of the statute makes clear, state actors violate the materiality provision if they deny any individual the right to vote based on a requirement that is immaterial "in determining whether such individual is qualified . . . to vote." 52 U.S.C. § 10101 (a)(2)(B). The rules governing a voter's qualification to register are "distinct from rules governing the conduct of elections." *LUPE*, 2023 WL 8263348, at *14, *16 (citing *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 13–17 (2013), and *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966)). Thus, "the wisdom of the [wet signature rule] is entirely irrelevant to the Court's analysis of Plaintiffs' Section 101 claims on the merits" because "the Materiality Provision is not a burden-interest balancing statute. Materiality Provision

APP247

violations are prohibited no matter their policy aim." *Id.* at *8; *see also Schwier v. Cox*, 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th Cir. 2006) (holding preventing "fraud" did not render mandatory disclosure of social security number "material").

In any event, county election officials do not consider the type of instrument used in signing a voter registration application as a factor in determining whether an applicant is qualified to vote. *See* Inman Decl. ¶¶ 15–20. County clerks are advised to accept voter registration applications with any type of signature or mark, *id.* ¶ 16, and there is no practice among county clerks of rejecting voter registration applications based on the quality or method of the signature, *id.* ¶ 17. Nor does the wet signature rule serve any function in determining the qualifications of absentee voters. While an absentee ballot application signature is compared to the voter's signature on their voter registration application, the comparable signature is *frequently* an electronic signature, since many voter registration forms come from voter registration agencies where applications are signed electronically. *Id.* ¶¶ 18–19. Additionally, when election officials compare signatures, they generally are viewing PDF scans of the signatures, and as a practical matter, it is very difficult to tell the difference between a signature made by pen and a signature made by a stylus (with electronic ink) or a digital image of a handwritten signature that is then printed and submitted. *Id.* ¶ 19. The wet signature rule therefore serves no function whatsoever in determining voters' qualifications.

Moreover, the SBEC was explicit that the purpose of the wet signature rule was to "resolve a conflict among county clerks" and promote "uniformity across the state." *See, e.g.*, Dodge Decl., Ex. E at 4–5; *id.*, Ex. I at 15:16–17. That explanation has nothing to do with determining a voter's qualifications, and thus provides no answer to Plaintiffs' materiality provision claim. And it is also unpersuasive on its own terms. Rather than promote uniformity, the wet signature rule establishes

APP218

a two-tiered system that allows some voters to sign their application forms electronically (such as those who do so at ODS) while denying the same right to others (those who mail or hand deliver an application at their county clerk's office). In contrast, Plaintiffs' construction ensures complete uniformity across the state, guaranteeing that all Arkansans may use electronic signatures regardless of where or how they register to vote. That construction is consistent with the Legislature's command that county clerks "shall" accept legible and complete voter registration forms signed under penalty of perjury. Ark. Const. amend. 51, § 9(c)(1), (c)(3)(A).

### 5.   Neither the Fifth Circuit's nor a Florida district court's determination that a wet signature requirement was material requires the same result here.

For at least two reasons, this Court should not rely on *Vote.org v. Callanen*, 89 F.4th 459 (5th Cir. 2023), or *Vote.org v. Byrd*, No. 4:23-CV-111-AW-MAF, 2023 WL 7169095 (N.D. Fla. Oct. 30, 2023), for those courts' determinations that a wet signature requirement on a voter registration application is material in determining voter qualifications.

First, this case is distinguishable. Arkansas's wet signature rule is unsupported by any legislative judgment, *supra* Argument Section II.C.3, whereas the wet signature requirements at issue in *Callanen* and *Byrd* were each enacted by the state legislature. *See Callanen*, 89 F.4th at 468 (noting Texas's wet signature requirement was passed by the Texas Legislature and signed by the Governor); *Byrd*, 2023 WL 7169095, at *1 (describing Fla. Stat. § 97.053(5)(a)(8)). The fact that Texas's wet signature requirement was a legislative enactment was critical in *Callanen*, where the Fifth Circuit gave deference to the "state legislature's judgment" as to the utility of the wet signature requirement. *Callanen*, 89 F.4th at 489. Thus, if this Court were to follow *Callanen* (which it need not), "[a]mong the questions for [it] to answer [would be] the weight that should be given to the State's legislative judgment" as to the materiality of a wet signatures on a voter registration form. *Id.* at 480. The answer to that question here is clear: none whatsoever. The wet

signature rule was not enacted by the Arkansas Legislature and there is no mention of a wet signature requirement in the Arkansas Constitution or the election code. Moreover, the wet signature rule runs contrary to the Legislature's choice to require only a "signature or mark" from applicants, without any command as to what instrument must be used. *See supra* Argument Sections II.C.2–II.C.3. Accordingly, even assuming that *Callanen* was correctly decided, that decision *supports* finding that the wet signature is immaterial under Arkansas law.

Second, the reasoning in *Byrd* and *Callanen* was flawed, and this court need not (and should not) follow it. Both courts ignored the plain text of the Civil Rights Act, which requires that the challenged requirement be "material *in determining voter qualifications*" to conclude that an invented—and entirely amorphous—interest in solemnity was enough to justify state laws requiring wet signatures in connection with voting. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). Based on this flawed reasoning, the district court in *Byrd* dismissed a challenge to a Florida law requiring prospective voters who have not provided an electronic signature to the Department of Highway Safety and Motor Vehicles ("DMV") to complete a paper registration application signed with their "original signature." 2023 WL 7169095, at *1. In doing so, the district court erroneously concluded at the pleading stage that—because a wet-ink signature purportedly "carries a solemn weight" that other types of signatures do not—it must be "material" for purposes of the materiality provision. *Id*. at *6. And the *Byrd* court further erred by failing to grapple with the fact that—as in Arkansas—Floridians who register to vote at the DMV may do so using an electronic signature, undercutting the idea that such signatures lack the necessary "solemnity" for voter registration. That court nowhere explained why the state of Florida had an interest in the "solemnity" of some prospective voters but not others.

APP220

Similarly, in *Callanen*, the Fifth Circuit concluded on summary judgment—again, with no supporting evidence in the record—that a Texas statute requiring individuals to sign their voter registration applications using their "original" or wet signature "fit within the strictures of the Materiality Provision" because "applying an original signature to a voter registration form carries 'solemn weight' that an imaged signature does not." *Callanen*, 89 F.4th at 489. Those courts' common conclusion is flawed because "solemnity" is not a qualification to vote, and the materiality provision's plain language does not authorize courts to invoke abstract state interests to justify the denial of a registration application for immaterial paperwork errors. *See supra* Argument Section II.C.4.

As applied here, the confused logic of *Byrd* and *Callanen* leads to the untenable conclusion that voters who register at ODS using an electronic signature filled out their applications in an insufficiently "solemn" manner, even though Arkansas law allows them to do so. *See supra* Argument Section II.C.2. The SBEC therefore has no basis to say that a wet signature is material in determining the voter qualifications of applicants who submit their applications in person or by mail to their county clerk's office.

**III.   Absent relief, Plaintiffs will face continued and ongoing irreparable harm because of the wet signature rule.**

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024) (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). Here, both the organizational Plaintiffs (GLA and VDO) and the individual Plaintiffs (Pastor and Loper) are suffering irreparable harm from the wet signature rule. The harms they face are "of such imminence that there is a clear and present need for equitable relief." *Id.* (quoting *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 951 (8th Cir. 2023)).

First, both GLA and VDO face irreparable harm because the wet signature rule directly forbids them from using their most effective tools for registering new voters in Arkansas, interfering with their core activities and undercutting their mission. *See* Dodge Decl., Ex. E at 6. Because of the wet signature rule, GLA has been forced to redesign its voter registration tool in a way that makes it far less effective. Foster Decl. ¶¶ 29–32. And VDO cannot activate the e-sign function for its Arkansas online tool at all. Hailey Decl. ¶¶ 9–10.

The wet signature rule also forces both GLA and VDO to expend resources in a manner that impairs their organizational missions. "Courts routinely recognize that organizations suffer irreparable harm when a defendant's conduct causes them to lose opportunities to conduct election-related activities, such as voter registration and education." *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) (collecting cases). Here, the wet signature rule imposes upon GLA the untenable choice of having to pare back its voter registration goals or, in order to maintain such goals, scale down its other civic engagement initiatives. Foster Decl. ¶¶ 31, 35–36. Similarly, VDO is prevented from employing its e-sign function for its Arkansas online tool, and it will be forced to rely on less effective means of assisting voters to register in the state. Hailey Decl. ¶ 10. The impact on both organizations comes at the expense of their activities aimed at encouraging and supporting voter participation in the upcoming 2024 elections, such as GOTV and voter assistance programs. Foster Decl. ¶¶ 33–34; Hailey Decl. ¶¶ 6, 10. "Such mobilization opportunities cannot be remedied once lost," *In re Georgia Senate Bill 202*, No. 1:21-CV-01259-JPB, 2023 WL 5334582, at *11 (N.D. Ga. Aug. 18, 2023) (quotation omitted), because "once the election occurs, there can be no do-over and no redress," *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also Emineth v. Jaeger*, 901 F.

Appellate Case: 24-2810   Page: 251   Date Filed: 09/06/2024 Entry ID: 5432887

APP222

Supp. 2d 1138, 1142 (D.N.D. 2012) ("Elections are, by nature, time sensitive and finite. While there will be other elections, no future election will be *this* election.").

Second, as to Pastor and Loper, there is no legal remedy that can compensate them for the loss of the opportunity to register with an electronic signature and subsequently vote in the 2024 elections. *See Fayetteville Pub. Libr. v. Crawford County*, 684 F. Supp. 3d 879, 910–11 (W.D. Ark. 2023). The right to vote is fundamental, and "[o]ther rights . . . are illusory if the right to vote is undermined." *Reynolds v. Sims*, 377 U.S. 533, 560 (1964). The materiality provision "protects the franchise of United States citizens [and] the failure to comply with that [statute] is an irreparable harm." *United States v. Georgia*, 892 F. Supp. 2d 1367, 1375 (N.D. Ga. 2012). Absent a preliminary injunction, Plaintiffs Pastor and Loper are irreparably deprived of a right guaranteed by the Civil Rights Act: to register and subsequently vote without denial of that right "because of an error or omission . . . [that] is not material in determining whether such individual is qualified . . . to vote." 52 U.S.C. § 10101(a)(2)(B); *see also League of Women Voters of N.C.*, 769 F.3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (same).

**IV.    The remaining equitable factors strongly favor granting a preliminary injunction.**

"The balance-of-harms and public-interest factors 'merge when the Government'—or, in this case, a state official in [their] official capacity—'is the [nonmoving] party.'" *Eggers v. Evnen*, 48 F.4th 561, 564–65 (8th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The balance of interests here favors granting a preliminary injunction. Most obviously, absent an injunction, Arkansas voters will be denied a right guaranteed by federal statute: to have otherwise legible and complete voter registration applications accepted by their county clerks

26

APP223

regardless of any immaterial errors or omissions. Likewise, the efforts of civic organizations like GLA and VDO to assist Arkansas voters to register to vote will be hampered by enforcement of the wet signature rule. Foster Decl. ¶¶ 20, 31, 35–36; Hailey Decl. ¶¶ 8–10. "[E]nsuring qualified voters exercise their right to vote," on the other hand, "is always in the public interest." *Ashcroft*, 336 F. Supp. 3d at 1006 (quoting *Action NC v. Strach*, 216 F. Supp. 3d 597, 648 (M.D.N.C. 2016)); *see also Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 672 (8th Cir. 2022); *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) ("The public is served by the preservation of constitutional rights." (quotation omitted)); *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). Granting preliminary relief here also fulfills Congress's purpose in enacting the materiality provision. *See* 1964 U.S.C.C.A.N. at 2394.

In contrast, none of the Defendants will be harmed by an injunction. Indeed, it is hard to fathom how an injunction could impose any harm on Defendants when both the Secretary of State and Attorney General previously acknowledged that the use of electronic signatures is entirely consistent with Arkansas law. *See supra* Background Parts III–IV. The SBEC's only justification for the emergency rule was to provide uniformity and clarity to voter registration in Arkansas. Dodge Decl., Ex. E at 1–2. But, as explained, any lack of clarity here was *created* by the Secretary's sudden about-face on electronic signatures and Plaintiffs' requested injunction would ensure uniformity across Arkansas. *See supra* Argument Section II.C.4. Thus, the equitable factors unequivocally favor granting Plaintiffs' Motion for Preliminary Injunction.

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction enjoining Defendants from enforcing the wet signature rule and from refusing to accept any voter registration application simply because it was signed with a digital or electronic signature.

27

APP224

Dated: July 11, 2024

Respectfully submitted,

*/s/ Uzoma N. Nkwonta*

SHULTS LAW FIRM LLP
Peter Shults (Ark. 2019021)
Amanda G. Orcutt (Ark. 2019102)
Steven Shults (Ark. 78139)
200 West Capitol Ave., Suite 1600
Little Rock, AR 72201
T: (501) 375-2301
F: (501) 375-6861
pshults@shultslaw.com
aorcutt@shultslaw.com
sshults@shultslaw.com

ELIAS LAW GROUP LLP
Uzoma N. Nkwonta* (DC 975323)
Christopher D. Dodge* (DC 90011587)
Omeed Alerasool* (DC 90006578)
Julie Zuckerbrod* (DC 1781133)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
F: (202) 968-4498
unkwonta@elias.law
cdodge@elias.law
oalerasool@elias.law
jzuckerbrod@elias.law

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

28

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served this 11th day of July, 2024, with a copy of this document via the Court's CM/ECF system.

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta

29

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

GET LOUD ARKANSAS, et al.,                                              PLAINTIFF

v.                              CASE NO. 5:24-CV-05121-TLB

JOHN THURSTON, et al.,                                                  DEFENDANTS

RESPONSE IN OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION

Defendants John Thurston; Sharon Brooks; Jamie Clemmer; Bilenda Harris-Ritter; William Luther; James Harmon Smith, III; and Johnathan Williams, in their official capacities as Commissioners of the State Board of Election Commissioners (collectively, "Defendants" or the "SBEC"), by and through their attorneys, Mitchell, Williams, Selig, Gates & Woodyard, PLLC, respectfully submit this response in opposition to Plaintiffs' Motion for Preliminary Injunction (the "Motion").

## I.      INTRODUCTION

In April 2024, the SBEC, consistent with its Constitutional charge, adopted a rule requiring that voter registration applications forms in Arkansas be (1) "complete and legible"; (2) "executed with a Signature or Mark made by the voter registration applicant"; and (3) submitted to the permanent registrar by mail, delivered in-person by the voter, or . . . delivered by a Third-Party Registration Organization."   SBEC passed the rule after learning of discrepancies and inconsistencies in how individual county clerks were handling the voter registration process in each of Arkansas's seventy-five counties.

More than a month after the rule took effect, Plaintiffs filed this action, in which they allege the rule's "Signature or Mark" requirement runs afoul of the Materiality Provision of the Civil

Rights Act of 1964.  Another month then passed before Plaintiffs moved for extraordinary relief in the form of a preliminary injunction.  The Motion presents a straightforward set of questions for the court.  Two are most important for present purposes.

*First*, do Plaintiffs have standing?  The answer is no, at least for the organizational Plaintiffs.

*Second*, and more importantly, have Plaintiffs carried their burden of showing that the "Signature or Mark" requirement is not "Material" and thus violates 52 U.S.C. § 10101(a)(2)(B)?  They have not, as "an original signature advances voter integrity" and "makes such a signature a material requirement."  *Vote.Org v. Callanen*, 89 F.4th 459, 489 (5th Cir. 2023).

For these reasons, and others, the Court should deny the Motion.

## II.   STATEMENT OF FACTS

Amendment 51 to the Arkansas Constitution was adopted in 1964 "to establish a system of permanent personal registration" in our State.  Ark. Const. amend. 51, § 1.  The Amendment was designed for the express purpose of ensuring that all persons who vote in Arkansas elections are "legally qualified" to do so.  Ark. Const. amend. 51, §§ 1, 3.  Amendment 51 permits the use of a "computer process" only for voter registration applications submitted by specifically enumerated "registration agencies."  Ark. Const. amend. 51, § 5(b)(2)–(4). These agencies include the Office of Driver Services, State Revenue Offices, public assistance agencies, and disabilities agencies.  Ark. Const. amend.  *Id.*  Outside of these avenues of voter registration, however, Amendment 51 does not allow for the use of any "computer process."  To submit a voter registration application by mail, for example, the application must include a "signature or mark

Appellate Case: 24-2810   Page: 257   Date Filed: 09/06/2024   Entry ID: 5432887
APP228

made under penalty of perjury that the applicant meets each requirement for voter registration." Ark. Const. amend. 51, § 6(a)(3)(F).

The phrase "signature or mark" was left undefined in the Constitution. Amendment 51 fills this void through the SBEC, which is constitutionally charged with the responsibility to "prescribe, adopt, publish and distribute" the "Rules and Regulations supplementary to this amendment and consistent with this amendment and other laws of Arkansas as are necessary to secure uniform and efficient procedures in the administration of this amendment throughout the State." Ark. Const. amend. 51, § 5(e)(1). In addition, the SBEC has a constitutional obligation to "prescribe, adopt, publish and distribute" the "detailed specifications of the registration record files, the voter registration application forms and other registration forms, including voter registration list maintenance forms, all of which shall be consistent with [Amendment 51] and uniform throughout the State." Ark. Const. amend. 51, § 5(e)(1).

The SBEC is a seven-member board comprised of the Secretary of State (who chairs the SBEC), two members appointed by the Governor, and one member each appointed by the chair of the state Democratic party, the chair of the state Republican party, the President Pro Tempore of the Senate, and the Speaker of the House of Representatives. In recent months, the SBEC "became aware of discrepancies and differences in how county clerks were accepting voter registration applications." Ex. 1, Letter from Richard Chris Madison to John Thurston, July 15, 2024 (the "SBEC Memorandum"), at 3. In some counties, the elected county "clerk was accepting electronically signed voter registration applications whereas other county clerks were not accepting electronically signed applications." *Id.* The SBEC concluded, "This created an unfair

Appellate Case: 24-2810   Page: 258   Date Filed: 09/06/2024   Entry ID: 5432887

APP229

and non-uniform application process for applicants" that "was dependent on the county [in] which the applicant resided." *Id.* at 3–4.

On April 23, 2024, in an effort to provide greater security in the election process, create uniformity in the administration of voter registration processes, and help prevent fraudulent voting practices, the SBEC, pursuant to its constitutional charge, adopted an emergency rule on the issue. The rule provides, "A permanent registrar shall accept a Registration Application Form that is: (a) complete and legible; (b) is executed with a Signature or Mark made by the voter registration applicant; and (c) is submitted to the permanent registrar by mail, delivered in-person by the voter, or is delivered by a Third-Party Registration Organization."  SBEC, Rule Regarding Voter Registration, May 4, 2024, § 1401(1).  "Signature or Mark" is defined as

> a handwritten wet signature or handwritten wet mark made on a Registration Application Form with a pen or other writing device that is physically moved across the form and that forms the applicant's signature or mark on the paper form.  A Signature or Mark that utilizes a computer to generate or recreate the applicant's signature or mark is not an acceptable signature or mark of the applicant for purposes of Amendment 51 §§ 6(a)(1) & (a)(3)(F) Registration Application Form.

*Id.*, § 1400(7).

The SBEC memorialized the rationales underpinning the rule in a declaratory order.  In this order, the SBEC first noted its constitutional and statutory obligation "to enforce election and voter registration laws.  Ark. Code Ann. § 7-4-120(a)."  Ex. 2, SBEC, Declaratory Order 2024-002, Apr. 23, 2024, at 1.  The SBEC went on to explain that Amendment 51 does not permit the acceptance of electronic signatures on voter registration applications unless processed by the Registration Agencies enumerated in Amendment 51.  *See id.* at 2.  This constitutional prohibition, the SBEC concluded, left county clerks without "the authority to accept voter registration applications completed with electronic signatures" submitted by third-party services like those the Plaintiffs wish to use here.  *Id.*  As the SBEC explained, based on principles of statutory

4

APP230

construction, a "voter registration application completed and submitted, other than through an identified Registration Agency, cannot include the use of computerized signatures or marks." *See id.* at 5–8.

After SBEC passed the rule, the Arkansas Legislative Council's executive subcommittee approved it, and it took effect on an emergency basis on May 4, 2024.  The rule expires on September 1, 2024.  Plaintiffs challenge the emergency rule here, arguing that it violates the Materiality Provision of the Civil Rights Act of 1964.  More than a month after they filed suit challenging the constitutionality of the "Signature or Mark" requirement, Plaintiffs filed the Motion, seeking an order enjoining Defendants from enforcing the emergency rule.

## III.   ARGUMENT

"A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant." *Roudachevski v. All-Am. Care Centers, Inc.*, 658 F.3d 701, 705 (8th Cir. 2011).  To prevail, Plaintiffs must, under Eighth Circuit precedent, carry this burden on four fronts: (1) the threat of irreparable harm to Plaintiffs; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on Defendants; (3) the probability that Plaintiffs will succeed on the merits; and (4) that public interest favors injunctive relief.  *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640

Appellate Case: 24-2810   Page: 260   Date Filed: 09/06/2024   Entry ID: 5432887
APP231

F.2d 109, 113 (8th Cir. 1981). Plaintiffs have failed to demonstrate that any of the *Dataphase* factors favor a preliminary injunction. Accordingly, the Motion should be denied.

**A.    Plaintiffs Have Failed to Carry Their Burden of Demonstrating a Likelihood of Success on the Merits.**

Success on the merits is "the most important" of the four [*Dataphase*] factors," and "requires a movant to demonstrate at least a fair chance of prevailing." *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (internal quotations omitted). Plaintiffs assert that one claim—the alleged violation of the Materiality Provision—is a likely source of success on the merits. However, Plaintiffs' claim fails on at least three independent grounds. *First*, as a threshold matter, Plaintiffs Get Loud Arkansas ("GLA") and Vote.org ("VDO") lack standing. *Second*, Plaintiffs are unable to establish that the "Signature or Mark" requirement is immaterial as a matter of federal law. And *third*, Plaintiffs cannot prevail because there is no private right of action under the Civil Rights Act.

**1.    Plaintiffs GLA and VDO Lack Standing.**

Plaintiffs GLA and VDO lack standing, as they have not alleged a cognizable injury capable of redress before this Court. Federal courts can only consider actual "Cases" and "Controversies." U.S. Const. art. III, § 2. Accordingly, a litigant must have standing "to invoke the authority of a federal court." *Pucket v. Hot Springs Sch. Dist. No. 23-2*, 526 F.3d 1151, 1157 (8th Cir. 2008) (internal quotations omitted). An organization may establish standing in two ways: organizational standing and associational standing. Plaintiffs GLA and VDO can show neither.

**a.    GLA and VDO Cannot Establish Organizational Standing.**

When asserting organizational standing, courts "conduct the same inquiry as in the case of an individual." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982). Specifically, the organization must establish "(1) that [it] suffered an 'injury-in-fact,' (2) a causal relationship

6

APP232

between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." *Pucket*, 526 F.3d at 1157.  The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotations omitted).  An organization can demonstrate injury in fact if it can show a "concrete and demonstrable injury to [its] activities which drains its resources and is more than simply a setback to its abstract social interests." *Nat'l Fed'n. of the Blind v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999) (citing *Coleman*, 455 U.S. at 379).  However, "[a]bsent specific facts establishing distinct and palpable injuries fairly traceable to the defendants' conduct the injury in fact requirement is not satisfied." *Id.* at 980–81 (internal citations omitted).

VDO alleges that it is injured by the "Signature or Mark" requirement, as it "*would like* to deploy its web platform *in future elections* in Arkansas.  The requirement, according to VDO, bars the use of VDO's e-signature function and frustrates its mission." Compl., ¶ 82 (emphasis added). VDO further claims that it "*will be forced* to redirect limited financial and staff resources" from its other projects "towards less efficient and more resource-intensive ways of assisting voters to register in Arkansas." *Id.*, ¶ 83 (emphasis added).

VDO's alleged injury does not qualify as an injury in fact, as it is not "certainly impending." *See Clapper*, 568 U.S. at 409.  VDO has not yet deployed its web platform in Arkansas and has not alleged any diversion of resources to date. Compl., ¶ 82–83. Such injury is thus merely conjectural and hypothetical.  VDO "cannot manufacture standing by choosing to make expenditures based on" an alleged harm that does not itself qualify as an injury in fact. *See Clapper*, 568 U.S. at 402.  Indeed, VDO does not allege that "Signature or Mark" requirement has impacted it in any "measurable way." *See Cross*, 184 F.3d at 981.  VDO's theory of standing

APP233

depends on speculation because it presumes that a voter in Arkansas will attempt to use a to-be-created web platform for the purpose of registering to vote at some unknown time in the future. This mere speculation is not enough to confer standing.

GLA likewise fails to meet the test for organizational standing.  GLA asserts that it is an Arkansas nonprofit that seeks to "increase civic participation in Arkansas."  Compl., ¶ 11. Specifically, GLA "works to register new voters, engage low propensity voters, and mobilize all eligible citizens to utilize the power of their vote to shape the future of Arkansas." *Id.*  GLA alleges that the "Signature or Mark" requirement "caused immediate damage to GLA's voter registration efforts and will severely restrict how it conducts voter registration efforts moving forward." *Id.*, ¶ 73.  GLA further alleges that, unable to submit applications bearing electronic signatures, it "has also been forced to divert its limited staff and financial resources towards less efficient means of pursuing its voter registration goals" by "retraining its staff . . . to attend public events to encourage people to register to vote using paper applications." *Id.*, ¶ 78–79; Mot., at 9.

However, GLA has not shown how engaging in alternative efforts to "register new voters, engage low propensity voters, and mobilize" eligible citizens to vote perceptibly impairs its mission to "improve civic participation in Arkansas." *See Id.*, ¶ 79; Mot., at 2.  Responding to developments in state election law is part and parcel of GLA's stated mission.  GLA cannot list its usual actions and assert that it has diverted resources from those same actions.  Accordingly, GLA has not shown a distinct and palpable injury sufficient to confer standing, as it cannot demonstrate that its expenditure of resources occurred outside its normal operations. *See Cross*, 184 F.3d at 979; *see also Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017) (holding that a diversion of resources when a party has not been harmed is a "self-inflicted budgetary choice that cannot qualify as an injury in fact").

APP234

Both VDO and GLA have failed to connect their alleged harms to any state action, and there is no actual or imminent injury for a favorable decision to redress.  Thus, neither Plaintiff has introduced allegations sufficient to confer organizational standing.

### b.   GLA and VDO Cannot Establish Associational Standing.

To establish associational standing, an organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Kuehl v. Sellner*, 887 F.3d 845, 851 (8th Cir. 2018) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

VDO cannot make use of associational standing, as it does not have members.  *See Vote.Org v. Callanen*, 39 F.4th 297, 303, n.2 (5th Cir. 2022) ("Because it is a non-membership organization, Vote.org cannot contend that it has associational standing").  GLA has similarly failed to allege that it has any members; nor does the group claim that any of its members have been injured in any way from the "Signature or Mark" requirement.  Any such speculation is plainly insufficient to demonstrate a concrete and particularized injury.

For these reasons, both VDO and GLA have failed to satisfy the settled Article III standing requirements.

### 2.   The "Signature or Mark" Requirement Is "Material" and Does Not Violate Section 10101(a)(2)(B).

On the merits, Plaintiffs' constitutional challenge fails because the "Signature or Mark" requirement is "material" and plainly comports with what is permitted in the Arkansas Constitution.

The Materiality Provision provides,

APP235

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B).

As the Supreme Court has held, a state "indisputably has a compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Regulations enacted to protect the integrity of a state's election instills public confidence in the electoral process because it "encourages citizen participation in the democratic process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008).

Contrary to Plaintiffs' assertion, the Arkansas Constitution does not expressly permit individuals to electronically sign voter registration applications. *See* Mot., at 17. Amendment 51 delineates the requirements for voter registration and provides that "[n]o person shall vote or be permitted to vote in any election unless registered in a manner provided for by this amendment." Ark. Const. amend. 51, § 3; *see also Martin v. Kohls*, 2014 Ark. 427, at 17, 444 S.W.3d 844, 854 (Goodson, J., concurring) (noting that Amendment 51 provides a "comprehensive regulatory scheme governing the registration of voters"). The Amendment, per its express terms, requires an "identifying signature" on voter registration applications. Ark. Const. amend. 51, § 6(a)(1). The Amendment only authorizes electronic signatures for processes implemented by identified Registration Agencies. *Id.*, § 5(b)(2)–(4). But nowhere else in the Amendment is the use of electronic signatures authorized (such as via third-party services like VDO), which led to inconsistent processes utilized by county clerks across seventy-five different counties in Arkansas—all of which are voting in the same statewide election.

Plaintiffs contend that the only material requirements are contained in Article 3 of the Arkansas Constitution: that an individual is "(1) a U.S. citizen; (2) a resident of Arkansas; (3) at least 18 years of age; and (4) lawfully registered to vote in that election." Ark. Const. art. 3, § 1(a); Compl., ¶ 88.  But these are not the only requirements "material in determining whether such individual is qualified under State law to vote." *See* SBEC, Rule Regarding Voter Registration, May 4, 2024, § 10101(a)(2)(B).  In other words, the Materiality Provision does not prohibit Arkansas from enacting rules important to safeguarding election integrity, as it does not displace state registration rules.  If it did, "virtually every rule governing how citizens vote would [be] suspect." *Callanen*, 39 F.4th at 306, n.6.

The SBEC implemented the "Signature or Mark" requirement as a means of standardizing the procedure across the State's seventy-five counties.  Requiring a non-electronic, or "wet," signature on all voter registration applications submitted in-person by the voter, mailed, or delivered by a third-party registration organization leads to statewide uniformity.  And a uniform process furthers Arkansas's interest in preventing fraud, verifying voter identity and eligibility, and promoting the integrity of the voter registration process.  It also does not frustrate the registration process—any Arkansas citizen who is at least eighteen years of age and otherwise qualified to vote may still register using the same process, using a non-electronic signature, that has been in place for decades since Amendment 51 passed in 1964.

Arkansas's position on the issue is consistent with the recent decision of the Fifth Circuit, which ruled that a similar "Signature or Mark" requirement on voter registration cards, also challenged by Plaintiff VDO, was permissible and did not violate the Materiality Provision. *Vote.Org v. Callanen*, 89 F.4th 459, 489 (5th Cir. 2023) (finding that "an original signature advances voter integrity" and "makes such a signature a material requirement").  Similarly, a

APP237

United States District Court in the Northern District of Florida granted a motion to dismiss on this very question. *Vote.org v. Byrd*, No. 4:23-CV-111-AW-MAF, 2023 WL 7169095, at *7 (N.D. Fla. Oct. 30, 2023). In that case, Plaintiff VDO again challenged a Florida signature requirement, putting forth the very same arguments it does in the present case. *Id.* at *5. The court rejected VDO's argument that a wet signature requirement "bears no relation to the statutory qualifications, the applicant's age, citizenship, and residence," and held that "the acceptance of electronic signatures in certain circumstances does not render the wet signature requirement immaterial," as "original signatures carry different weight." *Id.*, at *6 (internal quotations omitted).

This Court should follow suit and find that "requiring an original signature meaningfully, even if quite imperfectly, corresponds to the substantial State interest." *See Callanen*, 89 F.4th at 489. SBEC's contention that "an original signature advances voter integrity" and creates statewide uniformity "is legitimate, is far more than tenuous, and under the totality of circumstances, makes such a signature a material requirement." *Id.*; *see also Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020) (holding that election officials "may reject applications and ballots that do not clearly indicate the required information required by [state law] without offending 52 U.S.C. § 10101(a)(2)(B)."); *League of Women Voters of Arkansas v. Thurston*, No. 5:20-CV-05174, 2023 WL 6446015, at *17 (W.D. Ark. Sept. 29, 2023), *judgment entered*, No. 5:20-CV-05174, 2023 WL 6445795 (W.D. Ark. Sept. 29, 2023) (correctly noting that "the Materiality Provision does not establish a least-restrictive-alternative test for the material information required"). Indeed, only one district court has allowed this type of claim to proceed, and it did not enter an injunction; it simply allowed the claim to proceed past the pleading stage. *See Vote.org v. Georgia State Election Bd.*, 661 F. Supp. 3d 1329, 1341 (N.D. Ga. 2023).

Thus, Plaintiffs cannot show a likelihood of success on the merits, as the "Signature or Mark" requirement is a material requirement of Arkansas's voter registration and election administration processes.

**3.    52 U.S.C. § 10101 Does Not Create a Private Right of Action and Cannot Be Enforced by Private Parties in a 42 U.S.C. § 1983 Suit.**

Plaintiffs also lack a private right of action here.  The "central inquiry" in "determining whether a private remedy is implicit in a statute not expressly providing one" is "whether Congress intended to create, either expressly or by implication, a private cause of action." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575 (1979).  The Supreme Court has called the approach of "recognizing implied causes of action" an "*ancient regime.*" *Ziglar v. Abbasi*, 582 U.S. 120, 131 (2017).  "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.  *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (internal quotations omitted).  Absent "rights-creating language," statutes may not be privately enforced.  *Id.* at 277 (internal quotations omitted).

52 U.S.C. § 10101 does not explicitly create a private right of action.  Instead, Congress created a cause of action for "the Attorney General." § 10101(c) ("the Attorney General may institute for the United States . . . a civil action or other proper proceeding for preventive relief").  Many courts have held that section 10101 (previously codified at 42 U.S.C. § 1971) does not create a private right of action.  *See, e.g.*, *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000) ("Section 1971 is enforceable by the Attorney General, not by private citizens); *Gilmore v. Amityville Union Free Sch. Dist.*, 305 F. Supp. 2d 271, 279 (E.D.N.Y. 2004) (Section "1971 does not provide for a private right of action by individuals").  *But see League of Women Voters of Arkansas v. Thurston*, No. 5:20-CV-05174, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021) (permitting a plaintiff to bring a private cause of action via section 10101).

APP239

Nor may Plaintiffs rely on an implied private right of action. The language of the federal Materiality Provision focuses on the local official regulated, rather than individual voters. 52 U.S.C. § 10101(a)(2)(B) ("No person acting under color of law shall . . ."). This is not the "rights-creating language" required to maintain a private right of action. *See Sandoval*, 532 U.S. at 277, 289. And "Courts should presume that Congress intended that the enforcement mechanism provided in the statute be exclusive." *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1011 (8th Cir. 1999). As the Eighth Circuit held in *Does v. Gillespie*, a "statute that speaks to the government official . . . does not confer the sort of individual entitlement that is enforceable under § 1983." 867 F.3d 1034, 1041 (8th Cir. 2017) (internal quotations omitted). In other words, "the negative implication of Congress's provision for enforcement by the Attorney General is that the statute does not permit private rights of action." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016) (holding no private right of action exists to enforce Materiality Provision).

Defendants acknowledge that one judge in this district recognized the existence of a private right of action in *League of Women Voters of Arkansas*. Defendants, however, urge the Court to reach a different conclusion here. The Court should, as the Eight Circuit has recognized, "presume that Congress intended that the enforcement mechanism provided in [52 U.S.C. § 10101] be exclusive." *Alsbrook*, 184 F.3d at 1011. This is especially true in light of Eighth Circuit decisions issued in the years following *League of Women Voters of Arkansas*, where the court has noted it will not "fill in the gaps" where statutes lack a private right of action. *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204, 1209 (8th Cir. 2023). 52 U.S.C. § 10101 includes no private right of action, express or implied, and "nothing short of an unambiguously conferred right will support" one. *See Osher v. City of St. Louis, Missouri*, 903 F.3d 698, 702 (8th

APP240

Cir. 2018) (internal quotations omitted).  With "an unambiguously conferred right" missing, Plaintiffs cannot use 52 U.S.C. § 10101 as a vehicle to obtain private relief.

    **4.**    **A Preliminary Injunction Is Inappropriate Because Plaintiffs Will Not Suffer Irreparable Harm in the Absence of Injunctive Relief.**

To succeed in demonstrating a threat of irreparable harm, "the movant must show that harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 597 (8th Cir. 2022) (internal quotations omitted).  "The absence of irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Id.*  Importantly, federal courts may not issue advisory opinions.  *Carney v. Adams*, 592 U.S. 53, 58 (2020).  "It has long been its considered practice not to decide abstract, hypothetical or contingent questions." *Vorbeck v. Schnicker*, 660 F.2d 1260, 1264 (8th Cir. 1981).

Here, Plaintiffs cannot show a threat of irreparable harm, as the temporary emergency rule adopted by SBEC, which is the subject of this lawsuit, is on the verge of being superseded by a rule recently passed by SBEC, effective on September 1, 2024.  Any ruling on the emergency rule at this stage would amount to an impermissible advisory opinion.  *See id.*; *see also Pub. Water Supply Dist. No. 8 of Clay Cnty., Mo. v. City of Kearney, Mo.*, 401 F.3d 930, 933 (8th Cir. 2005) (finding that because an injury was not "certainly impending," an "opinion [the court] would issue would be advisory, in contravention of Article III, and a waste of resources").

Further, Plaintiffs VDO and GLA will suffer no harm, and certainly no irreparable harm, as they are organizations that cannot vote and do not have standing.  *See supra*, § 1.  And VDO and GLA have offered no reasons for why they cannot direct their outreach programs to facilitating voter registration in a way that complies with state law; their assertions that they should be

permitted to utilize any technology they want in registering voters is not an injury capable of redress before this Court.

When boiled down, the two individual Plaintiffs' only claim of irreparable harm is that "the loss of the opportunity to register with an electronic signature and subsequently vote in the 2024 elections."  Mot., at 26.  But this alleged threat of irreparable injury is non-existent, as the individual Plaintiffs can simply submit new voter registration applications with handwritten signatures.

Because Defendants inflicted no irreparable injury on Plaintiffs or any Arkansas voter, injunctive relief at this stage offers nothing to Plaintiffs and would be tantamount to an advisory opinion.

## IV.    <u>CONCLUSION</u>

The Court should deny the Motion.

Respectfully submitted,

Byron Freeland (Ark. Bar No. 72039)
Graham Talley (Ark. Bar No. 2015159)
**MITCHELL, WILLIAMS, SELIG,**
**GATES & WOODYARD, PLLC**
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Phone: (501) 688-8800
Fax: (501) 688-8807
Email: bfreeland@mwlaw.com
        gtalley@mwlaw.com

APP242

**STATE BOARD OF ELECTION COMMISSIONERS**

Secretary of State
**John Thurston**
Chairman

501 Woodlane Street – Suite 122 South
**Little Rock, Arkansas 72201**
**(501)682-1834 or (800)411-6996**

**Chris Madison**
Director

**Waylan Cooper**
Legal Counsel

**Sharon Brooks**
**Jamie Clemmer**
**Bilenda Harris-Ritter**
**William Luther**
**J. Harmon Smith**
**Johnathan Williams**
Commissioners



**Charlie Morris**
Election Administration Supervisor

**Jon Davidson**
Educational Services Manager

July 15, 2024

Chairman John Thurston
Arkansas State Board of Election Commissioners
501 Woodlane Street, Ste. 122S
Little Rock, Arkansas, 72201

**Re: Public Comments – Rule Regarding Voter Registration**

Secretary Thurston,

The State Board proposed the Rule titled, *Rule Regarding Voter Registration,* which was initially adopted as an emergency rule with an effective date of May 4, 2024. Following the emergency rule adoption, the State Board proceeded with adopting the Rule for permanent promulgation. That process includes a thirty-day comment period which closed at 11:59 p.m. on Sunday, July 14, 2024. The State Board Staff also presided over a public comment hearing on July 11, 2024. This memorandum is to provide information to the Board regarding the comments submitted by Arkansans.

As of the cut-off time for submission of comments, SBEC Staff has received over two hundred (200) written comments through email. At the public comment hearing, approximately 16 speakers presented comments on the proposed Rule.

This memorandum will address the commentators, for Board review, by categorizing the emails into group topics.
Those topics include:
1. Commentators in favor of the proposed Rule; and



2. Commentators opposed to the proposed Rule.

The commentators opposed to the proposed Rule are sub-divided into <u>five categories:</u>

    a. In favor of Online-Voter Registration systems
    b. Wet-signature is outdated
    c. E-signature is allowed by law
    d. Low Voter registration and Turn-out rates
    e. Other
        i. Disabled Voters' Access to Voter Registration
        ii. Access to printing facilities or postal services
        iii. Confusion for Officials
        iv. The Rule is Disenfranchising voters

## I.    Commentators in favor of the proposed rule.

This category of commentators generally stated that wet signatures provide greater security in the election process and help to prevent fraudulent voting practices. These commentators supported adoption of the Rule.

## II.    Commentators opposed to the proposed rule.

### A. In favor of Online-Voter Registration systems

These commentators generally reference the fact that forty-two (42) other states permit online registration, and that Arkansas is one of the only few states that does not permit online registration.

### <u>Response to "In favor of Online-Voter Registration systems"</u>

Staff researched other states that permit online registration and noted several factors relevant to the Board's consideration. First, the states that Staff sampled had express legislation permitting or directing a State Officer, such as the State Board of Elections or the Secretary of

APP244

the respective state, to build, operate, and maintain an online voter registration system.[1]

Of the surrounding and contiguous states to Arkansas that have online VR, they are all operated by that State's Secretary of State or State Election Board. Neither Texas nor Mississippi has online voter registration. See https://ballotpedia.org/Online_voter_registration (last viewed July 14, 2024).

1. Louisiana's online VR system is operated by the Secretary of State, the web address is:
   a. https://www.sos.la.gov/ElectionsAndVoting/Pages/OnlineVoter Registration.aspx
2. Tennessee's Secretary of State operates its online VR system, the web address is:
   a. https://ovr.govote.tn.gov/
3. Missouri's Secretary of State operates its online VR system, the web address is:
   a. https://www.sos.mo.gov/elections/goVoteMissouri/register.aspx
4. Oklahoma's State Election Board's operates its online VR system, the web address is:
   a. https://okvoterportal.okelections.us/

Secondly, Staff was unable to locate any state that utilized an online VR system where the registration system was built, maintained, and operated by a third-party registration organization.[2]

Thirdly, the SBEC became aware of discrepancies and differences in how county clerks were accepting voter registration applications. It was reported that, in some counties, the clerk was accepting electronically signed voter registration applications whereas other county clerks were not accepting electronically signed applications. This

---

[1] One Commentator at the Public Comment Hearing specifically referenced North Dakota as switching to online voter registration; however, upon research, North Dakota does not require voter registration to vote, only the voter must have one of a limited form of identification that lists the voter as a resident of North Dakota.

[2] Arizona utilizes a system operated by "ServiceArizona" which is "an authorized service website for the Arizona Department of Transportation." See https://servicearizona.com/applicationFAQ/voter#3466 (last viewed July 14, 2024).

Appellate Case: 24-2810   Page: 274   Date Filed: 09/06/2024 Entry ID: 5432887
APP245

created an unfair and non-uniform application process for applicants. Whether the applicant could apply using an electronic signature was dependent on the county to which the applicant resided. The SBEC is specifically directed to adopt such rules as necessary to provide uniformity across the state in the administration of voter registration processes.

### B. Wet Signature is outdated

Many commentators utilized chain emails which each stated nearly identical comments. Of these chain emails, the allegation is that wet signatures are an outdated process in 2024. These commentators generally reference the availability of electronic signatures on financial records and other legally enforceable transactions. Similarly, the chain email that uses the first sentence "I oppose outdated 'wet signature' policy for Arkansas Voter Registration Applications" also references that verifiable e-signatures are essential for Arkansas because we rank so low in voter participation, and that "eliminating online access to registration suppresses access to the democratic process."

### <u>Response to "Wet Signature is outdated"</u>

Staff categorizes these comments regarding wet signature as outdated because the commentators appear to believe that the Rule is a change from the historical status quo which has required wet signatures, except from Constitutionally recognized agencies such as the DMV registration process. Coupled with this response is the lack of specific legislative or constitutional authority to build, operate, and maintain an online voter registration process.

Further responding to this category of commentary is the fact that the Arkansas Secretary of State sought Attorney General Opinion 2020-014. In that opinion, the Secretary of State asked whether it would be permissible under Amendment 51, for the Secretary to "establish an online voter registration system?" Op. Ark. Att'y Gen. No. 014 at 1 (2020). The Opinion responded that the Secretary does not have authority under the parameters of Amendment 51 to create an online voter registration system. The Opinion also asked that, if the Secretary was without the authority to create an online system, could Amendment 51 be amended

Appellate Case: 24-2810    Page: 275    Date Filed: 09/06/2024 Entry ID: 5432887

by the legislature to "permit an online voter registration system." *Id.* at 3. The AG opined that the Legislature could, by a 2/3rds vote, approve an amendment to Amendment 51 and authorize a system of online voter registration.

An online voter registration bill was proposed during the 2023 session. House Bill 1537 proposed amending Amendment 51 directing the Secretary of State to "prepare and administer electronic voter registration application forms." H.B. 1537, 94th General Assem., Reg. Sess. (Ark 2023). The Bill did not get out of committee. House Bill 1517 of 2021 also proposed amending Amendment 51 to direct the Secretary of State to "prepare and administer electronic voter registration forms." H.B. 1517, 93rd General Assem., Reg. Sess. (Ark 2021). The 2021 bill did not pass the Senate.

Commentators have also pointed to Attorney General Opinion 2024-049. That opinion addresses a slightly different question. The 049 opinion directs that a third-party organization must utilize the "mail voter registration application form." Op. Ark. Att'y Gen. No. 049, at 2 (2024). The opinion states that Amendment 51 "does not define a signature or mark, nor does it specify how a signature or mark may be made." *Id.* The opinion continues, "[c]onsequently, given the historical acceptance of signatures produced through a variety of means, the widespread acceptance of electronic signatures, and the fact that Amendment 51 does not contain any restrictions on how a 'signature or mark' may be made, I believe that an electronic signature satisfies Amendment 51's 'signature or mark' requirement." *Id.* at 3. The opinion then goes on to discuss the third-party's creation of its own "electronic voter registration application." The opinion then states that a "third-party non-governmental agency cannot create and use a different form of its own to register voters." *Id.* at 4.

SBEC is specifically directed to "prescribe, adopt, publish and distribute: (1) such Rules and Regulations supplementary to this amendment and consistent with this amendment and other laws of Arkansas as are necessary to secure uniform and efficient procedures in the administration of this amendment throughout the State." Ark. Const. Amend. 51 § 5(e)(1). Under this explicit Constitutional authority, the SBEC proposes the Rule in question.

APP247

Given the historical processes of voter registration in Arkansas, coupled with the inability of the Secretary of State to create an online voter registration system, (Op. Ark. Att'y Gen. No. 014 (2020)), coupled with the absence of express authorization in Amendment 51 permitting online voter registration systems, (HB1537 of 2023 and HB 1517 of 2021) and the requirement that the SBEC adopt such rules to "secure the uniform and efficient procedures in the administration of [Amendment 51] throughout the State" the proposed Rule maintains the current voter registration process and is compliant with the requirements of Amendment 51.  Maintaining the current voter registration processes across the State serves the interests of "uniform and efficient procedures" because the Rule does not change the current and historical means of registration in the State.

### C. E-Signature is allowed by law

Commentators under this category generally state that electronic signatures are permissible under Arkansas Law, and they often reference the Federal E-sign act of 2000.  The comments generally reference that electronic signatures are enforceable for taxes, contracts, house purchases, and a wide array of commercial and legal transactions.  The commentators generally argue that, if electronic signatures are permissible on such important individual transactions, then they should be permissible for registering to vote.

### Response to "E-Signature is allowed by law"

SBEC would direct commentators to the information provided in the previous section wherein the Secretary of State does not have the authority to create an online voter registration system.  During the 2021 and 2023 sessions, bills were proposed to expressly authorize and direct the Secretary of State to create an online voter registration system.  Both of those bills failed in the legislature.

SBEC would also direct commentators to the limitations placed within the electronic signature law adopted in Arkansas. Arkansas law regarding electronic records and signatures can be found at Section 25-32-105 et. seq. However, commentators fail to identify the limitations placed within those sections.  Particularly, the provision that states,

"This chapter does not require a record or signature be created, generated, sent, communicated, received, stored, or otherwise processed or used by electronic means or in electronic form." Ark. Code Ann. § 25-32-105(a).   That section continues, "[t]his chapter applies only to transactions between parties each of which has agreed to conduct transactions by electronic means." *Id.* at (b). Further, that section provides, "[w]hether an electronic record or electronic signature has legal consequences is determined by this chapter and **other applicable law**." *Id.* at (e) (emphasis added).  Finally, Arkansas law provides, that "each governmental agency of this state **shall determine whether and the extent to which it will** send and **accept** electronic records and **electronic signatures to and from other persons** and otherwise create, generate, communicate, store, process, use, and rely on electronic records and electronic signatures."  Ark. Code Ann. § 25-32-118(a)(1) (emphasis added).  That section concludes with, "this chapter does not require a governmental agency of this State to use or permit the use of electronic records or electronic signatures." *Id.* at (c).

Consequently, the law permits the use of electronic signatures for governmental transactions; however, it does not require the governmental unit accept electronic signatures nor does it mandate the use of electronic signatures. Given the history of voter registration in Arkansas, the history of failed attempts to amend Arkansas Constitution Amendment 51 to expressly permit online voter registration, and the unambiguous limitations on governmental acceptance of electronic signatures in Arkansas law, the proposed Rule complies with applicable history and legal authority.

### D. Low Voter registration and Low Voter turnout

Commentators reference, in varying forms, that Arkansas ranks lowest in voter turnout in the nation, or that Arkansas has the lowest voter participation rates in the country. Alternatively, Commentators state that Arkansas has one of the lowest percentages of citizens participating in civic duties.

Appellate Case: 24-2810     Page: 278     Date Filed: 09/06/2024 Entry ID: 5432887

## Response to "Low Voter registration[3] and Low Voter turnout"

The proposed Rule, as stated above, seeks to maintain the current registration process and does not take new action. The SBEC states that, without express legislative authority, the creation of an online voter registration process is not permitted. As stated above, states that have online voter registration processes have express legislation directing a state agency, usually the Secretary of State or Election's Board, to build, operate, and maintain the online system of voter registration.

As for voter participation, the proposed Rule has no bearing on whether registered voters exercise their right to vote. The Rule supports the current and historical methods of registration and does not exceed legislative authority granted to the SBEC by Amendment 51 §5(e).

### E. Other

Commentators included other statements that do not fall within the four categories above. The more specific comments will be addressed below.

### i.   Disabled Voters' Access to Voter Registration

Numerous commentators speak regarding access and availability of voter registration for disabled or transportation-challenged voters. Disability Rights of Arkansas provided a comment opposing the proposed Rule. The commentator stated that the wet signature requirement negatively impacts mobility impaired applicants or those with

---

[3] It appears that Commentators are relying on a survey study titled, "2023 Arkansas Civic Health Index" to support this allegation. That survey appears to rely only on registration rates for Little Rock and North Little Rock, according to the end note sited for the report. Also, SBEC would note that Census data states that as of July 2022, Arkansas had 2,348,518 residents over 18, and according to a June 2022 report, Arkansas had 1,765,681 registered voters. Those number compute to a 75.2% registered voter rate per eligible population. Also, for the 2020 election, Arkansas had 1.4 million registered voters, and 1.2 million of them voted. See https://www.arkansasonline.com/news/2021/sep/05/arkansas-statistics-on-voting-reported/. Arkansas Secretary of State reports for the November 2020 election showed a 66.9% voter turnout. See https://results.enr.clarityelections.com/AR/106124/web.274956/#/summary.

Appellate Case: 24-2810     Page: 279     Date Filed: 09/06/2024 Entry ID: 5432887
APP250

degenerative disabilities, such as those without arms or ability to move their limbs or those with vision impairment. The commentator states that technology through online voter registration could lessen these impediments to registering.

### Response to "Disabled Voters' Access to Voter Registration"

Arkansas law permits a disabled voter to register to vote and they may do so by requesting the county clerk mail a voter registration form to the voter. The voter may also utilize the assistance and support of disability rights groups, such as DRA, to assist in completing the registration form. Amendment 51 directs agencies who assist the disabled to make voter registration a part of their programming and requires that the agencies' employees and officers assist voters in the registration process. The form includes the opportunity for disabled voters to make their mark that is witnessed by another. That mark acts as their signature for purposes of registering to vote. The proposed Rule does not alter or change the methods and manners used to register voters with physical impairments.

### ii.   Access to printing facilities or postal services

Numerous Commentators discuss the inability of applicants to have access to a printer or postal services, and they reference the "young people, the elderly, people with disabilities, and those living in rural areas."

### Response to "Access to printing facilities or postal services"

Applicants may contact their representative county clerk and request a voter registration form be mailed to them to complete. Similarly, the form is readily available at local governmental offices, including the DMV and other offices that have regular contact with citizens of the State. An applicant could also contact the Secretary of State and request the form be mailed to him or her to complete. Most all citizens of the state have access to a pen, but not all have access to a tablet or computer device to register online. As for postal services, all residents of Arkansas have access to local postal facilities, their county clerk's office, or other governmental offices to register to vote.

APP251

Without express legislation, the current law does not permit the Secretary of State to operate an online voter registration system. If the Secretary cannot operate such a system, it does not seem logical that a third-party organization that is not specifically identified in Amendment 51 could circumvent the restriction on the Secretary and create its own online voter registration system.

### iii.   Confusion for Officials

One Commentator at the public comment hearing stated that he was concerned that county clerks would not be able to determine if an application is submitted with a wet signature or not, and that this Rule creates confusion for officials in clerks' offices who are charged with processing voter registration forms.

### Response "Confusion for Officials"

The proposed Rule does not alter the process of voter registration that has been occurring under Amendment 51.  The proposed Rule follows the traditional process by which voter registration applications are received and processed by county clerks across the state. Arkansas Amendment 51 governs what a Clerk must do when a deficient application is submitted.   It provides, "[i]f an applicant for voter registration fails to provide any of the information required by this section, the permanent register shall notify the applicant of the failure and provide the applicant with an opportunity to complete the form in a timely manner to allow for its completion before the next election for federal office." Ark. Const. Amend. 51 § 6(a)(8). When the clerk receives an application, they are to "notify applicants whether their applications are accepted or rejected or are incomplete." *Id*. at § 9(d).  That section continues, "[i]f the information required by the permanent registrar is missing from the voter registration application, the permanent registrar shall contact the applicant to obtain the missing information." *Id*.

Thus, current law governs the process by which a clerk is to resolve a defective application.  If an applicant submits an application that is not signed by wet ink signature, then the clerk has a duty to contact the applicant to remedy the deficiency.  Much like if the applicant failed to

Page **10** of 12

APP252

put his or her date of birth on the application, then the clerk has a duty to contact the applicant to remedy the deficiency as well.

### iv.   The Rule is Disenfranchising voters

Many commentators argue that adoption of the Rule disenfranchises voters, and because of the low voter participation rate, this Rule should not be adopted.

### Response to "The Rule is Disenfranchising voters"

As stated above, the proposed Rule is to maintain the current processes for voter registration. As stated above, if the Secretary of State is not lawfully eligible to create an online voter registration process, then a third-party organization operating outside the governmental system cannot circumvent the law to create its own online voter registration system. As stated above, the Arkansas legislature has had two separate bills before it, both in 2021 and 2023, which would expressly authorize online voter registration processes. Neither of those two proposals were adopted. Applicants have several means available to register to vote. They may register at many government offices, they may register at their county clerk's office, they may register by requesting the form be mailed to them at their residence, and they may go to a voter registration drive and complete the form for submission.

## III.   Conclusion

The State Board has responded to each of the comments proposed by commentators regarding the rule titled Rule Regarding Voter Registration. For any comment not specifically addressed herein, they have each been reviewed and were not applicable to the proposed Rule, or were considered and no modification or change to the Rule is recommended. For all other comments, which are within the above categories, each comment has been reviewed and no modifications or changes to the Rule is recommended.

Appellate Case: 24-2810   Page: 282   Date Filed: 09/06/2024 Entry ID: 5432887
APP253

Respectfully yours,

Richard Chris Madison
Director – State Board of Election Commissioners

APP254

**STATE BOARD OF ELECTION COMMISSIONERS**

Secretary of State
**John Thurston**
Chairman

501 Woodlane Street – Suite 122 South
Little Rock, Arkansas 72201
(501)682-1834 or (800)411-6996

**Chris Madison**
Director

**Waylan Cooper**
Legal Counsel

**Sharon Brooks**
**Jamie Clemmer**
**Bilenda Harris-Ritter**
**William Luther**
**J. Harmon Smith**
**Johnathan Williams**
Commissioners



**Charlie Morris**
Election Administration Supervisor

**Jon Davidson**
Educational Services Manager

# DECLARATORY ORDER
## 2024-002

The State Board of Election Commissioners (SBEC) received a Declaratory Order Request from a Mr. Michael J. Massucco, a Pulaski County registered voter. The SBEC may issue a Declaratory Order pursuant to authority granted by Ark. Code Ann. § 25-15-206 and SBEC Board Rule § 1104.  The SBEC hereby states the following:

## I.   JURISDICTION TO ISSUE A DECLARATORY ORDER

1. The State Board finds that it has the authority to issue the requested order based on the fact the controlling sections of law are election law and voter registration law.

2. The State Board is empowered to enforce election and voter registration laws.  Ark. Code Ann. § 7-4-120(a).

3. State agencies are required to hear petitions for declaratory orders regarding the applicability of any rule, statute, or order enforced by that agency. Ark. Code Ann. § 25-15-206.

Appellate Case: 24-2810     Page: 284     Date Filed: 09/06/2024 Entry ID: 5432887
APP255

## II.   QUESTIONS PRESENTED BY THE PETITION

**Question Number 1:**

Does Arkansas Constitutional Amendment 51 permit electronic signatures for voter registration applications that are not processed through the Department of Motor Vehicles?

**Holding of the SBEC:** No. As discussed below, voter registrations that are completed using a computerized process are only permitted when made a part of the processes implemented by identified Registration Agencies, as those are listed in Amendment 51 §§ 5(b)(2)-(4). The Uniform Electronic Transaction Act, codified at § 25-32-101 *et*. seq. is inapplicable to the mandates of Amendment 51.

**Question Number 2:**

Does a county clerk have the authority to accept voter registration applications completed with electronic signatures that are not submitted by identified Registration Agencies listed in Amendment 51 §§ 5(b)(2)-(4)?

**Holding of the SBEC:** No. A county clerk as the permanent registrar is tasked with recording in the centralized system voter registration applications for lawfully completed and submitted applications.   A county clerk does not have discretion to accept an application that is signed with a computer process, unless the application comes from an identified Registration Agency.

**Question Number 3:**

Are voter registration application forms that have been submitted with electronic signatures, but not received from an identified Registration Agency valid?

Appellate Case: 24-2810     Page: 285     Date Filed: 09/06/2024 Entry ID: 5432887
APP256

**Holding of the SBEC:** No. A registration application is either complete and valid or incomplete and invalid. A registration application submitted with an electronic signature, that did not originate from an identified Registration Agency, is invalid because it fails to include the required signature of the applicant.


### Question Number 4:

Are electronically signed voter registration applications received by a county clerk, but which did not originate from an identified Registration Agency valid if the voter moves to another county in Arkansas?

**Holding of the SBEC:** No. As stated in response to Question 3 above, a registration is either complete and valid or incomplete and invalid. An application submitted with an electronic signature, and not received from an identified Registration Agency, is invalid and cannot be cured by subsequently transferring the registration to another county. If the registration is invalid at the time of its submission, it remains invalid for that voter until cured by submission of a complete and valid voter registration application that includes a wet signature on a paper form or is submitted by an identified Registration Agency.

APP257

## III.  ANALYSIS

**A.  Does Arkansas Constitutional Amendment 51 permit electronic signatures for voter registration applications that are not processed through the Department of Motor Vehicles?**

1. Arkansas Constitutional Amendment 51 establishes the current system of permanent personal voter registration in Arkansas. Ark. Const. amend. 51, § 1.  The amendment further provides that "No person shall vote or be permitted to vote in any election unless registered in a manner provided for by this amendment." *Id*. at § 3. A voter who is registered according to the requirements of Amendment 51 does not have to register to vote again, unless "such registration is cancelled or subject to cancellation in a manner provided for by this amendment." *Id*. at § 4.

2. The County Clerk is the permanent registrar for each county in the state. *Id*. at § 2(b). A voter may register in-person by appearing at the County Clerk's office and completing the necessary form in the presence of the Clerk. *Id*. at § 9(h).

3. An applicant may utilize application services provided by State authorized and identified "Registration Agencies."  *Id*. § 5(a). Registration Agencies are identified as the "Office of Driver Services of the Revenue Division of the Department of Finance and Administration and all State Revenue Offices; Public assistance agencies, which shall mean those agencies that provide services under the Food Stamps, Medicaid, Aid to Families with Dependent Children (AFDC), and the Special Supplemental Food Program for Women, Infants and Children (WIC) programs; Disabilities agencies, which shall mean agencies that offer state-funded programs primarily engaged in providing services to persons with disabilities; Public Libraries; and the Arkansas National Guard." *Id*. at §§ 5(a)(1)-(5).

4. Of these Registration Agencies, only certain ones are designated as eligible to utilize a "computer process" as part of their voter registration applications.  *Id*. at §§ 5(b)(2)-(4). The Office of Driver

Appellate Case: 24-2810   Page: 287   Date Filed: 09/06/2024 Entry ID: 5432887

Services and State Revenue Offices, public assistance agencies, and disability agencies may each use "**a computer process**" when computer process is available as part of the agencies' interactions with an applicant. *Id*. at §§ 5(b)(2)-(4) (emphasis added).

5. A voter may also mail a "state or federal mail voter registration application form" to register. *Id*. at § 9(c)(2). Furthermore, "[a]ny person may distribute state registration cards." *Id*. at § 5 (b)(1).

6. The voter registration card "may only require identifying information, including **signature or mark**, and other information, including data relating to previous registration by the applicant, as is necessary to assess the applicant's eligibility and to **administer voter registration** and **other parts of the election process**." *Id*. at § 6(a)(1) (emphasis added). The voter must include his or her "signature or mark made under penalty of perjury that the applicant meets each requirement for voter registration. *Id*. at § 6(a)(3)(F).

7. A voter registration application that is submitted in-person by the voter, mailed, or delivered by a third-party registration organization must be signed by the applicant, thus meeting the Signature or Mark requirement of Amendment 51 §§ 6(a)(1) & 6(a)(3)(F).

8. The Arkansas Supreme Court provides that when construing "a provision of the Arkansas Constitution, if the language of the provision is plain and unambiguous, each word must be given its obvious and common meaning, and neither rules of construction nor rules of interpretation may be used to defeat the clear and certain meaning of a constitutional provision. *Buonauito v. Gibson*, 2020 Ark. 352, 6, 609 S.W.3d 381, 385 (2020) (citing Ghegan & Ghegan, Inc., v. Weiss, 338 Ark. 9, 991 S.W.2d 536 (1999)).

9. The Arkansas Supreme Court also utilizes the statutory construction principle of "expressio unius est exclusio alterius" that means the express designation of one thing may properly be construed to mean the exclusion of another." *Id*. at 6, 609 S.W.3d at 386. This term is described as "negative implication." *State ex. Rel.*

Appellate Case: 24-2810   Page: 288   Date Filed: 09/06/2024 Entry ID: 5432887

*Rutledge v. Purdue Pharma*, 2021 Ark. 133, 624 S.W.3d 106, 111 (2021) (citing Antonin Scalia & Byan A. Garner, Reading Law: *The Interpretation of Legal Texts*, 107 (2012)).

10.     Amendment 51 refers to "Computer Process" only regarding "Registration Agencies." The term "Computer Process" is unambiguous and is described within Amendment 51 for those identified "Registration Agencies."

11.     The use of a computer process for voter registration applications is limited to the identified "Registration Agencies." The Office of Driver Services and State Revenue offices may use a computer process when assisting a citizen with voter registration when the computer system minimizes duplicative information. Ark. Const. amed. 51 § 5(b)(2).  They must also have "available the federal or state mail voter registration application form" for customers. *Id.*

12.     Public assistance agencies and disabilities agencies can use "computer process when a computer process is available." *Id.* at §§ (b)(3) & (4). Public assistance and disabilities agencies must use a form or process that combines the application for their services with voter registration when available.

13.     The inclusion of "Computer Process" with one avenue of voter registration application, while not including that term in other voter registration application processes means that the drafters of the Amendment recognized the distinction between Registration Agencies and other means of registration when a registration application form is used.  The inclusion of "Computer Process" for one group of registration methods means the exclusion of "Computer Processes" in the other methods of voter registration application.

14.     A voter's signature or mark is required as part of the voter registration process.  *Id.* at § 6(a)(1). The voter's signature or mark is more than a just the applicant's affirmation of the responses provided on the application.  The signature or mark provided by a

Appellate Case: 24-2810     Page: 289     Date Filed: 09/06/2024 Entry ID: 5432887

voter is a necessary component for the verification of the voter's identity.

15.     A voter who submits a request for an absentee ballot, for example, must sign the absentee ballot application. The signature of the voter is compared between a voter's registration application and the voter's absentee ballot application. Ark. Code Ann. § 7-5-404(a)(2)(A). If the two submissions are "not similar, the county clerk shall not provide an absentee ballot to the voter." *Id*. This signature comparison is one of the "**other parts of the election process**" referenced in Amendment 51. Ark. Const. amend. 51 § 6(a)(1) (emphasis added).

16.     Ensuring that lawfully registered voters sign or mark their documents is further supported by the criminal penalties associated with signature forgery. Forging the "signature of a voter on an absentee ballot application, absentee ballot voter statement, or voter registration application," is a felony.  Ark. Code Ann. § 7-1-105(a)(19).

17.     The Uniform Electronic Transaction Act of 2001 (codified at Ark. Code Ann. § 25-32-101, *et seq*.) is an Arkansas statute which allows, but does not require, under certain circumstances, "electronic signatures" to be a valid legal signature for purposes of many business, commercial, and governmental affairs transactions. Ark. Code Ann. §§ 25-32-102(8), (9) & (17).  The statute defines what is an "electronic signature" and when such an electronic signature may be substituted for an actual physical signature. *Id*.

18.     The scope of this statute is limited by its terms in stating that its provisions are "subject to other applicable substantive law." Ark. Code Ann. § 25-32-103(d).  Additionally, its construction and application are further limited to be "consistent with other applicable law." Ark. Code Ann. § 25-32-106(1).

19.     The substantive and applicable law regarding voter registration in the State of Arkansas is Amendment 51.  Computer Processes are expressly permitted for identified Registration Agencies.  Computer Processes are not permitted for other means

Appellate Case: 24-2810     Page: 290     Date Filed: 09/06/2024 Entry ID: 5432887

of voter registration applications. The inclusion of the term "Computer Process" for Registration Agencies is an express authorization of computer processes as part of the completion of voter registration while engaging with those identified Registration Agencies on other matters.

20.     A voter registration application completed and submitted, other than through an identified Registration Agency, cannot include the use of computerized signatures or marks. The Uniform Electronic Transaction Act of 2001 is self-limiting in its applicability by its terms. Accordingly, the provisions of the Uniform Electronic Transaction Act of 2001 do not apply to the current voter registration system prescribed by Amendment 51.

21.     The signature or mark requirement must be made by a wet signature or wet mark applied to the paper form by the voter without the use of a computer-generated signature or mark or computer reproduced signature or mark.

22.     A disabled voter may receive assistance in making his or her signature or mark by another person who provides the name, address, and telephone number of the assistor.

23.     A voter registration application that is submitted by an identified Registration Agency, listed in Amendment 51 § 5(b)(2)-(4) may utilize a computer process for the voter registration application. All other voter registration applications must be submitted with a wet signature or wet mark made on the paper form that is transmitted to the permanent registrar.

APP262

**B.** **Does a county clerk have the authority to accept voter registration applications completed with electronic signatures that are not submitted by identified Registration Agencies listed in Amendment 51 §§ 5(b)(2)-(4)?**

24.     The permanent registrar for a county "shall register qualified applicants when a legible and complete voter registration application is received and acknowledged by the permanent registrar." *Id.* at § 9(c)(1).

25.     When a voter submits his or her voter registration by mail, it will be accepted by the permanent registrar when "[a] legible and complete voter registration application form is postmarked not later than thirty (30) days before the election…." *Id.* at § 9(c)(3).

26.     If an application is missing required information, then the "permanent registrar **shall** contact the applicant to obtain the missing information." *Id.* at § 9(d) (emphasis added).  Furthermore, when an "applicant lacks one (1) or more of the qualifications required by law of voters in this state, the permanent registrar **shall not** register the applicant, but **shall** document the reason for denying the applicant's registration and promptly file or enter the application and the documented reason for denying registration in the statewide registration record files." *Id.* at § 9(f) (emphasis added).

27.     A county clerk, as the permanent registrar, does not have the authority to accept a voter registration application that is signed with a computer processed or computer-generated signature or mark unless the application is submitted by an identified Registration Agency. A paper voter registration application that is submitted by a voter in-person, mailed, or delivered by a third-party registration organization must be signed with a wet signature or wet mark made by the voter applicant.

Appellate Case: 24-2810     Page: 292     Date Filed: 09/06/2024 Entry ID: 5432887
APP263

**C.**   **Are voter registration application forms that have been submitted with electronic signatures, but not received from identified Registration Agency valid?**

28.      As discussed in response to **Sections A** and **B** above, a voter's registration application that is signed with an electronic signature and delivered by the voter, mailed by the voter, or submitted on behalf of the voter by a third-party registration organization is not complete and, therefore, not valid.

29.      Electronic or computer processed voter registration applications are only permitted when submitted by an identified Registration Agency listed in Amendment 51 § 5(b)(2)-(4).

**D.**   **Are electronically signed voter registration applications received by a county clerk, but which did not originate from an identified Registration Agency valid if the voter moves to another county in Arkansas?**

30.      A voter, who is properly registered, "may cause his or her registration to be transferred to his or her new address or new name by completing and mailing a federal or state mail voter registration application form." *Id.* at § 10(a).

31.      The voter may also update his or her address at the Office of Driver Services, state revenue offices, public assistance agencies, disabilities agency, or other voter registration agency, "by signing a mailed request to the permanent registrar, giving his or her present address and the address at which he or she was last registered or his or her present name and the name under which he or she last registered, or by applying in person at the office of the permanent registrar." *Id.*

32.      A registered voter may also update his or her address when moving from one county to another county by completing a mail voter registration application form, updating at a Registration Agency, signing a mailed request to the permanent registrar, or by applying in person at the new county's permanent registrar's office. *Id.* at §§ 10(b)(1)(A)-(D).

Appellate Case: 24-2810     Page: 293     Date Filed: 09/06/2024 Entry ID: 5432887
APP264

33.     A voter who is registered by an application that included an electronic signature that was created or duplicated through the use of a computer process and was delivered by the voter, mailed by the voter, or delivered on behalf of the voter by a third-party registration organization is not valid at the time of the original submission.   An invalid registration cannot be cured by subsequently moving, unless the applicant completes a new voter registration application that includes a wet signature or wet mark or is submitted on behalf of the voter by an identified Registration Agency listed in Amendment 51 § 5(b)(2)-(4).

The forgoing Order is approved and adopted by the State Board of Election Commissioners on April 23, 2024.

As evidence of its adoption, the State Board instructs the Director of the SBEC to affix his signature to this Order.

**IT IS SO ORDERED.**

Richard Chris Madison
SBEC Director

Appellate Case: 24-2810      Page: 294     Date Filed: 09/06/2024 Entry ID: 5432887

APP265

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| GET LOUD ARKANSAS, et al., | |
| Plaintiffs, | Civil Action |
| *v.* | Case No. 5:24-cv-05121-TLB |
| JOHN THURSTON, et al., | |
| Defendants. | |

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

I.    Plaintiffs are likely to succeed on the merits. ........................................................ 2

      A.    Plaintiffs have standing as to each Defendant. ........................................... 2

      B.    The use of a wet signature is immaterial in determining whether an individual is qualified to vote under Arkansas law.................................................. 6

      C.    Plaintiffs may sue to enforce the materiality provision. ............................ 12

II.    Defendants' ongoing rejection of mail voter registration applications signed with electronic signatures causes Plaintiffs irreparable harm. ....................................... 17

CONCLUSION .................................................................................................................. 20

CERTIFICATE OF SERVICE ........................................................................................... 22

APP267

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Alexander v. Sandoval,*
    532 U.S. 275 (2001)...................................................................................17

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment,*
    86 F.4th 1204 (8th Cir. 2023) ...................................................................15

*Ark. United v. Thurston,*
    517 F. Supp. 3d 777 (W.D. Ark. 2021)......................................................6

*Common Cause Ind. v. Lawson,*
    937 F.3d 944 (7th Cir. 2019) .....................................................................5

*Does v. Gillespie,*
    867 F.3d 1034 (8th Cir. 2017) .................................................................15

*Emineth v. Jaeger,*
    901 F. Supp. 2d 1138 (D.N.D. 2012)........................................................19

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024)................................................................................3, 6

*In re Ga. Senate Bill 202,*
    No. 1:21-CV-01259-JPB, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) ......................8, 9, 19

*Gonzaga Univ. v. Doe,*
    536 U.S. 273 (2002)............................................................................13, 16

*Good v. Roy,*
    459 F. Supp. 403 (D. Kan. 1978).............................................................15

*Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel,*
    570 F.3d 520 (3d Cir. 2009).....................................................................14

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982)..................................................................................4

*Health & Hosp. Corp. of Marion Cnty. v. Talevski,*
    599 U.S. 166 (2023)................................................................13, 14, 16, 17

*La Unión del Pueblo Entero v. Abbott,*
    No. 5:21-CV-0844-XR, 2023 WL 8263348 (W.D. Tex. Nov. 29, 2023)..........................7, 8, 9

APP268

*League of Women Voters of Ark. v. Thurston*,
No. 5:20-CV-05174, 2021 WL 5312640 (W.D. Ark. Nov. 15, 2021)....................................12

*League of Women Voters of Ark. v. Thurston*,
No. 5:20-CV-05174, 2023 WL 6446015 (W.D. Ark. Sept. 29, 2023) ....................................4

*League of Women Voters of Mo. v. Ashcroft*,
336 F. Supp. 3d 998 (W.D. Mo. 2018) ...............................................................................19

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ..............................................................................................19

*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) .............................................................................................19

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).............................................................................................................3

*McKay v. Thompson*,
226 F.3d 752 (6th Cir. 2000) ..............................................................................................14

*Mi Familia Vota v. Fontes*,
No. CV-22-00509-PHX-SRB, 2024 WL 862406 (D. Ariz. Feb. 29, 2024) .......................8, 12

*Migliori v. Cohen*,
36 F.4th 153 (3d Cir. 2022) ........................................................................................ *passim*

*Ne. Ohio Coal. for the Homeless v. Husted*,
837 F.3d 612 (6th Cir. 2016) ..............................................................................................15

*Osher v. City of St. Louis*,
903 F.3d 698 (8th Cir. 2018) ..............................................................................................15

*Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*,
97 F.4th 120 (3d Cir. 2024) ................................................................................................12

*Schnuck Mkts., Inc. v. First Data Merch. Servs. Corp.*,
852 F.3d 732 (8th Cir. 2017) ..............................................................................................17

*Schwier v. Cox*,
340 F.3d 1284 (11th Cir. 2003) ..................................................................................*passim*

*Schwier v. Cox*,
412 F. Supp. 2d 1266 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th Cir. 2006) ...................7, 9

*Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*,
574 F. Supp. 3d 1260 (N.D. Ga. 2021) .................................................................................5

*St. Paul Area Chamber of Com. v. Gaertner*,
    439 F.3d 481 (8th Cir. 2006) ...................................................................4

*Tex. Democratic Party v. Hughs*,
    474 F. Supp. 3d 849 (W.D. Tex. 2020).................................................17

*Town of Chester v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017).............................................................................2, 3

*United States v. Georgia*,
    892 F. Supp. 2d 1367 (N.D. Ga. 2012)................................................20

*VanDerStok v. Garland*,
    625 F. Supp. 3d 570 (N.D. Tex. 2022) .................................................19

*Vote.org v. Byrd*,
    700 F. Supp. 3d 1047 (N.D. Fla. 2023).................................................11

*Vote.org v. Callanen*,
    89 F.4th 459 (5th Cir. 2023) ........................................................ *passim*

*Wash. Ass'n of Churches v. Reed*,
    492 F. Supp. 2d 1264 (W.D. Wash. 2006) .............................................9

**Constitutional Provisions**

Ark. Const. art. 3, § 1 ..................................................................................7

Ark. Const. amend. 51, § 5 ...........................................................................8

Ark. Const. amend. 51 § 11 ..........................................................................7

**Statutes**

42 U.S.C. § 1396a(a)(23)(A) ......................................................................16

42 U.S.C. § 4622(a) ...................................................................................15

52 U.S.C. § 10101 ............................................................................ *passim*

Ark. Code Ann. § 10-3-309(c) ....................................................................18

**Other Authorities**

Fed. R. Civ. P. 15(d) ..................................................................................19

Appellate Case: 24-2810   Page: 299   Date Filed: 09/06/2024   Entry ID: 5432887
APP270

**INTRODUCTION**

In their opening brief, Plaintiffs Get Loud Arkansas ("GLA"), Vote.org ("VDO"), Nikki Pastor, and Blake Loper explained why election officials cannot lawfully reject a mail voter registration application simply because the applicant entered an electronic, rather than a handwritten, signature. The Civil Rights Act's materiality provision prohibits state and local election officials from rejecting a voter registration application due to errors or omissions that are "not material in determining whether such individual is qualified under State law." 52 U.S.C. § 10101(a)(2)(B). The instrument used to enter a signature has nothing to do with determining voter qualifications. Defendants barely dispute that point; *nowhere* in their oppositions do they explain how a wet signature—as compared to a digital or electronic signature—is material in determining whether a person is qualified to vote. Nor could they. In fact, the Pulaski County Clerk, for her part, *concedes* that Plaintiffs have a valid materiality provision claim.

Rather than grapple with the merits, Defendants chiefly dispute standing, but only in part. Each Defendant claims that *some* Plaintiffs have not suffered a cognizable injury, but none disputes that at least *one* Plaintiff has standing—which is all that Article III requires. Their arguments also distort the relevant facts. The SBEC adopted a wet signature requirement that by its own admission *requires* county clerks to reject any mail voter registration application that is signed electronically.[1] County clerks, including Defendants Harrell, Lewallen, and Hollingsworth, are constitutionally obligated to enforce this rule. And this enforcement prevents GLA and VDO from using their online tools to help register Arkansans to vote—a canonical injury-in-fact. Likewise, the rule has caused would-be Arkansas voters, including Plaintiffs Pastor and Loper, to have their voter

---

[1] Defendants Thurston, Brooks, Clemmer, Harris-Ritter, Luther, Smith, and Williams—sued in their official capacity as commissioners of the Arkansas State Board of Election Commissioners—are collectively referred herein as "the SBEC."

APP271

registration applications rejected. Enjoining Defendants' promulgation and enforcement of this arbitrary registration requirement will redress these harms. And while the SBEC alone contends that Plaintiffs may not sue to enforce the materiality provision, it ignores the overwhelming weight of precedent saying the exact opposite, as well as the plain rights-conferring language of the provision itself.

As for the remaining equitable factors, no Defendant refutes any of the extensive testimony establishing that Plaintiffs will suffer irreparable harm absent injunctive relief, or that election officials have no reason to differentiate between a handwritten and electronic signature when registering voters. Nor do Defendants dispute that the public interest favors enjoining the wet signature rule. Thus, for the purposes of Plaintiffs' motion, the critical facts are uncontested: The wet signature rule is a recent invention that denies Arkansans the right to vote based on paperwork errors or omissions that are irrelevant in determining whether an individual is qualified to vote. This arbitrary requirement plainly violates the materiality provision of the Civil Rights Act, and this Court should grant Plaintiffs' motion for preliminary injunction.

## ARGUMENT

### I.      Plaintiffs are likely to succeed on the merits.

#### A.      Plaintiffs have standing as to each Defendant.

At the outset, Defendants' fragmented standing arguments pose no barrier to preliminary relief because only a single plaintiff needs to have standing against any given defendant to obtain relief. *See, e.g.*, *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). Each Defendant here has effectively conceded that at least one Plaintiff has standing against them. The SBEC, for example, contests standing as to organizational Plaintiffs GLA and VDO, but not the individual Plaintiffs, Pastor and Loper. *See* Resp. in Opp'n to Mot. for Prelim. Inj. at 6–9, ECF No. 53 ("SBEC Opp."). The Benton and Pulaski County Clerks claim the *individual* Plaintiffs lack

2

standing to sue *them* specifically but, as in their motions to dismiss, they ignore GLA and VDO altogether. *See* ECF No. 54 at 2 (incorporating Benton County Clerk's Motion to Dismiss, ECF No. 41); ECF No. 55 at 2–3 (incorporating Pulaski County Clerk's Motion to Dismiss, ECF Nos. 39–40). And the Washington County Clerk does not contest any Plaintiff's standing. *See* ECF Nos. 50–51. Accordingly, there is no dispute that "[a]t least one plaintiff . . . ha[s] standing to seek each form of relief requested in the complaint" as to each Defendant. *Town of Chester*, 581 U.S. at 439.

Defendants' standing arguments are wrong anyway. The wet signature requirement prevents GLA and VDO from deploying tools designed to help voters register using electronic signatures, and it harms voters—like Pastor and Loper—who used GLA's online tool and had their applications rejected. These harms are traceable to, and redressable by, the SBEC—which imposed this requirement—and the county clerk Defendants, who are tasked with enforcing it. These simple and undisputed facts readily satisfy the elements of standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

### 1.    Plaintiffs have standing to sue the SBEC.

The SBEC's argument that GLA and VDO lack standing to sue its members is a non-starter. As the Supreme Court recently explained, "[g]overnment regulations that require or forbid some action by the plaintiff[s] almost invariably satisfy both the injury in fact and causation requirement." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) (explaining that "standing is usually easy to establish" in such cases). There is no dispute that the SBEC's wet signature rule prevents GLA and VDO from using their preferred tools for voter registration. *See* Decl. of Kristin Foster ¶¶ 29–30, ECF No. 46-2 ("Foster Decl."); Decl. of Andrea Hailey ¶¶ 7–9, ECF No. 46-3 ("Hailey Decl."). That alone provides GLA and VDO standing to sue the SBEC. *See All. for Hippocratic Med.*, 602 U.S. at 382.

3

APP273

That conclusion is buttressed by the fact that the wet signature rule was expressly intended to stifle GLA's voter registration efforts, as the SBEC effectively admitted. *See* Decl. of Christopher D. Dodge, ECF No. 46-7 ("Dodge Decl."), Ex. E at 4–7 (repeatedly citing GLA's voter registration efforts as the basis for the wet signature rule). Where, as here, a law "is challenged by a party who is a target or object of the [law's] prohibitions, 'there is ordinarily little question that the [law] has caused him injury.'" *St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 485 (8th Cir. 2006) (quoting *Minn. Citizens Concerned for Life v. Fed. Election Comm'n*, 113 F.3d 129, 131 (8th Cir. 1997)). This unabashed targeting of GLA's and VDO's online tools also creates a separate basis for standing: The wet signature rule forces the organizations to pursue their voter registration goals in ways that are more costly yet less efficient, all of which diverts resources from other critical programs and imperils each organization's ability to accomplish its mission. *See* Foster Decl. ¶¶ 13–16, 32; Hailey Decl. ¶¶ 7–8, 10; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (finding standing where petitioners' steering practices impaired organization's ability to provide counseling and referral services); *League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2023 WL 6446015, at *10 (W.D. Ark. Sept. 29, 2023) (finding standing where new absentee voting rules forced voter outreach organization to divert resources to ballot efforts and away from redistricting efforts). Indeed, the Fifth Circuit, based on nearly identical facts, found that VDO established organizational standing to challenge Texas's legislatively-enacted wet signature rule. *Vote.org v. Callanen*, 89 F.4th 459, 470–71 (5th Cir. 2023).[2]

---

[2] *Callanen* addressed and reached conclusions on a wide range of issues. Many of those conclusions are based on sound reasoning and achieved unanimous support among the *Callanen* panel, including on threshold issues related to standing and the enforceability of the materiality provision. *See infra* Section I.C. However, as Plaintiffs explain in Section I.B, the panel majority's conception of "materiality" is deeply flawed, as the well-reasoned dissent on that issue explained.

4

APP274

The SBEC disputes little of this. Instead, it asserts that GLA's diversion of resources to more expensive and less efficient means of registering voters did not impair its mission because voter engagement is part of GLA's normal activities. SBEC Opp. at 8. That is simply wrong: Courts have not only rejected this argument repeatedly, but also explained why it makes no sense. As the Seventh Circuit explains, "[a]ny work to undo a frustrated mission is, by definition, something in furtherance of that mission . . . [i]ndeed, we have a hard time imagining . . . why it is that an organization would undertake any additional work if that work had nothing to do with its mission." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 954–55 (7th Cir. 2019); *see also Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1270 (N.D. Ga. 2021). GLA has described how its other mission-critical activities are suffering because of its diversion of resources towards less-effective voter registration activities. Foster Decl. ¶¶ 32–36. And despite its attempts to ameliorate the harm that the wet signature rule has had on its voter registration efforts, GLA is no longer on track to meet its annual voter registration targets—which seemed readily attainable until the SBEC banned GLA's tool. *Id.* ¶¶ 8, 31. These are concrete injuries and the SBEC identifies no persuasive authority that suggests otherwise.

As to VDO, the SBEC only argues that it is not suffering a *present* injury because it had not already deployed its online tool in Arkansas. SBEC Opp. at 7–8. That is incorrect. But for the wet signature rule, VDO intends to use its e-sign function in Arkansas. Hailey Decl. ¶ 9. But because the rule is in place, VDO is currently using less effective means of assisting voters to register by offering an online tool that requires the applicant to print, sign, and send their application to their county clerk, and in doing so VDO's ability to accomplish its mission through voter registration activities is impaired. *Id.* ¶¶ 7, 10. Because VDO would utilize its e-sign function in its online tool to assist "applicants in Arkansas, just as it has done successfully in several other

5

APP275

states," *id.* ¶ 9; *see also id.* ¶¶ 4–5, 7, and the wet signature rule prevent it from doing so, *id.* ¶¶ 8–10, the organization is suffering a present injury. *See All. for Hippocratic Med.*, 602 U.S. at 395.

While both GLA and VDO have standing to sue the SBEC, it bears emphasis that the SBEC does not dispute Pastor's and Loper's standing. That concession dooms the SBEC's reliance on jurisdictional arguments to contest Plaintiffs' likelihood of success on the merits because, "[i]n a multi-plaintiff suit, only one plaintiff need satisfy the constitutional standing requirements." *Ark. United v. Thurston*, 517 F. Supp. 3d 777, 792 (W.D. Ark. 2021) (citing *Horne v. Flores*, 557 U.S. 433, 446–47 (2009)).

## 2.    Plaintiffs have standing to sue the county clerk Defendants.

The Benton and Pulaski County Clerks incorporate their arguments that Plaintiffs lack standing to sue them from their motions to dismiss. *See* ECF No. 54 at 2; ECF No. 55 at 2–3. These arguments are flawed for the reasons already explained in Plaintiffs' opposition to those motions to dismiss. *See generally* ECF No. 49. For one, they are focused exclusively on Pastor and Loper—they do not attack GLA's or VDO's standing. Nor could they. Under the Arkansas Constitution, county clerks are tasked with enforcing voter registration rules, *id.* at 2–4, and the clerks do not dispute that they are required to enforce the SBEC's wet signature rule, *id.* at 6–7. Enjoining such enforcement will redress GLA's and VDO's injuries. *Id.* at 8–9.

## B.    The use of a wet signature is immaterial in determining whether an individual is qualified to vote under Arkansas law.

Only two Defendants—the SBEC and the Washington County Clerk—dispute whether Plaintiffs are likely to succeed on their materiality provision claim. *See* SBEC Opp. at 9–13; ECF No. 51 at 2. The Pulaski County Clerk *agrees* that Plaintiffs are likely to succeed on the merits—she just claims Plaintiffs should not succeed against her, based on a flawed standing theory. ECF No. 55 at 2; *see also supra* Section I.A.2; ECF No. 49. But even the Defendants who dispute the

6

APP276

merits concede that Plaintiffs have satisfied most of the elements of a materiality provision claim—they dispute only whether a wet signature is "material in determining" a person's qualification to vote. But in doing so, they (1) misread the Civil Rights Act; (2) rely on a flawed reading of the Arkansas Constitution; and (3) point to distinguishable (and wrongly decided) out-of-circuit authority. These arguments fail.

*1.*  Rather than grapple with the materiality provision's text, Defendants seek to construct a different statute than the one Congress wrote. They claim, for instance, that the wet signature rule is "material" because it "leads to statewide uniformity" and "promot[es] the integrity of the voter registration process." SBEC Opp. at 11. Neither of those purported policy rationales has anything to do with whether a wet signature is "material in determining" a person's qualification to vote, however.[3] Under the Civil Rights Act, it is not enough for a requirement to be "helpful" in some abstract sense; it must be "material *in determining whether [an] individual is qualified under [Arkansas] law to vote*." 52 U.S.C. § 10101(a)(2)(B) (emphasis added); *see also Schwier v. Cox*, 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005) (holding preventing "fraud" did not render mandatory disclosure of social security number "material"), *aff'd*, 439 F.3d 1285 (11th Cir. 2006); *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2023 WL 8263348, at *8–9 (W.D. Tex. Nov. 29, 2023) ("*LUPE*") (holding fraud prevention did not render identification number requirement material), *stayed pending appeal sub nom. United States v. Paxton*, No. 23-50885 (5th Cir. Dec. 15, 2023) (per curiam).

---

[3] Under Arkansas law, a voter is qualified to vote if they are: (1) a U.S. citizen, (2) an Arkansas resident, (3) at least eighteen years old, (4) have not been convicted of a felony, and (5) have not been adjudged mentally incompetent by a court. Ark. Const. art. 3, § 1(a); Ark. Const. amend. 51 § 11(a). *Cf. Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003) (noting "the only *qualifications* for voting in Georgia are U.S. Citizenship, Georgia residency, being at least eighteen years of age, not having been adjudged incompetent, and not having been convicted of a felony" (emphasis in original)).

APP277

Critically, Defendants fail to dispute that Arkansas county election officials do not consider the type of instrument used in signing a voter registration application in determining whether an applicant is qualified to vote. *See* Decl. of Susan Inman ¶¶ 15–20, ECF No. 46-6 ("Inman Decl."). The materiality provision prohibits such extraneous requirements. *See, e.g.*, *Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *37 (D. Ariz. Feb. 29, 2024) (concluding that required information must be "more than useful or minimally relevant" to survive scrutiny under materiality provision); *LUPE*, 2023 WL 8263348, at *14; *In re Ga. Senate Bill 202*, No. 1:21-CV-01259-JPB, 2023 WL 5334582, at *10 (N.D. Ga. Aug. 18, 2023) ("[T]he fact that the [pen and ink signature] is not used to determine voter qualifications merely reinforces the immateriality of the [pen and ink rule]."). But even if state interests did play a role in a materiality provision analysis, Defendants offer no support for their assertion that the wet signature rule advances such interests. They offer no explanation, for example, as to how such a rule prevents fraud when many Arkansas voters already use electronic signatures to register at state agencies. *See* Ark. Const. amend. 51, § 5; *see also* Inman Decl. ¶ 18. Nor do they explain why the SBEC could not achieve uniformity by requiring clerks to *accept* electronic signatures on mail voter registration applications. Instead, they double down on their argument that the Arkansas Constitution requires a bifurcated voter registration regime, whereby voters who register at registration agencies are "authorize[d]" to use electronic signatures, but those who register in person, by mail, or via third-party services are not. SBEC Opp. at 10. That argument is wrong about Arkansas law. *See* Br. Supp. Mot. for Prelim. Inj. at 18–20, ECF No. 46-1 ("Opening Br."). And it is also far from self-evident how such a dual-track system "standardiz[es]" the state's voter registration procedure, "furthers Arkansas's interest in preventing fraud, verifying voter identity and eligibility," or "promot[es] the integrity of the voter registration process," SBEC Opp. at 11,

even if such goals had relevance to the materiality provision analysis. Defendants do not even attempt to draw a connection between the wet signature rule and these purported state interests.[4]

   *2.*   Defendants erroneously assert that the wet signature rule is "material" simply because it "comports with what is permitted in the Arkansas Constitution." *Id.* at 9. Whether or not an administrative rule comports with the state constitution says nothing about its lawfulness under the Civil Rights Act—a federal statute. This is evident from the text of the Civil Rights Act itself. Subsection (a)(1) guarantees the right of citizens "who are otherwise qualified by law to vote" to exercise that right "notwithstanding" "any constitution, law, custom, usage, or regulation of any State or Territory." 52 U.S.C. § 10101(a)(1). Even if Defendants properly interpreted Arkansas law (and they do not), that would be no defense to a materiality provision claim. *See, e.g.*, *LUPE*, 2023 WL 8263348, at *14–18 (holding state statute requiring disclosure of ID number violated materiality provision); *Senate Bill 202*, 2023 WL 5334582, at *8 (finding plaintiffs established substantial likelihood of success on claim that state statute requiring date of birth on absentee ballot outer envelope violated materiality provision); *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1270–71 (W.D. Wash. 2006) (finding statute requiring state to match potential registrants' social security number or driver's license number prior to registration likely violated materiality provision); *Schwier*, 412 F. Supp. 2d at 1276 (holding state statute requiring social security number disclosure for voter registration violated materiality provision). Adopting Defendants' view would effectively repeal the materiality provision, declaring that states may wantonly adopt practices that violate its terms provided they enshrine such rules in state law. *But see LUPE*, 2023 WL 8263348,

---

[4] Moreover, while some Defendants argue that preserving integrity and preventing fraud in the election process could be reasons for the materiality of a wet signature, they offer no evidence that the SBEC adopted the wet signature rule for those reasons or thought those reasons important enough to even mention before adopting the rule.

APP279

at *14 (rejecting "tautological[]" argument that "*whatever* requirements might be imposed by state law in order to vote" are material, as such logic "would erase the Materiality Provision from existence" (quotations omitted)). Congress enacted the materiality provision to prevent exactly that. *See Callanen*, 89 F.4th at 487 (rejecting "that States may circumvent the Materiality Provision by defining all manner of requirements . . . as being a qualification to vote and therefore 'material'").

Defendants' reading of the Arkansas Constitution is also wrong on its own terms. They appear to suggest that because Amendment 51 permits the use of a "computer process" for voter registration applications submitted by certain registration agencies, the Arkansas Constitution prohibits the use of any "computer process" outside of those agencies. *See* SBEC Opp. at 2 (citing Ark. Const. amend. 51, § 5(b)(2)–(4)). But by Defendants' own admission, the wet signature rule is "targeted to just the signature part" of the voter registration application, and all individuals can "type their address in using a computer process." Dodge Decl., Ex. I at 39:9–40:8. There is no reason (and Defendants offer none) why the Arkansas Constitution would implicitly prohibit voters from using a computer to fill out one part of an application but not others. Indeed, the Arkansas Attorney General himself came to the (correct) conclusion that the Arkansas Constitution in no way imposes a requirement for any specific *kind* of signature. Dodge Decl., Ex. D at 1, 3.

*3.* Defendants also ask this Court to follow *Callanen*'s and *Byrd*'s flawed conclusions about the materiality of a wet signature on voter registration applications but ignore the distinctions between those cases and this one. *See* Opening Br. at 22–23. Most notably, nothing in Arkansas law reflects any "legislative judgment" that a wet signature is important—let alone material—in determining voter eligibility. *See Callanen*, 89 F.4th at 480. In fact, Arkansas law reflects the exact

APP280

*opposite* judgment—that "a signature marked by many means is valid." Dodge Decl., Ex. D at 3 (further determining "that an electronic signature satisfies Amendment 51").

In any event, those decisions are based on erroneous reasoning. In *Byrd*, the district court erred by shifting the analysis away from whether the form of a signature is material in determining a voter's qualifications to whether "a copied, faxed, or otherwise non-original signature is equal in stature to an original, wet signature." *Vote.org v. Byrd*, 700 F. Supp. 3d 1047, 1055 (N.D. Fla. 2023). But the materiality provision does not include a safe harbor for non-material requirements that have some purported justification: It prohibits denial of the right to vote based on any error or omission unless the error or omission materially bears on the voter's qualifications. *See* 52 U.S.C. § 10101(a)(2)(B). Similarly, the majority opinion in *Callanen* contains significant legal errors as to the definition of "material," even as it appropriately rejected the same threshold arguments Defendants raise here. *See supra* note 2. As the dissent recognized, the majority opinion "invokes a line of constitutional vote-denial cases . . . for the proposition that states have considerable discretion in establishing rules for their own elections," but ignores the fact that the plain text of the materiality provision "expressly limits states' purported 'considerable discretion.'" *Callanen*, 89 F.4th at 491–92 (Higginson, J., dissenting) (cleaned up). "The considerable deference to be given to state election procedures thus has no place in a materiality analysis." *Id.* at 492 (cleaned up). The majority also erroneously injected "the multifactorial test in *Thornburg v. Gingles*— which applies to section 2 claims under the Voting Rights Act—in its materiality analysis." *Id.* (citing 478 U.S. 30 (1986)). But "reliance on the *Gingles* factors is inapposite in the materiality context" because plaintiffs bringing a claim under the materiality provision "need only demonstrate that the state's procedural requirement 'is not material in determining whether' they are 'qualified' to vote." *Id.* (quoting 52 U.S.C. § 10101(a)(2)(B)). The divided panel's majority

constructed this strained reading of "materiality" from whole cloth. And most importantly, the *Callanen* majority disregarded the undisputed fact that election officials *did not use* the wet signature in any capacity to determine a voter's qualifications, which should have "slam[med] the door shut on any argument that [a wet signature] is material." *Id.* at 493 (citation omitted). Indeed, if this Court were to follow the *Callanen* majority on the merits, it would need to cast aside the materiality provision's plain text, graft irrelevant legal frameworks onto the Civil Rights Act, and ignore factual evidence to arrive at an illogical conclusion. The Court should decline to do so.

### C.    Plaintiffs may sue to enforce the materiality provision.

Federal courts have overwhelmingly concluded that private plaintiffs may sue to enforce the materiality provision. *See, e.g., Callanen*, 89 F.4th at 473–78; *Migliori v. Cohen*, 36 F.4th 153, 158–62 (3d Cir.), *vacated on other grounds sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022);[5] *Schwier*, 340 F.3d at 1294–97; *Mi Familia Vota*, 2024 WL 862406, at *33–36. Another judge from this same district is among this chorus of authority. *See League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021) ("A private right of action exists to enforce the materiality provision of the Civil Rights Act 52 U.S.C. § 10101[.]"). Nonetheless, the SBEC argues that there is no mechanism to privately enforce the materiality provision. SBEC Opp. at 13–15. This argument not only ignores the well-reasoned line of cases holding the opposite, but it also fails to apply recent Supreme Court precedent establishing the framework for determining when federal statutes confer enforceable rights.

---

[5] Although *Migliori* was vacated by the U.S. Supreme Court on mootness grounds, a subsequent decision of the Third Circuit—in a similar lawsuit also brought by private plaintiffs—did not revisit the conclusion that the materiality provision may be privately enforced. *See Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 139 (3d Cir. 2024) (holding materiality provision limited to voter qualification determinations and reversing district court order on those grounds only); *see also id.* at 143 n.3 (Shwartz, J., dissenting) (analyzing basis of plaintiffs' private right to enforce materiality provision).

APP282

*1.*   Under the Supreme Court's *Gonzaga* test, a federal statute is privately enforceable under § 1983 "where the provision in question is phrased in terms of the persons benefited and contains rights-creating, individual-centric language with an unmistakable focus on the benefited class." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) (cleaned up); *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84 (2002). The materiality provision unmistakably satisfies this test. The first section of the statute makes clear that "[a]ll *citizens of the United States who are otherwise qualified by law to vote* . . . *shall be entitled and allowed to vote at all such elections*." 52 U.S.C. § 10101(a)(1) (emphases added). And the materiality provision specifically prohibits any "person acting under color of law [from] . . . deny[ing] th[at] *right of any individual*." *Id.* § 10101(a)(2)(B) (emphasis added). Thus, "the focus of the [materiality provision's] text is . . . the protection of each individual's right to vote," *Schwier*, 340 F.3d at 1296, and it "places all citizens qualified to vote at the center of its import," *Migliori*, 36 F.4th at 159 (cleaned up). That text is "decidedly more rights-focused than language the Court has held *not* to confer a private right." *Callanen*, 89 F.4th at 474–75.[6]

The SBEC ignores the "right of any individual" language, and instead argues that the materiality provision's text "focuses on the local official regulated, rather than individual voters." SBEC Opp. at 14. But it ignores that the Third, Fifth, and Eleventh Circuits have each rejected this precise theory when it comes to the materiality provision. *Callanen*, 89 F.4th at 473–75; *Migliori*, 36 F.4th at 159; *Schwier*, 340 F.3d at 1296–97. And the Supreme Court has since explained that it "would be strange to hold that a statutory provision fails to secure rights simply because it

---

[6] The materiality provision's text also parallels the rights-conferring language in Titles VI and IX, which the Supreme Court held confers an enforceable private right of action. *Gonzaga*, 536 U.S. at 284. Specifically, the materiality provision's "[n]o person . . . shall" formulation targets "the denial of rights to individuals" and is "clearly analogous to the rights-creating language [in Titles VI and IX] cited by the Supreme Court in *Gonzaga*." *Schwier*, 340 F.3d at 1291, 1296.

APP283

considers, alongside the rights bearers, the actors that might threaten those rights (and we have never so held)." *Talevski*, 599 U.S. at 185 (holding that similar language in the Medicaid Act conferred a federal right); *see also Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 530 (3d Cir. 2009) (finding it irrelevant that the statute was framed in terms of "responsibilities imposed on the state").[7] What matters is that the provision contains "rights-creating language" and speaks "in terms of the persons benefited." *Talevski*, 599 U.S. at 186 (citations omitted). The materiality provision meets that test.

   ***2.*** The SBEC ignores the authority above, choosing instead to rely on a small (and increasingly isolated) number of cases concluding that the materiality provision can only be enforced by the U.S. Attorney General. SBEC Opp. at 13 (collecting cases). But these cases offer threadbare analysis, and not one conducts the requisite analysis under *Gonzaga* to determine whether the materiality provision may be privately enforced through § 1983. For example, in *McKay v. Thompson*, the Sixth Circuit held (prior to *Gonzaga*) in *one sentence* that the materiality provision "is enforceable by the Attorney General, not by private citizens." 226 F.3d 752, 756 (6th Cir. 2000). That was the sum of its analysis; a stark contrast to the extensive treatment the issue received in *Schwier*, *Migliori*, and *Callanen*, each of which post-date *McKay* (and two of which reject it expressly). *See Callanen*, 89 F.4th at 473–78; *Migliori*, 36 F.4th at 159–62; *Schwier*, 340 F.3d at 1294–97.[8] A subsequent decision from the Sixth Circuit acknowledged that the Eleventh

---

[7] In finding the provision privately enforceable, the Third, Fifth, and Eleventh Circuits detailed the extensive legislative history showing that Congress desired such private enforcement. *See Callanen*, 89 F.4th at 474–78; *Schwier*, 340 F.3d at 1294–97; *see also Migliori*, 36 F.4th at 161–62. That extensive history also weighs strongly in favor of finding private enforcement.

[8] The Sixth Circuit also relied on nothing more than a single district court decision that similarly offered no real analysis of the issue. *See McKay*, 226 F.3d at 756 (citing *Willing v. Lake Orion Cmty. Sch. Bd. of Trs.*, 924 F. Supp. 815, 820 (E.D. Mich. 1996)). That decision, in turn, relied solely upon an earlier district court case that did not even involve the materiality provision and

Circuit had broken with *McKay* but recognized that it could not revisit the matter because "[*McKay*] binds this panel." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612 (6th Cir. 2016). Since then, every court considering the issue—at both the appellate and trial level, including in this district—has concluded that the materiality provision may be enforced by private parties.

The SBEC next resorts to irrelevant authority. In *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, the plaintiffs did not bring their claim under § 1983 and chose to proceed exclusively on the theory that the Voting Rights Act supplies its own implied cause of action. 86 F.4th 1204, 1208–09 (8th Cir. 2023) (recognizing the question of "*who* can sue under § 2" is the "centerpiece" of the case); *see also id.* at 1212–13 ("[W]e already know that private plaintiffs can bring proceedings to enforce voting guarantees that the Attorney General cannot. The most prominent example is 42 U.S.C. § 1983." (cleaned up)). The Court accordingly did not analyze whether that claim could have been brought through § 1983, nor did it discuss the Supreme Court's decision in *Talevski*. *See id.* at 1217–18 (rejecting plaintiffs' "belated request to add a § 1983 claim to their complaint" and "declin[ing] to say anything further about what would have happened if the advocacy groups had acted sooner"). The decision is therefore doubly irrelevant here: (1) it did not concern Plaintiffs who chose to proceed under § 1983, as Plaintiffs do here, *see* Compl. at 3, 23, ECF No. 2; and (2) because it concerned the Voting Rights Act—not the Civil Rights Act—it offers no insight into whether the relevant statutory text *here* satisfies *Gonzaga*. Also irrelevant are *Osher v. City of St. Louis*, 903 F.3d 698, 702 (8th Cir. 2018), and *Does v. Gillespie*, 867 F.3d 1034, 1041 (8th Cir. 2017). Those cases concerned statutes—42 U.S.C. §

---

that concluded with little analysis that the Attorney General's right to enforce a statute implicitly precludes a private right. *See Good v. Roy*, 459 F. Supp. 403, 405–06 (D. Kan. 1978). Its suggestion predates *Gonzaga* and is squarely rejected by the various other courts to consider this issue in the context of the materiality provision.

APP285

4622(a) and 42 U.S.C. § 1396a(a)(23)(A), respectively—that lack the "explicit rights-creating terms" and "unmistakable focus on the benefited class" that are clearly present in the materiality provision. *Gonzaga*, 536 U.S. at 284 (quotation omitted).

**3.** Because Plaintiffs have "demonstrat[ed] that [the materiality provision] confers rights on a particular class of persons, the right is presumptively enforceable by § 1983." *Id.* at 274 (citation omitted). This presumption can only be overcome if Defendants show that Congress *expressly* forbids proceeding under § 1983 or does so *implicitly* by creating a "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Talevski*, 599 U.S. at 186. The Civil Rights Act does not expressly forbid the use of § 1983 to enforce the materiality provision, nor does it expressly grant the Attorney General exclusive enforcement power. *See Migliori*, 36 F.4th at 160–61. While the SBEC briefly contends that the Attorney General's right to enforce the materiality provision creates *implicit* incompatibility with private enforcement, SBEC Opp. at 14, it fails to say much as to why. Contrary to that bare claim, the statute itself contemplates private enforcement, authorizing suits in federal court "without regard to whether the party aggrieved shall have exhausted" any remedies provided by law. 52 U.S.C. § 10101(d); *see also Schwier*, 340 F.3d at 1296 (explaining this language was intended to "remove roadblocks" for suits by private plaintiffs (cleaned up)). The legislative history of the Civil Rights Act further makes clear that Congress *desired* such concurrent enforcement. *Callanen*, 89 F.4th at 475–76 (interpreting "the[] 1957 amendments as augmenting the implied but established private right to sue with an explicit right in the Attorney General"). In fact, "the first part of what is now Section 10101 was routinely enforced through Section 1983. That means there is a long history of *compatibility* between at least parts of Section 10101 and Section 1983 that predates the addition of the Attorney General enforcement in 1957." *Id.* at 476 (citing *Schwier*, 340 F.3d at 1295).

APP286

Finally, there is nothing "comprehensive" about enforcement by the Attorney General. *Talevski*, 599 U.S. at 186. The Supreme Court has found "implicit preclusion" in only three cases, each of which "concerned statutes with self-contained enforcement schemes that included statute-specific rights of action." *Talevski*, 599 U.S. at 189 (collecting cases). The materiality provision, in contrast, "lacks any specific 'private judicial right of action' or 'private federal administrative remedy' that requires plaintiffs to comply with particular procedures." *Callanen*, 89 F.4th at 476 (quoting *Talevski*, 599 U.S. at 190). Nor does it contain an administrative exhaustion requirement or a more restrictive private remedy. *Migliori*, 36 F.4th at 160, 162. "Thus, this exception to using Section 1983 is inapplicable." *Callanen*, 89 F.4th at 476.[9]

## II.   Defendants' ongoing rejection of mail voter registration applications signed with electronic signatures causes Plaintiffs irreparable harm.

The SBEC presents three arguments on irreparable harm, but otherwise ignores the remaining equitable factors, conceding that the public interest weighs in favor of preliminary relief and that the harm faced by Plaintiffs outweighs any faced by Defendants. *See* Opening Br. at 26–27; *see also Schnuck Mkts., Inc. v. First Data Merch. Servs. Corp.*, 852 F.3d 732, 737 (8th Cir. 2017) (concluding that defendants forfeit the arguments they do not raise).[10] This Court should swiftly reject the SBEC's novel attempts to minimize the irreparable harm that the wet signature requirement continues to cause Plaintiffs.

---

[9] Furthermore, the text, structure, and legislative history exhibits "affirmative evidence" that Congress intended to independently supply a private remedy through the Civil Rights Act. *Alexander v. Sandoval*, 532 U.S. 275, 293 n.8 (2001). For one, the statute establishes jurisdiction for any "proceedings instituted" by a "party aggrieved" to enforce the law. 52 U.S.C. § 10101(d). In addition, private litigants obtained equitable remedies under the Civil Rights Act for decades before Congress amended the statute to provide for enforcement by the Attorney General. *Schwier*, 340 F.3d at 1295. And "[a]fter the 1957 amendment . . . private plaintiffs continued to bring their own causes of action under other provisions of the Act, including the Materiality Provision." *Tex. Democratic Party v. Hughes*, 474 F. Supp. 3d 849, 858 (W.D. Tex. 2020) (collecting cases).

[10] No county clerk Defendant disputes that each of the equitable factors weigh in Plaintiffs' favor.

APP287

*1.*  The SBEC contends Plaintiffs are not harmed by its emergency rule because it will soon lapse. SBEC Opp. at 15. But that argument is flawed in two key respects. To begin, the irreparable harm Plaintiffs are experiencing is not caused only by that emergency rule. As Plaintiffs have made clear, they challenge *any* requirement that mail voter registration forms contain wet signatures, not merely the emergency rule expiring on September 1, 2024. *See, e.g.*, Compl. at 2 n.1 ("The phrase 'wet signature rule' refers to the State Board of Election Commissioners' emergency rule, and any other regulations or procedures that county clerks have applied to reject applications with electronic or digital signatures."), 24–25 (requesting injunctive relief against enforcement of "any other requirement that applicants sign their voter registration applications by hand or with a wet signature" and rejection "on the grounds that the application contains an electronic or digital signature"); *see also* Opening Br. at 8 & n.5, 27 (recognizing ongoing final rulemaking process and requesting this Court "enter a preliminary injunction enjoining Defendants . . . from refusing to accept any voter registration application simply because it was signed with a digital or electronic signature").

Further, the SBEC's argument cynically ignores that, ten days *before* filing its opposition, it adopted a *permanent* rule that is *identical* to the emergency rule. *See* ECF No. 53-1 at 1 (recognizing that the SBEC "proceeded with adopting the Rule for permanent promulgation").[11] Although the permanent rule does not go into effect until it is reviewed by the Arkansas Legislative Council, *see* Ark. Code Ann. § 10-3-309(c), Plaintiffs are not required to suffer silently until the

---

[11] *See also* Mary Hennigan, *Arkansas election board approves voter registration rule*, Arkansas Advocate (July 15, 2024), *available at* https://arkansasadvocate.com/2024/07/15/arkansas-election-board-approves-voter-registration-rule/ (reporting that the SBEC approved permanent wet signature rule).

APP288

very same requirement at issue is made permanent. And Plaintiffs can, of course, supplement their complaint to account for any such factual developments. *See* Fed. R. Civ. P. 15(d).

*2.* The SBEC's suggestion that organizations cannot suffer irreparable harm in the voting context is simply wrong. "Courts routinely recognize that organizations suffer irreparable harm when a defendant's conduct causes them to lose opportunities to conduct election-related activities, such as voter registration and education." *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) (collecting cases). GLA's and VDO's irreparable harm here includes "mobilization opportunities [that] cannot be remedied once lost." *Senate Bill 202*, 2023 WL 5334582, at *11 (quotation omitted); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("once the election occurs, there can be no do-over and no redress"); *Emineth v. Jaeger*, 901 F. Supp. 2d 1138, 1142 (D.N.D. 2012) ("Elections are, by nature, time sensitive and finite. While there will be other elections, no future election will be *this* election."). And it further includes diversion of resources that cannot be recouped. *See Louisiana v. Biden*, 55 F.4th 1017, 1033 (5th Cir. 2022) (affirming preliminary injunction based on "diversion of resources" resulting from "nonrecoverable compliance costs"); *Senate Bill 202*, 2023 WL 5334582, at *11 (similar); *see also* Foster Decl. ¶¶ 32–36; Hailey Decl. ¶ 10.

The SBEC's insistence to the contrary—that Plaintiffs could simply comply to avoid harm—gets it backwards. SBEC Opp. at 15–16. "[I]t is no answer to say that [a plaintiff] may avoid [irreparable] harm by complying with an unlawful agency rule." *VanDerStok v. Garland*, 625 F. Supp. 3d 570, 584 (N.D. Tex. 2022). GLA's and VDO's irreparable injuries cannot be remedied by compliance with the wet signature rule, because those injuries are *caused* by their ongoing compliance. *See supra* Section I.A. Thus, the injuries inflicted upon GLA and VDO are irreparable. *See* Opening Br. at 24–26.

*3.*  Lastly, Plaintiffs Pastor and Loper have been irreparably harmed because they have been "deprived of a right guaranteed by the Civil Rights Act." Opening Br. at 26. In attempting to dismiss their irreparable harm, the SBEC appears to conflate the opportunity to register to vote in the abstract with the opportunity to register to vote consistent with the guarantees of federal law. *Compare* SBEC Opp. at 16, *with* Opening Br. at 26. The SBEC's argument that Pastor and Loper could avoid injury by simply complying with the wet signature rule, *see* SBEC Opp. at 16, would undermine the very premise of federal voting protections: that enforced compliance with extraneous requirements violates the civil rights of voters entitled to register to vote, cast a ballot, and have that ballot counted. 52 U.S.C. § 10101; *see also United States v. Georgia*, 892 F. Supp. 2d 1367, 1375 (N.D. Ga. 2012).

## CONCLUSION

The Court should enter a preliminary injunction enjoining Defendants from enforcing the wet signature rule and from refusing to accept any voter registration application because it contains a digital or electronic signature.

APP290

Dated: August 5, 2024

Respectfully submitted,

*/s/ Uzoma N. Nkwonta*

SHULTS LAW FIRM LLP
Peter Shults (Ark. 2019021)
Amanda G. Orcutt (Ark. 2019102)
Steven Shults (Ark. 78139)
200 West Capitol Ave., Suite 1600
Little Rock, AR 72201
T: (501) 375-2301
F: (501) 375-6861
pshults@shultslaw.com
aorcutt@shultslaw.com
sshults@shultslaw.com

ELIAS LAW GROUP LLP
Uzoma N. Nkwonta* (DC 975323)
Christopher D. Dodge* (DC 90011587)
Omeed Alerasool* (DC 90006578)
Julie Zuckerbrod* (DC 1781133)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
F: (202) 968-4498
unkwonta@elias.law
cdodge@elias.law
oalerasool@elias.law
jzuckerbrod@elias.law

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served this 5th day of August, 2024, with a copy of this document via the Court's CM/ECF system.

_/s/ Uzoma N. Nkwonta_
Uzoma N. Nkwonta

22

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

GET LOUD ARKANSAS; VOTE.ORG;
NIKKI PASTOR; and TRINITY " BLAKE"
LOPER                                                      PLAINTIFFS


v.                              CASE NO.  5:24-CV-05121


JOHN THURSTON; SHARON BROOKS;
JAMIE CLEMMER; BILENDA HARRIS-
 RITTER; WILLIAM LUTHER;
JAMES HARMON SMITH, III; and JOHNATHAN
WILLIAMS, in their official capacities
as Commissioners of the Arkansas State
Board of Election Commissioners;
BETSY HARRELL, in her official capacity
as Benton County Clerk; BECKY LEWALLEN,
in her official capacity as Washington
County Clerk; and TERRI HOLLINGSWORTH,
 in her official capacity as Pulaski
County Clerk                                               DEFENDANTS


## MINUTES FOR BENCH RULINGS

The Court's minutes shall reflect that on August 29, 2024, the Court heard argument on Plaintiffs' Motion for Preliminary Injunction (Doc. 46) and Motions to Dismiss the Benton and Pulaski County Clerks, respectively (Docs. 39 and 41). The Court stated a summary of its findings and from the Bench **GRANTED the Motion for Preliminary Injunction and DENIED the Motions to Dismiss**.

With regard to the Plaintiffs' Motion for Preliminary Injunction, the Court found: (1) the requirement that voter registration applications be signed with a handwritten "wet" signature, rather than an electronic or digital signature, likely violates the Materiality Provision of the Civil Rights Act of 1964; (2) that enforcement of the wet signature rule will irreparably harm Plaintiffs; and (3) that both the balance of equities and public interest favor granting preliminary relief.

APP293

The Court then **ORDERED** from the Bench that Defendants, (and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them) were **PRELIMINARILY ENJOINED** from enforcing the wet signature rule AND from rejecting or refusing to accept any voter registration application on the ground that it was signed with a digital or electronic signature.

The Court also granted Plaintiffs—to the extent they deem necessary for technical reasons—leave to file a supplemental pleading(s) to envelope within their claims the version of the wet signature rule that was formally approved by the Arkansas Legislative Council on August 23rd.  Any such supplemental pleading(s) must be filed by September 4th and the Defendants may file an amended response(s) by no later than September 6th.

The Court stated it will file a more fulsome memorandum opinion to further explain its findings and rulings by no later than September 10th, at which time the motions may be terminated.

Mr. Talley then orally moved for a stay of the Preliminary Injunction as Ordered from the Bench, which the Court Denied.

**J. Brooks.**

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

GET LOUD ARKANSAS, et al.,                                    PLAINTIFF

v.                           CASE NO. 5:24-CV-05121-TLB

JOHN THURSTON, et al.,                                       DEFENDANTS

<u>NOTICE OF APPEAL</u>

Defendants John Thurston, Sharon Brooks, Jamie Clemmer, Bilenda Harris-Ritter, William Luther, James Harmon Smith, III, and Johnathan Williams, in their official capacities as Commissioners of the State Board of Election Commissioners (collectively, the "SBEC"), give notice of their appeal to the United States Court of Appeals for the Eighth Circuit from this Court's bench ruling issued on August 29, 2024, *see* ECF No. 65, granting Plaintiffs' Motion for Preliminary Injunction, *see* ECF No. 46, and ordering from the bench that Defendants were "PRELIMINARILY ENJOINED from enforcing the wet signature rule AND from rejecting or refusing to accept any voter registration application on the grounds that it was signed with a digital or electronic signature." ECF No. 65.

The Eighth Circuit has jurisdiction because this is an appeal from an interlocutory order of a district court of the United States granting a preliminary injunction. 28 U.S.C. § 1292(a)(1).

Respectfully submitted,

Byron Freeland, Ark. Bar No. 72039
Graham Talley, Ark. Bar No. 2015159
**MITCHELL, WILLIAMS, SELIG,**
**GATES & WOODYARD, PLLC**
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Phone: (501) 688-8800
Fax: (501) 688-8807
Email: bfreeland@mwlaw.com
        gtalley@mwlaw.com

2